**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen, P.C. (*pro hac vice* pending)
Oliver Paré (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
matthew.fagen@kirkland.com
oliver.pare@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*the Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*the Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>EDDIE BAUER LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-11422 (SLM)<br><br>(Joint Administration Requested) |

## DECLARATION OF
## STEPHEN COULOMBE, CO-CHIEF RESTRUCTURING
## OFFICER OF EDDIE BAUER LLC AND ITS AFFILIATES,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Stephen Coulombe, hereby declare under penalty of perjury:[2]

1.      The Company is the exclusive licensee of the Eddie Bauer brand for

brick-and-mortar retail sales in the United States and Canada.  The Company does not own the

---

[1]    The last four digits of Debtor Eddie Bauer LLC's tax identification number are 6060.  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/EddieBauer.  The location of Debtor Eddie Bauer LLC's principal place of business is 10401 Northeast 8th Street, Suite 500, Bellevue, WA 98004; the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Suite B100, Plano, TX 75024.

[2]    Capitalized terms not immediately defined herein have the meanings ascribed to them later in this Declaration.

Eddie Bauer brand, and the brand, along with wholesale and e-commerce sales thereunder, is not part of these chapter 11 cases.

2.      The first American to ever make it to the top of Mount Everest – Jim Whittaker – was wearing a bright red Eddie Bauer parka.  The same goose down technology, first patented in 1940 for the Eddie Bauer Skyliner jacket, proved essential during World War II; U.S. Army forces slept in Eddie Bauer sleeping bags and Air Force pilots wore specially designed Eddie Bauer flight suits.  The Eddie Bauer brand was indispensable to the U.S. military, Mr. Whittaker, and dozens of other notorious mountaineering expeditions, including the earliest ascents of K2, the Vinson Massif, and Mount Makalu.  And since its founding over 100 years ago in 1920, the Company has evolved at lower altitudes, counting millions of hobbyists and everyday consumers to an array of casual garments and home goods, including men's and women's shirts, pants, footwear, accessories, bags and camping gear, in addition to its famous outerwear.  The Company presently caters to a substantially wider market through its 175 retail locations across forty states in the United States and six provinces in Canada, employing approximately 2,200 people.

3.      The Company has undergone a series of ownership changes in the last 25 years, including in connection with two prior chapter 11 proceedings.  In 2003, the Debtors' then-parent company, Spiegel, Inc., spun the Company into a standalone enterprise at the conclusion of Spiegel's chapter 11 process.  Six years later, in the wake of the 2008 financial crisis, the Company again entered chapter 11, during which Golden Gate Capital acquired the Debtors' assets and operations.  Golden Gate Capital owned and operated the Eddie Bauer business from 2009 until 2021, when it sold Eddie Bauer's operating business (the "SPARC Acquisition") to SPARC Group Holdings LLC (together with certain of its affiliates, "SPARC") and its intellectual property portfolio, through a series of transactions, to an affiliate of Authentic Brands Group, LLC

2

(together with certain of its affiliates, "ABG").  In January 2025, 100% of the equity of SPARC was acquired by the parent company of another iconic American retail franchise, JCPenney.  The parent company of the combined entities currently owns and operates the Company along with several other major American retail brands under the trade name of Catalyst Brands ("Catalyst").  ABG currently licenses the North American brick-and-mortar retail rights for the Eddie Bauer brand to the Company.

4.      After the SPARC Acquisition, the Company continued to capitalize on early COVID-19 era changes in consumer preferences as demand for outdoor apparel and gear increased and consumer discretionary spending spiked after federal relief spending.  The Company also captured operations savings by enacting cost-saving measures, which led to positive EBITDA of $21 million during the last eight months of 2021.  Multiple headwinds in recent years, however, including shifting consumer preferences, resulted in a decline in customer demand well below the historical trendline since 2023.  In addition, a historic rise in inflation led to an increase in the Debtors' cost of doing business.  Further, the long-standing though recently suspended "de minimis" tariff exemption allowed non-U.S. retailers to import good without paying duties, and elevated tariffs have all coalesced to erode margins and have led to significant negative earnings.  Similar challenges plagued the broader retail industry, with approximately twenty-one retail companies with liabilities of at least $100 million filing for chapter 11 since the SPARC Acquisition.  The Company recorded negative earnings of approximately $2 million in 2022, $10 million in 2023, $82 million in 2024, and $80 million in 2025.

5.      As their financial challenges persisted, in the second half of 2025, the Debtors engaged Kirkland & Ellis LLP ("Kirkland"), as legal counsel, and Berkeley Research Group, LLC ("BRG"), as financial advisor, to help determine a value-maximizing path forward for the

Company.  Shortly thereafter, on October 3, 2025, the Company appointed Jeffrey Stein and Anthony Horton as disinterested managers (the "Disinterested Directors") of Debtors Eddie Bauer LLC, SPARC EB Holdings LLC, and Eddie Bauer Gift Card Services LLC (the "U.S. Debtors"), and delegated to the Disinterested Directors binding decision-making authority with respect to matters that constitute, or are reasonably likely to constitute, a conflict of interest between the Company and its related parties.  Mr. Stein and Mr. Horton were subsequently appointed as Disinterested Directors of 13051269 Canada Inc. and Eddie Bauer of Canada Corporation (the "Canadian Debtors").

6.    The Debtors' financial challenges continued to mount in the fourth quarter of 2025. As the Debtors explored initiatives and multiple options to attempt to improve the business, the Debtors determined that they could maximize value by stopping the accrual of fixed intellectual property licensing fees payable under the License Agreement.  The Debtors faced approximately $220 million in future fees due over the remaining six years of the License Agreement, and sales had declined to an extent that they could no longer support payment of the fixed licensing fees. Moreover, the Debtors' e-commerce business had become only marginally profitable, and the Debtors' wholesale business had become unprofitable.  To halt the accrual of these licensing fees, the Debtors, following good-faith, arm's-length negotiations overseen and approved by the Disinterested Directors, reached an agreement (the "License Termination Agreement") with ABG whereby the Debtors agreed to terminate their right to use the Eddie Bauer IP in connection with the e-commerce and wholesale business channels.  As part of the License Termination Agreement, the Debtors retained the exclusive right to operate their brick-and-mortar retail locations and were released from future obligations to pay the minimum royalty and certain other minimum fees and expenses under the License Agreement, resulting in approximately $220 million in savings.  The

wholesale and e-commerce rights with respect to the Eddie Bauer brand currently reside with Outdoor 5, LLC ("O5"), which is not part of these chapter 11 cases.

7.     Although the License Termination Agreement alleviated a substantial liability for the Company, the Debtors' revised financial projections continued to indicate that the Debtors would generate negative cash flow.  SPARC, which has been funding the Company's cash shortfalls through intercompany loans, resulting in an intercompany payable to SPARC in the amount of approximately $215 million as of the Petition Date, had also expressed an intention to cease funding future losses.  As a result, on November 24, 2025, the Debtors retained SOLIC Capital Advisors, LLC ("SOLIC," and collectively with BRG and Kirkland, the "Advisors") as investment banker to conduct a robust marking process (the "Going Concern Sale Process") for a potential going-concern sale of all or any portion of the Company's brick-and-mortar retail operations.

8.     SOLIC has reached out to 126 potential acquirers, including 68 financial and 58 strategic counterparties with investments and/or operational experience in the consumer retail space.  34 such parties executed non-disclosure agreements and accessed a virtual data room containing diligence materials regarding the Company.  The Company received two indications of interest on January 30, 2026 ("IOIs").  While these two IOIs have not yet resulted in a binding proposal for a going-concern sale, the Company, along with SOLIC and the other advisors, will continue to work with these parties postpetition to solidify a going concern transaction for some or all of the ongoing operations.

9.     In parallel with the Going Concern Sale Process, the Debtors (a) hired RCS Real Estate Advisors ("RCS") to analyze the Debtors' lease portfolio, (b) hired Hilco/SB360 to assist with the closure of certain historically unprofitable store locations, and, (c) with the assistance of

the Advisors, commenced negotiations with their Prepetition Lenders regarding a consensual and value-maximizing wind-down of any assets not sold in the Going Concern Sale Process.

10.     The Debtors' good-faith, arms' length negotiations with the Prepetition Lenders culminated in the parties' execution of the restructuring support agreement attached hereto as **Exhibit B** (the "Restructuring Support Agreement," and the parties thereto, the "RSA Parties"). The Restructuring Support Agreement enjoys the support of 100 percent of the ABL Lenders, Term Loan Lenders, and Subordinated Loan Lenders, and it allows the Debtors to pursue two interlocking processes to effect a value-maximizing restructuring and address the Company's balance sheet and operational challenges (together, the "Transactions"):

- the completion of one or more sales of the Debtors' assets free and clear of all liens, claims, and other encumbrances to the highest or otherwise best bidder(s) (each, a "Going Concern Sale Transaction"); and
- an orderly, value-maximizing winddown of all of the Debtors' brick-and-mortar retail operations that are not sold in a Going Concern Sale Transaction, subject to store closing procedures approved by the Court.

11.     Significantly, the Restructuring Support Agreement also provides commitments from all of the Debtors' funded-debt creditors to support a plan of reorganization (the "Plan") that will address all prepetition obligations and, provide a recovery for unsecured creditors as long as the class of unsecured creditors votes to accept the Plan.  Specifically, the Restructuring Support Agreement provides that the greater of (i) 10 percent of the net proceeds of asset sales remaining on the Debtors' balance sheet upon consummation of the Plan in excess of a threshold recovery amount for the ABL Lenders and (ii) $250,000 will be distributed to holders of general unsecured claims, as long as that class votes to accept the Plan.  In that event, holders of ABL Claims, Term Loan Claims, and Subordinated Term Loan Claims – collectively holding approximately $1.7 billion of senior secured funded debt – have agreed to forego what would be additional recovery to facilitate an efficient, consensual, and value-maximizing process.

12.     The Restructuring Support Agreement includes milestones for both a chapter 11 plan confirmation process and a sale process that will allow the Debtors to move through these chapter 11 cases efficiently and expeditiously, to both maximize the value for distribution to creditors and minimize the administrative expenses of the chapter 11 cases, crucially allowing the Debtors to fund the cases through consensual use of cash collateral rather than debtor-in-possession financing.  Specifically, the Debtors will file and prosecute a chapter 11 plan at the outset of the chapter 11 cases, within fourteen days of the Petition Date, and will seek to obtain confirmation of the chapter 11 plan within 70 days of the Petition Date.  The Restructuring Support Agreement milestones also include a bid deadline on or around March 3, 2026, an auction (if needed) on or around March 6, 2026, and a sale hearing on or about March 12, 2026.  To that end, the Company has filed a motion to establish bidding procedures governing an efficient, public, and flexible sale process to realize the potential value of existing assets as a going-concern, store closing procedures to continue to sell inventory and winddown any stores not part of a going-concern transaction, and a scheduling motion to put the cases on a track toward confirmation of the Plan and distribution to creditors.  The Debtors believe these combined and complimentary processes will maximize the value of the Debtors' estates for the benefit of all stakeholders.

*     *     *     *     *

13.     I am one of two Co-Chief Restructuring Officers (a "Co-CRO") of Eddie Bauer LLC (together with its affiliated debtors and debtors in possession, the "Company," or the

"Debtors")[3] and each of the Debtors. I have served as a Co-CRO to the Debtors since January 31, 2026.[4]

14. As a Co-CRO of the Debtors, I am responsible for, and am materially engaged with, the Debtors' operation and financial management including with respect to, among other things: (a) all restructuring activities and initiatives of the Company; (b) cash management and liquidity forecasting; (c) the development of, or revisions to, the Company's business plan, including assistance with the going concern and store closing sale processes described herein; (d) engagement with creditors and other stakeholders; (e) formulation and negotiation of the Restructuring Support Agreement described herein; and (f) overall contingency planning. I am a Managing Director at BRG, a professional services firm with offices located at 225 Franklin St, Suite 3200, Boston, Massachusetts 02110. I have more than twenty-five years of experience serving as a financial advisor and providing restructuring and performance improvement services to corporations, various creditor classes, equity owners, and directors of underperforming companies, including a significant number of large retailers with substantial national and international presences. I have previously served as, among other positions: Co-Chief Restructuring Officer of Independent Pet Partners, LLC; Chief Restructuring Officer of Gymboree Group; Chief Restructuring Officer of Sports Authority Holdings, Inc.; and Chief Financial Officer of rue21, Inc. Prior to joining BRG in May 2016, I was a Senior Managing Director at FTI Consulting, Inc., where I served in similar capacities on behalf of distressed companies. BRG professionals have provided financial advisory services in some of the largest chapter 11 cases,

---

[3]    A complete list of the Debtors in these chapter 11 cases is attached hereto as **Exhibit A**.

[4]    The Co-CROs have advised the Debtors in connection with a potential restructuring in their capacities as financial advisors to the Debtors since October 8, 2025.

including many in the retail sector such as Neiman Marcus, Stage Stores, and American Apparel, among others.

15.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of New Jersey (the "Court").  I submit this declaration (this "Declaration") to assist the Court and interested parties in understanding why the Debtors filed these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested in the motions filed along with the petitions (collectively, the "First Day Motions").

16.     The statements set forth in this Declaration are based upon my personal knowledge; my discussions with other members of the Debtors' management team and the Debtors' advisors; my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives; or my opinions based upon my knowledge and experience.  I am above eighteen years of age and am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

17.     To further familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors seek in the First Day Motions, I have organized this Declaration into four sections as follows:

- **Part I** provides a general overview of the Debtors' history and business operations;

- **Part II** provides an overview of the Debtors' prepetition organizational and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases; and

- **Part IV** sets forth the evidentiary basis for the relief requested in the First Day Motions.

## I.   The Company's History and Business Operations.

### A.   The Company's History.

18.     The Debtors are the exclusive licensee of the Eddie Bauer brand with respect to brick-and-mortar retail sales.  The Debtors sell Eddie Bauer goods in 175 retail locations in the United States and Canada.  The Debtors do not own the Eddie Bauer brand, and the brand, along with wholesale and e-commerce sales thereunder, is not part of these chapter 11 cases.

19.     The Eddie Bauer story began in 1920, when Mr. Bauer opened "Eddie Bauer's Tennis Shop" in Seattle, Washington in the back of a local hunting and fishing store, where he first specialized in building and repairing tennis gear.  Over the next five decades, Eddie Bauer pioneered goose down garments, outfitted the U.S. military in World War II, and outfitted some of the most daring mountain ascents in the world, including Jim Whitaker's ascent of Mt. Everest.

20.     Eventually, after nearly five decades at the helm of the company he created, Mr. Bauer sold his stake to business partner William F. Niemi and his son in 1968.  Under the Niemi's leadership, the Company re-entered the brick-and-mortar retail market by opening a storefront in San Francisco but soon sold to General Mills in 1971.  General Mills held the Company until 1988, during which time competing outdoor brands emerged.  The Company continued to develop high-performance outdoor gear in varying styles to compete in the evolving outdoor recreation market.  During this period, General Mills encouraged the expansion of the Company's catalog, as well as a wholesale business, which developed multiple sales channels for the Debtors.  General Mills also oversaw the addition of more casual clothing to the Company's traditional outdoor performance offerings and fostered cross-branding partnerships such as the

10

"Eddie Bauer Edition" of Ford vehicles, beginning in 1983.  By 1988, the Debtors maintained approximately sixty retail locations throughout the United States and Canada.

21.      General Mills sold the Company to catalog sales company Spiegel Inc. in 1988. Notwithstanding Spiegel's particular focus and expertise in catalogues, nearly all facets of the Debtors' business grew prodigiously under Spiegel's ownership.  True to its history of innovation, the Company became one of the earliest adopters of the retail e-commerce sales channel when its website went live in 1996, just three years after the world wide web became readily available to the public.  The Debtors' brick-and-mortar retail presence expanded dramatically over the same period.  By 2002, the Company had amassed nearly 400 retail locations and over 100 outlet stores that provided outdoor clothing to consumers in nearly every U.S. state and several Canadian provinces.  The Company also expanded beyond North America by adding retail locations in Japan and Germany and introducing a catalog offering in the United Kingdom.  In addition, Spiegel oversaw the expansion of the Company's product lines beyond clothing by adding home furnishing offerings.

22.      In 2003, however, in response to declining sales and mounting credit card defaults from Spiegel's unrelated high-risk consumer lending operation, Spiegel and its affiliates (including Eddie Bauer) filed for chapter 11 on March 17, 2003, in the Bankruptcy Court for the Southern District of New York (the "Spiegel Bankruptcy").  On June 21, 2005, Eddie Bauer emerged as a stand-alone company for the first time in thirty-four years, with ownership distributed to certain creditors of the Company's prepetition lenders.  Thereafter, the Company began trading on the NASDAQ in October 2006 under the symbol EBHI.

23.      This independent existence was short lived.  Due to significant macroeconomic headwinds stemming from the 2008 financial crisis, coupled with additional debt obligations that

the Company incurred following the Spiegel Bankruptcy, the Company filed for chapter 11 in its

own right in the Bankruptcy Court for the District of Delaware on June 17, 2009. Eddie Bauer

was sold out of those chapter 11 cases to Golden Gate Capital, and the Company was again under

private ownership. Golden Gate Capital would go on to hold Eddie Bauer for twelve years.

24.     In 2021, as the world began to recover from the COVID-19 pandemic, SPARC

acquired Eddie Bauer's operating business, placing it alongside the other retailers in SPARC's

portfolio. In January 2025, Penney Holdings LLC, the parent of JCPenney, acquired 100% of the

equity of SPARC in an all-equity transaction. The ultimate parent company of the combined

entities is primarily owned by Simon Property Group, Brookfield Corporation, and ABG. As

described in greater detail herein, SPARC has historically provided, and continues to provide, a

variety of operational and financial support to the Debtors. ABG currently owns the Eddie Bauer

intellectual property (the "Eddie Bauer IP").

**B.     The Company's Business Operations.**

**1.     Sales Categories and Channels.**

25.     Today, the Company sells products under the Eddie Bauer name in brick and mortar

retail stores in three primary categories: (a) sportswear; (b) outerwear; and (c) gifts, gear,

accessories, and footwear. "Sportswear" includes a broad spectrum of men's and women's

clothing, including pants, shorts, shirts, light hoodies, jackets, and other products and represents

approximately 72 percent of all sales. "Outerwear" includes, among other products, the

Company's array of down jacket offerings, as well as other coats and jackets, snowpants, and boots

and represents approximately 19 percent of all sales. Finally, as the name suggests, "gifts, gear,

accessories, and footwear" is a catch-all category that encompasses the remainder of the

Company's offerings, including hats, gloves, belts, boots, shoes, blankets, bags, and backpacks.

Gifts, gear, accessories, and footwear account for approximately 9 percent of all sales. Within

these varied product categories, men's sportwear is by far the most significant driver of the Company's revenue, accounting for approximately 40 percent of all sales.

26.    Historically, the Company maintained three primary sales channels: e-commerce, wholesale, and brick-and-mortar retail.  In the 2025 fiscal year, e-commerce represented approximately 34 percent of total sales, wholesale represented approximately 24 percent, and brick-and-mortar retail made up approximately 42 percent.  In 2025, the Company's brick-and-mortar retail and e-commerce business channels generated approximately $440 million in gross sales.  As discussed in Section III.D.1 below, the Company terminated its rights to operate the e-commerce and wholesale channels, effective January 31, 2026, as part of the License Termination Agreement.

27.    Since entering into the License Termination Agreement, the Company has substantially slimmed down its operations throughout the United States and Canada.  Leases for forty-nine unprofitable stores were not renewed.  Store closing sales commenced at the remaining 175 stores between January 26, 2026 and February 7, 2026, and are expected to continue throughout these chapter 11 cases for any stores not sold as part of a going-concern sale of some or all of the Company's business.

### 2.    Management Services.

28.    In addition to financial support of approximately $215 million since the SPARC Acquisition in 2021, the Company has been able to take advantage of the expertise and resources of the entire Catalyst organization, which has supported and amplified the Company's business operations initiatives.  In particular, over the last five years, SPARC and Catalyst have provided a wide array of operational support and financial assistance to the Debtors, including negotiating and maintaining a comprehensive corporate insurance program, calculating and remitting a majority of the Debtors' tax obligations on their behalf, and administering a complex suite of

employee benefits.  Such services have relieved the Debtors from certain substantial administrative burdens, ultimately enabling the Company to focus on delivering best-in-class products and customer experience.

29.    Specifically, as part of the shared services arrangement, SPARC has historically (a) paid certain of the Debtors' expenses directly on the Debtors' behalf; (b) transferred funds to the Debtors on a weekly basis to finance certain of the Debtors' expenses ((a) and (b) together, the "Covered Expenses"); and (c) provided the Debtors certain management and administrative services (the "SPARC Management Services").  In the case of (a), SPARC directly pays for and manages many of the Debtors' administrative functions on the Debtors' behalf, including paying employee wages, negotiating and funding employee benefits, and procuring and paying for a comprehensive corporate insurance program.  With respect to (b), SPARC remits funds to the Debtors on an as-needed basis to cover various expenses, such as the price of merchandise purchased from suppliers, that the Debtor entities typically pay for themselves.  Finally, regarding (c), certain Catalyst employees—many of whom have substantial industry expertise as retail executives—perform management and oversight functions for the Debtors.  Historically, the Debtors have received an invoice allocation from SPARC for a monthly management fee that compensates SPARC for the SPARC Management Services provided by Catalyst executives and other employees (such fee, the "Management Fee").  Additionally, in the ordinary course of business, the Debtors, after paying certain expenses directly to vendors and other third parties, have historically transferred excess funds generated by their operations, if any, to SPARC on a weekly basis via an intercompany transfer (such transfers, the "SPARC Transfers").

30.    The Debtors have benefited greatly from their shared services arrangement with SPARC.  By paying directly or funding indirectly certain of the Debtors' operational expenses,

including, among others, payroll expenses, insurance obligations, IT services, and marketing programs, SPARC has enabled the Debtors to preserve liquidity and meet obligations to third parties even amidst an ongoing acute liquidity shortage. The Debtors have also benefited from economies of scale and synergies across the brands within Catalyst. By outsourcing accounting and treasury management functions to Catalyst, for example, personnel costs that the Debtors would otherwise have to bear alone are shared by the Debtors and other Catalyst brands. In addition, the Debtors enjoy preferential pricing on certain goods and services negotiated by Catalyst for the benefit of all brands across the Catalyst family. Finally, the shared services arrangement enables the Debtors to benefit from the operational expertise of Catalyst leadership, who have substantial experience managing fashion brands similar to the Company.

II.    **The Company's Organizational Structure and Prepetition Capital Structure.**

    A.    **The Company's Organizational Structure.**

31.    An overview of the Company's current organizational structure is reflected below.



32.    Venue is proper in this district on at least two bases.  First, the only asset of Debtor 13051269 Canada Inc. in the United States is a bank account located in Lyndhurst, New Jersey. Second, Debtor Eddie Bauer LLC has five leases in New Jersey, three of which are in the Newark vicinage, including two significant locations at the American Dream Mall in East Rutherford, New Jersey and the Westfield Garden State Plaza in Paramus, New Jersey.  In addition, approximately 50 percent of all inventory sold by the Company is imported through the Port of Newark.

**B.    The Company's Prepetition Capital Structure.**

33.    As of the Petition Date, the Debtors are obligated on approximately $1.7 billion of aggregate outstanding principal and accrued interest for funded debt obligations, as reflected below:

| Prepetition Capital Structure (As of February 2026)[5] | | | | | | |
|---|---|---|---|---|---|---|
| | | Lead Lender | Maturity | Interest Rate | Commitment | Amount Outstanding |
| **ABL Facility** | **Loans** | Wells Fargo | September 19, 2030 | SOFR + 2.50% | $1,750,000,000 | **$728,477,563** |
| | **Letters of Credit** | | | Variable[6] | $202,000,000 | **$196,811,453** |
| **Term Loan Facility** | | WhiteHawk | September 19, 2030 | SOFR + 6.75% | $600,000,000 | **$600,000,000** |
| **Subordinated Loan Facility** | | Copper Retail JV LLC | February 19, 2031 | 15.0% | $211,844,000 | **$216,281,687** |
| **Total** | | | | | | **$1,741,570,703** |

While all of the Debtors are guarantors under the ABL Facility, only the U.S. Debtors are guarantors under the Term Loan Facility and Subordinated Loan Facility.  The borrower entities,

---

[5]    The obligations set forth in this chart represent the aggregate funded debt obligations of the U.S. Debtors.

[6]    Each outstanding letter of credit issued under the Prepetition ABL Facility accrues a letter of credit fee on the stated amount thereof, which fee varies based on whether the letter of credit is a standby letter of credit or a trade letter of credit.

specifically Penney Holdings LLC, Penney Borrower LLC, Penney OpCo LLC, and SPARC Group LLC, allocate proceeds of the Prepetition Loan Facilities to the Debtors and the other Catalyst brands according to a series of ordinary course arrangements.  In the case of the Debtors, operational shortfalls are funded by periodic draws on the ABL Facility, the proceeds of which draws are transferred through a series of intercompany transactions from the borrowers to the Debtor entities.  All of the Debtor entities have pledged substantially all of their assets in support of their respective obligations under the Prepetition Loan Facilities.

### 1.     The ABL Facility.

34.     The U.S. Debtors guarantee all obligations, and the Canadian Debtors guarantee a portion of the obligations,[7] under that certain Credit Agreement (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "ABL Credit Agreement"), dated as of December 7, 2020 by and among Penney Holdings LLC, Penney Borrower LLC, Penney OpCo LLC, SPARC Group LLC, each Restricted Subsidiary of Penney Holdings LLC party thereto as a borrower (collectively, the "Catalyst Borrowers"), each Restricted Subsidiary of Penney Holdings LLC party thereto as a Subsidiary Guarantor (each as defined therein, and together with the Catalyst Borrowers and any other Loan Party (as defined therein), the "ABL Parties"), the Lenders party thereto (the "ABL Lenders"), and Wells Fargo Bank, National Association, as administrative agent (the "ABL Agent").   The ABL Credit Agreement contemplates a revolving facility of up to $1.75 billion (the "ABL Facility").  Interest under the ABL Facility accrues at SOFR[8] *plus* 2.5 percent annually, subject to an interest rate step-down of

---

[7]   The Canadian Debtors' guarantee is limited to $6.4 million of obligations under the ABL Credit Agreement.

[8]   "SOFR" means the secured overnight financing rate published by the Federal Reserve Bank of New York (or by a successor) at http://www.newyorkfed.org (or at a successor's web page).

2.25 percent annually and 2.0 percent annually based on the Quarterly Average Excess Availability (as defined in the ABL Credit Agreement) and is paid in cash.

35.    The obligations under the ABL Facility (the "<u>ABL Obligations</u>," and claims on account of the ABL Obligations, the "<u>ABL Claims</u>") mature on September 19, 2030, and are secured by liens on substantially all of the assets of the ABL Parties.  As of the date hereof, an aggregate amount of approximately $728 million in unpaid principal and accrued but unpaid interest is outstanding under the ABL Facility.

### 2.    The Term Loan Facility.

36.    The U.S. Debtors guarantee all obligations pursuant to that certain Credit Agreement (as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>Term Loan Credit Agreement</u>"), dated as of September 19, 2025, by and among the Catalyst Borrowers, each other restricted subsidiary of Penney Holdings LLC party thereto as a subsidiary guarantor (together with the Catalyst Borrowers, the "<u>Term Loan Parties</u>"), each lender from time to time party thereto (collectively, the "<u>Term Loan Lenders</u>"), and WhiteHawk Capital Partners LP (the "<u>Term Loan Agent</u>"), as administrative agent and collateral agent.  The Term Loan Credit Agreement contemplates a term loan facility (the "<u>Term Loan Facility</u>") of up to $600 million in aggregate principal, with interest accruing at SOFR *plus* 6.75 percent annually and is paid in cash.

37.    The obligations under the Term Loan Credit Agreement (the "<u>Term Loan Obligations</u>") mature on September 19, 2030, and are secured by liens on substantially all of the assets of the Term Loan Parties.  As of the date hereof, approximately $600 million in unpaid principal is outstanding under the Term Loan Facility.

### 3.     The Subordinated Loan Facility

38.     The U.S. Debtors guarantee all obligations pursuant to that certain Second Amendment to Amended and Restated Term Loan Credit Agreement (as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "Subordinated Loan Credit Agreement," and collectively with the ABL Credit Agreement and the Term Loan Credit Agreement, the "Prepetition Loan Documents"), dated as of September 19, 2025, by and among the Catalyst Borrowers, each Restricted Subsidiary of Penney Holdings LLC party thereto as a Subsidiary Guarantor (as defined therein) (together with the Catalyst Borrowers, the "Subordinated Loan Parties," and, together with the ABL Parties and the Term Loan Parties, the "Prepetition Loan Parties"), each Lender (as defined therein) party thereto from time to time (collectively, the "Subordinated Loan Lenders," and, together with the ABL Lenders and the Term Loan Lenders, the "Prepetition Lenders"), and Copper Retail JV LLC, as administrative agent (the "Subordinated Loan Agent").  The Subordinated Loan Credit Agreement contemplates a term loan facility (the "Subordinated Loan Facility," and, together with the ABL Facility and Term Loan Facility, the "Prepetition Loan Facilities") of up to $216.2 million in aggregate principal, with compounding interest accruing at a rate of 15 percent, which, at the election of the Lead Administrative Borrower (as defined in the Subordinated Loan Credit Agreement) may be paid in kind.

