| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**McCARTER & ENGLISH, LLP**<br>Joseph Lubertazzi, Jr.<br>Jeffrey T. Testa<br>100 Mulberry Street<br>Four Gateway Center<br>Newark, New Jersey 07102<br>Telephone: (973) 622-4444<br>Facsimile: (973) 624-7070<br>Emails: jlubertazzi@mccarter.com<br>         jtesta@mccarter.com<br><br> -and-<br><br>Daniel F. Fiorillo (admitted *pro hac vice*)<br>Adam C. Silverstein (NJ Bar No. 037801992)<br>Sunni P. Beville (admitted *pro hac vice*)<br>**OTTERBOURG P.C.**<br>230 Park Avenue<br>New York, New York 10169-0075<br>Telephone: (212) 661-9100<br>Facsimile: (212) 682-6104<br>Emails: dfiorillo@otterbourg.com<br>         asilverstein@otterbourg.com<br>         sbeville@otterbourg.com<br><br>*Co-Counsel to Wells Fargo Bank, National*<br>*Association, as Prepetition ABL Administrative*<br>*Agent* |

| In re: | Chapter 11 |
|---|---|
| EDDIE BAUER LLC, *et al.*, | |
| Debtors.[1] | Case No. 26-11422 (SLM) |
| | (Jointly Administered) |

### ABL LENDERS' REPLY IN SUPPORT OF DEBTORS' MOTION FOR A FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION

---

[1]  The last four digits of Debtor Eddie Bauer LLC's tax identification number are 6060.  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/EddieBauer.  The location of Debtor Eddie Bauer LLC's principal place of business is 10401 Northeast 8th Street, Suite 500, Bellevue, WA 98004; the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Suite B100, Plano, TX 75024.

Wells Fargo Bank, National Association ("Wells Fargo"), in its individual capacity and as agent for itself and certain other lenders (collectively, the "ABL Lenders"), by and through its undersigned counsel, respectfully submits this reply ("Reply") in support of the Debtors' *Motion for Entry of a Final Order Authorizing the Debtors' Use of Cash Collateral and Granting Adequate Protection* [D.I. 7] (the "Motion") and in response to the *Objection to the Motion* [D.I. 268] (the "Objection") filed by the Official Committee of Unsecured Creditors (the "Committee").[2]

## PRELIMINARY STATEMENT

1.      The Debtors, the ABL Lenders and the Committee continue to negotiate a path forward that, if agreed and approved, would resolve the Objection.  No agreement has been reached yet and the extended deadline for the ABL Lenders to file this Reply is now upon it.  The ABL Lenders thus file this Reply in the event the Court is compelled to rule on the Motion, but with the ongoing aspiration that such a ruling will not be necessary.  But there should be no mistaking that, if the Court is required to rule, the Motion should be granted.

2.      There can be no dispute (and, indeed, the Committee does not dispute) that the ABL Lenders' Cash Collateral, and only the ABL Lenders' Cash Collateral, is being used to finance these Chapter 11 Cases.  The Debtors' budget shows that over $100 million of cash will be spent on operating and administrative expenses during the three-month budget period; and every penny of that amount comes from the ABL Lenders' Cash Collateral. *See Approved Budget* [D.I. 7, Ex. 1]. Nor can there be any dispute (and, again, the Committee does not contend otherwise) that the expenditure of the ABL Lenders' Cash Collateral is not being replaced with any new collateral to

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Motion.

2

which a replacement lien could attach and provide adequate protection to the ABL Lenders. And the ABL Lenders do not have any equity cushion in the Debtors' collateral that could serve as adequate protection. Just the opposite: the Debtors' assets are worth a small fraction of their secured debt obligations.

3.      In the face of these indisputable facts, and if the parties are unable to resolve this Motion consensually, the Committee would seek to jettison the entire adequate protection package that the Debtors negotiated, in the exercise of their business judgment, to obtain the ABL Lenders' consent to use their Cash Collateral to fund these Chapter 11 Cases. In its place, the Committee advances the novel proposition that the ABL Lenders must seek adequate protection by virtue of their resort to *non-debtor* collateral.

4.      The Committee's position has no support in fact or in law. In fact, the Committee fails to cite any factual evidence or case law in support of its position (because there is none). Nor is their unprecedented invocation of a novel equitable marshaling theory (prioritizing non-debtor assets over debtor assets) even remotely equitable. The Committee effectively seeks to substantively consolidate non-debtor assets solely for purposes of adequate protection, and does so on a selective basis and only when it suits their needs. The Committee ignores that its theory of adequate protection requires consideration of not just these Debtors' individualized circumstances, but the individualized circumstances of every other non-debtor co-borrower that cross-collateralized their assets under the consolidated credit facility. Requiring anything less would rewrite existing law. It also would sidetrack these proceedings into protracted ancillary litigation over the collateral securing *non-debtor* obligations. The Committee's proposed approach would open a Pandora's box of these, and other, unintended consequences.