39.     The obligations under the Subordinated Loan Credit Agreement (the "Subordinated Loan Obligations") mature on February 19, 2031, and are secured by liens on substantially all of the assets of the Subordinated Loan Parties.  As of the date hereof, approximately $216.2 million in unpaid principal remains outstanding on account of the Subordinated Loan Obligations.

### 4.     The Intercreditor Agreements.

40.     In connection with the Prepetition Loan Facilities, the Prepetition Lenders are party to two intercreditor agreements, which delineate collateral and payment rights among the Prepetition Lenders.  ***First***, the Prepetition Lenders are party to that certain Intercreditor Agreement, dated as of September 19, 2025, by and among the ABL Agent, the Term Loan Agent, the ABL Parties, and the Term Loan Parties (as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "ABL-Term Intercreditor Agreement").  The ABL-Term Intercreditor Agreement allocates payment and collateral rights as between the ABL Lenders and the Term Loan Lenders, specifically setting out which of the Debtors' assets constitute ABL Priority Collateral and Term Loan Priority Collateral (both as defined therein) as well as payment priority with respect to each category of collateral.  ***Second***, the Prepetition Lenders are also party to that certain Intercreditor Agreement, dated as of September 19, 2025, by and among the ABL Agent, the Term Loan Agent, the Subordinated Loan Agent, and the Prepetition Loan Parties (as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "Subordinated Intercreditor Agreement").   The Subordinated Intercreditor Agreement subordinates the Subordinated Loan Agent to the ABL Agent and Term Loan Agent in both lien and payment priority.

### 5.     The SPARC Intercompany Payable.

41.     Over the course of the approximately five-year period between the SPARC Acquisition and the Petition Date, the SPARC Transfers from the Debtors to SPARC have consistently been lower than the total amount of Covered Expenses, even before accounting for the Management Fee.  As a result, over time, the Debtors have accrued an intercompany payable to SPARC (the "SPARC Intercompany Payable"), which represents the difference between the Debtors' accrued obligations to SPARC on account of the Covered Expenses and the Management

Fee, on the one hand, and the aggregate funds that the Debtors have transferred to SPARC, on the other hand. As of the Petition Date, the SPARC Intercompany Payable totals approximately $215 million. The Covered Expenses, the SPARC Transfers, and the SPARC Intercompany Payable are recorded in the Debtors' centralized account system, monitored closely, and reconciled monthly.

### III.   Events Leading to These Chapter 11 Cases.

####    A.    Macroeconomic Headwinds Have Created a Challenging Retail Environment for the Company.

42.    In 2021, the Company began a new chapter following the SPARC Acquisition. At first, the Company seemed poised to benefit from COVID-19-era changes to consumer preferences



as demand for outdoor apparel and gear increased and the outdoor equipment market grew by approximately forty-four percent between 2019 and 2021. Sales were further buoyed as consumers saw their discretionary funds spike as a result of COVID-19 federal relief spending. These years were characterized by new consumers entering the outdoor apparel market and existing customers becoming more active. Such positive trends continued as consumers began to return to in-person shopping following the conclusion of the COVID-19 pandemic, and the Company saw positive

21

EBITDA of $21 million during the latter eight months of the Debtors' 2021 fiscal year. The Debtors were also able to capture operational savings and enact measures aimed to increase overall profitability.

43.    Despite this initial optimism, however, various macroeconomic headwinds have resulted in the Company being unable to sustain profitability. The Debtors' sales volumes have continually decreased since 2023, tracking broader trends in the outdoor retail industry. Specifically, the Debtors' trailing twelve-month revenue has dropped 19 percent compared to



Fiscal Year 2022, and gross margin compressed by approximately 9.5 percent over the same period.

44.    Like many retail businesses, the long-standing impacts of COVID-19 on supply chains resulted in shipping delays and increased the cost of materials, labor, and fuel. In addition, until recently, the Debtors' business had been materially and negatively impacted by the ability of non-U.S. online retailers to take advantage of the "de minimis exemption," which exempted goods valued under $800 from import duties. Certain non-U.S. online retailers used this exemption and

passed significant savings onto consumers.  Consequently, retailers like the Debtors that must pay tariffs to purchase product for their stores and warehouses in the United States were undercut. Although the "de minimis exemption" was canceled in August 2025, by that point the exemption had already materially and negatively impacted the Debtors' business.  Finally, recent reciprocal tariffs have significantly raised the cost of imports from nearly all countries.  The elevated tariff environment has continued to erode margins and created a challenging and uncertain environment for many retailers, including the Debtors.

45.    Together, these factors have resulted in a substantially diminished operational and financial outlook for the Debtors.  The Debtors have lost more than $172 million over the last three fiscal years and, in fiscal year 2025 alone, the Debtors lost approximately $80 million.

**B.    Retention of Advisors**

46.    On September 30, 2025, the Company retained Kirkland, as legal counsel, and, on October 8, 2025, the Company retained BRG, as financial advisor, to assist in evaluating measures and transactions available to meet the Company's goal of maximizing value for all stakeholders. In addition, the Company retained Reevemark, LLC ("Reevemark") on October 14, 2025, as communications consultant to assist with public relations considerations, communications materials, and related services, and on November 24, 2025, the Company retained SOLIC, as investment banker.  In preparation for these chapter 11 cases, on January 12, 2026, the Company retained Cole Schotz P.C. ("Cole Schotz"), as co-counsel and conflicts counsel.    On January 15, 2026, the Company also retained Osler, Hoskin & Harcourt LLC ("Osler"), as Canadian counsel.  In addition, on January 22, 2026, after soliciting proposals from three qualified claims and noticing firms pursuant to the Court's *Protocol for Retention of Claims and Noticing Agents under 28 U.S.C. § 156(c) Pending Adoption of Local Rule*, the Debtors retained Stretto, Inc.

as claims and noticing agent.  Finally, on January 29, 2026, the Debtors retained Hilco Merchant

Resources, LLC and SB360 Capital Partners, LLC (collectively, the "Liquidator") to assist with

the winddown of the Company's brick-and-mortar retail business, and on January 31, 2026, the

Company and BRG entered into a separate engagement letter, pursuant to which the Company

retained Stephen Coulombe and George Pantelis as Co-Chief Restructuring Officers for each of

the Debtors.

### C.      Corporate Governance.

47.      As part of the Company's evaluation of available measures and transactions to

advance its strategic goals and maximize value for stakeholders, the Company conducted a review

of its existing corporate governance infrastructure in late 2025.  The Company and its advisors

determined that it was in the best interests of the Company and its stakeholders to appoint two

disinterested managers to each of the boards of Debtors Eddie Bauer LLC, SPARC EB

Holdings LLC, and Eddie Bauer Gift Card Services LLC.  On October 3, 2025, the Company

appointed the Disinterested Directors to each such board and delegated binding authority to the

Disinterested Directors to, among other things:  (a) investigate and determine whether a conflict

of interests exists or is reasonably likely to exist between the Debtors, on the one hand, any of the

Debtors' current or former managers, officers, committee members, direct and indirect equity

holders, successors, assigns, subsidiaries, creditors, or affiliates, among others, on the other hand

(the "Conflict Matters"); (b) take any action with respect to any Conflicts Matters, including the

release or settlement of potential claims or causes of action and make any decision regarding all

or part of any transaction that constitutes (in whole or in part) a Conflict Matter; and (c) retain and

employ legal, financial, and other advisors to assist the Disinterested Directors in fulfilling their

duties.  Subsequently, on February 5, 2026, the Disinterested Directors were appointed to the

boards of Debtors 13051269 Canada Inc. and Eddie Bauer of Canada Corporation and delegated certain authority to review, consider, and approve transactions that constitute Conflict Matters.

48.     Prior to the Petition Date, with the assistance of the Company's proposed co-counsel and conflicts counsel, Cole Schotz, the Disinterested Directors began an initial assessment of (a) the existence of any potential claims or causes of action that the Debtors may hold relating to insiders and other affiliated entities; and (b) whether the Debtors should retain, release, or seek to settle any such potential claims or causes of action (the "Independent Investigation").

49.     Since their appointment, the Disinterested Directors have held meetings with the Company's advisors to analyze and discuss any potential Conflict Matters and the facts and circumstances surrounding potential claims and causes of action.  The Disinterested Directors, along with Cole Schotz, have also obtained access to a virtual data room containing, and are conducting a comprehensive review of, over 36,399 pages of diligence materials that may be relevant to the Independent Investigation.  As of the Petition Date, the Independent Investigation remains ongoing, and the Debtor releases contemplated in the Restructuring Support Agreement remain subject to the outcome of the Independent Investigation.

**D.     Pursuit of All Reasonable Alternatives.**

50.     The Debtors exhausted all available alternatives before electing to commence these chapter 11 cases.  Specifically, in an effort to maximize value for all stakeholders, the Company (a) engaged in a variety of operational cost-cutting measures in an attempt to address the Company's sizable operating expenses, (b) made changes to its leadership team, including appointing a new Chief Executive Officer, Ken Ohashi, in January 2025, (c) evaluated and modified its merchandising strategy, (d) exited certain unprofitable store locations; and (e) began

to explore a going concern sale of all or substantially all of the Company's brick-and-mortar retail business that is expected to continue during these chapter 11 cases. During this critical prepetition period while the Debtors explored every available avenue, SPARC continued to support the Company by funding the Debtors' operations.

### 1. The License Termination Transaction.

51.     As part of the SPARC Acquisition, the Company entered into a license agreement (the "License Agreement"), effective as of May 6, 2021, pursuant to which the Company licensed the Eddie Bauer IP from ABG for use in its e-commerce, wholesale, and brick-and-mortar retail business channels. In exchange for the license rights, the Company paid fees based on net sales. In addition to the percentage fees, the License Agreement contemplated a significant guaranteed minimum royalty (the "GMR") and an annual marketing fee (the "Annual Marketing Fee"), both of which were payable regardless of the Company's sales performance. The initial term of the License Agreement ran through January 31, 2032.

52.     In late 2025, the Debtors and the Advisors determined that sales had declined to an extent that they could no longer support payment of the fixed licensing fees. Accordingly, the Company and ABG entered into discussions regarding the future of the License Agreement. Following good-faith, arm's length negotiations and an exploration of alternatives, the Debtors and ABG entered into the License Termination Agreement. The License Termination Agreement contained several key terms, among others:

- *Mutual Termination of Wholesale and E-Commerce Rights.* The License Termination Agreement terminated the wholesale and e-commerce rights of the Company in exchange for eliminating the GMR and Annual Marketing Fee. The wholesale and e-commerce rights were transferred to O5;

- *Retention of North American Retail Rights.* The License Termination Agreement contemplated the Company's retention of the license to operate brick-and-mortar retail locations and sell merchandise under the Eddie Bauer IP, subject only to actual and accrued royalties; and

- ***Sell-Off Period.*** The License Termination Agreement also contemplated a one-year sell-off period, during which the Company can sell existing e-commerce and wholesale inventory through its retail stores or existing wholesale relationships in the United States and Canada, subject to actual and accrued royalty fees.

The License Termination Agreement offered to save the Debtors approximately $220 million of combined GMR and Annual Marketing Fee obligations over the remaining term of the License Agreement, and the wholesale channel and had become unprofitable and the e-commerce channel had become only marginally profitable. Accordingly, the Disinterested Directors determined that the License Termination Agreement represented the most value-maximizing path forward for the Company and, on October 10, 2025, voted to approve entry into the agreement. The License Termination Agreement became effective as of January 31, 2026, on which date the Company's right to operate the e-commerce and wholesale businesses was formally terminated. Following that date, the Company retained the right to operate its retail stores in the United States and Canada and remains obligated to pay the actual accrued royalty calculated as a percentage of net store sales without the accrual of any additional minimums or annual fees.

53. In addition, the License Termination Agreement required the Company to use commercially reasonable efforts to transfer the e-commerce and wholesale business channels, including related inventory, to O5 as third-party designee of ABG (the "O5 Transition"). Pursuant to the License Termination Agreement, the Company, with the assistance of Kirkland and BRG, negotiated a series of formal agreements (the "O5 Transition Documents") with O5 to effectuate the transfer of certain inventory, allocation of liabilities, treatment of employees, and the provision of transition services related to the e-commerce and wholesale businesses from the Company to O5. On December 9, 2025, the Company entered into a series of agreements to effectuate the O5 Transition as contemplated by the License Termination Agreement, and on January 31, 2026, the

License Termination Agreement became effective, formally terminating the Company's rights to operate the wholesale and e-commerce businesses.

### 2.      The Store Closing Sales.

54.      In addition to the License Termination, the Going Concern Sale Process, and multiple other measures to maximize value, the Debtors have initiated store closing sales in all of their stores.  The Debtors anticipate that the store closing sales will continue postpetition for approximately thirteen more weeks.  The proceeds and eventual labor cost savings from these store closings are expected to provide the Debtors with much needed liquidity and will help fund these chapter 11 cases.

55.      To streamline and facilitate the store closing sales and store closings, the Debtors have filed, contemporaneously herewith, the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances; (III) Modifying Customer Programs at the Closing Stores; and (IV) Granting Related Relief* (the "Store Closing Motion").  As discussed previously and in greater detail in the Store Closing Motion, the Debtors entered into a consulting agreement with the Liquidator to conduct store closing sales on a pre- and postpetition basis.  The Debtors evaluated other national liquidation firms before selecting the Liquidator and believe that that the terms set forth in such agreement, including a percentage fee based on the proceeds from asset dispositions, are the best and most value-maximizing alternative for the conduct of asset sales and store closures. The Debtors believe that utilizing the skills and resources of the Liquidator to effectively and efficiently conduct the sales and store closings will maximize value for all stakeholders.

### 3.    The Brick-and-Mortar Retail Going Concern Sale Process.

56.    As previously discussed, the Company retained SOLIC to, among other things, develop and conduct the Going Concern Sale Process for a potential going-concern sale of all or substantially all of the Company's remaining brick-and-mortar retail operations.  Specifically, in connection with the prepetition Going Concern Sale Process, which has been actively progressing for over a month as of the Petition Date, the Debtors, with SOLIC's assistance, contacted 126 potential acquirers, including sixty-eight financial and fifty-eight strategic counterparties with investments and/or operational experience in the consumer retail space.  As of the Petition Date, thirty-four parties have executed nondisclosure agreements and were provided with access to the Debtors' virtual data room (the "Data Room") containing a confidential information presentation and additional financial, operational, and legal diligence materials.  On January 16, 2026, SOLIC distributed a formal process letter informing these strategic and financial investors that initial indications of interest were to be submitted no later than January 30, 2026, by which date the Company received two IOIs from parties expressing interest in some or all of the Debtors' assets.  As of the Petition Date, the Company, along with SOLIC and the other advisors, are in active negotiations with the parties who submitted IOIs (the "IOI Parties") to refine their offers in pursuit of a potential going-concern transaction.  The process for soliciting formal bids from the IOI Parties and any other parties who may be interested in participating in the Going Concern Sale Process will be conducted pursuant to the order approving the Debtors' bidding procedures motion (such order, the "Bidding Procedures Order").  The procedures set forth in the Bidding Procedures Order (the "Bidding Procedures") create an orderly process for parties to submit formal bids and, if necessary, participate in an auction to select the highest or otherwise best bid.  The Biddings Procedures will ensure that any going-concern sale maximizes value for the Debtors, their creditors, and other parties in interest.

4. **The Restructuring Support Agreement**

57.     Notwithstanding the Debtors' efforts to pursue all available alternatives, in January 2026 it became clear to the Debtors, their management, and the Debtors' boards of directors that a comprehensive restructuring would be necessary to address the Debtors' balance sheet and operational challenges, especially in light of SPARC's message to the Company that SPARC intended to stop funding the Debtors' operations imminently.  Accordingly, the Debtors, with the assistance of their advisors, engaged in hard fought, arm's-length negotiations with the Prepetition Lenders that culminated in the Restructuring Support Agreement.

58.     Given that most Catalyst entities—including operating entities across all six of the Catalyst brands—are obligated on the Prepetition Loan Facilities, negotiations also focused on a potential amendment and forbearance agreement to be executed in anticipation of a potential chapter 11 filing by the Debtor entities.  Absent such an amendment and forbearance, the chapter 11 filing of the Debtors would have triggered events of default under the Prepetition Loan Facilities and entitled the Prepetition Lenders to accelerate their debt across the entire Catalyst enterprise.

59.     On February 8, 2026, following good-faith, arm's-length negotiations, the Debtors and the Prepetition Lenders entered into an amendment and forbearance agreement (the "Amendment and Forbearance Agreement") pursuant to which (a) the Prepetition Lenders consented to the Debtors' entry into the Restructuring Support Agreement and consummation of the Transactions (as defined herein); (b) the parties agreed that the Transactions do not constitute a Default, Event of Default, or Material Adverse Effect under and as defined in the Prepetition Loan Documents; and (iii) Debtor entities 13051269 Canada Inc. and Eddie Bauer of Canada Corporation agreed to provide a limited, secured guarantee of up to $6.4 million of the obligations under the ABL Facility.  The Restructuring Support Agreement puts the Debtors in a position to

(a) continue the Going Concern Sale Process and, to the extent that doing so is value-maximizing, conduct an expeditious, going-concern sale of all or part of the Debtors' remaining operations and (b) pursue a winddown of any portion of the Company's remaining operations not sold in a going-concern sale. Specifically, the Restructuring Support Agreement contemplates a transaction in accordance with the following key terms, among others:

- ***Transactions and Implementation.*** The Debtors may pursue (a) a sale or sales of all, substantially all, or a portion of the Debtors' assets and/or equity to the highest or otherwise best bidder(s) following a sale and marketing process to be conducted pursuant to the Bidding Procedures and Bidding Procedures Order; and (b) notwithstanding the sale process, the Debtors will continue the store closing sales with respect to any portion of the Debtors' business and store locations that are not sold otherwise sold.

- ***Distributions to Creditors Pursuant to Chapter 11 Plan.*** Through the Restructuring Support Agreement, the Debtors' entire funded-debt capital structure is committing to support confirmation of a chapter 11 plan that will (a) pay all allowed administrative and priority claims in full; (b) provide that, subject to the class of general unsecured creditors voting to accept the Plan, 100% of Net Proceeds (as defined in the Restructuring Support Agreement), whether from a going-concern sale or store-closing sales, *less* the GUC Contingent Recovery Pool (as defined below), will be distributed to the ABL Lenders, with general unsecured creditors receiving their *pro rata* share of the greater of (i) $250,000 or (ii) 10% of Net Proceeds in excess of the ABL Threshold Recovery Amount (as defined in the Restructuring Support Agreement) (such recovery, the "GUC Contingent Recovery Pool"); and (c) provide that Term Loan Claims, Subordinated Term Loan Claims, and existing equity interests will be extinguished with no recovery, and holders of such claims will forego a distribution they would have a right to in the event the class of general unsecured claims votes to accept the Plan.

- ***Releases.*** The chapter 11 plan will contain standard third-party releases and standard debtor releases, which debtor releases are subject to the results of the Independent Investigation.

- ***Amendment and Waiver.*** Each of the Consenting Lenders (as defined in the Restructuring Support Agreement) have executed amendments to their respective credit agreements waiving their rights to pursue remedies against any non-Debtor party, arising out of or related to the commencement and prosecution of the chapter 11 cases.

- ***Cash Collateral.*** The transactions contemplated by the Restructuring Support Agreement shall be funded through (a) the consensual use of cash

collateral, (b) proceeds from the Debtors' ordinary course operations and/or store closing sales, and (c) proceeds from any sale transaction or inventory liquidation.

- **Wind Down.** Following the conclusion of all store closing sales and, if applicable, a going-concern sale, the Debtors will be wound down in an orderly and court-approved process.

60.     The Debtors are committed to consummating the Transactions embodied in the Restructuring Support Agreement and maximizing value for all stakeholders. The Transactions are supported by all of the Debtors' funded debtholders, all of whom recognized that it is critical for the Debtors to move through the restructuring process as efficiently as possible to limit the administrative cost and burden on the Debtors' business imposed by the chapter 11 process. The Debtors were also able to negotiate a potential recovery for their unsecured creditors who sit behind approximately $1.7 billion of senior secured debt. Specifically, the greater of (i) 10 percent of the net proceeds of asset sales remaining on the Debtors' balance sheet upon consummation of the Plan (which will be adjusted for certain adequate protection payments to the ABL Lenders as a condition to the Debtors' consensual use of cash collateral) and (ii) $250,000 will be distributed to holders of general unsecured claims, as long as that class votes to accept the Plan. This concession by the secured lenders is aimed at fostering a consensual, expeditious, and value-maximizing restructuring. The Restructuring Support Agreement also provides for the following milestones to ensure an expeditious and value-maximizing chapter 11 process:

- not later than February 9, 2026, the Petition Date shall have occurred;

- not later than five days following the Petition Date, the Court shall have entered an order approving the Debtors' use of Cash Collateral (as defined in the Restructuring Support Agreement) on an interim basis;

- not later than fourteen days following the Petition Date, the Debtors shall have filed the Plan with the associated Disclosure Statement (as defined in the Restructuring Support Agreement);

- not later than 22 days after the Petition Date, the deadline for submitting a qualified bid for the Going Concern Sale Transaction shall have occurred (the "Bid Deadline");

- if applicable, no later than 3 days after the Bid Deadline, an auction to consider approval of the Going Concern Sale Transaction shall commence;

- not later than 40 days following the Petition Date, the Court shall have entered an order approving the Debtors' use of Cash Collateral on a final basis;

- if applicable, no later than 31 days after the Petition Date, the Court shall hold a hearing to consider approval of the Going Concern Sale Transaction;

- not later than 35 days following the Petition Date, the Court shall have entered an order approving the Disclosure Statement;

- not later than 70 days following the Petition Date, the Court shall have entered the Confirmation Order (as defined in the Restructuring Support Agreement); and

- not later than 75 days following the Petition Date, the Plan Effective Date (as defined in the Restructuring Support Agreement) shall have occurred.

61.    I believe that the Restructuring Support Agreement is the product of good faith, arm's length negotiations with the Prepetition Lenders and that the terms thereof provide the best and only restructuring option currently available to the Debtors and their estates.  The Transactions contemplated by the Restructuring Support Agreement position the Company to navigate the current business and operational environment and maximize value for all of the Debtors' stakeholders.

**E.    The Path Forward.**

62.    After exhausting all other available options, the boards of directors or managers, as applicable, of the Debtors, including, in each case, the independent directors or managers, as applicable, voted to commence these chapter 11 cases in the Bankruptcy court for the District of New Jersey and pursue the Transactions contemplated by the Restructuring Support Agreement. The Debtors enter these chapter 11 cases with the support of the Prepetition Lenders to implement an orderly winddown of their remaining brick-and-mortar retail operations while continuing to pursue a potential going-concern sale for all or part of the Debtors' business.  The Company believes the framework and roadmap embodied by the Restructuring Support Agreement will best

maximize value for all stakeholders and puts the Debtors on the strongest footing to continue as a going concern and continue supplying best-in-class to its customer base.

**IV.**    **Evidentiary Basis for Relief Requested in the First Day Motions.**

63.    Contemporaneously with the filing of this Declaration, the Debtors have filed several First Day Motions seeking relief to minimize the adverse effects of the commencement of these chapter 11 cases on their business and to ensure that their reorganization strategy can be implemented with limited disruptions to operations.  Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their business with minimal disruption and thereby preserving value for the Debtors' estates and various stakeholders.  I have reviewed each of the First Day Motions, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments and otherwise continue their business operations as sought in the First Day Motions.  The evidentiary support for the First Day Motions is set forth on **Exhibit C** attached hereto.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

\* \* \* \* \* \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 9, 2026

*By:  /s/ Stephen Coulombe*
Name:  Stephen Coulombe
Title:  Co-Chief Restructuring Officer

## **Exhibit A**

**The Debtors**

1. 13051269 Canada Inc.
2. Eddie Bauer, LLC
3. Eddie Bauer Gift Card Services, LLC
4. Eddie Bauer of Canada Corporation
5. SPARC EB Holdings, LLC

## Exhibit B

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with <u>Section 14.02</u>, this "**<u>Restructuring Support Agreement</u>**" or this "**<u>Agreement</u>**") is made and entered into as of February 8, 2026 (the "**<u>Execution Date</u>**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, collectively, the "**<u>Parties</u>**"):[1]

   i.    Eddie Bauer LLC, a Delaware limited liability company ("**<u>Eddie Bauer</u>**"), and each of its affiliates listed on **<u>Exhibit A</u>** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Lenders (the Entities in this clause (i), collectively, the "**<u>Company Parties</u>**");

   ii.   the undersigned holders (or beneficial holders) of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, ABL Claims that have executed and delivered counterpart signature pages to this Agreement, a joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**<u>Consenting ABL Lenders</u>**");

   iii.  the undersigned holders (or beneficial holders) of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively holding 100% of the Term Loan Claims, the "**<u>Consenting Term Loan Lenders</u>**"); and

   iv.   the undersigned holders (or beneficial holders) of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Subordinated Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iv), in their capacity as holders of Subordinated Loan Claims, collectively, the "**<u>Consenting Subordinated Loan Lenders</u>**" and,

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in <u>Section 1</u>.

together with the other entities in clause (ii) and clause (iii), the "**Consenting Lenders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Lenders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Transactions**");

**WHEREAS**, the Company Parties intend to implement the Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

### *AGREEMENT*

**Section 1.**     *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**ABL Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**ABL Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**ABL Loans**" has the meaning set forth in the Restructuring Term Sheet.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement, the Term Loan Credit Agreement, and the Subordinated Loan Credit Agreement, and including, in each case, any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in <u>Section 2</u> have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (including any debtor-in-possession financing or exit financing), use of cash collateral, liquidation, tender offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Transactions *provided*, *however*, that a Sale Transaction (or actions undertaken in connection therewith) solely as contemplated pursuant to, and in accordance with, the Restructuring Term Sheet and the Bidding Procedures Order, shall not constitute an Alternative Restructuring Proposal.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey, or any other United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

"**Bidding Procedures**" means the bidding procedures governing the submission and evaluation of bids in connection with the Sale Transaction, attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

"**Bidding Procedures Motion**" has the meaning set forth in the Restructuring Term Sheet.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving the Bidding Procedures Motion.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral**" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code.

"**Cash Collateral Order**" means, individually or collectively (as the context may require) any order or orders entered in the Chapter 11 Cases authorizing the use of cash collateral (whether interim or final) that has been consented to and approved by the Consenting ABL Lenders.

"**Causes of Action**" means any claims, cross-claim, third-party claim, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively (including any alter ego theories), matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, any of the Company Parties, including the ABL Claims, the Term Loan Claims, and the Subordinated Loan Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Transactions.

"**Confirmation**" means the Bankruptcy Court's entry of the Confirmation Order.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting ABL Lender**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Subordinated Loan Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Loan Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consummation**" means the occurrence of the Plan Effective Date.

"**Credit Agreements**" means, collectively, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Subordinated Loan Credit Agreement.

"**Debtors**" means, collectively, the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, including all exhibits, annexes, schedules, and supplements thereto, each as may be amended, supplemented, or modified from time to time.

"**Disclosure Statement Order**" means any order of the Bankruptcy Court approving the adequacy of the Disclosure Statement.

"**Disinterested Managers**" means the disinterested managers of SPARC EB Holdings LLC, Eddie Bauer LLC, Eddie Bauer Gift Card Services LLC, 13051269 Canada Inc., and Eddie Bauer of Canada Corporation.

"**Eddie Bauer**" has the meaning set forth in the recitals to this Agreement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Estate**" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**File**" or "**Filed**" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"**Final Order**" means, as applicable, any order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

"**First Day Pleadings**" means those certain pleadings Filed by the Debtors contemporaneously with the voluntary petitions on the Petition Date that the Company Parties determine are necessary or desirable to File.

"**Governmental Unit**" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

"**Holder**" means an Entity holding a Claim against, or an Interest in, any Debtor, as applicable.

"**Intercompany Claim**" means any Claim against one Debtor held by another Debtor.

"**Intercompany Interest**" means any Interest in one Debtor held by another Debtor.

"**Interests**" means the common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other Securities or agreements to acquire the common stock (including convertible debt), preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

"**Investigation**" means the Disinterested Managers' independent investigation regarding any potential Estate claims or Causes of Action.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lien**" has the meaning ascribed to it in section 101(37) of the Bankruptcy Code.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each transfer of any Company Claims/Interests that meets the requirements set forth in Section 8.01 of this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, Governmental Unit, or political subdivision thereof, or any other Entity.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization Filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Transactions in a manner consistent with the terms set forth in the Restructuring Term Sheet.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and/or term sheets of documents, agreements, schedules, and exhibits to the Plan that will be Filed by the Debtors with the Bankruptcy Court.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in any Company Claims/Interests), in its capacity as a dealer or market maker in any Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Qualified Marketmaker Joinder Date**" shall be the third (3rd) Business Day prior to the expiration of the voting deadline under the Plan.