3

5.      In contrast, the adequate protection package that *the Debtors* negotiated with the ABL Lenders to induce their permission to use their Cash Collateral to fund these cases is supported by the facts, the law, and is a reasonable exercise of the Debtors' business judgment. Courts in this Circuit, and elsewhere, have routinely approved the adequate protections granted by the Debtors – *e.g.*, pledging of avoidance actions, 506(c) waivers, "equities of the case" waivers, etc.[3]  The few cherry-picked authorities that the Committee comes forward with do not stand for the propositions for which they cite them, involved far less compelling circumstances than those here, or both.  For all of these reasons and those set forth below, Wells Fargo respectfully asserts that, if the parties are unable to resolve matters themselves, the Objection should be overruled, and the relief sought in the Motion should be granted on a final basis.

## ARGUMENT

### The Final Order's Adequate Protection Package is
### Fair, Reasonable, and Customary, and Should Be Approved

6.      A secured creditor is entitled to adequate protection—as a matter of right, not merely a matter of discretion—when the estate proposes to use the creditor's collateral and when the creditor is stayed from enforcing its interests.  *See* 11 U.S.C. §§ 361, 362(d), 363(e); 3 COLLIERS ON BANKRUPTCY ¶ 361.02 (16th ed. 2024) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339, at 343-44 (1977)).[4]  Protection of a secured creditor's interest in collateral is rooted in the Fifth Amendment of the United States Constitution and is recognized as a property right afforded the highest protection under the law.  *See* H.R. Rep. No. 595, at 339 (1977) ("The concept is derived from the fifth amendment protection of property interests"); *In re Keystone*

---

[3]      *See infra* at ¶¶ 23-38.

[4]      The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 *et seq*. Specific sections of the Bankruptcy Code are identified herein as "section ___."

4

*Camera Prods. Corp.*, 126 B.R. 177, 183 (Bankr. D.N.J. 1991) ("A secured creditor has a constitutional right to have the value of its secured claim on the petition date preserved.").[5]

7.      Here, it is an undisputable fact that the ABL Lenders are not adequately protected for the use of Cash Collateral based on the value of the Debtors' assets.  The financial facts of these cases are stark, undisputed, and devastating. Based on the Debtors' own budget, the ABL Lenders, by permitting the use of their Cash Collateral, will fund over $100 million in operating and administrative costs over the course of this case, and recover approximately $15.2 million at the conclusion of the cases.  Put differently, the ABL Lenders, who are funding every facet of these cases, will recover less than 20 cents of every dollar they spend on these cases.

8.      The Debtors' assets (*i.e.*, the ABL Lenders' collateral) are diminishing in value through multiple simultaneous and independent channels, each of which is ongoing, measurable, and irreversible.   The most immediate and quantifiable form of diminution is the daily consumption of Cash Collateral itself. The Approved Budget reflects that the Debtors are projected to generate approximately $95.7 million in total cash receipts over the life of these cases.  Every dollar of those receipts derives from the ABL Lenders' prepetition collateral – either prepetition accounts receivable or the postpetition sale of prepetition inventory.  From those receipts, the Debtors are projected to spend operating disbursements of approximately $49.0 million, payroll reimbursements to Parent Company of approximately $21.1 million, operating reimbursements to

---

[5]    Indeed, for over eighty years, the United States Supreme Court has recognized that the security interests possessed by a secured lender constitute "property," and are thus accorded protection by the Takings Clause of the Fifth Amendment. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S. Ct. 196, 85 L. Ed. 184 (1940); *see also United States v. Security Indus. Bank*, 459 U.S. 70, 103 S. Ct. 407 (1982) (categorizing the right of a secured "creditor in the collateral" as a "traditional property right"); *Chrysler Credit Corp. v. Ruggiere* (*In re George Ruggiere Chrysler-Plymouth, Inc.*), 727 F.2d 1017, 1019 (11th Cir. 1984) ("[S]ecurity interests are 'property rights' protected by the Fifth Amendment from public taking without just compensation"); *In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000) ("The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment.") (citing *In re Johnson*, 63 B.R. 550, 551 (Bankr. D. Colo. 1986)).

ME1\60448793.v1

the Parent Company of approximately $10 million.  The Debtors also will incur restructuring expenses of approximately $20.7 million, including store liquidation fees, professional fees, credit card holdbacks, and utility deposits.  The result, as reflected in the Approved Budget itself, is a net cash flow of negative $5.178 million over the entire case.  That cash drain is coupled with the dollar for dollar depletion of the ABL Lenders' prepetition accounts receivable and inventory that sourced the funding of Debtors' activities resulting in that cash burn.  The ABL Lenders are not merely watching their collateral erode.  They are funding the erosion themselves, out of their own collateral, with no mechanism for recovery of those losses in this case.