"**Required Consenting ABL Lenders**" means, as of the relevant date, Consenting ABL Lenders who own or control more than 50% in aggregate principal amount of the outstanding ABL Claims owned or controlled by all Consenting ABL Lenders in the aggregate as of such date.

"**Required Consenting Lenders**" means, collectively, the Required Consenting ABL Lenders, the Required Consenting Subordinated Loan Lenders, and the Required Consenting Term Loan Lenders.

"**Required Consenting Subordinated Loan Lenders**" means, as of the relevant date, Consenting Subordinated Loan Lenders who own or control more than 50% in aggregate principal amount of the outstanding Subordinated Loan Claims owned or controlled by all Consenting Subordinated Loan Lenders in the aggregate as of such date.

"**Required Consenting Term Loan Lenders**" means, as of the relevant date, Consenting Term Loan Lenders who own or control more than 50% in aggregate principal amount of the outstanding Term Loan Claims.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Documents**" means all agreements, instruments, pleadings, orders or other related documents utilized to implement the Sale Process and consummate a Sale Transaction, including, but not limited to, the Bidding Procedures, the Bidding Procedures Motion, the Bidding Procedures Order, the Sale Purchase Agreement (if any), and the Sale Order (if any), each of which shall contain terms and conditions that are materially consistent with this Agreement.

"**Sale Order**" means a Final Order, if any, approving a Sale Transaction, as contemplated by any applicable Sale Purchase Agreement, and subject to conditions set forth in the Restructuring Term Sheet.

"**Sale Process**" means the process to market and sell all or substantially all of the Debtors' assets to the highest or otherwise best bidder(s).

"**Sale Purchase Agreement**" means a purchase agreement, if any, with a third-party purchaser to effectuate a Sale Transaction.

"**Sale Transaction**" means a sale or sales of all or substantially all of the Debtors' assets or equity interests in accordance with the Restructuring Term Sheet, the Bidding Procedures, and the Bidding Procedures Order.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security**" or "**Securities**" has the meaning ascribed to it in section 2(a)(1) of the Securities Act.

"**Solicitation Materials**" means all materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Subordinated Loan Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Subordinated Loan Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Subordinated Loans**" has the meaning set forth in the Restructuring Term Sheet.

"**Term Loan Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Term Loan Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Term Loans**" has the meaning set forth in the Restructuring Term Sheet.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**United States Trustee**" means the Office of the United States Trustee for the district where the Chapter 11 Cases are pending.

1.02.    Interpretation.  Unless expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, if the last day of such period is a non-Business Day, the period in question shall end on the following Business Day;

(j)    the use of "include" or "including" is without limitation, whether stated or not; and

(k)    the phrase "counsel to the Consenting Lenders" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties.

9

**Section 2.**    *Effectiveness of this Agreement*.   This Agreement shall become effective and binding upon each of the Parties on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Lenders;

(b)    the following shall have executed and delivered counterpart signature pages of this Agreement:

(i)    holders of at least two-thirds of the aggregate outstanding principal amount of ABL Loans;

(ii)    holders of at least two-thirds of the aggregate outstanding principal amount of Term Loans; and

(iii)    holders of all of the aggregate outstanding principal amount of the Subordinated Loans.

(c)    counsel to the Company Parties shall have given notice to counsel to the Consenting Lenders in the manner set forth in Section 14.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred.

**Section 3.**    *Definitive Documents*.

3.01.    The Definitive Documents governing the Transactions shall mean the following and include any exhibits, schedules, amendments, modifications, or supplements thereto:  (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the Disclosure Statement Order and the other Solicitation Materials; (E) the First Day Pleadings and all orders sought pursuant thereto; (F) the Plan Supplement; (G) any Sale Documents; (H) any Cash Collateral Order and any motion seeking entry by the Bankruptcy Court of the Cash Collateral Order; and (I) such other definitive documentation as is necessary or desirable to consummate the Transactions.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Lenders.

**Section 4.**    *Commitments of the Consenting Lenders*.

4.01.    General Commitments, Forbearances, and Waivers.

(a)     During the Agreement Effective Period, each Consenting Lender, on a several and not joint basis, agrees, in respect of all of its Company Claims/Interests, as applicable, to:

(i)     support the Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Transactions;

(ii)     validly and timely deliver, and not withdraw, the consents, proxies, signature pages, tenders, ballots, or other means of voting or participation in the Transactions (including directing its nominee or custodian, if applicable, on behalf of itself and the accounts, funds, or Affiliates for which it is acting as investment advisor, sub-advisor, or manager to validly and timely deliver and not withdraw) with respect to all of the Company Claims/Interests owned by or held by such Consenting Lender;

(iii)     use commercially reasonable efforts to cooperate with the Company Parties in connection with the Company Parties' obtaining additional support for the Transactions from the Company Parties' other stakeholders;

(iv)     use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 4.02(b);

(v)     give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Transactions;

(vi)     cooperate with the Company Parties to obtain any and all required third-party governmental, regulatory, licensing, and/or other third-party approvals (including, without limitation, any necessary third-party consents) reasonably necessary to implement and/or consummate the Transactions;

(vii)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions, take all steps commercially reasonably necessary, to the extent reasonably requested by the Company Parties, to address any such impediment, and to negotiate in good faith reasonable and appropriate additional or alternative provisions to address any such impediment; and

(viii)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)     During the Agreement Effective Period, each Consenting Lender agrees, in respect of all of its Company Claims/Interests, as applicable, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

11

(ii)    seek, solicit, encourage, propose, File, support, consent to, or vote for, or enter into or participate in any discussions, agreements, understandings, or other arrangements with any Person regarding, or pursue or consummate, any Alternative Restructuring Proposal;

(iii)    execute or File any motion, objection, pleading, agreement, joinder, instrument, order, form, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)    initiate, direct any other Person or Entity to initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement, the Cash Collateral Order, or any other Definitive Document or as otherwise permitted under this Agreement;

(v)    exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Company Claims/Interests, including, without limitation, any right or remedy under the Credit Agreements that is inconsistent with this Agreement, except as permitted by the Cash Collateral Order or other Definitive Document;

(vi)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code, except to the extent permitted under the Cash Collateral Order or any other Definitive Document; or

(vii)    take any action that is inconsistent in any material respect with the Transactions.

(viii)    Notwithstanding anything to the contrary contained in Section 4 of this Agreement or otherwise, nothing herein shall or shall be construed to limit, impair, modify, or prejudice the rights, claims, and remedies available to the Consenting ABL Lenders, the Consenting Term Loan Lenders, or the Consenting Subordinated Loan Lenders under the Cash Collateral Order.

4.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)      to the extent that it is permitted to elect to opt out of the releases set forth in the Plan, elect not to opt out of or object to such releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)      to the extent that it is permitted to elect to opt in to the releases in the Plan, agree to opt in to and not object to such releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iv)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) through (iii) above during the Agreement Effective Period; and

(v)      support and take all actions reasonably requested by the Company Parties to facilitate approval of the Disclosure Statement, solicitation of the Plan, and Confirmation and Consummation of the Plan.

(b)      During the Agreement Effective Period, each Consenting Lender, in respect of each of its Company Claims/Interests, as applicable, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document Filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement, except to the extent such objection or action is taken in accordance with the Cash Collateral Order or any other Definitive Document.

(c)      During the Agreement Effective Period, the Consenting Lenders, as applicable, will consent to, and direct the Agents to consent to, the Company Parties' use of their Cash Collateral pursuant to the Cash Collateral Order.

**Section 5.**      *Additional Provisions Regarding the Consenting Lenders' Commitments*. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:  (a) affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement or under the Cash Collateral Order in connection with the Transactions or under the Definitive Documents; (c) prevent any Consenting Lender from enforcing any of its rights and remedies under this Agreement, the Cash Collateral Order, or any other Definitive Document, or asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, the Cash Collateral Order, or any other Definitive Document; (d) limit the rights of a Consenting Lender under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Lender's obligations under Sections 4 and 5 of this Agreement, the Cash Collateral Order or any other Definitive Document; (e) limit the ability of a Consenting Lender to purchase, sell, or enter into any transactions regarding the company Claims/Interests Claims, subject to the terms hereof; (f) constitute a waiver or amendment of any term or provision of the Credit Agreements or any of the other Loan Documents (as defined in the Credit Agreements); (g) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the Credit

13

Agreements or any of the other Loan Documents (as defined in the Credit Agreements); (h) except as and to the extent explicitly set forth in this Agreement, any Definitive Document, or as otherwise expressly agreed (email being sufficient), require any Consenting Lender to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Lender to the extent the foregoing are not reimbursed pursuant to the Cash Collateral Order; (i) prevent a Consenting Lender from taking any action that is required to comply with applicable Law; *provided* that if any Consenting Lender proposes to take any action that is otherwise inconsistent with this Agreement or the Transactions to comply with applicable Law, such Consenting Lender shall provide, to the extent commercially reasonable without violating applicable Law, at least five Business Days' advance, written notice to the Parties; (j) prohibit any Consenting Lender from taking any action that is not in contravention of this Agreement or the Transactions; or (k) contravene any Credit Agreement made by and between any Consenting Lender and non-debtor party (other than any violation triggered by or related to the preparation for, commencement of, or prosecution of the Chapter 11 Cases, the negotiation, execution, entry into, or performance under this Restructuring Support Agreement, or the negotiation, entry into, or effectuation of the Transactions).

**Section 6.** *Commitments of the Company Parties.*

6.01. <u>Affirmative Commitments</u>. Except as set forth in <u>Section 7</u>, during the Agreement Effective Period, the Company Parties agree to:

(a) support and take all steps reasonably necessary and desirable to consummate the Transactions in accordance with this Agreement;

(b) (i) pursue, consummate, and implement the Transactions on the terms and in accordance with the Milestones set forth in this Agreement, including by negotiating the Definitive Documents in good faith, and (ii) cooperate, as necessary, with the Consenting Lenders to obtain necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Transactions;

(c) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment, and to negotiate in good faith with the Consenting Lenders regarding reasonable and appropriate additional or alternative provisions to address any such impediment;

(d) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transactions;

(e) negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement;

(f) timely oppose any objections filed with respect to the Bankruptcy Court's approval of any of the Definitive Documents;

(g)      (i) provide drafts of the Disclosure Statement, the Plan, any other Solicitation Materials, and each other Definitive Document to, and afford a reasonable opportunity for comment and review of such documents by, the Consenting Lenders, (ii) consult in good faith with the Consenting Lenders regarding the form and substance of the Disclosure Statement and other Solicitation Materials, the Plan, and each other Definitive Document, sufficiently in advance of the filing, execution, distribution, or use (as applicable) thereof and not file, execute, distribute, or use (as applicable) the Disclosure Statement, other Solicitation Materials, the Plan, and each other Definitive Document unless such document is consistent with this Agreement and otherwise in form and substance reasonably acceptable in accordance with Section 3.02 of this Agreement, and (iii) negotiate in good faith, execute, perform their obligations under, and consummate the transactions contemplated by, the Definitive Documents to which the respective Company Parties are (or will be) a party or are otherwise bound by the provisions thereof;

(h)      promptly notify the Consenting Lenders in writing (electronic mail being sufficient) of any breach by any of the Company Parties in any respect of any of their obligations, representations, warranties, or covenants set forth in this Agreement or the Definitive Documents;

(i)      inform counsel to the Consenting Lenders reasonably promptly after becoming aware of any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Transactions;

(j)      to otherwise comply with all obligations to the Consenting Lenders, including reporting and notice requirements, set forth in the Cash Collateral Order;

(k)      seek additional support for the Transactions from their other material stakeholders to the extent reasonably prudent; and

(l)      provide counsel for the Consenting Lenders a reasonable opportunity to review draft copies of all First Day Pleadings.

6.02.  Negative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period (or beyond such period to the extent provided for under the Cash Collateral Order), each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Transactions described in, this Agreement or the Plan;

(c)      file or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join, or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the ABL Claims, Term Loan Claims, or Subordinated Loan Claims (or the liens or collateral in respect thereof) of the Consenting Lenders;

(d)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(e)     except to the extent permitted by Section 7.02 hereof, seek, solicit, support, encourage, propose, assist, consent to, vote for, enter into, or participate in any discussions, agreements, understandings, or other arrangements with any Person regarding, pursue, or consummate, any Alternative Restructuring Transaction;

(f)     consummate the Transactions unless each of the applicable conditions to the consummation of such transactions set forth in this Agreement (including the Plan Term Sheet) and the other applicable Definitive Documents has been satisfied (or waived by the applicable party or parties, including the Required Consenting Lenders); or

(g)     File any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 7.**     ***Additional Provisions Regarding Company Parties' Commitments***.

7.01.     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party (including any disinterested manager of such governing body, as applicable), after consulting with counsel, to take any action or to refrain from taking any action with respect to the Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.

7.02.     Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with Holders of Claims against or Interests in a Company Party (including any Consenting Lender), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Transactions or Alternative Restructuring Proposals.

7.03.     Nothing in this Agreement shall  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     ***Transfer of Interests and Securities***.

8.01.    During the Agreement Effective Period, no Consenting Lender shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    in the case of any Company Claims/Interests, the authorized transferee is either (1) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional "accredited investor" (as defined in the Rules), or (4) a Consenting Lender;

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest transferred) to counsel to the Company Parties at or before the time of the proposed Transfer; and

(c)    such Transfer shall not violate the terms of any order entered by the Bankruptcy Court with respect to the preservation of tax attributes.

8.02.    Upon compliance with the requirements of Section 8.01, the transferee shall be deemed a Consenting Lender and a Party for all purposes under this Agreement, and all of the Company Claims/Interests then held (and subsequently acquired) by such transferee shall be subject to this Agreement.  Upon the effectiveness of the Transfer, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Company Claims/Interests; *provided, however,* that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Lenders) and (b) such Consenting Lender must provide notice of such acquisition (including (i) the amount and type of Company Claim/Interest acquired and (ii) whether such Company Claims/Interests were acquired from an existing Consenting Lender) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Lender to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for

such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Lender without the requirement that the transferee be a Permitted Transferee.  Notwithstanding the foregoing, if, at the time of the proposed Transfer of such Company Claims/Interests to the Qualified Marketmaker, (i) such Company Claims/Interests may be voted on (A) the Plan or (B) any Alternative Restructuring Proposal, then the proposed transferor Consenting Lender must first vote such Company Claims/Interests in accordance with the requirements of Section 4 or (ii) such Company Claims/Interests have not yet been, and may not yet be, voted on the Plan or any Alternative Restructuring Proposal and such Qualified Marketmaker does not Transfer such Company Claims/Interests to a subsequent transferee prior to the Qualified Marketmaker Joinder Date, then such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Lender with respect to such Company Claims/Interests in accordance with the terms hereof; provided that, with respect to clause (ii) of the foregoing, the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Lender with respect to such Company Claims/ Interests at such time that the transferee of such Company Claims/Interests becomes a Consenting Lender with respect to such Company Claims/Interests.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

8.07.   Any Transfer in violation of this Section 8 shall be void *ab initio*.

**Section 9.     *Representations and Warranties of Consenting Lenders*.**  Each Consenting Lender severally, and not jointly, represents and warrants that, in addition to the representations and warranties set forth in Section 10 hereof, as of the date such Consenting Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)     it (i) is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in such Consenting Lender's signature page to this Agreement or a joinder or Transfer Agreement, as applicable, (ii) has not Transferred, or agreed to Transfer (other than in accordance with Section 10 of this Agreement), in whole or in part, any Claim or Cause of Action with respect to its Company Claims/Interests that is subject to the releases contemplated by the Transactions, and (iii) having made reasonable inquiry, is not the beneficial

or record owner of any ABL Claims, Term Loan Claims, or Subordinated Loan Claims, other than those reflected in such Consenting Lenders' signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to <u>Section 8</u>), as applicable;

(b)    it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are, and will be on the Plan Effective Date, free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to the applicable Credit Agreement and applicable Law;

(e)    it has not relied upon any other Party in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement;

(f)    it has made no prior assignment, sale, participation, grant, conveyance, or other Transfer of, and has not entered into any agreement to assign, sell, participate, grant, convey, or otherwise Transfer, in whole or in part, any portion of its rights, titles, or interests in any Company Claims/Interests that is inconsistent in any material respect with the representations and warranties of such Consenting Lender herein or would render such Consenting Lender otherwise unable to comply with this Agreement and perform its obligations hereunder; and

(g)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Lender in connection with the Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.    *Mutual Representations, Warranties, and Covenants*.**    Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement:

(a)    it is validly existing and in good standing under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

## Section 11.      *Termination Events*.

11.01.  <u>Consenting Lender Termination Events</u>.   This Agreement may be terminated (a) with respect to the Consenting ABL Lenders, by the Required Consenting ABL Lenders, (b) with respect to the Consenting Term Loan Lenders, by the Required Consenting Term Loan Lenders, and (c) with respect to the Consenting Subordinated Loan Lenders, by the Required Consenting Subordinated Loan Lenders, in each case, by the delivery to the Company Parties of a written notice in accordance with <u>Section 14.10</u> hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is materially adverse to the Consenting Lenders seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with <u>Section 14.10</u> hereof detailing any such breach;

(b)      any of the Milestones (as may have been extended in accordance with Section 16) is not achieved, except where such Milestone has been waived by the Required Consenting Lenders; <u>provided</u> that the right to terminate this Agreement under this Section 11.01(b) shall not be available to the Required Consenting Lenders if the failure of such Milestone to be achieved is caused by, or results from, the material breach by any terminating Required Consenting Lender(s) of its covenants, agreements, or other obligations under this Agreement;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any Final Order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with <u>Section 14.10</u> hereof detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such Final Order in contravention of any obligation set out in this Agreement;

(d)      termination of the Company Parties' right to use cash collateral under the Cash Collateral Order or upon any authorization of the Company Parties to use cash collateral without the prior consent and approval of the Required Consenting Lenders;

(e)      the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet in any material respect, or (ii) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by entering an order denying confirmation of the Plan or disallowing a material provision thereof (without the consent of the Required Consenting Lenders), unless the order granting such relief has been stayed, modified, or reversed within 14 days after such terminating Consenting Lender(s) delivers a written notice in accordance with Section 15.10 hereof; or

(f)      the entry of a Final Order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement.

11.02.   Company Party Termination Events.   Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Lenders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Lenders of notice of such breach;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any Final Order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters a Final Order denying confirmation of the Plan.

11.03.   Mutual Termination.   This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Lenders; and (b) each Company Party.

11.04.   Automatic Termination.   This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.05.   Effect of Termination.   Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party, and each Party subject to

such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action; *provided*, *however*, that in no event shall any such termination relieve any Party from (i) liability for its breach or non-performance if its obligations under this Agreement prior to the applicable Termination Date or (ii) obligations which by their terms expressly survive termination of this Agreement.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Transactions and this Agreement or otherwise; *provided*, *however*, any Consenting Lender withdrawing or changing its vote pursuant to this Section 11.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, File notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Lender, and (b) any right of any Consenting Lender, or the ability of any Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Lender.  No purported termination of this Agreement shall be effective under this Section 11.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d).  Nothing in this Section 11.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.    *Amendments and Waivers*.**

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the following Parties, solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of such Parties and unless otherwise specified in this Agreement: (i) the Required Consenting ABL Lenders; and (ii) the Required Consenting Term Loan Lenders, and (iii) the Required Consenting Subordinated Loan Lenders; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Lender, then the consent of each such affected Consenting Lender shall also be required to effectuate such modification, amendment, waiver, or supplement.

(c)      Any proposed modification, amendment, waiver or supplement that does not comply with this <u>Section 12</u> shall be ineffective and void *ab initio*.

(d)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.      *Miscellaneous***

14.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Transactions, as applicable.

14.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims

---

[2]    All releases and recipients of the Debtor release contemplated in this Agreement are subject to ongoing review and approval by the Disinterested Managers, including the results of any potential Investigation they may conduct.

arising under this Agreement:    (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.  <u>TRIAL BY JURY WAIVER</u>.    EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery; each such counterpart, when executed and delivered, shall be deemed an original, and all such counterparts, together, shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of such Party.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Lenders and in the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Eddie Bauer LLC
6501 Legacy Drive, Suite B100
Plano, TX 75024
Attention:           Glen Morris, Executive Vice President &
                            Chief Legal Officer
                            Dawn Wolverton, Secretary
E-mail address:    glen.morris@catalystbrands.com
                            dawn.wolverton@catalystbrands.com
with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:              Joshua A. Sussberg, P.C.
                        Matthew C. Fagen, P.C.
                        Oliver Paré
E-mail address:         joshua.sussberg@kirkland.com
                        matthew.fagen@kirkland.com
                        oliver.pare@kirkland.com

(b)      if to a Consenting ABL Lender, to the notice address provided on such Consenting ABL Lender's signature page

with copies to:

Otterbourg P.C.
230 Park Avenue
New York, New York 10169
Attention:              Daniel F. Fiorillo
E-mail address:         dfiorillo@otterbourg.com

(c)      if to a Consenting Term Loan Lender, to the notice address provided on such Consenting Term Loan Lender's signature page

with copies to:

Ropes & Gray LLP
1211 Avenue of the Americas

New York, New York 10036-8704
Attention:              Gregg Galardi
E-mail address:         gregg.galardi@ropesgray.com

(d)      if to a Consenting Subordinated Loan Lender, to the notice address provided on such Consenting Subordinated Loan Lender's signature page

with copies to:

Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
Attention:              Mark Silva
E-mail address:         msilva@choate.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.    <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Lender hereby confirms that its decision to execute this Agreement has been based upon its independent

investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12. <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13. <u>Waiver</u>. If the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16. <u>Severability and Construction</u>. If any provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18. <u>Capacities of Consenting Lenders</u>. Each Consenting Lender has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19. <u>Survival</u>. Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Section 14</u> and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and

effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, any and all releases shall remain in full force and effect.

14.20.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u>, <u>Section 12</u>, or otherwise, including a written approval by the Company Parties or the Required Consenting Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if it is conveyed in writing (including electronic mail) between each such Party's counsel without representations or warranties of any kind on behalf of such counsel.

**Section 15.**  *Restructuring Term Sheet*

15.01.  The Restructuring Term Sheet is expressly incorporated herein by reference and made a part of this Agreement as if fully set forth herein.  The terms and conditions of the Transactions are set forth in the Restructuring Term Sheet; *provided* that the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement and the applicable Definitive Documents implementing the Transactions.  In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the Restructuring Term Sheet shall govern.

**Section 16.**  *Milestones*

16.01.  The Company Parties will comply with the following milestones (collectively, the "**Milestones**"):

16.02.  (i)      not later than February 9, 2026, the Petition Date shall have occurred;

16.03.  (ii)     not later than 5 days following the Petition Date, the Bankruptcy Court shall have entered (i) an order approving the Company Parties' use of Cash Collateral on an interim basis and (ii) an order, in form and substance reasonably acceptable to the ABL Lenders, authorizing the continuation of going-out-of-business sales with respect to all of the Debtors' business and store locations (the "**Inventory Liquidation**");

16.04.  (iv)     not later than 14 days following the Petition Date, the Company Parties shall have filed the Plan with the associated Disclosure Statement;

16.05.  (v)      not later than 22 days after the Petition Date, the deadline for submitting a qualified bid for the Sale Transaction shall have occurred (the "**Bid Deadline**");

16.06.  (vi)  if applicable, no later than 3 days after the Bid Deadline, an auction to consider approval of the Sale Transaction shall commence;

16.07.  (vii) not later than 40 days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Company Parties' use of Cash Collateral on a final basis;

16.08.  (viii) if applicable, no later than 31 days after the Petition Date, the Bankruptcy Court shall hold a hearing to consider approval of the Sale Transaction;

16.09.  (ix)  not later than 35 days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement on a conditional basis;

16.10.  (x)     not later than 70 days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

16.11.  (xi)     not later than 75 days following the Petition Date, the Plan Effective Date shall have occurred.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

28

## <u>EXHIBIT A</u>

### Company Parties

1. SPARC EB Holdings LLC
2. Eddie Bauer LLC
3. Eddie Bauer Gift Card Services LLC
4. 13051269 Canada Inc.
5. Eddie Bauer of Canada Corporation

## **EXHIBIT B**

**Restructuring Term Sheet**

*Filing Version*

**Eddie Bauer LLC**
**RESTRUCTURING TERM SHEET**

February 8, 2026

This restructuring term sheet (including all exhibits and schedules hereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**") sets forth the principal terms and conditions of a transaction for Eddie Bauer LLC and certain of its affiliates that will be effectuated through voluntary chapter 11 cases. This Restructuring Term Sheet does not address all terms, conditions, or other provisions that would be required in connection with the restructuring or that will be set forth in the definitive documents, which are subject to agreement in accordance with the restructuring support agreement to which this Restructuring Term Sheet is attached (including all exhibits and schedules thereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Restructuring Support Agreement**").[1]

**THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAW. NOTHING IN THIS RESTRUCTURING TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE AND WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, AND DEFENSES OF EACH PARTY HERETO.**

**UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THE RESTRUCTURING TERM SHEET IS INCONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THE RESTRUCTURING TERM SHEET WILL CONTROL.**

**THIS RESTRUCTURING TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them elsewhere in this Restructuring Term Sheet or in the Restructuring Support Agreement.

| Overview | |
|---|---|
| **Debtors** | The Entities that are listed on <u>Exhibit A</u> to the Restructuring Support Agreement, which shall also be signatories to the Restructuring Support Agreement (each a "**<u>Debtor</u>**" and, collectively, the "**<u>Debtors</u>**"). |
| **Transaction Implementation and Overview** | The transactions described in this section (the "**<u>Transactions</u>**") will be implemented pursuant to confirmation of a prearranged chapter 11 plan substantially consistent with this Restructuring Term Sheet (the "**<u>Plan</u>**") in cases to be commenced by the Debtors under chapter 11 of title 11 of the United States Code (as amended, the "**<u>Bankruptcy Code</u>**") in the United States Bankruptcy Court for the District of New Jersey (the "**<u>Bankruptcy Court</u>**," such cases, the "**<u>Chapter 11 Cases</u>**," and the date of the commencement of the Chapter 11 Cases, the "**<u>Petition Date</u>**"). |
| | The Transactions will be supported by: (i) the Consenting ABL Lenders, represented by Otterbourg P.C. as of the date hereof; (ii) the Consenting Term Loan Lenders, represented by Ropes & Gray LLP as of the date hereof; (iii) the Consenting Subordinated Loan Lenders, represented by Choate, Hall & Stewart LLP as of the date hereof (the entities in clauses (i)–(iii), collectively, the "**<u>Consenting Lenders</u>**"); and (iv) the Debtors, in each case on the terms set forth herein.  The Plan will provide for, among other things, a settlement with the holders of ABL Claims, Term Loan Claims, and Subordinated Loan Claims against the Debtors on the terms set forth herein. |
| | On the Plan Effective Date, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, and release of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to among the Debtors or the Plan Administrator (as defined herein), as applicable, and the holder of such Allowed Claim or Allowed Interest. |
| | The Plan will be structured such that the Debtors may pursue: |
| | a) a sale or sales of all, substantially all, or a portion of the Debtors' assets or the equity of Eddie Bauer to the highest or otherwise best bidder(s) (the "**<u>Sale Transaction</u>**") following a sale and marketing process to be conducted pursuant to the Bidding Procedures and Bidding Procedures Order (the "**<u>Sale Process</u>**"); and |
| | b) notwithstanding the Sale Process, from and after the Petition Date, the Debtors shall conduct, and continue, the going-out-of-business sales with respect to all of the Debtors' business and store locations (the "**<u>Inventory Liquidation</u>**"). |
| | Following the completion of an Inventory Liquidation and, if applicable, a Sale Transaction, the Debtors or Wind-Down Debtors (as defined herein), as applicable, will effectuate an orderly liquidation and wind-down of any assets, businesses, or store locations not included in the Sale Transaction or Inventory Liquidation and payment of all Allowed Administrative Claims and funding |

| | |
|---|---|
| | the Professional Fee Escrow Amount, in accordance with the terms of this Restructuring Term Sheet (the "**Wind-Down Process**"). |
| | Notwithstanding the foregoing, the Debtors, in consultation with the Consenting Lenders, shall retain the right to suspend or terminate the Inventory Liquidation and pursue a Sale Transaction if doing so, in the Debtors' business judgment, maximizes the value of the Debtors' Estates; *provided*, that, in the event such Sale Transaction is not acceptable to the Required Consenting ABL Lenders in their Permitted Discretion (as defined below), then such suspension or termination of the Inventory Liquidation shall result in a cash collateral termination event under the Cash Collateral Order. |
| | Notwithstanding the occurrence of the Plan Effective Date, all ABL Claims (after giving effect to any Cash paydowns occurring on or before the Plan Effective Date), Term Loan Claims, and Subordinated Loan Claims shall be reserved and preserved as against all persons or entities; *provided*, that, with respect to the Debtors, the ABL Claims, Term Loan Claims, and Subordinated Loan Claims against the Debtors shall be subject to, and governed by, the Plan and Confirmation Order. |
| **Amendment and Waiver** | The Consenting Lenders have executed Amendments to their respective Credit Agreements waiving their rights to pursue remedies against any non-Debtor party, arising out of or related to the commencement and prosecution of the Chapter 11 Cases (the "**Amendment and Waiver**"). |
| **The Wind-Down Process; Wind-Down Amount** | At least one Debtor shall continue in existence after the Plan Effective Date (the "**Wind-Down Debtor**") for the purpose of, among other things: (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible and liquidating or otherwise monetizing any assets held by the Estates after the Plan Effective Date (if not otherwise monetized prior the Plan Effective Date), (ii) performing any obligations under any transition services agreement entered into in connection with a Sale Transaction, if applicable, (iii) resolving any disputed Claims and administering the Claims resolution process, (iv) paying Allowed Claims, (v) filing appropriate tax returns, and (vi) administering the Plan, if applicable, in an effective manner. |
| | The Debtors will designate a person or Entity to be appointed on the Plan Effective Date to serve as the administrator for the Wind-Down Debtor as will be set forth in the Plan (the "**Plan Administrator**"). |
| | The Wind-Down Debtor shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter. |
| | The Debtors and the Required Consenting Lenders shall negotiate an amount, which amount may be included in a segregated account (the "**Wind-Down Account**") held in trust by the Wind-Down Debtor, that is administered by the |