9.      Inventory on hand during the budget period is diminishing independently and simultaneously. The Debtors' inventory will be sold through going-out-of-business sales at recovery rates that are dramatically lower than the cost values at which that inventory was carried on the Petition Date.  This is an inherent and inescapable feature of distressed retail liquidation: as store closing announcements are made, customers anticipate and wait for deeper discounts, traffic patterns shift, and merchandise that would have commanded full or modestly discounted prices in a going-concern context is instead sold at steep markdowns to drive velocity.  Every item of inventory sold at a going-out-of-business discount generates less recovery than the same item would have generated on the Petition Date.  That difference, multiplied across the entirety of the Debtors' inventory, represents a concrete, quantifiable, and ongoing diminution in the value of the ABL Lenders' collateral.

10.     The Committee does not dispute these facts.  But the Committee seeks to avoid the consequences of these facts.

6

**The ABL Lenders Are Not Oversecured Because
Non-Debtor Collateral Cannot Be Considered**

11.     To escape the reality of the Debtors' assets being worth far less than their secured debt obligations and the burn of Cash Collateral without any replacement, the Committee pivots to allege that the ABL Lenders are oversecured by virtue of non-debtor assets.   But the Committee's unprecedented "oversecured" theory fails as a matter of law.  The Committee has not cited, because it cannot cite, a single provision of the Bankruptcy Code, a single case, or single sentence of legislative history supporting the proposition that a court must consider a secured creditor's recourse to non-debtor assets when determining whether that creditor is entitled to adequate protection for the use of cash collateral by a debtor.

12.      The Bankruptcy Code's text forecloses the Committee's theory at every turn. Section 361 provides adequate protection for the "interest of an entity in property." *See* 11 U.S.C. § 361. Section 363(e) conditions use of property on "adequate protection of such interest" in such property.  *See* 11 U.S.C. § 363(e).  The property at issue in each instance is the *Debtors'* property, *not* the property of Brooks Brothers, Nautica, Aeropostale, or Lucky Brand.  The fact that the ABL Lenders have recourse to the assets of non-debtor affiliates for significant cross-collateralized debt obligations does not mean that the Debtors are excused from providing adequate protection to the ABL Lenders for *their* use of cash collateral.   This is especially so where the non-debtor assets secure debt incurred not just by the Debtors, but by a conglomerate of non-debtor entities as well.

13.     The structure of Bankruptcy Code section 506 is informative.  Section 506(a) defines a secured claim by reference to "the value of such creditor's interest in the estate's interest in such property," and section 506(b) permits postpetition interest only where the value of that estate property exceeds the claim. *See* 11 U.S.C. § 506.  Courts interpreting these provisions have rejected efforts to rely on non-debtor assets in determining whether a creditor is oversecured. *See*

7

*DeNofa v. Nat'l Loan Investors, L.P. (In re DeNofa)*, 124 F. App'x 729, 730–31 (3d Cir. 2005) (holding that non-debtor property may not be included in determining whether a creditor is oversecured).  A parallel can and should be drawn to adequate protection under section 363.

14.     The Committee's argument also cannot be reconciled with other provisions of the Bankruptcy Code.  Section 552(b) limits the extent to which prepetition liens attach to postpetition proceeds, subject to the "equities of the case," which exists to prevent secured creditors from capturing value created by estate resources. *See* 11 U.S.C. § 552(b).  Sections 524(e) and 541, respectively, preserve the separate liability of non-debtors and confirm that bankruptcy does not collapse distinctions between debtor and non-debtor property. *See* 11 U.S.C. § 524(e). The Committee's theory, by contrast, would effectively import non-debtor assets into these estates for purposes of denying adequate protection—while leaving all other consequences of separateness intact. The Code does not permit such a one-way use of non-debtor property.

15.     The Committee's adequate protection theory fails for a more fundamental reason: it selectively invokes non-debtor collateral while ignoring the legal and economic realities that accompany that collateral.  The Committee seeks to compare the Debtors' obligations against a broader pool of assets that includes non-debtor collateral—without accounting for the separate indebtedness, priorities, and obligations that such collateral secures.  That is not a valid analysis. Collateral cannot be evaluated in isolation.  If non-Debtor assets are to be considered, then the full capital structure and obligations tied to those assets must also be considered.  The Committee ignores the other side of that equation.  And there is no precedent for conducting a trial, for adequate protection purposes, of the individualized financial circumstances of every co-borrower that would be impacted by the diminution of *their* collateral to fund *the Debtors'* chapter 11 cases.

ME1\60448793.v1

16.     Accepting the Committee's theory would also require this Court to conduct an enterprise-wide valuation mini-trial involving entities not before this Court, not subject to its jurisdiction, and whose own creditors and equity holders have no voice in this proceeding.

17.     If a creditors' committee could defeat adequate protection rights in any multi-entity lending structure by pointing to aggregate guarantor network value while ignoring the liabilities secured by that network, no rational lender would extend cross-collateralized credit on these terms. Congress did not intend that result.  No court has endorsed it. This Court, respectfully, should not be the first.  The Committee's adequate protection theory should be rejected out of hand.

### The Terms of the Final Order are Fair, Reasonable and Customary, and the Debtors' Agreement to the Final Order is a Proper Exercise of the Debtors' Business Judgment

18.     Bankruptcy courts routinely and properly defer to a debtor's business judgment on the terms of a post-petition financing arrangement.  *See Trans World Airlines, Inc v. Travellers Int'l A.G. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving an interim loan, receivables facility and asset-based facility because they "reflect[ed] sound and prudent business judgment … [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."); *see also In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding a court should "permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). As one bankruptcy court has observed, business judgments "should be left to the board room and not to [the] court." *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985).