3

| | Plan Administrator (the "**Wind-Down Amount**") to fund certain obligations under the Plan and the payment of costs, fees, and expenses related to the Wind-Down Process. Any Wind-Down Amount shall be in addition to the Professional Fee Escrow Amount held in the Professional Fee Escrow Account (both as defined herein). |
|---|---|
| **Cash Collateral** | The Transactions shall be funded through: (i) the consensual use of Cash Collateral; (ii) proceeds from the Debtors' ordinary course operations and/or going-out-of-business sales; and (iii) proceeds from any Sale Transaction or Inventory Liquidation, all of which funding sources shall be subject to the terms and conditions of the Cash Collateral Order. |
| | The requisite ABL Lenders (as defined herein) shall consent to the use of Cash Collateral on terms and conditions acceptable to each of the Required Consenting ABL Lenders and the Required Consenting Term Loan Lenders in their Permitted Discretion (as defined below), and set forth in the Cash Collateral Order, which shall be consistent with the terms of this Restructuring Term Sheet, the Restructuring Support Agreement, and the Intercreditor Agreements. Any Cash Collateral Order shall provide for, among other customary provisions, such as bankruptcy waivers, releases, stipulations, and acknowledgment of claims and liens, adequate protection of the Secured Lenders' secured claims, including in the form of adequate protection liens, adequate protection superpriority claims, reporting requirements, adequate protection payments for permanent application against the ABL Claims in amounts and frequency to be agreed to among the parties, and reasonable fees and expenses of the counsel and financial advisors to the ABL Lenders and the Term Loan Lenders as set forth in the Cash Collateral Order. For the avoidance of doubt, nothing in the Cash Collateral Order shall release Penney Holdings LLC, or any other obligor in the Credit Agreements, from its obligations under the Credit Agreements. |
| | Additionally, commencing on the last business day of the fourth week following the Petition Date, and each week thereafter, the Debtors shall make adequate protection cash payments (each, a "**Weekly Paydown**") from a U.S. Debtor's Bank Account[2] to the ABL Agent in an amount equal to the greater of (i) the amount set forth in the Approved Budget (as defined in the Cash Collateral Order) line item titled "Distribution to Creditors," and (ii) the Minimum Sweep Balance (as defined in the Cash Collateral Order) (such amount, the "**Weekly Paydown Amount**"), *provided* that, if (x) actual ending book cash as of the date of determination is less than (y) the amount set forth in the Approved Budget line item titled "Ending Book Cash" as of the date of determination in the applicable Approved Budget, then the Weekly Paydown Amount for such week shall be reduced by an amount equal to (y) *less* (x). For the avoidance of doubt, nothing herein shall in any way waive or limit the |

---

[2]    "Bank Account" shall have the meaning set forth in the *Interim Order (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Debtor Bank Accounts, Business Forms, and Books and Records; (II) Authorizing the Debtors to Continue to Perform Intercompany Transactions; (III) Waiving Certain U.S. Trustee Requirements; and (IV) Granting Related Relief.*

| | |
|---|---|
| | Debtors' obligation to comply with the applicable Approved Budget, subject to any Permitted Variances (as defined in the Cash Collateral Order) thereunder.<br><br>The "Carve Out" for the payment of estate professional fees, to be included in any Cash Collateral Order, is attached hereto as **Exhibit A**.<br><br>For the avoidance of doubt, nothing in any Cash Collateral Order or any other document executed, approved, or delivered in connection with the Chapter 11 Cases shall alter, modify, waive, or otherwise affect the terms, conditions, or provisions of the underlying Credit Agreements among the Secured Lenders, Penney Holdings LLC, and its non-Debtor affiliates party thereto, except as expressly agreed in writing among the applicable parties. Any Cash Collateral Order shall be in form and substance acceptable to the ABL Lenders as set forth in the Restructuring Support Agreement in the ABL Lenders' Permitted Discretion. "Permitted Discretion" as used herein shall mean acting reasonably in good faith from the standpoint of a secured creditor.<br><br>Pursuant to the Intercreditor Agreements, upon the Debtors' receiving the requisite consent of the ABL Lenders to use Cash Collateral in the Chapter 11 Cases, the Term Loan Lenders and Subordinated Loan Lenders (as defined herein) will be deemed to consent to such use of Cash Collateral, subject to the terms and conditions of the Intercreditor Agreements. |
| **Claims and Interests to be Addressed** | Outstanding indebtedness of the Debtors, Existing Equity Interests (as defined herein), and Intercompany Interests that will be restructured or otherwise addressed pursuant to the Transactions include:<br><br>a.) **ABL Loans**:  the revolving loans (the "**ABL Loans**") due under that certain Credit Agreement, dated as of December 7, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**," and the debt facility related thereto, as amended, supplemented, or otherwise modified from time to time, the "**ABL Facility**"), by and among Penney Holdings LLC, as lead administrative borrower, certain other Loan Parties (as defined in the ABL Credit Agreement), including the Debtors and  non-Debtor affiliates, the lenders party thereto, and Wells Fargo Bank, National Association, as administrative agent (the "**ABL Agent**") with approximately $675 million in principal amount outstanding (the Claims in respect thereof, the "**ABL Claims**," and the Holders thereof, the "**ABL Lenders**");<br><br>b.) **Term Loans**:  the term loans (the "**Term Loans**") due under that certain Credit Agreement dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Term Loan Credit Agreement**," and the debt facility related thereto, as amended, supplemented, or otherwise modified from time to time, the "**Term Loan Facility**"), by and among Penney Holdings LLC, as lead administrative borrower, the other Loan Parties (as defined in the Term Loan Credit Agreement), including the Debtors and non-Debtor affiliates, the lenders party thereto, and |

|  | Whitehawk Capital Partners LP, as administrative agent and collateral agent (the "**Term Loan Agent**") with approximately $600 million in principal amount outstanding (the Claims in respect thereof, the "**Term Loan Claims**," and the Holders thereof, the "**Term Loan Lenders**");<br><br>c.) **Subordinated Loans**: the subordinated term loans (the "**Subordinated Loans**" due under that certain Second Amendment to Amended and Restated Term Loan Credit Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Subordinated Loan Credit Agreement**," and the debt facility related thereto, as amended, supplemented, or otherwise modified from time to time, the "**Subordinated Loan Facility**"), by and among Penney Holdings LLC, as lead administrative borrower, the other Loan Parties (as defined in the Subordinated Loan Credit Agreement), the Debtors, the lenders party thereto, and Copper Retail JV LLC as administrative agent and collateral agent (the "**Subordinated Loan Agent**") with approximately $216 million in principal amount outstanding (the Claims in respect thereof, the "**Subordinated Loan Claims**," and the Holders thereof, the "**Subordinated Loan Lenders**");<br><br>d.) Other Intercompany Claims and Intercompany Interests; and<br><br>e.) Existing Equity Interests. |
|---|---|
| **Milestones** | The Debtors will comply with the milestones as set forth in the Restructuring Support Agreement (collectively, the "**Milestones**"): |

| Treatment of Claims and Interests | | | |
|---|---|---|---|
| Each Holder of an Allowed Claim or Interest shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim, Interest, or Intercompany Interest. | | | |
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment/ Voting** |
| **Unclassified Non-Voting Claims** | | | |
| **N/A** | **Administrative Claims** | Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of the Plan Effective Date and the date on which such Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter), or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | N/A |
| **N/A** | **Priority Tax Claims** | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Priority Tax Claim shall receive treatment consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| **Class 1** | **Other Secured Claims** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Plan Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option, in full and final satisfaction of such Allowed Other Secured Claim, either (a) payment in full in Cash in an amount equal to its Allowed Other Secured Claim, (b) delivery of the collateral securing its Allowed Other Secured Claim, or (c) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 2** | **Other Priority Claims** | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Plan Effective Date or in the ordinary course of business | Unimpaired / Deemed to Accept |

| | | | |
|---|---|---|---|
| | | as and when due or otherwise receive treatment consistent with section 1129(a)(9) of the Bankruptcy Code. | |
| **Class 3** | **ABL Claims** | On the Plan Effective Date, except to the extent that a Holder of an Allowed ABL Claim agrees to less favorable treatment, each Holder of an Allowed ABL Claim shall receive, in full and final satisfaction of such Allowed Claim against the Debtors, its *pro rata* share of:<br><br>i.    If Class 6 (General Unsecured Claims) votes to reject the Plan, 100% of Net Proceeds; or<br><br>ii.    If Class 6 (General Unsecured Claims) votes to accept the Plan, 100% of the Net Proceeds *less* the GUC Contingent Recovery Pool.<br><br>Notwithstanding the foregoing, all ABL Claims shall be reserved and preserved as against all persons or entities other than the Debtors (and as to the Debtors, all ABL Claims shall be subject to the Plan and Confirmation Order). | Impaired / Entitled to Vote |
| **Class 4** | **Term Loan Claims** | On the Plan Effective Date, each Term Loan Claim against the Debtors shall be deemed Allowed and shall be canceled, released, and extinguished as against the Debtors and each holder of an Allowed Term Loan Claim shall not receive any distribution on account of such Claim; *provided* that it is expressly understood and agreed that all Term Loan Claims shall be reserved and preserved as against all other Loan Parties (as defined in the Term Loan Credit Agreement) other than the Debtors (and as to the Debtors, the Allowed Term Loan Claims shall be subject to the Plan and Confirmation Order). | Impaired / Entitled to Vote |
| **Class 5** | **Subordinated Loan Claims** | On the Plan Effective Date, each Subordinated Loan Claim shall be deemed Allowed and will be canceled, released, and extinguished as against the Debtors, and each holder of an Allowed Subordinated Loan Claim shall not receive any distribution on account of such Claim; *provided* that it is expressly understood and agreed that all Subordinated Loan Claims shall be reserved and preserved as against all other Loan Parties (as defined in the Subordinated Loan Credit Agreement) other than the Debtors (and as to the Debtors, the Subordinated Loan Claims shall be subject to the Plan and Confirmation Order). | Impaired / Entitled to Vote |

| Class 6 | **General Unsecured Claims** | If Class 6 (General Unsecured Claims) votes to accept the Plan, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of the GUC Contingent Recovery Pool. If Class 6 (General Unsecured Claims) votes to reject the Plan, all Allowed General Unsecured Claims shall be canceled, released, and extinguished and will be of no further force or effect, and Holders of Allowed General Unsecured Claims shall not receive any distribution, property, or other value under the Plan on account of such Allowed General Unsecured Claims. | Impaired / Entitled to Vote |
|---|---|---|---|
| Class 7 | **Intercompany Claims** | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor, either:<br><br>i.    Reinstated;<br><br>ii.    set off, settled, discharged, contributed, canceled, and released without any distribution on account of such Intercompany Claim; or<br><br>iii.    otherwise addressed at the option of the applicable Debtor. | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |
| Class 8 | **Intercompany Interests** | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor, either:<br><br>i.    Reinstated;<br><br>ii.    set off, settled, discharged, contributed, canceled, and released without any distribution on account of such Intercompany Interest; or<br><br>iii.    otherwise addressed at the option of the applicable Debtor. | Unimpaired / Deemed to Accept or Impaired / Deemed to Reject |
| Class 9 | **Existing Equity Interests** | On the Plan Effective Date, all Existing Equity Interests will be canceled, released, and extinguished and will be of no further force and effect. No holders of Existing Equity Interests will receive a distribution under the Plan on account of such Existing Equity Interests. | Impaired / Deemed to Reject |

| General Provisions Regarding the Plan | |
|---|---|
| **Transactions** | The Confirmation Order shall be deemed to authorize and ratify, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the transactions therein.  On the Plan Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Transactions. |
| **Other Executory Contracts** | On the Plan Effective Date, all executory contracts and unexpired leases of the Debtors not assumed or assumed and assigned under the Plan or the subject of a separate motion to assume shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. |
| **Tax Matters** | The parties will work together in good faith and will use commercially reasonable efforts to structure and implement the Transactions in a tax efficient and cost-effective manner. |
| **Survival of Indemnification Provisions and D&O Insurance** | All indemnification provisions, consistent with applicable Law, of the Debtors (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) that are in place as of the Petition Date for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, shall be (i) reinstated and remain intact, irrevocable, and shall survive the Plan Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors, as applicable, than the indemnification provisions in place prior to the Plan Effective Date; and (ii) shall be assumed by the Wind-Down Debtor.<br><br>In addition, after the Plan Effective Date, the Wind-Down Debtor will not terminate or otherwise reduce the existing coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Plan Effective Date relating to the period prior to the Plan Effective Date, and (i) all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Plan Effective Date and (ii) any other individuals, in each case of (i) and (ii), covered by such existing insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Plan Effective Date. |
| **Retained Causes of Action** | The Debtors' rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Debtors under the Cash Collateral Order and/or Plan, shall be retained by, or transferred to, the Wind-Down Debtor on the Plan Effective Date. |

| | |
|---|---|
| **Free and Clear of Claims and Interests** | No Entity holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan.  All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Plan Effective Date except as expressly provided in the Plan or the Confirmation Order. |
| **Professional Fee Escrow Account** | The Plan shall provide for the establishment of, on the Plan Effective Date, an interest-bearing escrow account (the "**Professional Fee Escrow Account**") established and funded on or prior to the Plan Effective Date in an amount not less than the aggregate unpaid professional fees for the respective estate professionals as of the Plan Effective Date, less any unapplied cash deposited in respect of the Carve-Out (which cash shall be added to the Professional Fee Escrow Account) (the "**Professional Fee Escrow Amount**") for the benefit and exclusive purpose of satisfying such unpaid professional fees.   The Professional Fee Escrow Account shall not be and shall not be deemed property of the Debtors or the Wind-Down Debtor or encumbered in any way; *provided*, that to the extent surplus funds remain in the Professional Fee Escrow Account after all professional fee claims have been resolved by the Bankruptcy Court (if applicable) or settled, such funds shall be returned to the Wind-Down Debtor for distribution in accordance with the Plan; *provided*, *further,* that the Debtors' and Wind-Down Debtor's obligations with respect to professional fee claims shall not be limited nor deemed limited in any way to the balance of funds held in the Professional Fee Escrow Account.<br><br>For the avoidance of doubt, the Professional Fee Escrow Amount shall be separate from the Wind-Down Amount. |
| **Debtor Releases, Third--Party Releases, Injunction, and Exculpation** | The Plan will include releases, consistent with the terms set forth on **Exhibit B**, as well as customary injunctions and exculpations in each case to the fullest extent permitted by law and effective as of the Plan Effective Date; *provided* that the Debtors' release shall be subject in all respects to the Disinterested Managers' Investigation. |
| **Satisfaction and Release of Claims** | **ABL Claims:**  On the Plan Effective Date, each ABL Claim shall be deemed Allowed and will be released and extinguished against the Debtors following receipt by the ABL Lenders of all Net Proceeds to be paid under the Plan for application against the ABL Claims, and each holder of an Allowed Term Loan Claim shall be deemed to waive any such ABL Loan Claims against the Debtors.<br><br>**Term Loan Claims:**  On the Plan Effective Date, each Term Loan Claim shall be deemed Allowed and will be released and extinguished against the Debtors, and each holder of an Allowed Term Loan Claim shall be deemed to waive any such Term Loan Claims against the Debtors.<br><br>**Subordinated Loan Claims:**  On the Plan Effective Date, each Subordinated Loan Claim shall be deemed Allowed and will be released and extinguished against the Debtors, and each holder of an Allowed Subordinated Loan Claim |

| | |
|---|---|
| | shall be deemed to waive any such Subordinated Loan Claims against the Debtors. |
| **Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including, among other things, provisions addressing the Bankruptcy Court's retention of jurisdiction, the vesting of assets, release of liens, the compromise and settlement of Claims and Interests, and the resolution of disputed Claims. |
| **Conditions Precedent to the Plan Effective Date** | The following shall be conditions to the Plan Effective Date (the "Conditions Precedent to the Plan Effective Date"): |
| | a.) the Restructuring Support Agreement shall not have been validly terminated by any of the parties thereto and shall continue to be in full force and effect; |
| | b.) each document or agreement constituting Definitive Documents contemplated in the Restructuring Support Agreement shall (a) be in form and substance consistent with the Restructuring Support Agreement and this Restructuring Term Sheet, (b) have been duly executed, delivered, acknowledged, filed, and/or effectuated, as applicable, and (c) be in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Plan Effective Date or otherwise waived; |
| | c.) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated; |
| | d.) the Professional Fee Escrow Account shall have been established and funded in Cash; |
| | e.) the Bankruptcy Court shall have entered the Confirmation Order, and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered; |
| | f.) to the extent not otherwise addressed herein, all actions, documents, and agreements necessary to implement and consummate the Transactions shall have been effected and executed and shall be in form and substance consistent with this Restructuring Term Sheet; and |
| | g.) the Debtors shall have funded the Wind-Down Amount in Cash. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Conditions Precedent to the Plan Effective Date may not be waived without the express prior written consent (which may be via email of counsel) of (a) the Debtors, and (b) the Required Consenting Lenders, which waiver shall be effective without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. |

| Definitions | |
|---|---|
| **"ABL Term Loan Intercreditor Agreement"** | means that certain Intercreditor Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified prior to the Petition Date), by and among (a) the ABL Agent, (b) the Term Loan Agent, (c) Penney Holdings LLC, as lead administrative borrower, (d) the other borrowers signatory thereto, and (e) the guarantors signatory thereto. |
| **"ABL Threshold Recovery Amount"** | means (i) an amount equal to 60% of the cost value of all retail inventory, wholesale inventory, credit card accounts receivable, and wholesale receivables of the Debtors, based on the levels of such assets in the Approved Budget (as defined in the Cash Collateral Order) as of the Petition Date *less* (ii) the aggregate amount of all Weekly Paydowns actually paid as of the Plan Effective Date. |
| **"Administrative Claim"** | means a Claim against any of the Debtors arising on or after the Petition Date and before the Plan Effective Date for the costs and expenses of administration of the Chapter 11 Cases pursuant to sections 330, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' business incurred on or after the Petition Date and through the Plan Effective Date; (b) Allowed Professional Claims (to be defined in the Plan); and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code. |
| **"Allowed"** | means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a proof of Claim timely Filed by the applicable bar date (or for which Claim or Interest a proof of Claim or proof of Interest, as applicable, is not required under the Plan, the Bankruptcy Code, or a Final Order); (b) a Claim or Interest that is scheduled by the Debtors as not contingent, not unliquidated, and not disputed, and for which no proof of Claim or proof of Interest, as applicable, has been timely Filed; or (c) a Claim or Interest allowed pursuant to the Plan or a Final Order; *provided*, that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection is so Filed, such Claim or Interest shall have been Allowed by a Final Order. Any Claim or Interest that has been or is hereafter listed on the schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding proof of Claim or proof of Interest is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim or Interest of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtors or Wind-Down Debtors, as applicable. For the avoidance of doubt, a proof of Claim or proof of Interest Filed after the applicable bar date shall not be Allowed for any purposes whatsoever absent entry of a Final Order |

| | |
|---|---|
| | allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings. |
| "**Cash**" | means cash and cash equivalents, including bank deposits, checks, and other similar items in the legal tender of the United States of America. |
| "**Existing Equity Interests**" | means any Interest in SPARC EB Holdings LLC. |
| "**General Unsecured Claims**" | means any Claim against a Debtor that is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) an Other Secured Claim, (iv) an Other Priority Claim, (v) an ABL Claim, (vi) a Term Loan Claim, (vii) a Subordinated Loan Claim, (vi) an Intercompany Claim, or (vii) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; *provided* that, in any event, General Unsecured Claims shall include the SPARC Intercompany Claim. |
| "**GUC Contingent Recovery Pool**" | means the greater of (i) $250,000 and (ii) 10% of Net Proceeds in excess of the ABL Threshold Recovery Amount. |
| "**Intercreditor Agreements**" | means, collectively, the ABL Term Loan Intercreditor Agreement and the Senior-Subordinated Intercreditor Agreement. |
| "**Net Proceeds**" | means all Cash, if any, held by the Wind-Down Debtor after the completion of the Wind-Down Process, after giving effect to the payment or reservation of amounts for Allowed Administrative Claims and the funding of the Professional Fee Escrow Amount in accordance with the terms of this Restructuring Term Sheet. |
| "**Other Priority Claim**" | means a Claim against any of the Debtors, other than an Administrative Claim or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| "**Other Secured Claim**" | means a Claim against any of the Debtors, other than an ABL Claim, a Term Loan Claim, or a Subordinated Loan Claim, (a) secured by a valid, perfected, and enforceable lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code. |
| "**Priority Tax Claim**" | means any Claim against any of the Debtors of a Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| "**Secured Lenders**" | means collectively, the ABL Lenders, the Term Loan Lenders, and the Subordinated Loan Lenders. |
| "**Senior-Subordinated Intercreditor Agreement**" | means that certain Intercreditor Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) the ABL Agent, (b) the Term Loan Agent, (c) the Subordinated Loan Agent, and (d) the Loan Parties (as defined in the Senior-Subordinated Intercreditor Agreement) party thereto. |

| "***SPARC Intercompany Claim***" | means that certain Intercompany Claim in the amount of approximately $215 million held by SPARC Group Holdings LLC against Eddie Bauer LLC. |
|---|---|

**Exhibit A**

**Carve Out**

(a)     As used in this Interim Order, "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, which shall not be limited by any budget (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $70,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and, to the extent set forth in the Approved Budget, the Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by any of the Prepetition Agents of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by any of the Prepetition Agents of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap") of which the foregoing $750,000 shall be funded into the Funded Reserve Account (as defined herein) from the Cash Collateral.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by any of the Prepetition Agents to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of a Termination Event (as defined herein) and upon termination of the Debtors' right to use Cash Collateral, as applicable, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     *Delivery of Weekly Fee Statements*.  Not later than 7:00 p.m. (prevailing Eastern Time) on Wednesday of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors (email being sufficient) a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided*, that, within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver (email being sufficient) one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date, and the Debtors shall cause such Weekly Statement and Final Statement to be delivered as soon as reasonably practicable to the Prepetition Agents.  If any Professional Person fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person.

(c)    *Carve Out Reserves*.

(i)    Commencing with the week ended February 13, 2026, and on or before the Thursday of each week thereafter, the Debtors shall utilize all cash on hand as of such date and, to the extent insufficient, any available cash thereafter held by any Debtor, to fund a reserve account in an amount equal to the sum of (A) the greater of (1) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statements delivered on the immediately prior Wednesday to the Debtors and the Prepetition Agents, and (2) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the Approved Budget during such week, plus (B) the Post-Carve Out Trigger Notice Cap, plus (C) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the two weeks occurring after the most recent Calculation Date. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "Funded Reserve Account") to pay such Allowed Professional Fees (the "Funded Reserves") prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from such Funded Reserve Account.

(ii)    On the day on which a Carve Out Trigger Notice is delivered by any of the Prepetition Agents to the Debtors with a copy to counsel to the Committee (if any) (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and, to the extent the foregoing is insufficient, any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraph 13(a)(i)–(iii). The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "Pre-Carve Out Trigger Notice Reserve") to pay prior to any other claims, first, the amounts set forth in paragraph 13(a)(iii) above, and, second, the amounts set forth in paragraph 13(a)(i)–(ii) above. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") to pay prior to any and all other claims the amounts set forth in paragraph 13(a)(iv) above.

(d)    *Application of Carve Out Reserves*.

(i)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in paragraph 13(a)(i)–13(a)(iii) (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the amounts set forth in clause 13(a)(iv), until the Pre-Carve Out Amounts are indefeasibly paid in full. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, following the indefeasible payment in full of all obligations set forth in paragraph 13(a)(iv) above, subject to paragraph 13(d)(iii) below, all remaining funds shall be distributed first to the Prepetition ABL Administrative Agent and the Prepetition Term Loan Agent on account of the Adequate Protection Obligations until indefeasibly paid in full, and thereafter to the Prepetition Subordinated Loan Agent, in each case in accordance with their respective rights and priorities as of the Petition Date and as otherwise set forth in this Interim Order.

(ii)    All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in paragraph 13(a)(iv) (the "Post-Carve Out Amounts"). If the Post-Carve

2

Out Trigger Notice Reserve has not been reduced to zero, following the indefeasible payment in full of all obligations set forth in paragraph 13(a)(iv) above subject to paragraph 13(d)(iii) below, all remaining funds shall be distributed first to the Prepetition ABL Administrative Agent and the Prepetition Term Loan Agent on account of the Adequate Protection Obligations until indefeasibly paid in full, and thereafter to the Prepetition Subordinated Term Loan Agent, in each case in accordance with their respective rights and priorities as of the Petition Date and as otherwise set forth in this Interim Order.

(iii)    Notwithstanding anything to the contrary in the Prepetition Loan Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in paragraph 13(c)(ii) above, then, any excess funds in either of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph 13(c)(ii) above, prior to making any payments to any of the Prepetition Secured Parties.

(iv)    Notwithstanding anything to the contrary in the Prepetition Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the Adequate Protection Liens shall automatically attach to (and be deemed automatically perfected with respect to) any residual interest in the Carve Out Reserves after the applicable amounts set forth in paragraph 13(a)(i)–(iv) above have been indefeasibly paid in full, with any excess paid to the Prepetition Agents for application in accordance with this Interim Order.

(v)    Further, notwithstanding anything to the contrary in this Interim Order, (A) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (B) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, or Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the Prepetition Loan Documents, the Carve Out shall be senior to the Adequate Protection Liens, the Prepetition Secured Obligations, and any and all other forms of adequate protection, liens, or claims securing or supporting any claim or obligation whatsoever.

(e)    *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)    *No Direct Obligation to Pay Allowed Professional Fees*.  None of the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the chapter 11 cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)    *Payment of Allowed Professional Fees on or After the Termination Declaration Date*. So long as the Carve-Out Reserves have been fully funded, following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no

3

Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(h)    Nothing herein, including the inclusion of line items in the Approved Budget for Professional Persons, shall be construed as consent to the allowance of any particular professional fees or expenses of the Debtors, of the Committee, or of any other person or shall affect the right of the Prepetition ABL Administrative Agent or the Prepetition Term Loan Agent to object to the allowance and payment of such fees and expenses.  Furthermore, nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition ABL Administrative Agent or the Prepetition Term Loan Agent in any way to pay compensation to or to reimburse expenses of any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(i)    The Funded Reserve Account shall be held by Stretto, Inc., the Debtors' Claims and Noticing Agent, at a nationally recognized, well-capitalized bank (the "Depository Bank"), and such amounts shall be held by Stretto, Inc. in trust solely and exclusively for the payment of the Carve Out and no other purpose.  The Depository Bank shall be required to hold and disburse such funds only in accordance with, and expressly authorized by, the Carve Out provisions of this Interim Order, and the Depository Bank shall be entitled to rely conclusively (without further inquiry) on written disbursement instructions delivered by Debtors' counsel as being in compliance with the Carve Out provisions of this Interim Order; provided, that nothing herein shall be construed to impose upon the Depository Bank any duty to monitor or verify compliance with this Interim Order, and the Depository Bank shall incur no liability to any party in interest for acting (or refraining from acting) in accordance with such instructions of this Interim Order.  The Debtors shall promptly serve this Interim Order on the Depository Bank.