19.     To determine whether the business judgment test is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar

9

circumstances." *In re Duta Auto. Sys. Inc*., 2007 WL 7728109, at \*97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah Oct. 8, 1981).

20.     Here, with no other forms of adequate protection available to offer to the ABL Lenders for the substantial use of their Cash Collateral, the protections that the Debtors offered to induce the ABL Lenders' consent were reasonable.  The Debtors determined, in the reasonable and independent exercise of their business judgment, that access to Cash Collateral on the terms provided in the proposed Final Order offers the best opportunity to maximize the value of the Debtors' estates.  The proposed Final Order enables the Debtors to continue to operate their business while effectuating an orderly wind down and liquidation of their assets for the benefit of all stakeholders.  The restructuring strategy, including the adequate protection package proposed in the Final Order, reflects weeks of prepetition negotiations among the parties.

21.     The proposed Final Order is not a menu from which the Committee may select favorable provisions and discard unfavorable ones.  It is an integrated, carefully balanced arrangement in which each component was negotiated as part of a comprehensive whole.  The adequate protection liens, the superpriority claims, the section 506(c) waiver, the marshaling waiver, the section 552(b) waiver, the challenge period, and the professional fee budget were each agreed to in the context of all the others. Allowing the Committee to surgically excise the provisions it dislikes — without confronting the consequences for the arrangement as a whole — would destroy the negotiated equilibrium and could eliminate the ABL Lenders' consent altogether, terminating Cash Collateral availability, collapsing the wind-down process, and

10

causing the disorderly liquidation that would harm every stakeholder in these cases — including the unsecured creditors the Committee purports to represent.

22. Under these circumstances, this Court should not second guess the agreements between the parties (as urged by the Committee), but instead should grant the relief requested by the Debtors in the Motion on a final basis. The Debtors' decision to use Cash Collateral on the terms of the Final Order is a sound exercise of its business judgment and should not be disturbed.

**Superpriority Claim and
<u>Liens on Avoidance Actions are Proper</u>**

23. The Committee contends that the granting of liens on the proceeds of, among other things, avoidance actions as adequate protection for the use of Cash Collateral is improper. The Committee is wrong.

24. Contrary to the Committee's objection, the granting of replacement liens in the proceeds of avoidance claims is, in fact, "for the benefit of the estate." 11 U.S.C. § 550(a). The replacement liens are appropriate and benefit the estates because it is in exchange for the ABL Lenders' agreement to permit the Debtors to use Cash Collateral to finance the wind down and liquidation of the Debtors. There is no legal basis for displacing the Debtors' business judgment in this regard. *E.g., In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Aug. 1, 2022), Docket No. 332, Tr. 29:23-30:7 (concluding that "[t]here is simply no serious legal basis to contend that avoidance action proceeds are legally required to be preserved for unsecured creditors or to conten[d] that they cannot properly be pledged in appropriate circumstances," and "identify[ing] no such impediment or factor that warrants a judicial override of Debtors' business judgment regarding this aspect of the DIP facility") (citations omitted).[6]

---

[6] *See also Gonzales v. Nabisco Div. of Kraft Foods, Inc.* (*In re Furrs*), 294 B.R. 763, 782-83 (Bankr. D.N.M. 2003) (settlement agreement, in which trustee granted a lien in avoidance proceedings to secured lenders and agreed to pay two-thirds of the net proceeds from the avoidance proceedings to secured lenders, but did not absolutely

11

25. It, therefore, is not surprising that courts have entered orders granting liens on, or otherwise disposing of, Chapter 5 causes of action in favor of debtors' secured creditors. In *Mellon Bank, N.A. v. Dick Corp.*, for example, the Seventh Circuit held that the debtor's grant of a lien on the proceeds of avoidance actions was "for the benefit of the estate" under section 550, where doing so allocated "this value to the objecting secured lenders to compensate them for risk" related to post-petition financing. 351 F.3d 290, 292-93 (7th Cir. 2003). The court explained: "Lest this way of resolving the issue be taken to assume that § 550(a) requires that some benefit flow to unsecured creditors, we add that the statute does not say this. Section 550(a) speaks of benefit to the *estate*–which in bankruptcy parlance denotes the set of all potentially interested parties–rather than to any particular class of creditors." *Id.* at 293 (emphasis in original).