**Exhibit B**

**Releases**

| Release Provisions | |
|---|---|
| **Related Party** | "*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or Entity's current and former directors, managers, officers, committee members, members of any governing body, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals, representatives, and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees. |
| **Released Party** | "*Released Party*" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Wind-Down Debtor and the Plan Administrator; (c) the Agents; (d) each Consenting Lender; (e) each Releasing Party; (f) each current and former Affiliate of each Entity in clause (a) through the following clause (g); and (g) each Related Party of each Entity in clause (a) through this clause (g); *provided, however*, that, in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan, and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered. |
| **Releasing Party** | "*Releasing Party*" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Wind-Down Debtor and the Plan Administrator; (c) the Agents; (d) each Consenting Lender; (e) all Holders of Claims that vote to accept the Plan; (f) all Holders of Claims who are deemed to accept the Plan but who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (g) all Holders of Claims who abstain from voting on the Plan, other than those who were not sent a ballot or an opt out form in accordance with the Disclosure Statement Order, and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in the Plan; (h) all Holders of Claims or Interests who vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided for in the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) to the maximum extent permitted by law, each Related Party of each Entity in clause (a) through this clause (j); *provided, however*, that, in each case, |

| | |
|---|---|
| | an Entity in clause (f) through clause (j) shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered. |
| **Releases by the Debtors (the "<u>Debtor Release</u>")** | Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of the Debtors, their Estates, and, if applicable, the Wind-Down Debtors and the Plan Administrator, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, the Wind-Down Debtors, or the Plan Administrator), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort, contract, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, the Wind-Down Debtors, if applicable, the Plan Administrator, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, the Debtors, their Estates, or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, any direct or indirect investment in any Debtor by any Released Party, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, any other benefit provided by any Debtor to any Released Party, cash management arrangements, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, any avoidance actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the decision to File the Chapter 11 Cases, the Wind-Down Process, the Sale Process, the negotiation, formulation, preparation, dissemination, or consummation of the Restructuring Support Agreement, the Transactions, the Credit Agreements, |

| | |
|---|---|
| | the Cash Collateral Order, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if applicable), the Sale Transaction (if applicable), the Plan and related agreements, instruments, and other documents, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Wind Down Process, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Sale Transaction, the Confirmation Order, any Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Sale Transaction, and (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.<br><br>Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Wind-Down Debtors or the Plan Administrator, asserting any Claim or Cause of Action released pursuant to the Debtor Release. |
| **Releases by Holders of Claims and Interests (the "<u>Third-Party Release</u>")** | Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Plan Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Party's authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all Claims and Causes of Action whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Wind-Down Debtors (if applicable)), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, |

whether in Law or equity, whether sounding in tort, contract, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, the Debtors (including the capital structure, management, ownership, or operation thereof), or their Estates or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, any investment in any Debtor by any Released Party, the Transactions, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, any benefit provided by a Debtor to any Released Party, cash management arrangements, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, any avoidance actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the decision to File the Chapter 11 Cases, the Wind-Down Process, the Sale Process, the negotiation, formulation, preparation, dissemination, or consummation of the Restructuring Support Agreement, the Transactions, the Credit Agreements, the Disclosure Statement, the Plan Supplement, the Sale Transaction (if applicable), the Plan and related agreements, instruments, and other documents, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Wind Down Process, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Sale Transaction, the Confirmation Order, any Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Sale Transaction, and (ii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained

|  | in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Transactions and implementing the Plan; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release. |
|--|--|

<u>**EXHIBIT C**</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Eddie Bauer LLC and its affiliates and subsidiaries bound thereto and the Consenting Lenders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Lender" and a ["Consenting Term Loan Lender" / "Consenting ABL Lender" / "Consenting Subordinated Loan Lender"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Loan | |
| Term Loan | |
| Subordinated Loan | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## **Exhibit C**

**Evidentiary Support for First Day Motions**[1]

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the applicable First Day Motion.

I.      **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Debtor Bank Accounts, Business Forms, and Books and Records; (II) Authorizing the Debtors to Continue to Perform Intercompany Transactions; (III) Waiving Certain U.S. Trustee Requirements; and (IV) Granting Related Relief (the "Cash Management Motion").**

1.      In the ordinary course of business, the Debtors and their non-Debtor affiliates (the "Non-Debtor Affiliates") maintain and operate a complex cash management system (the "Cash Management System"). As of the Petition Date, the Cash Management System comprises thirty-two bank accounts (such accounts, together with any other bank accounts the Debtors may open in the ordinary course of business, the "Bank Accounts"). Twenty-one of the Bank Accounts are owned by entities incorporated in the United States and are primarily associated with the Debtors' United States operations (the "U.S. Cash Management System"). Eleven of the Bank Accounts are owned by entities incorporated in Canada and are primarily associated with the Debtors' Canadian operations (the "Canadian Cash Management System"). Each of the Bank Accounts is owned either by a Debtor or a Non-Debtor Affiliate and is held at one of six banks in the United States or Canada (such banks, collectively, the "Cash Management Banks"). The Bank Accounts all hold either U.S. dollars or Canadian dollars. As of the Petition Date, the Debtors hold approximately $20.0 million in total cash across Debtor Bank Accounts.

2.      The Cash Management System is critical to the Debtors' operations. The Debtors rely on the Cash Management System to efficiently and effectively collect, transfer, and disburse funds in the ordinary course of business. As such, the predictable flow of funds through the Cash Management System plays a crucial role in facilitating accurate cash monitoring, forecasting, and reporting. In the ordinary course of business, the Debtors' treasury department maintains daily oversight of the Cash Management System and implements controls for accepting, processing, and releasing funds, including in connection with Intercompany Transactions. Likewise, the Debtors'

accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are properly accounted for.

3.      ***The Bank Accounts***.  Thirty-one of the thirty-two Bank Accounts in the Cash Management System are owned and controlled by the Debtors (the "Debtor Bank Accounts").  A single Bank Account is owned by a Non-Debtor Affiliate, SPARC Group LLC.  The Debtors' Cash Management Banks in the United States are JPMorgan Chase Bank, N.A. ("JPM"); PNC Bank, N.A. ("PNC"); Bank of America, N.A. ("BofA"); U.S. Bank, N.A. ("U.S. Bank"); and Wells Fargo Bank, N.A. ("Wells Fargo").  The sole Cash Management Bank in Canada is the Bank of Nova Scotia ("Scotiabank").

4.      ***Ordinary Course Cash Flows***.  Most cash generated by the Debtors' retail operations enters the Cash Management System via the Collection Accounts.  Each of the Collection Accounts collects funds from a distinct revenue source or is associated with a distinct type of transaction.  Of the nine U.S. Collection Accounts, five collect funds from cash transactions in the Debtors' United States brick-and-mortar retail stores (the "U.S. Store Collection Accounts").  Cash is manually transported on a regular basis from each retail store to a nearby branch of one of the five U.S. Cash Management Banks to be deposited in the U.S. Store Collection Accounts.  Once deposited, the funds are then manually transferred periodically from the U.S. Store Collection Accounts to the Concentration Account, a zero-balance account that sweeps all funds to the Main U.S. Operating Account on a continuous basis throughout each business day.  The U.S. Store Collection Accounts typically maintain very low balances because the Debtors' in-store sales are typically processed using payment methods other than cash.

5.      The remaining U.S. Collection Accounts currently collect or historically collected funds from other distinct sources of the Debtors' revenue.  Several of the U.S. Collection Accounts

are zero-balance accounts that sweep to an Operating Account on a continuous basis throughout each business day. Four Canadian Collection Accounts also collect funds from distinct sources of the Debtors' revenue. Each of the Canadian Collection Accounts is a zero-balance account that sweeps to the Canadian Operating Account at the end of each business day. Receipts from in-store sales made in cash or with a credit card other than Visa or Mastercard are deposited directly in the Canadian Operating Account without first passing through a Collection Account.

6.    After entering the Cash Management System via a Collection Account, cash is either moved directly to one of the Main Operating Accounts or pooled in the Concentration Account and then moved to the Main U.S. Operating Account. Once it is within one of the Main Operating Accounts, cash is then moved out of the Cash Management System, either via the Disbursement Accounts or via an Intercompany Transfer. In the ordinary course of business, the Debtors make payments from the Disbursement Accounts to third parties. Each of the Disbursement Accounts is dedicated to facilitating disbursements to specific types of third-party payees. Most of the Disbursement Accounts settle payments to third parties with funds drawn from one of the Main Operating Accounts. Most of the Disbursement Accounts are zero-balance accounts that sweep any funds not disbursed at the end of each business day to the Operating Account from which they draw funds to settle payments.

7.    ***The Payment Processing Fees***. In the ordinary course of business, the Debtors accept payment in several formats, in addition to accepting cash payments at their brick-and-mortar retail locations. To process payments from customers that are not made in cash, the Debtors utilize the payment processing services of several Payment Processors (the "Payment Processing Services"). The Debtors are party to certain agreements with the Payment Processors, pursuant to which the Payment Processors charge the Debtors fees for the Payment Processing Services

(the "Payment Processing Fees").   The Debtors incur approximately $6.5 million in Payment Processing Fees per year.   As of the Petition Date, the Debtors estimate that they owe approximately $500,000 on account of unpaid Payment Processing Fees.   Given that most payments the Debtors receive are not made in cash, the Payment Processing Services are critical to the Debtors' ability to generate revenue.

8.       ***The Transport Fees***.  In the ordinary course of business, the Debtors incur certain fees in connection with the transport of cash generated at the Debtors' brick-and-mortar retail locations (the "Transport Fees").  Specifically, seven Security Providers make regularly scheduled cash pickups at many of the Debtors' retail stores; thereafter, the Security Providers deliver the cash to nearby branches of the Cash Management Banks.   The Debtors incur approximately $265,000 in Transport Fees per year.  As of the Petition Date, the Debtors estimate that they owe approximately $27,000 on account of unpaid Transport Fees.

9.       ***Credit Card Program***.   As part of the Cash Management System, the Debtors provide credit cards administered by PNC to certain employees to pay for various travel and procurement expenses in the ordinary course of business (the "Credit Card Program").   As of the Petition Date, there are nine active cards (the "Credit Cards") associated with the Credit Card Program.  Each Credit Card has a monthly credit limit, which varies based on the specific Credit Card's uses and expected covered expenses.   The Debtors' aggregate spend in 2025 under the Credit Card Program averaged approximately $25,000 per month, but this varies significantly and may be as low as $1,000 in any given month.

10.       ***Compliance with the Bankruptcy Code and Guidelines***.  Five of the Debtors' six Cash Management Banks are Authorized Depositories under the U.S. Trustee Guidelines and hold deposits that are insured by the FDIC.  The Debtors also maintain nine Canadian Bank Accounts

at Scotiabank, a Canadian bank that is not an Authorized Depository under the U.S. Trustee Guidelines. Although not an Authorized Depository, Scotiabank is well-capitalized, financially stable, and widely recognized to be a reputable banking institution. The principal basis for excluding Scotiabank from the U.S. Trustee Guidelines is that Scotiabank is a Canadian financial institution, not that Scotiabank is considered financially unsound. The Debtors keep only those funds in the Canadian Bank Accounts that are required to meet weekly operating expenses that must be paid in Canadian dollars. Any excess funds held in the Canadian Bank Accounts are manually moved to a U.S. Operating Account on a weekly basis. This process keeps balances in the Canadian Bank Accounts from week to week as low as possible and significantly reduces any potential risk of allowing the Debtors to maintain the Canadian Bank Accounts at Scotiabank. The Canadian Bank Accounts are necessary to support the Debtors' operations in the Canadian market, including by facilitating disbursements to and receipts from local vendors and customers.

11.      ***Compliance with U.S. Trustee Guidelines as to Business Forms and Books and Records***. As part of the Cash Management System, the Debtors use a variety of preprinted businesses forms (including letterhead, correspondence forms, invoices, and other business forms) in the ordinary course of business (collectively, and as they may be modified from time to time, the "Business Forms"). The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records"). To avoid disruption to the Cash Management System and incurrence of unnecessary expenses, the Debtors request authorization to continue using the Business Forms and Books and Records, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.

12.    ***Intercompany Transactions***.  In the ordinary course of business, the Debtors engage in routine cash and non-cash transfers, both with one another and with certain Non-Debtor Affiliates (the "Intercompany Transactions").  All Intercompany Transactions are conducted via manual account transfers among certain of the Collections and Operating Accounts and are recorded as intercompany receivables and payables (the "Intercompany Balances").  There are three primary types of Intercompany Transactions:

13.    ***First***, in the ordinary course of business, Debtors Eddie Bauer Gift Card Services LLC and Eddie Bauer LLC engage in Intercompany Transactions (the "Gift Card Intercompany Transfers") related to the Debtors' gift card program.  As discussed in greater detail in the Customer Programs Motion, the Debtors allow their customers to purchase prepaid, non-expiring gift cards in various denominations ranging from $10 to $500.  Receipts from such sales are collected in the BofA account ending in 5746 owned by Debtor Eddie Bauer Gift Card Services LLC.  On a periodic basis, the funds collected in such account are manually transferred to the Main U.S. Operating Account owned by Debtor Eddie Bauer LLC when the funds therein meet a certain threshold.  The Debtors possess records of all Gift Card Intercompany Transfers made since 2021.

14.    ***Second***, in the ordinary course of business, Debtors Eddie Bauer LLC and Eddie Bauer of Canada Corporation engage in Intercompany Transactions (the "U.S.-Canada Intercompany Transfers") to, among other things, ensure that the Debtors' Canadian funding needs are adequately met and ensure that the Debtors' Canadian operations continue uninterrupted.  The U.S.-Canada Intercompany Transfers take three forms.  Eddie Bauer LLC pays certain of Eddie Bauer of Canada Corporation's ordinary course expenses that must be made in U.S. dollars, such as payments to various vendors and suppliers.  Eddie Bauer LLC also engages in Intercompany Transfers with Eddie Bauer of Canada Corporation to ensure Eddie Bauer of Canada Corporation

has sufficient funds to satisfy payments to third parties that are regularly made in Canadian dollars. Lastly, Eddie Bauer LLC historically acquired substantially all inventory that the Debtors sell in both the United States and in Canada. The Debtors possess records of all inventory transfers since 2021. Except for the stocking of Eddie Bauer of Canada Corporation's inventory by Eddie Bauer LLC, the Debtors will continue to make U.S.-Canada Intercompany Transfers postpetition to ensure Eddie Bauer of Canada Corporation remains adequately funded.

15.     **Third**, since 2021, in the ordinary course of business, the Debtors have participated in a shared services arrangement with their intermediate parent, SPARC Group Holdings LLC, as well as with non-Debtor affiliates SPARC Group Holdings and Catalyst Brands LLC (collectively with certain of their other non-Debtor affiliates "SPARC"). As part of the shared services arrangement, SPARC has historically (a) paid certain of the Debtors' expenses directly on the Debtors' behalf; (b) transferred funds to the Debtors on a weekly basis to finance certain of the Debtors' expenses ((a) and (b) together, the "Covered Expenses"); and (c) provided the Debtors certain management and administrative services (the "SPARC Management Services"). Historically, the Debtors have paid SPARC a monthly management fee that compensates SPARC for the portion of their time that SPARC executives and other employees spend providing the SPARC Management Services (such fee, the "SPARC Management Fee"). Additionally, in the ordinary course of business, the Debtors, after paying expenses made directly to vendors and other third parties, manually transfer excess funds generated by their operations, if any, to SPARC on a monthly basis via an Intercompany Transfer between the PNC account ending in 3604 maintained by Debtor Eddie Bauer LLC and the PNC account ending in 2524 maintained by Non-Debtor Affiliate SPARC Group Holdings LLC (such transfers, the "SPARC Transfers," and together with

the Gift Card Intercompany Transfers and the U.S.-Canada Intercompany Transfers, the "Intercompany Transfers").

16.    The Intercompany Transactions, including the Gift Card Intercompany Transfers, the U.S.-Canada Intercompany Transfers, and the SPARC Intercompany Transfers, are an essential component of the Debtors' operations and centralized Cash Management System. By facilitating timely payment of key Debtor expenses, including, but not limited to, payroll expenses and payments made to suppliers of merchandise, the Intercompany Transactions enable the Debtors to fulfill their obligations to critical third parties.

II.    **Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Stretto, Inc. as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief (the "Stretto 156(c) Retention Application").**

17.    Although the Debtors have not yet filed their schedules of assets and liabilities and statements of financial affairs, they anticipate that there will be thousands of entities that will need to be noticed. Due to the size of these chapter 11 cases, the appointment of a claims and noticing agent is necessary and in the best interests of the Debtors, their estates and creditors, and all parties in interest.

III.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

18.    In the ordinary course of business, the Debtors incur, collect, and withhold various taxes and fees as a result of their operations in the United States and Canada, including, among others: (a) foreign income taxes; (b) sales and use taxes; (c) goods and services taxes; (d) franchise taxes; (e) property taxes; (f) customs duties fees; and (g) regulatory and other taxes, penalties, interests, assessments, and fees, including fees charged by Tax Service Providers ((a) through (g), collectively, the "Taxes and Fees"). The Debtors directly or indirectly remit, as applicable, the Taxes and Fees to various federal, state, local, and governmental units (as that term is defined in

section 101(27) of the Bankruptcy Code), including various taxing and licensing authorities (each, an "<u>Authority</u>" and collectively, the "<u>Authorities</u>") on a periodic basis (e.g., monthly, quarterly, or annually, as applicable).

19.      Non-Debtor affiliates SPARC Group Holdings and Catalyst Brands LLC (collectively with certain of their other non-Debtor affiliates "<u>SPARC</u>") perform certain administrative functions on behalf of the Debtors, including, among others, managing the calculation and ultimate payment of the vast majority of the Taxes and Fees that the Debtors owe to various federal, state, and local governments.[2]  In these scenarios, in the ordinary course of business, SPARC pays the applicable Taxes and Fees directly.  Any charges related to such Taxes and Fees are booked as an intercompany payable in favor of SPARC and increase the SPARC Intercompany Payable.  In other instances (such as in the case of certain state franchise taxes), the Debtors remit the Taxes and Fees directly to the applicable Authority.  By relieving the Debtors of a substantial portion of the burden of ensuring that they remain in compliance with the myriad of state, local, and federal taxing regimes to which the Debtors are subject, SPARC has allowed the Debtors to focus more closely on serving their customers.

20.      The Debtors, either directly or through SPARC, generally pay and remit the Taxes and Fees through checks, electronic fund disbursements, and certain third-party tax service providers, including, among others, Kroll, LLC ("<u>Kroll</u>"), Ryan, LLC ("<u>Ryan</u>"), RSM Canada LLP ("<u>RSM</u>"), and Corporation Service Company ("<u>CSC</u>," and together with Kroll, Ryan, and RSM, the "<u>Tax Service Providers</u>," and each a "<u>Tax Service Provider</u>"), on a periodic basis, as required by applicable laws and regulations.  From time to time, the Debtors may also

---

[2]      In some instances, the Taxes and Fees are assessed on the SPARC enterprise as a whole, and SPARC charges the Debtors for their portion of such Taxes and Fees by booking an intercompany payable that increases the SPARC Intercompany Payable.

receive tax credits for overpayments or refunds with respect to certain of the Taxes and Fees.  In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

21.    Furthermore, the Debtors, either directly or through SPARC, are subject to, or may become subject to, audit investigations on account of tax returns and/or tax obligations in respect of prior years ("Audits") during these chapter 11 cases.  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors, either directly or through SPARC (such additional Taxes and Fees, the "Assessments").[3]  Critically, in certain of the jurisdictions where the Debtors operate, the Debtors must be able to accept a proposed resolution of an Audit and make a payment with respect to such resolution in a timely manner.

22.    The Debtors estimate that they owe approximately $7.0 million on account of the Taxes and Fees as of the Petition Date, none of which they believe to be past due.

23.    Any failure to pay the Taxes and Fees (whether directly or through SPARC) could materially disrupt the Debtors' business operations in several ways, including that:  (a) in certain circumstances, the Debtors could lose their ability to conduct business in the applicable jurisdictions; (b) in the event of failure to pay Customs Duties, the Debtors' customs brokers may, in some instances, assert shippers' and warehousemens' liens against the imported and exported goods, the U.S. Customs Service may assert a lien against such goods under 19 C.F.R. § 141.1(d) (2026), and non-U.S. customs Authorities may assert similar liens or take other action against the Debtors in their respective jurisdictions; (c) the Authorities may seek to recover unpaid Taxes and Fees directly from the Debtors' directors, officers, or employees, thereby distracting such key

---

[3]    Nothing in the Taxes Motion, or any related order, constitutes or should be construed as an admission of liability by the Debtors with respect to any Audit or Assessment.  The Debtors expressly reserve all rights with respect to any Audit and the right to contest any Assessments claimed to be due as a result of any Audit.

personnel from the administration of these chapter 11 cases; (d) nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code, which could result in the Authorities assessing fees, interest, and penalties against the Debtors; and (e) the Debtors may have increased tax liability if interest and penalties accrue on the unpaid Taxes and Fees, which amounts may also be entitled to priority treatment.  Finally, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and such funds may not constitute property of the Debtors' estates.

24.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I submit that the Taxes Motion should be approved.

**IV.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage and the Surety Standby Letter of Credit Entered into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance, Surety Coverage, and Letters of Credit; and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

25.     ***The Insurance Policies and Related Payment Obligations.***  In the ordinary course of business, the Debtors, either directly or through non-Debtor affiliate Catalyst Brands LLC or certain of their non-debtor affiliates (together with SPARG Group Holdings LLC and certain of their non-debtor affiliates, "<u>SPARC</u>") maintain approximately sixty-three insurance policies (collectively, the "<u>Insurance Policies</u>") administered by various third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>").  Generally, the Insurance Policies fall into the following categories:  automotive, cyber, crime, employment practices, ocean cargo, production, property (including earthquake), general and excess liability, directors' and officers' liability, workers' compensation, and umbrella liability.

26.    As described in greater detail in the First Day Declaration and in the Cash Management Motion, SPARC performs certain administrative functions on behalf of the Debtors, including, among others, managing the Insurance Policies.  Most of the Insurance Policies are held by non-Debtor affiliates Penney Holdings LLC or Copper Retail JV LLC as the primary insured.  In each case, the Debtors, as indirect subsidiaries of the primary insured entities, are covered under the applicable Insurance Policies.  Debtor Eddie Bauer of Canada Corporation, on the other hand, directly maintains two Insurance Policies.

27.    With the exception of the Insurance Policies that Debtor Eddie Bauer of Canada Corporation pays for directly, SPARC makes all payments for the Insurance Policies, including any charges related to premiums, deductibles, self-insured retention fees, and insurance broker fees.  As a result of such payments and others that SPARC makes on the Debtors' behalf, in the ordinary course of business, the Debtors have historically accrued the SPARC Intercompany Payable, which represents the difference between the Debtors' accrued obligations to SPARC on account of the Covered Expenses and the SPARC Management Fee (each as defined in the Cash Management Motion) and the aggregate funds they have transferred to SPARC.  Any charges related to the Debtor's proportional share of the Insurance Policies, as calculated by SPARC based on the amount of the Insurance Policy coverage attributed to the Debtors, are booked as an intercompany payable in favor of SPARC and increase the SPARC Intercompany Payable (as defined in the Cash Management Motion), which accrues monthly.  By relieving the Debtors of a significant portion of the burden of administering a highly complex insurance program, SPARC has allowed the Debtors to focus more closely on serving their customers.

28.    The Insurance Policies are generally one-year policies that renew annually.  A schedule of the Insurance Policies is attached as Exhibit C to the Insurance Motion.  The Debtors,

either directly or through SPARC, as applicable, have selected policy specifications and insured limits that they believe to be appropriate given the relative risk of loss, the cost of the coverage, and industry practice.  In the opinion of the Debtors' management, they maintain adequate insurance with limits and coverages that they believe to be commercially reasonable.

29.     The Debtors' ability to, either directly or through SPARC, as applicable, maintain the Insurance Policies, to renew, supplement, and modify the same as needed, and to obtain new insurance coverage and satisfy corresponding premium payments in the ordinary course of business is essential to preserving the value of the Debtors' business, operations, and assets. Furthermore, maintaining such coverage is not entirely optional: in many instances, insurance coverage is required by the statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the Bankruptcy Code and the *Region 3 Operating Guidelines for Chapter 11 Cases* (the "U.S. Trustee Guidelines") published by the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") require, among other things, that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  *See* 11 U.S.C. § 1112(b)(4)(C) and U.S. Trustee Guidelines § 3.  It is therefore critical that the Debtors maintain appropriate insurance coverage at all times.

30.     Historically, the Debtors have incurred liabilities of approximately $2.4 million per year on account of the Insurance Policies, including premiums and all other related fees.  As of the Petition Date, the Debtors estimate that they owe approximately $200,000 on account of the Insurance Policies, including the Debtors' proportionate share of any premiums, deductibles, self-insured retention fees, and insurance broker fees.  The Debtors request authority to maintain the existing Insurance Policies, including, without limitation to:  (a) pay, either directly or through SPARC, all outstanding prepetition amounts owed on account of the Insurance Policies in cash as

they become due and payable and to continue making such payments in the ordinary course of the Debtors' business; (b) renew, supplement, or modify the Insurance Policies as needed; and (c) enter into new insurance policies in the ordinary course of business to ensure uninterrupted coverage.

31.     ***The Surety Bonds and Related Payment Obligations***.  In the ordinary course of business, the Debtors are required to maintain various surety bonds (each, a "Surety Bond" and, collectively, the "Surety Bonds") that allow the Debtors to conduct core aspects of their business, guarantee their ability to perform certain actions, and secure their performance obligations (the "Surety Bond Program").  Unlike the Insurance Policies, the Debtors pay for the Surety Bonds directly, while SPARC procures and maintains the Surety Bond Program on the Debtors' behalf. As of the Petition Date, the Debtors, either directly or through SPARC, maintain approximately twenty-one Surety Bonds in an aggregate bond amount of approximately $10.9 million.  The Surety Bonds primarily guarantee the Debtors' performance with respect to certain utilities, customs, and sales tax obligations.

32.     For example, the Debtors must maintain bonds to assure the United States Customs and Border Protection ("U.S. Customs") that they will be able to pay any applicable duties, taxes, and fees that arise on account of the Debtors' import activity.[4]  Failure to provide, maintain, or timely replace the Surety Bonds may result in violations of federal law.  In addition, in the ordinary course of business, the Debtors often post utility bonds to guarantee their obligations to certain utility providers that service the Debtors' brick-and-mortar retail footprint.  Failure to post such utility surety bonds could jeopardize the Debtors' relationship with certain of their utility

---

[4]     *See* 19 U.S.C. § 1623; 19; C.F.R. pt. 113 (2026).

providers, which would be detrimental to the aims of these chapter 11 cases.  A schedule of the Surety Bonds that the Debtors currently maintain is attached as <u>Exhibit D</u> to the Insurance Motion.

33.    Historically, the Debtors have spent approximately $115,000 per year on account of the Surety Bond Program.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Surety Bond Program.  Nonetheless, out of an abundance of caution, the Debtors request authority, but not direction, to, either directly or through SPARC, maintain the existing Surety Bond Program, including, without limitation, to: (a) pay all outstanding prepetition amounts owed on account of the Surety Bond Program as they become due and payable and to continue making such payments in the ordinary course of the Debtors' business; (b) renew, supplement, cancel, or modify the Surety Bonds as needed, and to enter into new surety bonds; and (c) provide collateral in the form of cash collateral supporting the Surety Standby Letter of Credit and otherwise comply with collateral and indemnity requirements, in each case in the ordinary course of business.

34.    The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to a surety.  Unlike an insurance policy, if a surety incurs a loss on a surety bond, it is generally entitled to recover the full amount of that loss from the principal (*i.e.*, the Debtors).  Here, however, the Surety Bonds are supported by a fully cash-collateralized standby letter of credit (the "<u>Surety Standby Letter of Credit</u>") with Wells Fargo Bank, National Association as the fronting bank, and the Debtors' surety providers, Liberty Mutual Insurance Co., Zurich Insurance Company Ltd., Trisura Guarantee Insurance Company, Fidelity and Deposit Company of Maryland, and Nationwide Mutual Insurance Company (the "<u>Surety Providers</u>"), as the beneficiaries.  Any draw by the surety with respect to a surety loss would be satisfied from the cash collateral backing the Surety Standby Letter of Credit, rather than giving rise to a

16

reimbursement claim against the Debtors.  The Surety Standby Letter of Credit serves as a backstop to the approximately $10.4 million in total outstanding Surety Bonds.

**V.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants; (II) Granting Administrative Expense Priority to Undisputed Obligations on Account of Outstanding Orders; and (III) Granting Related Relief (the "<u>Critical Vendors Motion</u>").**

35.      ***Critical Vendor Claims.***  The Debtors operate in the highly competitive retail industry.  The Debtors' ability to continue generating revenue —and ultimately, the success of these chapter 11 cases—is dependent entirely on their ability to sell merchandise at their brick-and-mortar retail locations.  In the ordinary course of business, the Debtors engage a limited number of vendors that provide critical services, without which the Debtors would be unable to effectively sell their high-quality products to customers.  Such vendors provide, among other things, information management support at the Debtors' stores, risk management solutions, and store maintenance services (such vendors, collectively, the "<u>Critical Vendors</u>," and the claims held by the Critical Vendors, the "<u>Critical Vendor Claims</u>").  More specifically, the Debtors operate hundreds of stores that rely on the services provided by the Critical Vendors in order to remain operationally efficient, secure, and well-maintained.  Such vendors support the operation of the Debtors' stores by enabling the functioning of point-of-sale systems, inventory management, regulatory compliance, and basic store maintenance services to ensure that physical retail locations remain safe and operational.  Without such services, the Debtors would face significant disruptions in their ability to provide their products to customers, which would immediately and irreparably harm the Debtors' business.  The Debtors, therefore, must be able to maintain these critical services, and timely payment to the Critical Vendors is fundamental the Debtors' ability to preserve the value of their estates and to ensure a seamless transition into chapter 11.