26. In *In re Murray Metallurgical Coal Holdings, LLC*, the court adopted *Mellon Bank* in approving a chapter 11 plan that included the sale of avoidance proceeds. 623 B.R. 444, 515-16 (Bankr. S.D. Ohio 2021). The court explained that "the Seventh Circuit held that the granting of a lien on preferential transfer actions benefitted the estate even though it was only the secured creditors that were entitled to the proceeds because the granting of the lien facilitated postpetition financing and the sale of the debtor." 623 B.R. at 516 (citing *Mellon Bank*, 351 F.3d at 293); *see*

---

assign avoidance actions to secured lenders, was "for the benefit of the estate"); *In re Metaldyne Corp.*, 2009 WL 2883045, at *4-5 (Bankr. S.D.N.Y. June 23, 2009) (granting replacement liens in proceeds of avoidance claims as "adequate protection for Prepetition Term Lender being primed by the DIP Facility," where "[t]he Debtors have only limited unencumbered assets upon which replacement liens can be provided: avoidance actions and the Unencumbered Foreign Stock"); *In re AppliedTheory Corp.*, 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008) ("I was surprised to see the Creditors' Committee arguing that under no circumstances could the Lenders have a claim on the proceeds of avoidance actions and other initially unencumbered assets, even if necessary to give them adequate protection. Of course those assets started out unencumbered. But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection. That's expressly authorized under section 361(2)."); *Rafool v. Propack Sys., LLC* (*In re Fleming Packaging Corp.*), 2007 WL 4556985, at *6 (Bankr. C.D. Ill. Dec. 20, 2007) ("This Court does not consider Section 550(a)'s 'for the benefit of the estate' phraseology as a statutory requirement that the unsecured creditors benefit directly from the recovery of an avoided transfer, *i.e*., that the recovered funds end up in the pockets of unsecured creditors.").

12

*also Pitman Farms v. ARKK Food Co. LLC* (*In re Simply Essentials, LLC*), 78 F.4th 1006 (8th Cir. 2023) (holding that avoidance causes of action are property of the bankruptcy estate under section 541 of the Bankruptcy Code and may be sold by a trustee or debtor-in-possession under section 363).

27. The Committee's reliance on *Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm*, 229 F.3d 245, 250 (3d Cir. 2000), is misplaced. In *Buncher*, the court addressed whether the bankruptcy court's finding of lack of fair consideration in an alleged fraudulent conveyance was supported by the evidence. In that context, the court made a passing reference, drawn from a bankruptcy treatise, that recoveries under section 544(b) should inure to the benefit of all unsecured creditors not only those creditors who had the right to avoid the transfer. *Id.* That observation was ancillary to the holding and cannot be read to establish that avoidance actions are immune from liens, may not be pledged, or are categorically unavailable as adequate protection collateral. *Id. Buncher* itself states "the purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate." *Id.*

28. The Committee's reliance on *Citicorp Acceptance Co. v. Robinson* (*In re Sweetwater*), 55 B.R. 724 (D. Utah 1985), *aff'd in part, rev'd in part*, 884 F.2d 1323 (10th Cir. 1989), is also misplaced. In *In re Sweetwater*, the court explained, in a larger discussion over the ability of a trustee or debtor-in-possession to assign the right to pursue avoidance actions, that the avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors. *See id.* at 733. Despite the Committee's assertions to the contrary, unencumbered assets, including proceeds from avoidance actions, commercial tort claims, and other claims are not solely reserved for the benefit of unsecured creditors, but rather more broadly inure to the benefit of the estate. *See* 11 U.S.C. § 550(a) (preserving avoidance action recoveries "for the

13

benefit of the estate"); *In re Physiotherapy Holdings, Inc.*, 2017 WL 5054308, at *8 (Bankr. D. Del. Nov. 1, 2017) (holding that "the estate is more than the interest of creditors" and that "'for the benefit of the estate' does not mean for the benefit of creditors" but rather "'all legal or equitable interests of the debtor in property as of the commencement of the case'") (citations omitted).

29.     As case law recognizes, the granting of a replacement lien on property recovered or avoided from transfer pursuant to Chapter 5 causes of action serves as consideration for the ABL Lenders' agreement to allow the Debtors to use Cash Collateral to fund the Debtors' orderly liquidation.  The granting of replacement liens on Chapter 5 causes of action is thus for "the benefit of the estate" and proper.

### Waiver of Equitable Marshaling is Proper

30.     The Committee argues that the ABL Lenders should be required to marshal away from previously unencumbered Debtor assets — specifically, commercial tort claims, leasehold interests, estate causes of action against the ABL Lenders themselves, and the proceeds of each — and turn to those assets only as a last resort after exhausting non-debtor collateral and all of the Debtors' prepetition collateral.  In other words, the Committee is constructing a mandatory enforcement waterfall that exists nowhere in the Bankruptcy Code and nowhere in the case law, and is contrary to the terms of the ABL Lenders' loan documents.  Under the Committee's theory: first the ABL Lenders must exhaust non-debtor collateral, then prepetition Debtor collateral, and only as a last resort may they access specific unencumbered Debtor assets that the Committee has identified and reserved for unsecured creditors.  This framework would require this Court to manage the ABL Lenders' enforcement strategy across multiple legal entities, multiple jurisdictions, and multiple asset classes, none of which are before this Court, as a precondition to

14

the use of the ABL Lenders' own Cash Collateral.  That is not marshaling.  That is an unprecedented judicial imposition on a secured creditor's fundamental constitutional and statutory property rights, and is not supported by a single case or provision of the Bankruptcy Code.