36.     As of the Petition Date, the Debtors estimate that they owe approximately $2.5 million on account of Critical Vendor Claims, all of which is due or will become due during the Interim Period.  The Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Critical Vendor Claims and to continue to make all payments on a postpetition basis in the ordinary course of business, in each case to the extent that the Debtors determine, in their business judgment, that such payment is beneficial to the Debtors' estates.

37.     ***The Foreign Vendor Claims.***  The continual operation of the Debtors' business entails transacting with certain foreign vendors (collectively, the "<u>Foreign Vendors</u>," and the claims held by the Foreign Vendors, the "<u>Foreign Vendor Claims</u>").  The Debtors are known for their broad assortment of merchandise, much of which is obtained from vendors all over the world and the Foreign Vendors primarily provide the Debtors' with the merchandise that is necessary for maintaining appropriate inventory levels.  Without the continued support of these Foreign Vendors, the Debtors would face significant disruptions in their global supply chain.

38.     Based on the reactions of foreign suppliers in other chapter 11 cases, the Debtors believe there is a significant risk that some or all of the Foreign Vendors may stop shipping the highly-specialized merchandise that the Debtors need in order to stock their retail locations on a timely basis or, worse, may completely sever their business relationships with the Debtors if they do not receive timely payment.  Foreign suppliers and vendors located in foreign countries are often unfamiliar with the chapter 11 process, frequently react skeptically to various debtor protections, and may consider themselves beyond the jurisdiction of the Court and the automatic stay provisions of section 362(a) of the Bankruptcy Code.  Upon nonpayment of certain Foreign

Vendor Claims, Foreign Vendors may take other harmful actions short of severing their relations with the Debtors, including refusing to supply goods or services.

39.     Further, although the automatic stay applies to protect the Debtors' assets wherever they are located in the world, attempting to enforce the Bankruptcy Code in foreign countries is often a difficult, even fruitless, exercise.  In the absence of enforcement of the automatic stay, the Foreign Vendors could initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them or seek to attach or seize foreign assets of the Debtors or their non-Debtor affiliates even prior to obtaining a judgment.  It would be unduly time consuming and burdensome for the Debtors to seek to enforce an order of the Court in a Foreign Vendor's country in many instances, thereby compounding the loss and disruption in services.  As with any company, receiving critical products in a timely and cost-effective manner is critical to the Debtors' business.

40.     As of the Petition Date, the Debtors estimate that they owe approximately $1.0 million on account of the Foreign Vendor Claims, all of which is due or will become due during the Interim Period.  Accordingly, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Foreign Vendor Claims and to continue to make all payments on a postpetition basis in the ordinary course of business, in each case to the extent that the Debtors determine, in their business judgment, that such payment is beneficial to the Debtors' estates.

41.     ***The 503(b)(9) Claims.***  In addition, a portion of the Trade Claims includes claims entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code, which grants administrative expense priority to claims for certain inventory, goods, and/or materials received by the Debtors within the twenty days immediately preceding the Petition Date.    11

U.S.C. § 503(b)(9).  In the ordinary course of business, the Debtors may have received inventory and other goods from certain vendors within this twenty-day period (collectively, the "503(b)(9) Claimants"), thereby giving rise to prepetition claims of the 503(b)(9) Claimants (the "503(b)(9) Claims").

42.     Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts or supply agreements.  Rather, the Debtors obtain goods from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders if the Debtors do not timely pay the 503(b)(9) Claims.  Such refusal would negatively affect the Debtors' estates and would be highly disruptive to the Debtors' chapter 11 process.  The Debtors also believe that certain 503(b)(9) Claimants, if not timely paid, could demand payment in cash on delivery, which could put unnecessary strain on the Debtors' liquidity.  Addressing these demands would be both time-consuming and value-destructive, especially since 503(b)(9) Claims are already expected to be paid in full as administrative expenses.  As of the Petition Date, the Debtors estimate that they owe approximately $3.0 million on account of the 503(b)(9) Claims, all of which is due or will become due during the Interim Period and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

43.     For the foregoing reasons, the Debtors request authority, but not direction, to pay the undisputed 503(b)(9) Claims, as and when they come due.  Importantly, the Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims.  Rather, the Debtors will pay the 503(b)(9) Claims as they come due in the ordinary course of business, provided that such claimants make commercially reasonable efforts to maintain or restore Customary Trade Terms.

44.     ***The Lien Claims.***  The Debtors' business depends on the uninterrupted flow of inventory and other goods through their supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' inventory and merchandise.  The Debtors rely on a number of third-party warehousemen (collectively, the "Warehousemen") to provide warehousing and inventory as well as on various freight vendors, ocean carriers, truckers, common or contract carriers, customs brokers, and other shipping services providers (collectively, the "Shippers," and together with the Warehousemen, the "Lien Claimants") for the receipt, distribution, and delivery of their merchandise that the Debtors sell in their stores.  The Debtors' continued relationship with the Lien Claimants is essential to maximizing the value of their estates—the Debtors simply cannot afford any meaningful disruption to the flow of their merchandise at this critical juncture in these chapter 11 cases.

45.     In particular, the Lien Claimants provide the Debtors with crucial logistics services, including storage, handling, and distribution of large quantities of the Debtors' products and inventory.  Given the Debtors' need to supply hundreds of brick-and-mortar retail locations with a consistent stream of inventory, the Debtors must order and securely store substantial amounts of merchandise on hand for distribution.  Until such inventory can be directed to the retail locations where it is needed, it must be received, inventoried, and stored in warehouses.  Once an inventory need emerges at a given retail location, or an order is placed, the applicable products and/or merchandise must be selected from a warehouse, packaged, and shipped to the applicable location.

46.     Under the laws of most states, the Lien Claimants will, in certain circumstances, have a lien on goods in their possession that secures the charges or expenses [5] incurred in

---

[5]     For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and

connection with the transportation of goods (the "Lien Claims").  If the Lien Claims are not satisfied, the Lien Claimants may refuse to release the Debtors' property, thereby disrupting the Debtors' operations and ability to sell their merchandise.  Moreover, the value of the assets in the possession of the Lien Claimants generally exceeds the cost of paying the associated Lien Claims. The Debtors' ability to maintain access to their merchandise and products stored and shipped by third parties is therefore critical to the success of these chapter 11 cases.

47.    As of the Petition Date, the Debtors estimate that they owe approximately $12.0 million on account of the Lien Claims, $7.0 million of which is due or will become due during the Interim Period.  Accordingly, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Lien Claims to the extent that the Debtors determine, in their business judgment, that such payment is beneficial to the Debtors' estates.  The Debtors intend to pay only those undisputed and valid prepetition Lien Claims that are necessary and critical to enhance the value of their estates and only where they believe, in their business judgment, that the benefits to their estates will exceed the costs of satisfying the Lien Claims, including the expenses and delay of contesting asserted liens, to their estates.

48.    ***Outstanding Orders.***  Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  In the mistaken belief that they would be general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the

---

for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  U.C.C. § 7-307(a) (2003).

Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders.

## VI.    Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").

49.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration will also allow the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") and all parties-in-interest to monitor these chapter 11 cases with greater ease and efficiency.

## VII.    Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, (IV) Authorizing Fee Payments to the Utility Agent, and (V) Granting Related Relief (the "Utilities Motion").

50.    The Debtors operate hundreds of retail locations across the United States and Canada, as well as four distribution centers and one corporate office.  At such locations, in the ordinary course of business, the Debtors obtain, either directly or indirectly through their landlords, electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash disposal), internet, and other similar services (collectively, the "Utility Services") from a number of utility providers or brokers (each, a "Utility Provider" and, collectively, the "Utility Providers").

51.    The Debtors pay certain of the Utility Providers with the assistance of various utility service aggregators, including, Capturis, LLC ("Capturis") and Waste Harmonics, LLC

("<u>Waste Harmonics</u>" and together with Capturis, the "<u>Utility Agents</u>").  In exchange for these services, the Debtors pay the Utility Agents monthly fees in the ordinary course of business (the "<u>Utility Agent Fees</u>").

52.    In addition, the Debtors pay many of the Utility Providers indirectly pursuant to the terms of the Debtors' real property leases.  In such instances, Utility Services are billed directly to the Debtors' landlords and "passed through" to the Debtors as part of the Debtors' rent or operating expense payments.  While the relief the Debtors seek in the Utilities Motion does not allocate any specific amounts toward Utility Providers that indirectly supply Utility Services through the Debtors' landlords, the Debtors, out of an abundance of caution, request authority to continue paying such Utility Services indirectly through their landlords in the ordinary course of business.

53.    Historically, the Debtors have spent approximately $6.0 million per year on account of the Utility Services, including amounts paid through the Utility Agents but excluding Utility Services that are billed directly to the Debtors' landlords.

54.    To provide additional assurance of future payment, the Debtors propose to deposit approximately $202,000 (the "<u>Adequate Assurance Deposit</u>") into a segregated, interest-bearing bank account.  The Debtors have also provided certain of the Utility Providers with prepetition cash deposits, letters of credit, prepayments, surety bonds, and other forms of security, as applicable (collectively, the "<u>Prepetition Deposits</u>").  As of the Petition Date, the Debtors estimate that the aggregate amount currently held as Prepetition Deposits for all Utility Providers is approximately $52,700.  The Debtors propose to maintain the Adequate Assurance Account with a balance equal to approximately one-half of the Debtors' historical monthly cost of Utility Services from the Utility Providers, which may be adjusted by the Debtors to account for the

termination of Utility Services by the Debtors or other arrangements with individual Utility Providers with respect to adequate assurance of payment.

55.      Additionally, the Debtors seek approval of their proposed adequate assurance procedures, which set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance while at the same time allowing the Debtors to continue their business operations uninterrupted.

56.      The Debtors would not be able to maintain ordinary course operations without uninterrupted access to the Utility Services.  Without uninterrupted access to electricity, internet, heat, water, waste management, and the other Utility Services at their stores and other business locations, the Debtors would be unable to conduct going out of business sales, continue to sell products at stores that may be included in a going-concern sale, or continue to carry out critical corporate functions.  Should any Utility Provider refuse or discontinue service, the Debtors' ability to maximize the value of their estates for the benefit of all stakeholders would be severely disrupted.  Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

**VIII.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

57.      The Debtors seek authority to pay the following aggregate prepetition amounts on account of the Employee Compensation and Benefits:

| RELIEF SOUGHT | AMOUNT REQUESTED[6] |
|---|---|
| Wage Obligations | $6,025,000 |
| Withholding Obligations | $554,000 |
| Reimbursable Expenses | $20,000 |
| Health and Welfare Plans and Benefits | $626,000 |
| Workers' Compensation Programs | $35,000 |
| Retirement Plans | $1,215,000 |
| Paid Leave Benefits | $395,000 |
| Non-Insider Severance Programs | $0 |
| Non-Employee Board Member Compensation (Final Order Only) | $0 |
| Additional Benefits Programs | $0 |
| Payroll Processor Obligations | $30,000 |
| **TOTAL** | **$8,895,000** |

58.     As of the Petition Date, the Debtors' workforce is comprised of approximately 2.200 employees, almost all of whom are located in the United States and Canada.  Approximately 500 of the Debtors' employees are full-time, and approximately 1,400 are part time.  The Debtors also employ as many as 300 or more seasonal temporary employees from time to time, mostly during the holiday season (the "Temporary Employees").  Approximately 1,600 full- and part-time employees are located in the United States (the "U.S. Employees"), and approximately 300 full- and part-time employees are located in Canada (the "Canadian Employees," and together with the U.S. Employees and the Temporary Employees, the "Employees").  Approximately seventy Employees serve in various corporate roles for the Debtors (such Employees, the "Corporate Employees"), while the remainder primarily work in the Debtors' brick-and-mortar retail locations

---

[6]     Unless otherwise stated, all monetary amounts that are denominated in Canadian dollars ("CAD") have been converted to the United States dollars ("USD") at an exchange rate of .7376 CAD to 1.00 USD in accordance with the Federal Reserve Economic Data, https://fred.stlouisfed.org/series/DEXCAUS (retrieved on February 4, 2026).

(such Employees, the "Retail Employees").  None of the Employees are represented by a union or employed pursuant to a collective bargaining agreement.

59.    ***Wage Obligations***.  In the ordinary course of business, the Debtors incur obligations on account of the Employee Compensation, the Independent Contractors, and the Store Performance Bonus Program (collectively, the "Wage Obligations").  Historically, the Debtors have incurred liabilities of approximately $70 million per year on account of the Wage Obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $6.0 million on account of the Wage Obligations.

60.    Any loss of Wage Obligations would result in substantial financial hardship to the Employees and the Independent Contractors and could lead to significant attrition.  Considering the indispensable value the Employees and the Independent Contractors provide to the Debtors' estates and the cost attendant to filling sudden vacancies, it is critical that the Debtors maintain their workforce during the pendency of these chapter 11 cases.

61.    ***Employee Compensation***.  In the ordinary course of business, the Debtors incur payment obligations on account of Employees' wages, overtime, and similar obligations (the "Employee Compensation").  With respect to U.S. Employees, SPARC remits Employee Compensation directly to such Employees on the Debtors' behalf.  Thereafter, in the ordinary course of business, the Debtors record an intercompany payable in favor of SPARC that increases the SPARC Intercompany Payable on account of such amounts.  In addition, approximately three U.S. Employees perform various corporate services for the Debtors as well as other SPARC brands.  For such Employees, SPARC charges the Debtors via the SPARC Intercompany Payable for the portion of each such Employee's biweekly compensation that corresponds to the amount of time such Employee spends servicing the Debtors' operations.  Finally, with respect to the

Canadian Employees, the Debtors pay such Employees directly via direct deposit, other electronic means, or checks on a biweekly basis. All base Employee Compensation accrues on a salaried or hourly basis.

62. Historically, the Debtors have incurred liabilities of approximately $61 million and $6.2 million per year on account of Employee Compensation for the U.S. Employees and the Canadian Employees, respectively. As of the Petition Date, the Debtors estimate that they owe approximately $5.6 million on account of Employee Compensation.

63. ***Independent Contractors***. In the ordinary course of business, the Debtors partner with Independent Contractors who provide critical design, planning, product and sourcing, and merchandising services. The Debtors incur payment obligations to the Independent Contractors for their services and pay the Independent Contractors or their respective staffing agency, as applicable, through the Debtors' standard procurement and payment system following submission of documented and supported invoices. Continuing to pay the Independent Contractors is critical for the Debtors to maintain and administer their estates during these chapter 11 cases.

64. The amount and frequency of payments made on account of the Independent Contractors depends on the type of services they provide, but historically, the Debtors have incurred liabilities of approximately $650,000 per year on account of the Independent Contractors. As of the Petition Date, the Debtors estimate that they owe approximately $330,000 on account of the Independent Contractors.

65. ***The Store Performance Bonus Program.*** In the ordinary course of business, the Debtors offer store managers, assistant managers, and supervisors the opportunity to receive bonus payments to incentivize individual store performance (the "Store Performance Bonus Program"). In general, such bonus amounts are based on the achievement of objective sales and payroll metrics

that are established each month by the Debtors' leadership team.  Each store has different sales and payroll metrics that are set in accordance with Company-wide financial targets and business goals.  In order to participate in the Store Performance Bonus Program, eligible Employees must, among other things, meet certain set hours requirements during the applicable month.  For example, store managers must work at least 160 hours in a four-week month in order to be eligible for a bonus under the Store Performance Bonus Program for that month, subject to certain exceptions.  Payments on account of the Store Performance Bonus Program are generally paid on a two-month delay.  For example, amounts paid pursuant to the Store Performance Bonus Program for January 2026 would typically not be paid until March 2026.

66.    With respect to U.S. Employees, SPARC remits any amounts earned under the Store Performance Bonus Program directly to such Employees on the Debtors' behalf.  Thereafter, in the ordinary course of business, the Debtors record an intercompany payable in favor of SPARC that increases the SPARC Intercompany Payable on account of such amounts.  With respect to the Canadian Employees, the Debtors pay such Employees any amounts earned under the Store Performance Bonus Program directly via direct deposit, other electronic means, or checks on a biweekly basis.

67.    Historically, the Debtors have incurred liabilities of approximately $1.2 million per year on account of the Store Performance Bonus Program.  As of the Petition Date, the Debtors estimate that they owe approximately $95,000 on account of Store Performance Bonus Program.  For the avoidance of doubt, the relief sought with respect to the Store Performance Bonus Program does not include payment to any "insider" (as such term is defined in section 101(31) of the Bankruptcy Code).

68.    **_Withholding Obligations_**.  In the ordinary course of business, the Debtors incur

obligations on account of Payroll Deductions and Employer Payroll Taxes (collectively,

the "Withholding Obligations").  With respect to the U.S. Employees, SPARC coordinates all

Payroll Deductions and Employer Payroll Taxes on the Debtors' behalf and remits such amounts

to the applicable authorities.  Thereafter, in the ordinary course of business, the Debtors record an

intercompany payable in favor of SPARC that increases the SPARC Intercompany Payable on

account of such amounts.  With respect to the Canadian Employees, the Debtors directly withhold

and remit funds on account of various federal, provincial, and local taxes as well as income taxes,

employee benefits elections and garnishments, and employer taxes under the laws of Canada.

69.    Historically, the Debtors have incurred liabilities of approximately $8.5 million and

$510,000 per year on account of the Withholding Obligations for the U.S. Employees and the

Canadian Employees, respectively.  As of the Petition Date, the Debtors estimate that they owe

approximately $554,000 on account of the Withholding Obligations.

70.    **_Deduction Obligations_**.  In the ordinary course of business, during each applicable

payroll period, the Debtors, through SPARC, routinely deduct certain amounts from U.S.

Employees' paychecks, including garnishments and similar deductions, as well as other pre-tax

and after tax deductions payable pursuant to certain employee benefit plans discussed in the Wages

Motion.  Such deductions include an Employee's share of healthcare benefits and insurance

premiums, 401(k) contributions, legally ordered deductions, and miscellaneous deductions (the

"U.S. Deductions").  In Canada, the Debtors routinely deduct certain amounts from Canadian

Employees' paychecks, including garnishments and similar deductions, as well as other pre-tax

and after-tax deductions payable pursuant to certain benefit plans discussed in the Wages Motion,

such as an Employee's share of healthcare benefits and insurance premiums, retirement

30

contributions, and miscellaneous deductions (the "Canadian Deductions," and, together with the U.S. Deductions, the "Payroll Deductions").

71.    Historically, the Debtors have withheld and remitted, either directly or through SPARC, as applicable, approximately $3.2 million and $89,000 per year on account of the U.S. Deductions and the Canadian Deductions, respectively.  As of the Petition Date, the Debtors estimate that they owe approximately $84,000 on account of withheld but not yet remitted Payroll Deductions.

72.    ***Employer Payroll Taxes***.  In the ordinary course of business, the Debtors incur obligations on account of employee payroll taxes that are typically based on a percentage of gross payroll, as well as additional amounts for federal and state unemployment insurance, Social Security and Medicare taxes, and other foreign social insurance contributions (the "Employer Payroll Taxes").  With respect to the U.S. Employees, SPARC processes and forwards the applicable Employer Payroll Taxes on the Debtors' behalf to the appropriate taxing authorities in accordance with remittance intervals and deadlines established by such taxing authorities.  With respect to the Canadian Employees, the Debtors withhold and remit such amounts to DayForce, Inc. ("DayForce"), a Payroll Processor, which subsequently remits funds to the appropriate federal, provincial, and local taxing authorities in accordance with remittance intervals and deadlines established by Canadian taxing authorities.  Historically, the Debtors have incurred liabilities of approximately $5.7 million per year on account of the Employer Payroll Taxes.  As of the Petition Date, the Debtors estimate that they owe approximately $470,000 on account of the Employer Payroll Taxes.

73.    ***Reimbursable Expenses***.  In the ordinary course of business, the Debtors reimburse Employees for certain expenses that they incur on behalf of the Debtors within the scope of their

employment (the "<u>Reimbursable Expenses</u>").  Reimbursable Expenses include, among others, certain necessary business expenses that are directly related to the Employees' job duties, such as work travel, lodging, and meals.  Employees generally incur Reimbursable Expenses through to personal credit cards or, in certain instances, to credit cards issued by the Debtors.  Employees who pay for their own Reimbursable Expenses up front are responsible for maintaining and submitting verifying documentation for reimbursement to the Debtors through the Emburse, Inc. ("<u>Emburse</u>") expense management platform.  SPARC maintains the relationship with Emburse and determines the validity of submitted charges for reimbursement.  Once SPARC determines that submitted charges are for valid reimbursable business expenses, the Debtors reimburse the submitting Employees directly.  If the Debtors were unable to reimburse Employees for the Reimbursable Expenses, they may be in conflict with certain applicable employment laws.  In addition, such an outcome would impose an undue hardship on Employees who incurred the Reimbursable Expenses on the Debtors' behalf with the understanding that such expenses would be reimbursed fully.  The Debtors' inability to reimburse such expenses would impose significant financial hardship on such individuals where the obligations were incurred for the Debtors' benefit.

74.     Historically, the Debtors have incurred liabilities of approximately $240,000 per year on account of the Reimbursable Expenses.  As of the Petition Date, the Debtors estimate that they owe approximately $20,000 on account of Reimbursable Expenses.

75.     ***Health and Welfare Coverage and Benefits***.  The Debtors offer their Employees the ability to participate in a number of health, insurance, and benefits programs depending on their full- or part-time status and whether they are located in or outside the United States.  To be eligible for full-time benefits, an Employee must typically either be salaried or have worked an average of thirty or more hours per week in an annual look-back period.  The benefits include,

among others, U.S. Medical Plan, the U.S. Health and Medical Accounts, the U.S. Life Insurance

Plan, the U.S. Dental Insurance Plan, the U.S. Vision Insurance Plan, the U.S. Employee Disability

Program, and the U.S. Additional Insurance Plans (each, along with the COBRA Benefits,

the "U.S. Health and Welfare Plans and Benefits").  The Debtors also subsidize or continue to

provide certain benefits to certain former U.S. Employees after their termination, retirement, or

disability leave, including, without limitation, benefits provided under the Consolidated Omnibus

Budget Reconciliation Act of 1985 ("COBRA Benefits").

76.    With respect to the Canadian Employees, insurance and benefits offerings include,

among others, the Canadian Medical Plans, the Canadian Life Insurance Plan, the Canadian Dental

Insurance Plan, and the Canadian Employee Disability Program (collectively, the "Canadian

Health and Welfare Plans and Benefits," and, together with the U.S. Health and Welfare Plans and

Benefits, the "Health and Welfare Plans and Benefits").  In the case of the Canadian Health and

Welfare Plans and Benefits, the Debtors directly administer such benefits to the Canadian

Employees.

77.    The Debtors' U.S. Health and Welfare Plans and Benefits include:

- *U.S. Medical Plan.*  Eligible full-time U.S. Employees may participate in medical,
prescription, and virtual care coverage programs (the "U.S. Medical Plan") through
self-funded plans administered by Aetna Inc. ("Aetna").  Specifically, U.S.
Employees may choose from one of four options with fixed premiums: (i) the
"Premium PPO" plan, which gives participating U.S. Employees flexibility by
allowing them to visit any doctor in- or out-of-network in exchange for a low
deductible and out-of-pocket maximum; (ii) the "Basic PPO" plan, which gives
participating U.S. Employees similar flexibility to the Premium PPO plan but with
higher coinsurance and deductible costs; (iii) the "High Deductible Health Plan,"
which has lower premiums but results in a higher deductible and out-of-pocket
maximum; and (iv) the "Value Medical Plan," which gives participating U.S.
Employees the lowest available monthly premium in exchange for higher
deductibles, coinsurance, and copayment rates.  Only the U.S. Employees
participating in the High Deductible Health Plan are eligible for an HSA.

  For the U.S. Medical Plan, U.S. Employees are responsible for the approximately
20 percent of total premium costs while the Debtors, indirectly through SPARC,

incur obligations on account of the remainder.  Beginning on January 1, 2026, in order to help alleviate the financial strain associated with rising insurance premiums, U.S. Employees began receiving monthly subsidies of (i) $250 for U.S. Employees making less than $70,000 per year in Employee Compensation and (ii) $150 for U.S. Employees making greater than $70,000 per year in Employee Compensation (the "Health Care Transition Credit").  Health Care Transition Credit funds are deposited into U.S. Health and Medical Accounts to the extent the U.S. Employees maintain such accounts.

Legal spouses, domestic partners, and dependent children are eligible dependents and can be additionally covered.  Approximately 76 percent of eligible U.S. Employees enroll in U.S. Medical Plan.  Under the agreement with Aetna, SPARC is self-funded without a stop loss limit.  As medical plan providers under the Aetna plan, SPARC pays medical claims under the U.S. Medical Plan as they become due on daily basis.  Employee contributions are deducted directly from the respective Employee's paychecks and are held by SPARC to fund a portion of the payment of U.S. Employee medical claims.

Historically, the Debtors have incurred liabilities, indirectly through SPARC, of approximately $4.6 million per year on account of the U.S. Medical Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $585,000 on account of U.S. Medical Plan.

- *U.S. Health and Medical Accounts.*  Eligible full-time U.S. Employees may contribute to a health or dependent care flexible spending account (the "FSAs") or a health savings account (the "HSA," and, together with the FSAs, the "U.S. Health and Medical Accounts"), administered by HealthEquity, Inc. ("HealthEquity").  The FSAs and the HSA allow U.S. Employees to voluntarily set aside pre-tax funds to pay for eligible health and welfare expenses.  An HSA is only available to U.S. Employees that opt for the High Deductible Health Plan.  For the 2026 calendar year, each eligible U.S. Employee may contribute up to $7,500 to an FSA or up to $9,750 to an HSA depending on, among other things, such U.S. Employee's age and familial status.  The Debtors, indirectly through SPARC, contribute an annual seed of up to $1,000 per U.S. Employee who maintains an HSA.  In addition, the Debtors, indirectly through SPARC, pay an administration fee of approximately $2,000 to HealthEquity on account of the U.S. Health and Medical Accounts.

  Historically, the Debtors have incurred liabilities, indirectly through SPARC, of approximately $52,000 per year on account of the U.S. Health and Medical Accounts.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the U.S. Health and Medical Accounts.

- *U.S. Life Insurance Plan.*  Eligible full-time U.S. Employees receive basic life insurance at an amount calculated based on a percentage of the Employee's annual earnings at no cost.  In addition, all U.S. Employees are offered supplemental, spousal, and child life products, as well as accidental death and dismemberment coverage, on a voluntary, U.S. Employee-paid basis (the "U.S. Life Insurance

Plan"), administered by New York Life Insurance Company Group Benefit Solutions ("New York Life").

Historically, the Debtors have incurred liabilities, indirectly through SPARC, of approximately $60,000 per year on account of the U.S. Life Insurance Plan. As of the Petition Date, the Debtors estimate that they owe approximately $7,000 on account of the U.S. Life Insurance Plan.

- **U.S. Dental Insurance Plan.** Eligible full- and part-time U.S. Employees may participate in basic or enhanced dental care programs through self-funded plans administered by Delta Dental Plans Association (the "U.S. Dental Insurance Plan"). The dental plans provide for both in- and out-of-network coverage. The dental plan is self-funded, and as such, the Debtors, indirectly through SPARC, pay the dental claims of U.S. Employees. U.S. Employee contributions to the dental plans are deducted directly from the respective U.S. Employee's paychecks and are held, indirectly through SPARC, by the Debtors to fund a portion of the payment of dental claims.

  Historically, the Debtors have incurred liabilities, indirectly through SPARC, of approximately $55,000 per year on account of the U.S. Dental Insurance Plan. As of the Petition Date, the Debtors estimate that they owe approximately $7,000 on account of the U.S. Dental Insurance Plan.

- **U.S. Vision Insurance Plan.** Eligible full- and part-time U.S. Employees may participate in vision care coverage programs through fully insured plans provided by VSP Vision Care, Inc. (the "U.S. Vision Insurance Plan"). The vision plans provide for both in- and out-of-network coverage.

  Historically, the Debtors have incurred *de minimis* liabilities on account of the U.S. Vision Insurance Plan. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the U.S. Vision Insurance Plan.