31.  Even putting that aside, the Committee's argument collapses under the doctrine's threshold requirements. Marshaling is a narrow equitable doctrine that applies only where two creditors share a common debtor and two funds of that same debtor are available. *See e.g.*, *Meyer v. United States*, 375 U.S. 233, 236 (1963) (recognizing that the equitable doctrine of marshaling is a creditor right that "rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds."); *Off. Comm. of Unsecured Creditors of Am.'s Hobby Ctr. v. Hudson United Bank* (*In re Am.'s Hobby Ctr., Inc.*), 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) (explaining that the "common debtor" requirement for marshaling "is not met where the two funds sought to be marshaled are held separately, such as by a corporation and its shareholder") (citation omitted).[7] That prerequisite is not met where, as here, the Committee seeks to force the ABL Lenders to proceed against assets of non-debtor entities or otherwise distinct obligors. Nor, in any event, does the Committee have standing to invoke the doctrine: unsecured creditors generally cannot compel marshaling.[8] *See Simon & Schuster, Inc. v. Advanced Mktg. Servs., Inc.* (*In re Advanced Mktg.*

---

[7] Because marshaling is an equitable doctrine, it is "designed to promote fair dealing and justice." *Meyer*, 375 U.S. at 237.  "Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Id*. However, the doctrine of marshaling "is not applied when the senior secured creditor would be delayed or inconvenienced in the collection of the debt owed it." *Galey & Lord Inc., v. Arley Corp.* (*In re Arlco, Inc.*), 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999).

[8] A few courts have recognized limited circumstances in which the usual rule barring unsecured creditors from invoking marshaling does not control—most commonly where a bankruptcy trustee proceeds under section 544(a) as a hypothetical lien creditor, or where extraordinary facts justify treating separate obligors or insider-provided collateral as effectively satisfying the doctrine's equitable requirements. But those cases are narrow and fact-specific, and they do not help the Committee here. The Committee is not a trustee exercising strong-arm powers, has not obtained derivative authority to assert such status, and does not allege the kind of insider abuse, veil-piercing, or other extraordinary facts that led those courts to depart from the ordinary rule. *See, e.g., Off. Comm. of Unsec. Creditors of High Strength Steel, Inc., v. Lozinski* (*In re High Strength Steel, Inc.*), 269 B.R. 560, 573–

ME1\60448793.v1

*Servs., Inc.*), 360 B.R. 421, 427 (Bankr. D. Del. 2007) ("'[U]nsecured creditors cannot invoke the

equitable doctrine of marshaling.'") (citations omitted).  Because the Committee cannot satisfy

either the doctrinal prerequisites or the threshold standing requirement, the Committee's

marshaling theory fails as a matter of law.

32.    Furthermore, the commercial tort claims, leasehold interests, and estate causes of

action are contingent, unliquidated, and entirely speculative assets of unknown and completely

unproven value.  The Committee has not identified a single commercial tort claim, estate cause of

action or leasehold interest of any specific economic significance.  What the Committee has done

is point to categories of unproven, contingent assets and demand that this Court treat those assets

as a mandatory prior resort, protecting them for unsecured creditors before the ABL Lenders may

access anything else and without offering (because they cannot offer) ABL Lenders any other form

of adequate protection to protect the use of over $100 million in Cash Collateral.[9]

33.    Lastly, there are numerous examples where courts have entered orders approving

a debtor's exercise of its business judgment to grant such waivers. *See, e.g.*, *In re Careismatic*

*Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (same); *In re Cyxtera Techs.,*

---

74 (Bankr. D. Del. 2001) (holding that a chapter 7 trustee, as a hypothetical lien creditor under section 544(a), had standing to seek marshaling, while emphasizing the doctrine's equitable limits); *Fundex Cap. Corp. v. Balaber-Strauss (In re Tampa Chain Co.)*, 53 B.R. 772, 777–79 (Bankr. S.D.N.Y. 1985) (recognizing trustee standing under section 544(a) and considering exception to common-debtor requirement based on allegations warranting disregard of corporate separateness); *Berman v. Green (In re Jack Green's Fashions for Men Big & Tall, Inc.)*, 597 F.2d 130, 133 (8th Cir. 1979) (affirming marshaling in unusual circumstances involving insider-owned real estate and multiple related bankruptcy estates, based on the court's equitable power).

[9]    In support of its position that the Prepetition Secured Parties are not entitled to Waivers of Section 506(c) Surcharge Claims and Marshaling remedies, the Committee cites the following cases: *In re Samuel's Jewelers, Inc.*, No. 18-11818 (KJC), Docket No. 252; (Bankr. D. Del. Sept. 18, 2018); *In re The Weinstein Co. Holdings LLC*, No. 18-10601 (MFW), Docket No. 267 (Bankr. D. Del. Apr. 19, 2018); *In re The Bon-Ton Stores, Inc.*, No. 18-10248 (MFW), Docket No. 352 (Bankr. D. Del. Mar. 12, 2018); *In re Frank Theatres Bayonne/South Cove, LLC*, No. 18-34808 (SLM), Docket No. 212 (Bankr. D.N.J. Jan. 28, 2019); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ), Docket No. 520 (Bankr. S.D. Tex. Nov. 15, 2018).  However, the court in each of these cases granted the section 506(c) and marshaling relief included in the proposed Final Order.