- **U.S. Employee Disability Program.** Eligible full-time U.S. Employees are provided long-term disability benefits (the "U.S. Long-Term Disability Benefits") and short-term disability benefits (the "U.S. Short-Term Disability Benefits," and, together with the U.S. Long-Term Disability Benefits, the "U.S. Disability Benefits"), with supplemental long-term disability benefits available on a voluntary basis (collectively, the "U.S. Employee Disability Program"). New York Life provides U.S. Long-Term Disability Benefits coverage, and Sedgwick Claims Management Services, Inc. ("Sedgwick," and, together with New York Life, the "U.S. Employee Disability Providers") provides U.S. Short-Term Disability Benefits coverage. The U.S. Employee Disability Program is designed to protect Employees' income if they are unable to work due to illness or injury. Upon an Employee's application for disability payment, the U.S. Employee Disability Providers make certain determinations regarding eligibility and the benefits amount.

Historically, the Debtors have incurred liabilities, indirectly through SPARC, of approximately $85,000 per year on account of the U.S. Employee Disability Program.  As of the Petition Date, the Debtors estimate that they owe approximately $10,000 on account of the U.S. Employee Disability Program.

- ***U.S. Additional Insurance Plans.***  Eligible full- and part-time U.S. Employees are offered various critical illness, accident, and hospital indemnity insurance benefits (the "U.S. Additional Insurance Plans") through Aetna.  The U.S. Additional Insurance Plans are designed to offer resources such as lump sum benefits for severe and critical illnesses, injuries from accidents, and hospital admissions.

  Historically, the Debtors have incurred liabilities, indirectly through SPARC, of approximately $330,000 per year on account of the U.S. Additional Insurance Plans. Following the Employee Transition, however, the U.S. Additional Insurance Plans are now generally U.S. Employee-paid.  As such, as of the Petition Date, the Debtors do not believe that they owe any amounts on account of the U.S. Additional Insurance Plans.

- ***COBRA Benefits.***  The Debtors, indirectly through SPARC, are required to offer certain former U.S. Employees COBRA Benefits following the termination of their employment (the "COBRA Eligible Employees").  The COBRA Benefits allow former U.S. Employees to continue taking advantage of the U.S. Medical Plan, U.S. Dental Insurance Plan, and U.S. Vision Insurance Plan for up to eighteen, and occasionally thirty-six, months after their termination.  The COBRA Eligible Employees are typically responsible for paying all costs associated with COBRA Benefits, except with respect to those former Employees with the title "Director"[7] or higher upon termination.

  Of the seven former Employees currently enrolled in COBRA Benefits, none are eligible to have any of their COBRA Benefits costs paid for by the Debtors. Accordingly, as of the Petition Date, the Debtors do not believe there are any prepetition amounts outstanding on account of COBRA Benefits.

78.    The Debtors' Canadian Health and Welfare Plans and Benefits include:

- ***Canadian Medical Plans.***   The Debtors provide eligible full-time Canadian Employees the opportunity to enroll in medical and healthcare plans administered by Manulife Financial Corporation ("Manulife," and such plan, collectively, the "Canadian Medical Plans") that provide benefits above the Canadian provincial healthcare system.  The Canadian Medical Plans includes individual plans for, among other things, major medical expenses, prescription drugs, vision care,

---

[7]    "Director" is used in reference to the Debtors' internal company hierarchy and not in reference to any appointed directorship.

paramedical services, and travel assistance, and it permits use of a health spending account.

Participating Canadian Employees make biweekly payments of $7.75 for individual coverage and $21.33 for family coverage on account of the Canadian Medical Plans, which amounts are deducted from such Employees' paychecks. The Debtors cover an average of approximately sixty-six percent of premium costs while the Canadian Employees cover the remaining thirty-four percent. Legal spouses, domestic partners, and eligible dependents and can also be additionally covered. Approximately ninety percent of eligible Canadian Employees enroll in Canadian Medical Plans.

Historically, the Debtors have spent approximately $56,000 per year on account of administration fees and premiums for the Canadian Medical Plans. As of the Petition Date, the Debtors estimate they owe approximately $8,000 on account of administration fees and premiums for the Canadian Medical Plans.

Under the agreement with Manulife, the Debtors are self-insured, subject to certain claims offsetting by Manulife, a subset of the Canadian Medical Plans, specifically the major medical expense and prescription drug plans. As self-funded medical plan providers under the Manulife plan, the Debtors pay claims arising from the major medical and prescription drug plans as they become due on a monthly basis. Canadian Employee contributions are deducted directly from the respective Canadian Employee's paychecks and are held by the Debtors to fund a portion of the payment of major medical and prescription coverage claims.

Historically, the Debtors have spent approximately $53,000 per year on account of claims from the Canadian Medical Plans. As of the Petition Date, the Debtors estimate they owe approximately $2,000 on account of claims from the Canadian Medical Plans.

- ***Canadian Life Insurance Plan.*** The Debtors provide eligible full-time Canadian Employees with basic life insurance equal to the Employees' annual base earnings at no cost. Canadian Employees may also purchase additional life insurance coverage on voluntary, Employee-paid basis, which they pay for via biweekly deductions from their paychecks. The life insurance plans for Canadian Employees are administered by Manulife (the "Canadian Life Insurance Plan," and, together with the U.S. Life Insurance Plan, the "Life Insurance Plans").

  Historically, the Debtors have spent approximately $7,000 per year on account of administration fees and premiums for the Canadian Life Insurance Plan. As of the Petition Date, the Debtors estimate they owe approximately $1,000 on account of administration fees and premiums for the Canadian Life Insurance Plan.

- ***Canadian Dental Insurance Plan.*** The Debtors offer eligible full-time Canadian Employees the opportunity to enroll in a dental plan administered by Manulife ("Canadian Dental Insurance Plan"). The Canadian Dental Insurance Plan offers a $36.88 annual deductible for individuals or $73.76 for family coverage. Coverage rates and plan maximums depend on the level of coverage that a Canadian

Employee elects.  Canadian Employees make biweekly payments on average of $5.52 for individual dental coverage or $15.11 for family dental coverage, which amounts are deducted from such Employees' paychecks.  The Debtors cover an average of approximately sixty percent of the cost of premiums for the Canadian Dental Insurance Plan, while the Canadian Employees cover the remaining forty percent.  Approximately eight-eight percent of eligible Canadian Employees enroll in Canadian Dental Insurance Plan.

Under the agreement with Manulife, the Debtors are self-insured for the Canadian Dental Insurance Plan.  As self-funded plan providers under the Manulife plan, the Debtors pay claims arising from the Canadian Dental Insurance Plan as they become due on a monthly basis.  Canadian Employee contributions are deducted directly from the respective Canadian Employee's paychecks and are held by the Debtors to fund a portion of the payment of Canadian Dental Insurance Plan claims.  Historically, the Debtors have spent approximately $26,000 per year on account of administration fees and premiums for the Canadian Dental Insurance Plan.  As of the Petition Date, the Debtors estimate they owe approximately $4,000 on account of administration fees and premiums for the Canadian Dental Insurance Plan.

Historically, the Debtors have not incurred costs on account of the Canadian Dental Insurance Plan claims.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of Canadian Dental Insurance Plan claims.

- ***Canadian Employee Disability Program.***  The Debtors offer provide full-time Canadian Employees with long-term and short-term disability benefits, as well as accidental death and dismemberment benefits through Manulife (the "Canadian Employee Disability Program").  Specifically, the Canadian Employee Disability Program includes the following benefits:

  - *Long-Term Disability*:  After having been employed by the Debtors for 180 days, Canadian Employees receive long-term disability benefits.  For medical disability that exceeds twenty-six weeks, once Manulife approves a long-term disability claim, Canadian Employees may receive 60 percent of their monthly earnings, up to $7,300 per month.

  - *Short-Term Disability*:  After having been employed by the Debtors for 180 days, Canadian Employees receive short-term disability benefits.  Once Manulife approves a short-term disability claim, Canadian Employees may receive 60 percent of their weekly earnings, up to $1,100 per week for up to twenty-six weeks.

  - *Accidental Death & Dismemberment*:  Canadian Employees are automatically provided with accidental death and dismemberment insurance equal to the Employee's annual base earnings.

- Historically, the Debtors have spent approximately $16,000 per year on account of the Canadian Employee Disability Program.  As of the Petition Date, the Debtors

38

estimate they owe approximately $2,000 on account of administration fees and premiums for the Canadian Employee Disability Program.

79.    Historically, the Debtors have incurred liabilities of approximately $5.2 million and $158,000 per year on account of the Debtors' U.S. Health and Welfare Plans and the Canadian Health and Welfare Plans, respectively.  As of the Petition Date, the Debtors estimate that they owe approximately $626,000 on account of the Health and Welfare Plans.  As previously discussed, any failure to continue the Health and Welfare Plans and Benefits would likely cause the Employees to experience severe hardship and would make it difficult for the Debtors to retain their workforce, whose efforts will be essential in continuing going-out-of-business sales and/or preserving certain stores for a potential going concern sale.

80.    ***Workers' Compensation***.  In the ordinary course of business, the Debtors, either directly or through SPARC, maintain workers' compensation insurance policies in accordance with applicable requirements in the United States and equivalent coverages in Canada, as required by local laws.  With respect to U.S. Employees, SPARC maintains workers' compensation insurance for such Employees on the Debtors' behalf at the statutorily required level for each state in which the U.S. Employees are located (the "U.S. Workers' Compensation Program").  In the ordinary course of business, any costs that SPARC incurs in connection with the U.S. Workers' Compensation Program are recorded as an intercompany payable in favor of SPARC that increases the SPARC Intercompany Payable on account of such amounts.  With respect to the Canadian Employees, the individual provinces in which the Canadian Employees are located administer workers' compensation programs (the "Canadian Workers' Compensation Program," and, together with the U.S. Workers' Compensation Program, the "Workers' Compensation Programs").

81.     Applicable state and foreign laws require the Debtors to maintain the Workers' Compensation Programs and/or pay fees to maintain such programs, as applicable.  If the Debtors fail to maintain the Workers' Compensation Programs, the Debtors may be prohibited from operating in certain jurisdictions across the United States and Canada.  The payment of all obligations related to the Workers' Compensation Programs is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

82.     The Debtors are not aware of any active open claim under the Workers' Compensation Programs.  To the extent any Employees assert claims arising under the Workers' Compensation Programs, however, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to permit such Employees to proceed with such claims.  Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Programs, their inability to do so may result in adverse legal consequences that potentially could disrupt the chapter 11 process.  This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Programs.

83.     Historically, the Debtors have incurred liabilities of approximately $380,000 and $18,000 per year on account of the U.S. Workers' Compensation Program and the Canadian Workers' Compensation Program, respectively.  As of the Petition Date, the Debtors estimate that they owe approximately $35,000 on account of the Workers' Compensation Programs.

84.     *The 401(k) Plan*. In the ordinary course of business, the Debtors, indirectly through SPARC, offer eligible full-time U.S. Employees the opportunity to participate in a retirement savings plan that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  The 401(k) Plan is administered by Alight, Inc. and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.

U.S. Employees are offered a 5 percent 401(k) match.  Historically, the 5 percent match was funded into U.S. Employees' retirement accounts in the first quarter of the year on account of the contributions such Employees made during the prior year.  For instance, if a U.S. Employee contributed 5 percent of their salary to their retirement account in 2025, the Debtors, through SPARC, would contribute the 5 percent match in the first quarter of 2026.  Thereafter, in the ordinary course of business, the Debtors would record an intercompany payable in favor of SPARC that increased the SPARC Intercompany Payable on account of such amounts.  Following the Employee Transition, the 5 percent match is now contributed to U.S. Employees' 401(k) accounts on a biweekly basis.

85.    Historically, the Debtors have incurred liabilities of approximately $1.2 million per year on account of the 401(k) Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $1.2 million on account of the 401(k) Plan, primarily on account of the 5 percent match that U.S. Employees accrued in 2025.  Many U.S. Employees' retirement savings consist solely of the 401(k) Plans, and many U.S. Employees choose to participate in the 401(k) Plans because of the 401(k) match contributions.  Continuing the 401(k) Plans and the 401(k) match contributions are essential to maintaining U.S. Employee morale and minimizing attrition, both of which are critical to a successful resolution of these chapter 11 cases.

86.    ***The Canadian Retirement Plans.***  In the ordinary course of business, the Debtors offer eligible full-time Canadian Employees the opportunity to participate in a structured retirement savings plan (the "SRSP") and a deferred profit-sharing program (the "DPSP," and, together with the SRSP, the "Canadian Retirement Plans," and, the Canadian Retirement Plans together with the 401(k) Plan, the "Retirement Plans") administered by Manulife.  Under the SRSP, participating Canadian Employees may contribute a percentage of their biweekly earnings

to a retirement savings account. Under the DPSP, the Debtors match 100 percent of the participating Employee's contributions to the SRSP for the first 3 percent of eligible biweekly earnings, and 50 percent for the next 2 percent of eligible biweekly earnings.

87.     Historically, the Debtors have incurred liabilities of approximately $170,000 per year on account of the Canadian Retirement Plans. As of the Petition Date, the Debtors estimate that they owe approximately $15,000 on account of the Canadian Retirement Plans.

88.     ***Paid Leave Benefits.*** In the ordinary course of business, eligible Employees receive paid leave benefits in order to promote a healthy work-life balance and a positive culture. Specifically, Canadian Employees are provided with paid leave benefits in accordance with applicable Canadian law (the "Canadian Paid Leave Benefits"). For U.S. Employees, the paid leave benefits program consists of, for salaried Employees, the Flexible Time Off Policy (the "Flex PTO"), and, for hourly Employees, the accrual-based Supporting Time Away from Work Policy (the "STA PTO," and, together with the Flex PTO, the "U.S. Paid Leave Benefits," and, the U.S. Paid Leave Benefits together with the Canadian Paid Leave Benefits, the "Paid Leave Benefits"). When an Employee elects to use paid leave, that Employee is paid his or her regular hourly or salaried rate. A brief description of the Flex PTO and STA PTO policies are outlined below:

> ***Flex PTO.*** Under the Flex PTO program, Employees do not accrue paid time off or sick time—rather, they are given reasonable flexibility to take time off without limitation, provided they maintain satisfactory job performance and obtain prior authorization.

> ***STA PTO.*** Under the STA PTO program, paid leave accrues at a set rate per hour for every hour worked, with the rate of accrual and maximum accrual amount increasing with Employee tenure. Paid leave under the STA PTO program is available for a variety of uses, including vacation, sickness, and other personal uses. At most, an Employee can accrue thirty-four days of paid leave per year, and Employees may only carry over forty hours of paid leave from year to year.

89.     In addition, Family and Medical Leave Act leave, military leave, safety leave, jury duty leave, and other leave obligations are recognized as required by applicable state law. Upon

a U.S. Employee's termination, accrued but unused paid leave is typically paid out in accordance with Company policy and applicable law and regulations.

90.     Historically, the Debtors have incurred liabilities of approximately $14,000 per year on account of the Paid Leave Benefits.  As of the Petition Date, the Debtors estimate that they have incurred a total of approximately 390,000 on account of the Paid Leave Benefits.  The Debtors, however, are not able to determine with certainty the prepetition Paid Leave Benefits obligations that will come due in the postpetition period.  Continuing the Paid Leave Benefits is essential to maintaining Employee morale during these chapter 11 cases, in addition to ensuring that the Debtors remain in compliance with applicable law.

91.     ***Non-Insider Severance Program***.  In the ordinary course of business, the Debtors incur obligations on account of a severance program for the benefit of certain non-Insider Employees.  Under the Non-Insider Severance Programs, certain full-time Employees may be eligible for payment of severance if their employment is terminated due to store closure, a reduction in force or downsizing, unit closure, or job elimination (each, a "Qualifying Termination").  Severance accruals and payments vary based on title and length of employment and generally fall into one of three categories:  general Corporate Employee severance (the "Corporate Employee Severance Program"), upper-level Corporate Employee severance (the "Upper-Level Employee Severance Program"), and the store-level severance (the "Retail Employee Severance Program," and, together with the Upper Level Employee Severance Program and the Corporate Employee Severance Program, the "Non-Insider Severance Programs"):

- ***The Corporate Employee Severance Program.***  Under the Corporate Employee Severance Program, Corporate Employees with the titles of "Associate," "Manager," or "Senior Manager" are eligible for severance accruals.  Eligible Employees accrue severance benefits at a rate of one week of severance per year of employment, subject to a specified minimum severance amount.  Specifically, Associates accrue a minimum of three weeks and a maximum of eight weeks of base pay.  Managers and Senior

Managers accrue a minimum of four weeks and a maximum of twelve weeks of base pay.

- **The Upper-Level Employee Severance Program.** Under the Upper-Level Severance Program, Corporate Employees with titles of "Director" or higher are eligible for severance accruals. Eligible Employees accrue a set amount of base pay that corresponds to their title, regardless of their tenure with the Debtors. For the avoidance of doubt, the titles used to determine qualification for the Upper-Level Employee Severance Program are simply the nomenclature of the Debtors' company hierarchy and do not refer to appointed director or officer positions, and they do not necessarily indicate managerial authority akin to that typically held by an "insider." Specifically, Employees with titles of "Director" and "Senior Director" receive severance benefits equal to four months of base pay.

- **The Retail Employee Severance Program.** Under the Retail Employee Severance Program, eligible Retail Employees receive different severance entitlement based on the nature of their Qualifying Termination. To be eligible for any entitlement under the Retail Employee Severance Program, the Retail Employee must be salaried or have worked an average of more than thirty hours per week in an annual lookback period. Where an eligible Retail Employee's Qualifying Termination is for any reason other than store closure, the Retail Employee is entitled to regular Retail Employee severance (the "<u>Regular Retail Employee Severance</u>"). Where an eligible Retail Employee's Qualifying Termination is a store closure, however, the Retail Employee may be eligible for special store closure severance (the "<u>Store Closure Severance</u>").

  - **Regular Retail Employee Severance.** Regular Retail Employee Severance is offered to eligible Retail Employees with the title "Assistant Manager" or higher who experienced a Qualifying Termination. Regular Retail Employee Severance entitles eligible Retail Employee to severance payments equal to two weeks of base pay.

  - **Store Closure Severance.** Store Closure Severance is offered to eligible Retail Employees who are terminated due to store closure. Store Closure Severance entitles eligible Retail Employees to the Regular Retail Employee Severance, plus: (a) for salaried "General" and "Assistant Managers," four weeks of base pay; (b) for salaried special managers, $2,000; and (c) for all other eligible Retail Employees, an hours-based award.

For purposes of determining severance, base pay is determined: (a) for salaried Employees, based on the Employees base rate of pay at the time of termination and (b) for hourly Employees, based on the average number of hours that such Employee worked per week during an annual lookback period.

92.    Payments on account of the Corporate and Retail Employee Severance Programs are generally paid in a lump sum following an Employee's Qualifying Termination date. Payments

on account of the Upper Level Employee Severance Program, however, are made monthly on the last Friday of each month. Payments under the Corporate Employee Severance Program and the Upper-Level Employee Severance Program are, in accordance with applicable law, predicated on the receiving Employee executing a comprehensive release in favor of the Company. The Non-Insider Severance Programs are critical to maintaining Employee morale and loyalty, particularly at the outset of these chapter 11 cases. Failure to maintain the Non-Insider Severance Programs would likely result in increased instability in the Debtors' workforce, which would frustrate the Debtors' chapter 11 efforts.

93.     Historically, the Debtors have incurred liabilities of approximately $500,000 per year on account of the Non-Insider Severance Programs. As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Non-Insider Severance Programs. During the pendency of these chapter 11 cases, however, the Debtors believe they will owe approximately $4.2 million on account of the Non-Insider Severance Programs, approximately $215,000 of which the Debtors anticipate paying on an interim basis prior to entry of the Final Order. The relief sought with respect to the Non Insider Severance Programs does not include payment to any "insider."

94.     ***Non-Employee Board Member Compensation***.  As of the Petition Date, the Debtors' boards of directors or managers, as applicable, include eight non-Employee individuals (the "<u>Non-Employee Directors</u>"), only two of whom (the "<u>Disinterested Managers</u>") are specifically compensated for their services to the Debtors' boards. The Disinterested Managers receive $40,000 per month, paid monthly in advance and prorated for partial service, plus a daily fee of $5,000 for any day that a Disinterested Manager devotes more than four hours of time for activities outside of the scope of normal board duties (the "<u>Disinterested Manager Payments</u>").

The Disinterested Managers are also entitled to expense reimbursement for certain reimbursable expenses (the "Disinterested Manager Reimbursable Expenses," and, together with the Disinterested Manager Payments, the "Non-Employee Board Member Compensation").  The Non-Employee Directors are critical components of the Debtors' governance structure and are vital to ensuring that the Debtors continue to adhere to governance best practices.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of Non-Employee Board Member Compensation.

95.    ***The WARN Act Obligations.***  Prior to the Petition Date, the Debtors issued notices pursuant to the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2102 et. seq. (the "Federal WARN Act"), various state law equivalents, including the Millville Dallas Automotive Plan Job Loss Notifications Act, N.J.S.A. 34:21 1 et seq. and the Securing Timely Notification and Benefits for Laid off Employees Act, Wash. Rev. Code § 49.45.900 (2025) (the "State WARN Acts"), and certain Canadian law equivalents (the "Canadian WARN Acts") to approximately 300 Employees that are expected to be impacted by a qualified "mass layoff" (collectively, the "WARN Act Notices").  Unless an exception applies, the Federal WARN Act generally requires sixty days' advance notice to affected employees and governmental entities prior to implementation of a "mass layoff" or a "plant closing."  In addition to the Federal WARN Act, the Debtors must comply with various State WARN Acts and the Canadian WARN Acts, which may include longer notice periods, statutory severance, and penalty requirements.  As of the Petition Date, the obligations owed to Employees who were issued WARN Act Notices (the "WARN Act Obligations") are undetermined.

96.    ***Additional Benefit Programs***.  Eligible Employees may also participate in a range of ancillary benefits programs (the "Additional Benefits Programs").  For U.S. Employees, the

Additional Benefits Programs include, among others:  (a) identity theft protection; (b) attorney services; (c) mental health counselling; and (d) commuter spending accounts.  In addition, certain Canadian Employees receive mental health counselling benefits as part of the Additional Benefits Programs.  Historically, the Debtors have incurred liabilities of approximately $400,000 per year on account of the Additional Benefits Programs.  Following the Employee Transition however, the Additional Benefits Programs are Employee paid.  As such, as of the Petition Date, Debtors do not believe that they owe any amounts on account of the Additional Benefits Programs.

97.      ***Payroll Vendor Obligations***.  In the ordinary course of business, the Debtors incur payment obligations on account of various software services, including PeopleSoft and DayForce, that supplement the Debtors' human resources functions, including payroll processing, withholding calculations, payment remittances, and payroll tax reporting (such obligations, the "Payroll Processor Obligations," and such providers, the "Payroll Processors").

98.      Failure to pay the Payroll Processor Obligations could disrupt Employee payment and scheduling, as well as deduction and tax withholding and remittance.  These disruptions would cause significant Employee hardship, which would make it difficult to retain the Debtors' workforce and would almost certainly cause violations of certain withholding and remittance regulations.  Historically, the Debtors have incurred liabilities of approximately $120,000 per year on account of the Payroll Processor Obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $30,000 on account of the Payroll Processor Obligations.

## IX.   Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs; and (II) Granting Related Relief (the "SOFAs and Schedules Motion").

99.      The ordinary operation of the Debtors' business requires the Debtors to maintain voluminous books and records and complex accounting systems.  To prepare the Schedules and Statements, the Debtors must compile information from their books and records, from documents

relating to the claims of many thousands of creditors, and from the Debtors' many assets and contracts. This information is extensive and spread throughout the Debtors' organization. Collecting the necessary information will require an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors, at a time when these resources would be best used to stabilize the Debtors' business operations. Given the substantial effort required to prepare the Schedules and Statements, the critical prepetition demands on the Debtors' management and professionals, and the imperative of maintaining uninterrupted business operations following the Petition Date, the Debtors will not be able to properly and accurately complete the Schedules and Statements within the required time period.

100. Prior to the Petition Date, the Debtors focused primarily on preparing for the chapter 11 filing, preparing the business to transition into chapter 11, and negotiating with their significant creditor constituencies to ensure a soft landing into chapter 11. Although the Debtors are working diligently to prepare what will be voluminous Schedules and Statements, and are working diligently to move the process forward, the Debtors anticipate that they may require up to seventeen additional days to complete the Schedules and Statements thoroughly and accurately.

101. The size of the Debtors' enterprise, the extensive amount of information that must be assembled and compiled, and the acute constraints facing the Debtors' personnel in the early days of these chapter 11 cases collectively constitute good and sufficient cause for granting the requested extension of time. No party-in-interest will be prejudiced by the extension requested in the SOFAs and Schedules Motion because (a) the Schedules and Statements will be filed in advance of any deadline for filing proofs of claim in these chapter 11 cases and (b) the Debtors have financial and operational incentives to progress these chapter 11 cases as expeditiously as possible. The Debtors therefore request that the Court extend the fourteen-day period by an

additional seventeen days, for a total of thirty-one days after the Petition Date, without prejudice to the Debtors' right to request further extensions for cause shown.

X.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs, (B) Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "Customer Programs Motion").**

102.    For more than one hundred years, the Debtors' iconic American brand has played a leading role in outfitting the outdoor recreation industry by producing and selling innovative lifestyle clothing, high-performance gear, and equipment to North American customers.  Today, the Debtors serve millions of customers each year at hundreds of brick-and-mortar store locations throughout the United States and Canada.

103.    In the ordinary course of business, the Debtors maintain various programs that are vital to the Debtors' ability to engender goodwill among their current customers, maintain brand loyalty in the competitive retail industry, and drive revenue at their brick-and-mortar retail locations.  Such programs include:  (a) the Adventure Rewards Program; (b) the Co-Branded Credit Card Program; (c) the Gift Card Program; (d) the Refund and Exchange Program; and (e) the Charitable Programs (collectively, the "Customer Programs").  Although the obligations related to the Customer Programs are typically booked as a liability in the Debtors' books and records, most of the Customer Programs *do not* require a cash outlay on the part of the Debtors.  Rather, the Debtors are able to fulfill the vast majority of their obligations related to the Customer Programs by providing certain pricing mechanisms, incentives, discounts, and other accommodations to their customers without spending cash.

104.    The Debtors believe that their ability to continue the Customer Programs and honor any obligations thereunder in the ordinary course of business is necessary to help the Debtors maintain their reputation for quality, enhance customer retention, and ensure that they are able to

continue operating their retail enterprise.  Maintaining the Customer Programs is therefore critical to the Debtors' ongoing operations during the pendency of these chapter 11 cases and is necessary to maximize the value of their estates for the benefit of all stakeholders.  Accordingly, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.

105.    ***The Adventure Rewards Program.***  The Debtors' hallmark customer loyalty program is the Adventure Rewards Program (the "Adventure Rewards Program"), in which approximately ten million of the Debtors' customers (the "Adventure Rewards Members") are enrolled.  The Adventure Rewards Program is an important engagement tool that allows Adventure Rewards Members to receive promotional discounts and other benefits.  Historically, Adventure Rewards Members have been responsible for approximately 80% of the Debtors' annual sales volume.

106.    The Adventure Rewards Program operates on a points-based system (such points, the "Rewards Points") whereby each dollar an Adventure Rewards Member spends on the Debtors' merchandise translates to Rewards Points at certain ratios depending on a particular Adventure Rewards Member's loyalty tier.  The Debtors offer three loyalty tiers under the Adventure Rewards Program that correspond to an Adventure Rewards Member's spend on the Debtors' merchandise within the prior twelve-month period.  From the lowest tier to the highest tier, these levels are Adventurer, Explorer, and Guide.

107.    Adventure Rewards Members receive the benefits of their new loyalty tier as soon as they qualify for it, and they maintain that loyalty tier for one year (*e.g.*, if a customer spends $600 on January 15, 2025, they will receive Guide benefits from that day until January 15, 2026).

108.    Rewards Points are converted into redeemable merchandise credit on a quarterly basis through the issuance of Adventure Rewards Members certificates (the "Adventure Rewards Certificates") that detail the Rewards Points Adventure Rewards Members have earned and the corresponding dollar amount of credit they can apply towards purchases of the Debtors' merchandise.  Regardless of which loyalty tier a particular Adventure Rewards Member qualifies for, they receive credit worth $5 for every 500 Rewards Points they have accumulated.  An $80 Adventure Rewards Certificate (corresponding to a redemption of 8,000 Rewards Points) is the maximum that an Adventure Rewards Member may receive in any given quarter—if an Adventure Rewards Member has a balance of greater than 8,000 Rewards Points, anyremaining Rewards Points are rolled over to the next quarterly cycle.  Adventure Rewards Certificates are generally issued to Adventure Rewards Members in February, May, August, and November and are redeemable for approximately nine weeks after their issuance.  Rewards Points expire after twelve months if a customer does not make any qualifying purchases during that time period.  The Company may also issue Adventure Rewards Certificates in its discretion.

109.    The Debtors have historically issued Adventure Rewards Certificates worth approximately $10 million each year in connection with the Adventure Rewards Program.  Due to the limited timeframe whereby Adventure Rewards Members may redeem the Adventure Rewards Certificates, however, the Debtors typically recognize only a small fraction of such liability.