ME1\60448793.v1

*Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same); *In re David's Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (same). The ABL Lenders' right to adequate protection must be protected against the conclusory arguments put forth by the Committee.

**Waiver of Section 506(c) Surcharge**
**Claims is Proper**

34.     The Committee's objection to the section 506(c) surcharge waiver fails on similar grounds.  The U.S. Supreme Court has directly and definitively established that the trustee, and only the trustee, may recover from secured collateral the reasonable, necessary costs of preserving or disposing of that collateral under section 506(c). *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).  Other parties in interest may not independently assert surcharge claims under section 506(c). *Id.*  The Second Circuit has confirmed that a creditors' committee lacks standing to assert section 506(c) claims independent of the trustee or debtor in possession, and that section 1109(b)'s general right to be heard does not transform a committee into the legal representative of the estate for purposes of asserting section 506(c) rights. *See Smart World Tech., LLC v. Juno Online Servs., Inc. (In re Smart World Tech., LLC),* 423 F.3d 166, 181-82 (2d Cir. 2005); *see also In re River Ctr. Holdings, LLC*, 394 B.R. 704, 717 (Bankr. S.D.N.Y. 2008) ("The Supreme Court has made clear that only the trustee has the power, under the plain language of the Code, to assert a section 506(c) claim.").  The right to assert, and therefore the right to waive, a section 506(c) surcharge claim belongs exclusively to the Debtors as debtors in possession.  The Debtors have exercised that right by agreeing to the waiver in the proposed Final Order.  The Committee's objection should be overruled on standing grounds without reaching the merits.

35.     On the merits, the section 506(c) objection fails because the Committee ignores the economic realities of the case.  The administrative costs of these cases are being borne solely

ME1\60448793.v1

by the ABL Lenders.[10]   The section 506(c) waiver is not a mechanism for shifting costs to unsecured creditors.   It is a recognition of the straightforward economic reality that the ABL Lenders are already bearing every dollar of preservation cost themselves, through their own Cash Collateral, under a budget this Court has approved.   There is nothing left to surcharge.

36.       There are numerous examples where courts have entered orders approving a debtor's exercise of its business judgment to grant such waivers. *See e.g.*, *In re Forever21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Nov. 5, 2019) (approving waivers subject to carve-out); *In re Blackhawk Mining LLC*, No. l9-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Mar. 29, 2019) (same); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Feb. 27, 2018) (same).   The ABL Lenders respectfully request that the Court do the same in this case.

## Waiver of the "Equities of the Case" Exception is Proper

37.       Section 552(b) of the Bankruptcy Code provides that a secured creditor's prepetition lien will attach to the postpetition proceeds of its prepetition collateral "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(1).   The "equities of the case" exception is a means of allocating the value of postpetition collateral proceeds between the secured creditor and the estate. *See Stanziale v. Finova Cap. Corp. (In re Tower Air, Inc.)*, 397 F.3d 191, 205 (3d Cir. 2005) ("Section 552(b) is normally relevant in Chapter 11, 'to prevent a secured creditor from reaping benefits

---

[10]   Where a secured creditor has agreed to fund administrative costs from its collateral and subordinate its liens to a professional-fee carve-out, a section 506(c) waiver is particularly appropriate, as the creditor has, in effect, already bargained for it. *See, e.g.*, *In re Mineral Park, Inc.*, No. 14-11996 (Bankr. D. Del.), Hr'g Tr. 43:10–12, Sept. 23, 2014 (overruling committee's objection and finding that secured lender funding the carve-out had, in effect, paid for a section 506(c) waiver); *In re MPM Silicones, LLC*, No. 14-22503 (Bankr. S.D.N.Y.), Hr'g Tr. 58:10–13; 93:12–20, May 23, 2014 (noting that where a carve-out is provided, a section 506(c) waiver is desirable to avoid future litigation over surcharge).

ME1\60448793.v1

from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate.'").

38.    The factual predicate of the section 552(b) exception is conclusively absent.  The ABL Lenders' collateral is not appreciating.  It is being liquidated at going-out-of-business prices that the Debtors' own liquidator has revised downward since the outset of these cases.  Every dollar invested in the Debtors' operations comes from the ABL Lenders' own Cash Collateral, not from unencumbered estate resources.[11]  There is no windfall for the ABL Lenders to disgorge. The Approved Budget, which governs every dollar of Cash Collateral use in these cases, confirms that the ABL Lenders' own money is the exclusive source of estate financing, and that money is being consumed, not invested for appreciation.  The equities of this case support recognition of the Debtors' exercise of business judgment and approval of the terms agreed to by the ABL Lenders for consensual use of their Cash Collateral.