110.    As of the Petition Date, there are no outstanding unexpired Adventure Rewards Certificates.  However, there are outstanding unexpired Rewards Points that Adventure Rewards Members have accrued but for which they have yet to receive Adventure Rewards Certificates.  Accordingly, the Debtors request authority, but not direction, to continue operating the Adventure Rewards Program in the ordinary course of the Debtors' business, including by issuing new

Adventure Rewards Certificates to customers on account of Rewards Points that customers have accrued prior to the Petition Date.

111. ***The Co-Branded Credit Card Program.*** In the ordinary course of business, the Debtors partner with Imprint Payments, Inc. ("Imprint") to offer their customers the opportunity to apply for a co-branded Mastercard credit card issued by First Electronic Bank (such card, the "Eddie Bauer World Mastercard," and the program associated therewith, the "Co-Branded Credit Card Program"). The Eddie Bauer World Mastercard can be used anywhere that Mastercard is accepted. Customers apply for the Eddie Bauer World Mastercard online or in one of the Debtors' stores and must be approved by Imprint (such customers, following approval, the "Cardholders"). The Co-Branded Credit Card Program is governed by that certain credit card program agreement by and between Imprint and SPARC Group LLC, dated June 4, 2024, and that certain addendum by and among Imprint, SPARC Group LLC, and Debtor Eddie Bauer LLC, dated June 4, 2024 (the "Credit Card Program Agreement").

112. Pursuant to the Credit Card Program Agreement, First Electronic Bank extends revolving credit to the Cardholders. When Cardholders use their Eddie Bauer World Mastercard to make purchases, First Electronic Bank is responsible for funding those transactions, and Cardholders must reimburse First Electronic Bank for such purchases. Imprint then makes various payments to the Debtors, including royalty payments, profit-sharing remittances, and marketing reimbursements that are based on the performance of the Co-Branded Credit Card Program. Royalty payments and marketing reimbursements are generally calculated and paid as a percentage of net purchases after accounting for any returns, cancellations, and disputed or unauthorized transactions, among other factors. By contrast, profit-sharing remittances are based on the overall profitability of the Co-Branded Credit Card Program and are inclusive of, among other things,

credit losses, chargebacks, and other program expenses.  In addition, the Debtors receive interchange relief payments, whereby the Debtors are reimbursed for the interchange fees that the Company is charged for when transactions occur at their brick-and-mortar stores using the Eddie Bauer World Mastercard.

113.    The Co-Branded Credit Card Program works together with the Adventure Rewards Program to drive customer loyalty and repeat engagement.  Specifically, Cardholders earn three Rewards Points for each dollar they spend using the Eddie Bauer World Mastercard at any of the Debtors' brick-and-mortar retail locations or online, two Rewards Points at gas stations and restaurants, and one Rewards Point for all other purchases.  If a Cardholder is also registered for the Adventure Rewards Program, the Rewards Points they earn on purchases of the Debtors' merchandise are multiplied—"Adventurers" earn six Rewards Points for each dollar they spend on the Debtors' merchandise, "Explorers" earn seven Rewards Points for each dollar they spend on the Debtors' merchandise, and "Guides" earn eight Rewards Points for each dollar they spend on the Debtors' merchandise.  In addition to enhanced Adventure Rewards Program earnings, Cardholders are offered Cardholder-only savings and promotional benefits, including a percentage discount on their first purchase of the Debtors' merchandise with the Eddie Bauer World Mastercard.  As a result, the Co-Branded Credit Card Program is a valuable component of the Debtors' customer engagement strategy, as Cardholders historically demonstrate higher transaction frequency and greater overall spend on the Debtors' merchandise as compared to non-Cardholders.

114.    As of the Petition Date, the Debtors do not believe that they have any outstanding liabilities on account of the Co-Branded Credit Card Program.  Out of an abundance of caution, however, the Debtors request authority, but not direction, to:  (a) honor all outstanding amounts

on account of the Co-Branded Credit Card Program, including any prepetition amounts with respect thereto, as they become due and payable in the ordinary course of the Debtors' business and (b) continue performing under the Credit Card Program Agreement in the ordinary course of business.

115.    ***The Gift Card Program.***  Like many other retail businesses, the Debtors allow their customers to purchase prepaid, non-expiring gift cards (the "Gift Cards," and the program related thereto, the "Gift Card Program"), in various denominations ranging from $10 to $500.  In addition, the Debtors may issue Gift Cards for store credit in connection with certain returns of products in the ordinary course of business.  The Debtors sell Gift Cards to their customers in their retail stores and at certain third-party locations.  Once issued, the Gift Cards may be redeemed in-store for merchandise at a later date.[8]  The Gift Card Program is an important liquidity driver for the Debtors because it allows them to receive immediate funds without having to simultaneously convey merchandise to their customers.  Gift Cards are also a critical customer retention and engagement tool as they encourage repeat interactions with the Debtors' retail channels and future merchandise purchases.

116.    The Debtors have issued approximately $21 million worth of Gift Cards in the last three years, and customers typically redeem approximately $5.2 million worth of Gift Cards per year at the Debtors' brick-and-mortar store locations and former e-commerce platform.  Although the Debtors do not believe that all of the outstanding Gift Cards will be redeemed over the course of these chapter 11 cases, the Debtors request authority, but not direction, to honor all outstanding

---

[8]    Historically, customers could redeem Gift Cards both online and at brick-and-mortar locations.  As discussed in greater detail in the First Day Declaration, effective as of January 31, 2026, the Company's right to use Eddie Bauer intellectual property with respect to its e-commerce and wholesale business channels was terminated and assigned to the O5 Group (the "O5 Transaction").  In connection with the O5 Transaction, the Debtors retained all accrued Gift Card liabilities, and previously-issued Gift Cards may only be redeemed at the Debtors' brick-and-mortar retail locations.

prepetition liabilities on account of the Gift Card Program as customers redeem them and to continue honoring such obligations in the ordinary course of the Debtors' business.

117. ***The Refund and Exchange Program.*** As is customary in the retail industry, the Debtors allow their customers to return or exchange merchandise in its original unworn/unused condition with proof of purchase within sixty days of the purchase date, subject to certain exceptions (the "Refund and Exchange Program"). Pursuant to the Refund and Exchange Program, customers may either receive a replacement product or opt for a full refund in the original form of payment. If a product is deemed defective but there is no proof of purchase or the product was purchased outside of the sixty-day return window, the customer may exchange or replace it with a similar item at the Debtors' stores for up to one year from the purchase date. Historically, the Debtors have processed approximately $157 million per year of refunds and exchanges under the Refund and Exchange Program, which constitutes approximately 13.5% of the Debtors' gross sales.

118. Programs like the Refund and Exchange Program are common in the retail industry, and similar programs are used by the Debtors' competitors. Maintaining the Refund and Exchange Program is critical to preserving the goodwill of the Debtors' loyal customer base. Without the Refund and Exchange Program, potential customers may be unwilling to shop at the Debtors' remaining brick-and-mortar retail locations, the ultimate cost of which would be borne by the Debtors' estates. Accordingly, the Debtors request authority, but not direction, to honor all outstanding prepetition liabilities on account of the Refund and Exchange Program as customers request returns or exchanges and to continue honoring such obligations in the ordinary course of the Debtors' business.

119.   ***The Charitable Programs.***   The Debtors partner with certain charitable organizations, including the Heroes Project and American Forests, to offer customers the ability to participate in a charitable giving program at the point of purchase (collectively, the "Charitable Programs").  When customers make purchases, they are presented with an offer to donate, which can include rounding up their purchase price to the nearest dollar.  These donations are accumulated by the Debtors on behalf of the participating charities and remitted to the applicable Charitable Program on a quarterly basis.  The Charitable Programs are a crucial aspect of building customer goodwill and maintaining the Debtors' reputation for community investment in a way that aligns with and reinforces the Debtors' brand values.  If the Charitable Programs were to be interrupted or terminated, the Debtors' reputation with customers may be harmed and could generate unfavorable media coverage during the critical early days of these chapter 11 cases.  Such an outcome would harm the value of the Debtors' estates.

120.   Historically, the Debtors have collected and paid approximately $600,000 per year on behalf of the Charitable Programs.  As of the Petition Date, the Debtors have accrued a *de minimis* amount from customers not yet paid on account of the Charitable Programs.  Accordingly, the Debtors request authority, but not direction, to honor all outstanding amounts on account of the Charitable Programs, including any prepetition amounts with respect thereto, in the ordinary course of the Debtors' business**.**

XI.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact or Withhold Certain Confidential Information of Customers, (D) Redact Certain Personally Identifiable Information, and (E) Serve Certain Parties in Interest by Email; (II) Approving the Form and Manner of Service of the Notice of Commencement; and (III) Granting Related Relief (the "Creditor Matrix Motion").**

121.    ***Consolidated List of the 30 Largest Unsecured Creditors.***  Because the top creditor lists for each individual Debtor overlap, the Debtors submit that filing separate lists for each Debtor would be of limited utility.  In addition, the exercise of compiling separate top creditor lists for each individual Debtor could consume an excessive amount of the Debtors', and their advisors', limited time and resources.  The Debtors believe that the Top 30 List will better aid the U.S. Trustee in the efforts to communicate with these creditors.

122.    ***Consolidated Creditor Matrix.***  Allowing the Debtors to prepare and maintain a consolidated list of their creditors (the "Consolidated Creditor Matrix"), in lieu of filing a separate creditor matrix for each Debtor, is warranted under the circumstances of these chapter 11 cases where there are hundreds of thousands of creditors and parties in interest.  Converting the Debtors' computerized information to a format compatible with the matrix requirements and preparing a separate list of creditors for each Debtor would be expensive, time consuming, and administratively burdensome and would increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.

123.    ***Redaction of Certain Confidential Information of Customers.***  Cause exists pursuant to section 107(b)(1) of the Bankruptcy Code to authorize the Debtors to redact from any paper filed or to be filed with the Court or otherwise made public in these chapter 11 cases, including the Consolidated Creditor Matrix, the Top 30 List, and the schedules of assets and liabilities and the statements of financial affairs (collectively, the "Schedules and Statements"),

57

the name, email addresses, physical addresses and telephone numbers of individuals and entities

(collectively, the "Customer List").  The Debtors vie for customers in the highly competitive retail

market.  If the Debtors were required to disclose the Customer List, the Debtors' business

operations may be harmed by loss of customers to competitors, which could negatively impact the

Debtors' estates.  Not only would disclosing the Customer List provide an unfair advantage to the

Debtors' competitors by making information about the Debtors' commercial operations publicly

available, but the deluge of customer solicitation that would inevitably follow from such a

disclosure would significantly increase the risk of customer attrition.  Attrition in the Debtors'

customer base would diminish the value of the Debtors' estates and distract the Debtors from their

restructuring efforts.  Providing the Customer List publicly, for free, would be detrimental to the

prospect of a going concern reorganization that maximizes value for the Debtors' stakeholders.

124. ***Redaction of Certain Personally Identifiable Information of Individuals.***  Cause

exists pursuant to section 107(c) of the Bankruptcy Code to redact from any paper filed or to be

filed with the Court in these chapter 11 cases, including but not limited to the Consolidated

Creditor Matrix and the Schedules and Statements, the home and email addresses of natural

persons, including the Debtors' employees and individual equity holders.  Personally identifiable

information can be used to perpetrate identity theft and phishing scams or to locate survivors of

domestic violence, harassment, or stalking.  Furthermore, disclosures of personally identifiable

information violating the CCPA would expose the Debtors to potential civil liability and

significant financial penalties.

125. ***Authorization to Provide Service via Email.***  The Bankruptcy Rules generally

require notices be served on creditors at their addresses but give bankruptcy courts significant

latitude to modify the general rule.  *See* Fed. R. Bankr. P. 2002(m) and 9007.  Here, serving notices

by traditional mail is cost-prohibitive given the size of the Consolidated Creditor Matrix and the total amount of cash collateral available to fund these chapter 11 cases.  With over 200,000 parties included on the Consolidated Creditor Matrix as of the Petition Date, serving notices by traditional mail would drain a material amount of the Debtors' available cash at a time when such funds could instead be used to fund the administration of the Debtors' chapter 11 cases.

126.    Not only is email service likely the most efficient and cost-effective manner by which service of all interested parties can be completed, it is also the most likely to facilitate creditor responses.  Other than the face-to-face interactions that the Debtors have with their customers at the brick-and-mortar retail locations, email is the primary channel through which the Debtors' creditors correspond with the Debtors.  The Debtors structure nearly all ordinary course business communications around email, rather than traditional mail service or an alternate channel of communication, because email communication provides the Debtors with a convenient, reliable, and cost-effective tool to communicate important information in a timely manner to various parties who routinely deal with the Debtors in the ordinary course of business.

127.    ***Service of Notices to Creditors by Proposed Claims and Noticing Agent***.  The Debtors believe that using Stretto to promptly provide notices to all applicable parties will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.  Additionally, Stretto will assist the Debtors in preparing creditor lists and mailing initial notices including serving the notice of commencement (the "Notice of Commencement") of these chapter 11 cases on all parties listed on the Consolidated Creditor Matrix to advise them of the meeting of creditors under section 341 of the Bankruptcy Code.  Authorizing Stretto to handle service and noticing will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties

listed on the Debtors' voluminous Consolidated Creditor Matrix.  It is more efficient to authorize the Proposed Claims and Noticing Agent to mail or email, as applicable, all notices, including the Notice of Commencement.   Accordingly, Stretto should undertake such mailings and email service.

**XII.   Debtors' Motion for Entry of Order (I) Authorizing Eddie Bauer LLC to Act as Foreign Representative and (II) Granting Related Relief (the "Foreign Representative Motion").**

128.   Pursuant to the Foreign Representative Motion, the Debtors seek entry of an order: (a) authorizing, but not directing, Eddie Bauer LLC ("Eddie Bauer") to act as foreign representative on behalf of the Debtors' estates pursuant to section 1505 of the Bankruptcy Code and (b) granting related relief.

129.   The Debtors operate a portion of their brick-and-mortar retail business in Canada. Specifically, Debtors Eddie Bauer of Canada Corporation and 13051269 Canada Inc. are Canadian corporations (together, the "Canadian Debtors") that operate twenty-four retail locations across six Canadian provinces.  Eddie Bauer of Canada Corporation employs all of the Debtors' Canadian employees and leases all of the retail space for the Debtors' Canadian operations.

130.   I understand that Eddie Bauer as the proposed Foreign Representative, in order to protect the Debtors' assets and operations in Canada and ensure coordinated administration of the Debtors' estates, the Debtors intend to seek additional relief in Canada on behalf the Debtors' estates via an ancillary proceeding (the "Canadian Proceeding") in a court of proper jurisdiction in Ontario, Canada (the "Canadian Court") pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 (as amended, the "CCAA").  The purpose of the Canadian Proceeding is to:  (a) request that the Canadian Court recognize the Debtors' chapter 11 cases as "foreign main proceedings" and Eddie Bauer as a "foreign representative" under the applicable provisions of the CCAA; (b) request that the Canadian Court lend assistance to this Court in

protecting the Debtors' assets, operations, and property in Canada.; and (c) seek any other appropriate relief and protections from the Canadian Court that Eddie Bauer deems just and proper in the furtherance of the protection of the Debtors' estate.

131.    To commence the Canadian Proceeding, the Debtors require authority for a Debtor entity to act as the "foreign representative" on behalf of the Debtors' estates (the "Foreign Representative").  Therefore, the Debtors request authority to appoint Eddie Bauer, an affiliate of the Canadian Debtors, as such Foreign Representative.

132.    For Eddie Bauer to seek recognition as the Foreign Representative in the Canadian Proceeding and thereby apply to have the Debtors' chapter 11 cases recognized by the Canadian Court, this Court must enter an order authorizing Eddie Bauer to act as the Foreign Representative in the Canadian Proceeding.  If the order is granted, Eddie Bauer will be able to file the order with the Canadian Court as the instrument authorizing Eddie Bauer to act as the Foreign Representative pursuant to section 46 of the CCAA.

133.    I believe that authorizing Eddie Bauer to act as the Foreign Representative on behalf of the Debtors' estates in the Canadian Proceeding will allow for coordination between these chapter 11 cases and the Canadian Proceeding and provide an effective mechanism to protect and maximize the value of the Debtors' assets and estates.

**XIII.  Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code; (II) Approving the Form and Manner of Notice; and (III) Granting Related Relief (the "Automatic Stay Motion").**

134.    The Debtors operate a substantial retail enterprise with brick-and-mortar locations in nearly every U.S. state and several Canadian provinces.  The Company's North American operations include its retail locations, distribution centers, and corporate offices nationwide and in Canada, supported by a network of hundreds of vendors located in dozens of countries that supply

key products and services.  The vast reach of the Debtors' retail business requires the Debtors, in the ordinary course of business, to rely on, and incur obligations to, suppliers of goods and services that are based outside the United States.  These goods and services are tailored to meet the expectations that the Debtors' customers have for the Debtors' business—accordingly, such suppliers are vital to preserving the value of the Debtors' business.  Without continued support from their non-U.S. vendors, the Debtors would face severe interruptions to their daily operations, which would result in a significant loss of operational efficiency and negatively affect stakeholder value at the outset of these chapter 11 cases.

135.    Certain of the Debtors' foreign suppliers, however, may lack meaningful, if any, relationships with the United States.  As such, non-U.S. creditors and contract counterparties may be unfamiliar with the chapter 11 process, the scope of a debtor in possession's authority to operate its business, and/or the importance and implications of the automatic stay.  Certain of the Debtors' non-U.S. creditors—and others—may attempt to enforce liens or seize assets located outside of the United States or take other actions violating the automatic stay to the detriment of the Debtors, their estates, and creditors.  Additionally, upon the commencement of these chapter 11 cases, counterparties to the Debtors' agreements could attempt to terminate unexpired leases or executory contracts pursuant to *ipso facto* or other provisions, in contravention of sections 362 and 365 of the Bankruptcy Code.  Similarly, governmental units outside of the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, franchises, or other similar grants held by a Debtor that are required for the Debtors' ongoing business operations, in violation of sections 362 and 525 of the Bankruptcy Code.

**XIV.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances; (III) Modifying Customer Programs at the Closing Stores; (IV) Granting Related Relief (the "<u>Store Closing Motion</u>").**

136.   Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to assume and perform under that certain Letter Agreement Governing Inventory Disposition, dated as of January 29, 2026, made by and between Eddie Bauer LLC and certain of its affiliates (collectively, as applicable, the "<u>Merchant</u>"), Hilco Merchant Resources, LLC ("<u>Hilco</u>"), and SB360 Capital Partners, LLC ("<u>SB360</u>," and, together with Hilco, the "<u>Agent</u>")[9] (as may be amended and supplemented from time to time) (the "<u>Agency Agreement</u>"); (b) authorizing and approving the conduct of store closings or similar themed sales that are ongoing as of the Petition Date at the stores listed on <u>Exhibit A</u> to the Agency Agreement (the stores located in the U.S., the "<u>U.S. Closing Stores</u>" and the stores located in Canada, the "<u>Canadian Closing Stores</u>," and together, the "<u>Closing Stores</u>") pursuant to the procedures set forth in the Store Closing Motion, with such sales of Store Closure Assets at the Closing Stores to be free and clear of all liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (the "<u>Sales</u>" or "<u>Store Closings</u>"), in accordance with the terms of the store closing sale guidelines; (c) approving modifications to certain customer programs, including the acceptance of gift cards; and (d) granting related relief.

137.   ***Store Closings.***   Over the past several years, the Debtors have been forced to grapple with macroeconomic and retail-specific market pressures and headwinds, including, among other things, reduced discretionary spending on outdoor apparel, persistent inflation, and

---

[9]   Pursuant to that certain letter dated January 30, 2026, Hilco provided notice to the Debtors under Section M of the Agency Agreement that it has determined to syndicate certain aspects of the Agency Agreement to Gordon Brothers Retail Partners, LLC ("<u>GBRP</u>").

post-COVID-19 supply chain issues.  Given the expenses associated with a substantial brick-and-mortar presence and the issues affecting the retail industry more generally, a significant number of the Debtors' stores are operating at sub-optimal levels.

138.    Prior to the Petition Date, the Debtors took several steps to rationalize their lease footprint.  ***First***, leases for unprofitable stores were allowed to expire without renewal, specifically including forty-nine expiring on January 31, 2026.  As of the Petition Date, all such store closings have been completed.  ***Second***, on January 29, 2026, the Debtors executed the Agency Agreement with the Agent so that they could be prepared to effectuate a liquidation of all or any portion of their remaining store locations.  Store Closings commenced at the remaining 175 stores in the Debtors' brick-and-mortar retail footprint between January 26, 2026, and February 7, 2026, and are expected to continue throughout these chapter 11 cases absent a going concern sale of some or all of the Company's remaining stores.  As of the Petition Date, these 175 Closing Stores are currently liquidating any remaining Debtor-owned inventory and furniture, fixtures, and equipment ("FF&E").  The Debtors anticipate that all Store Closings will continue postpetition for approximately thirteen more weeks.  The proceeds and eventual labor cost savings from these Store Closings are expected to provide the Debtors with much needed liquidity and will help fund these chapter 11 cases.

139.    In the weeks prior to the Petition Date, the Debtors launched a marketing process to solicit bids for all or any portion of the Debtors' remaining brick-and-mortar retail operations as a going concern (the "Prepetition Sale Process").  The Prepetition Sale Process yielded multiple indications of interest ("IOIs"), which the Debtors, along with their advisors, are working to refine in pursuit of a potential going-concern sale of some or all of their remaining stores.  The Debtors anticipate that the negotiation and refinement of the IOIs, as well as the ongoing solicitation of

potential topping bids, will continue on a postpetition basis.  The relief that the Debtors seek in the Store Closing Motion will permit the Debtors to continue to market the remaining stores and simultaneously continue the Store Closings at the Closing Stores in pursuit of a value maximizing restructuring.  To the extent the Debtors determine that selling some or all of the remaining stores will, in their business judgement, maximize the value of their estates, the Debtors may pause or discontinue Store Closings at such stores that become subject to such sale.  The Debtors estimate that the aggregate net sales proceeds from all Sales at the Closing Stores will be approximately $21.3 million.

140.    ***Agency Agreement.***    In anticipation of these chapter 11 cases, the Debtors retained the Agent pursuant to the Agency Agreement to serve as the Debtors' agent with respect to the Store Closings and Sales.  The Agent has significant expertise and experience in serving as a consultant both in- and out-of-court for store closings and sales for businesses, merchandise, furniture, fixtures and equipment, and store operations that are substantially similar to those of the Debtors.  In late January and early February 2026, the Agent commenced Store Closings in 175 locations across the Debtors' lease portfolio.

141.    The Debtors anticipate continuing the ongoing Store Closings after the Petition Date and will therefore need to continue partnering with the Agent.  After careful consideration of available alternatives and in consultation with their advisors, the Debtors concluded in their business judgment that (a) the services of the Agent are necessary (i) for a seamless and efficient large-scale store closing process, as is contemplated by the Store Closing Motion and the Agency Agreement, and (ii) to maximize the value of the saleable inventory located in the Closing Stores (as defined in the Agency Agreement, the "Merchandise"), and the associated FF&E (Merchandise and FF&E, collectively, the "Store Closure Assets"), and (b) the Agent is qualified and capable of

performing the required tasks set forth in the Agency Agreement in a value-maximizing manner. Further, the Agent is already in the process of liquidating inventory at most of the Closing Stores.

142. ***Sale Guidelines.*** The Debtors seek approval of the Sale Guidelines, which are streamlined procedures to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code. As set forth below, the Sale Guidelines are substantially similar to sale guidelines approved in retail bankruptcies in this district. The Debtors also seek approval of the Sale Guidelines to provide newspapers, other traditional advertising media, digital marketplaces, and other digital marketing and advertising platforms in which the Sales may be advertised with comfort that the Debtors are conducting the Sales in compliance with applicable law and with the Court's approval. The Debtors seek interim approval of the Sale Guidelines to allow the continuation and commencement of the Sales at the Closing Stores.

143. The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, including the Agent, that the Sale Guidelines will provide the best and most efficient means of selling the Store Closure Assets in order to maximize their value to the estates. The Debtors estimate that the currently contemplated Store Closings at the Closing Stores will conclude no later than April 30, 2026.

144. ***Liquidation Sale Laws and Dispute Resolution Procedures.*** Certain jurisdictions in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws"). The Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, and

augmentation limitations that would otherwise apply to the Store Closings.  Such requirements hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Sale Guidelines, and to the extent such guidelines conflict with the Liquidation Sale Laws, the Sale Guidelines shall control.  For the purpose of orderly resolving any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the U.S. Sale Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors request that the Court authorize the Debtors to implement the dispute resolution procedures set forth in the Store Closing Motion.

145.  ***Fast Pay Laws.***  Many U.S. states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws" and together with the Liquidation Sale Laws, the "Applicable State Laws").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.  Under ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final checks to coincide with an employee's final day of work where required by applicable law.  This process requires the Debtors' payroll department to calculate individual payments upon termination, prepare each termination payment check, obtain authorization for each such check, and then prepare each such check for mailing.

146.  The nature of the Store Closings contemplated by the Store Closing Motion will result in numerous associate and store manager employees being terminated during the Store Closings.  Given the number of employees who will be terminated during the Store Closings, the process of delivering final payroll to affected employees will likely take several days following

the applicable terminations, making compliance with the Fast Pay Laws burdensome to the Debtors' estates, if not impossible.  To be clear, the Debtors intend to pay their terminated employees as expeditiously as possible and under normal payment procedures; however, the Debtors' payroll systems may simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with the Fast Pay Laws.  Accordingly, the Debtors request a waiver of compliance with the applicable Fast Pay Laws to the extent the Debtors' payroll systems or operations limit their ability to comply with the same.

147.    ***Lease Restrictions***.   The Debtors also request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value of their estates through the Store Closings and Sales.  In certain cases, the contemplated Store Closings and Sales may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions would also hamper the Debtors' ability to maximize value in selling their inventory.

148.    The Debtors also request that any entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf be enjoined from interfering with or otherwise impeding the conduct of the Store Closings and Sales.  The Debtors further request that any such entities be enjoined from instituting any action against the Debtors in any court (other than in the Court or Canadian Court as applicable) or before any administrative body that in any way directly or indirectly interferes with, obstructs,

or otherwise impedes the conduct of the Store Closings, the Sales or the advertising and promotion (including through the posting of signs) of the Sales.

149.    ***Abandonment.***  The Debtors intend to sell any marketable owned FF&E present in the Closing Stores or otherwise transfer valuable FF&E to the Debtors' other store locations.  In their business judgment, however, the Debtors may determine that the cost associated with holding, transferring, or selling such property exceeds the proceeds that they will realize from its sale or that such property may not be saleable at all.  In such cases, retaining the property would be burdensome to the estates, and the property would be of inconsequential value.

150.    For the avoidance of doubt, the Debtors will not sell any personal identifying information (which means information that alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) ("PII") as part of the Store Closings, and all personal identifying information will be removed from any FF&E prior to the sale or abandonment of the same.

151.    ***Store Closing Severance Plan.***  As discussed in greater detail in the Wages Motion, on January 1, 2026, the Debtors instituted a Store Closing Severance Plan (the "Store Closing Severance Plan") to compensate store-level non-insider employees who remain in the employ of the Debtors during the Sales.  Under the Debtors' Store Closing Severance Plan, eligible hourly store associates who have been actively employed at a Closing Store for thirty days prior to the applicable Sale Termination Date are eligible to receive a lump sum payment based on the average number of weekly hours worked during the applicable Store Closing period, ranging from $500 to $1,200.  Exempt managers are eligible to receive a lump sum payment of $2,000 and general

69

managers, store managers, and assistant managers are eligible to receive a one-time lump sum payment of four weeks' pay.

152.    ***Customer Programs***.    The Sales and Store Closings require that the Debtors make certain modifications to their customer programs to reflect new realities.  Accordingly, the Debtors intend to implement the following changes in all Closing Stores, which will be clearly posted for customers at cash registers and online for the duration of the Store Closings.

- ***Adventure Rewards Program.***    The Debtors will continue to honor Rewards Points on account of the Debtors' Adventure Rewards Program for twenty-one days from the date of the Interim Order.  After such twenty-one period, the Debtors will discontinue the Adventure Rewards Program with respect to the Closing Stores, so that customers will no longer earn Rewards Points on account of purchases at Closing Stores nor will such Closing Stores honor Adventure Reward Certificates.

- ***Refunds and Exchanges***.    Merchandise sold in the Sales will be on a "final" basis and returns of such items will not be accepted at any of the Debtors' retail locations.

- ***Gift Cards***.    The Debtors will continue to accept the Debtors' validly-issued gift cards at Closing Stores for twenty-one days from the date of the Interim Order.  Following such twenty-one-day period, the Debtors will no longer accept gift cards at such Closing Stores.  Notwithstanding any policy or law to the contrary, the gift cards and related customer programs are not redeemable for cash at any time.

153.    I believe that the relief requested in the Store Closing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases.   Accordingly, on behalf of the Debtors, I respectfully submit that the Store Closing Motion should be approved.