### Objections to the Length of the Challenge Period and Investigation Budget are Meritless

39.    The Committee objects to the investigation budget ($50,000) and the amount of time (60 days) provided in the proposed Final Order to investigate and commence any causes of action against the Prepetition Secured Parties' liens and claims.  However, any extension of the length of the Challenge Period would directly result in additional administrative expenses that only can be paid for with the use of Cash Collateral.  Moreover, an independent investigation of any

---

[11]    *See, e.g., In re Hostess Brands, Inc.*, No. 12-22052 (Bankr. S.D.N.Y.), Hr'g Tr.58-59, Feb. 2, 2012 (the willingness of the secured creditors "to provide for a carve-out upfront as opposed to letting the professionals hang on that point" was a sufficient "tradeoff" to justify section 552(b) waiver); *In re Am. Media, Inc.*, No. 10-16149 (MG), 2010 WL 5141244, at *4 (Bankr. S.D.N.Y. Dec. 6, 2010) ("In light of the Prepetition Agent's and Prepetition Lenders' agreement to subordinate their liens and superpriority claims to the Carve Out ... and to permit the use of their Cash Collateral as set forth herein, the Prepetition Agent and Prepetition Lenders are entitled to (a) a waiver of any 'equities of the case' claims under section 552(b) of the Bankruptcy Code and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.").

19

potential claims or causes of action held by the Debtors was already conducted by disinterested managers appointed to certain of the Debtors' board of directors.  No claims were identified by such investigation.

40.     The Committee also seeks to increase its Professional Fee budget from $1,000,000 to no less than $3.5 million.  The increase sought in the budget for Committee Professional Fees is especially egregious given that the plan confirmation process is already well underway and this Court has already conditionally approved the Disclosure Statement.  Moreover, evidence proffered by the Debtors demonstrates that the Approved Budget is more than sufficient to prosecute these Chapter 11 cases. *See Coulombe Declaration in Support of Motion* [D.I. 8] at ¶¶ 7 and 8.  The Committee offers no justification to support its request for more than $2.5 million in additional funds for its professionals.  In all events, these additional funding obligations cannot be imposed on the ABL Lenders without their consent. *See, e.g.*, *In re Hotel Syracuse, Inc.,* 275 B.R. 679, 683 (Bankr. N.D.N.Y. 2002) (holding that even in a situation where the secured lender agreed to a "carve out" for Debtor's counsel, it is not required in the Bankruptcy Code that a "carve out" be provided to the Committee's counsel). Furthermore, the relief the Committee is seeking is also not warranted under the law. *See Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood Assoc.),* 153 F.3d 61, 68 (2d Cir. 1998) ("[A]bsent an agreement to the contrary, a secured creditor's collateral may only be charged for administrative expenses, including attorney's fees, to the extent these expenses directly benefited that secured creditor.").

**The Committee's Other Objections**
**Have Been Resolved or Are Otherwise Meritless**

41.     The ABL Lenders respond to the Committee's remaining objections as follows:

a.      <u>Remedies</u>.  The Debtors' assets are currently being liquidated through an orderly wind down process subject to the terms and conditions of the interim

20

cash collateral order. D.I. 67.  In the event of a termination or default, the ABL Lenders must provide five business days' notice to foreclose on the Debtors' assets.  The Committee seeks to subject the ABL Lenders' enforcement rights to further notice and motion.  Any further delay imposes on the ABL Lenders a significant risk of collateral value dissipation.  Five business days' notice provides ample time for any party in interest to raise any concerns with the Court while balancing the ABL Lenders' rights to protect the value of their collateral.

b.    Adequate Protection Payments and Releases.  The ABL Lenders agree that the adequate protection payments and Debtors' release are subject to the Committee's Challenge rights.

c.    Reporting.  The ABL Lenders agree that the Committee shall have similar rights as the ABL Lenders with respect to information, access, and reporting in connection with the Debtors and these Chapter 11 Cases.

d.    Carve-Out.  The ABL Lenders consent to the use of Cash Collateral within the Approved Budget, including as to the amount of the Carve-Out.  The ABL Lenders do not object to a re-allocation of the Carve-Out amounts among professionals and other administrative expenses, but the ABL Lenders do not consent to increasing the amount of the Carve-Out.

## CONCLUSION

42.    The ABL Lenders respectfully request that the Court deny the Objection and enter the proposed Final Order in the form and content agreed to by the Debtors and the Prepetition Secured Parties.

21

Dated:  March 25, 2026

**McCARTER & ENGLISH, LLP**

*/s/ Jeffrey T. Testa*

Joseph Lubertazzi, Jr.
Jeffrey T. Testa
100 Mulberry Street
Four Gateway Center
Newark, New Jersey 07102
Telephone: (973) 622-4444

**OTTERBOURG P.C.**
Daniel F. Fiorillo (admitted *pro hac vice*)
Adam C. Silverstein (NJ Bar No. 037801992)
Sunni P. Beville (admitted *pro hac vice*)
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100

*Co-Counsel to Wells Fargo Bank, National Association, as Prepetition ABL Administrative Agent*

22