UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Fran B. Steele, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: Fran.B.Steele@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 26-11422(SLM) |
| | : | |
| | : | (Jointly Administered) |
| EDDIE BAUER LLC, et al., | : | |
| | : | The Honorable Stacey L. Meisel |
| Debtors.[1] | : | |
| | : | Hearing Date: April 16, 2026 @ 10:00 am |
| | : | |

**UNITED STATES TRUSTEE'S OBJECTION TO THE SECOND AMENDED
JOINT PLAN OF REORGANIZATION OF EDDIE BAUER LLC AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE
BANKRUPTCY CODE**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S.

Trustee"), through his undersigned counsel, hereby objects to the *Second Amended Joint Plan of*

*Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of the*

*Bankruptcy Code.* (the "Plan"), *See* Dkt. 363 and respectfully states as follows:

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors'
claims and noticing agent at https://cases.stretto.com/EddieBauer.

## PRELIMINARY STATEMENT

1.     In contravention of United States Supreme Court precedent and applicable state law, the Plan contains objectionable non-consensual third-party releases.

2.     In addition, the Plan contains an overbroad injunction provision and improperly seeks the waiver of the 14-day stay pursuant to Fed. R. Bankr. P. 3020(e).

3.     Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court enter an order denying confirmation.

## JURISDICTION AND STANDING

4.     This Court has jurisdiction to hear and determine confirmation of the Plan and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable orders of the United States District Court of the District of New Jersey issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

5.     Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").  Under 28 U.S.C. § 586(a)(3)(B) the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

6.     The U.S. Trustee has standing to be heard concerning confirmation of the Plan and this Objection pursuant to 11 U.S.C. § 307. *See U.S. Tr. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under section 307, which goes beyond mere pecuniary interest).

2

**BACKGROUND**

**A.      The Chapter 11 Cases**

7.      On February 9, 2026 (the "Petition Date"), Eddie Bauer LLC and its Debtor Affiliates (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  *See* Dkt. 1.

8.      The Debtors continues to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.      On February 25, 2026, the U.S. Trustee filed a Notice of Appointment of a Creditors' Committee (the "Committee") in the within case. *See* Dkt. 210.

**B.      The Debtors and their Business**

10.      As of the Petition date, the Debtors were the exclusive licensee of the Eddie Bauer brand with respect to brick-and-mortar retail sales of Eddie Bauer casual garments and home goods.  As of the Petition Date, the Company had 175 retail locations across forty states and the United States and six provinces in Canada, employing approximately 2,200 people.  *See* Dkt. 198.

11.      According to the First Day Declaration of Reid Snellenbarger, prior to the commencement of these chapter 11 cases, the Debtors  reached an agreement in principle with their prepetition secured lenders regarding the terms of a Restructuring Support Agreement which contemplated a potential sale of all, substantially all, or any portion of the Debtors' remaining retail operations and related assets followed by a court-supervised wind-down of the Debtors' remaining store operations. *See* Dkt. 11.

**C.    The Disclosure Statement and Plan.**

12.    On February 23, 2026, the Debtors filed a *Disclosure Statement Relating to the Joint Plan of Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of The Bankruptcy Code.   See* Dkts. 197 and 198.

13.    Also, on February 23, 2026, the Debtors filed a *Notice of Hearing on Debtors' Motion for Entry of an Order (I) Conditionally Approving The Adequacy of the Information Contained in the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures With Respect to Confirmation of the Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief.* (the "Motion"). *See* Dkt. 199.

14.    On March 15, 2026, the Debtors filed a *First Amended Joint Plan of Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of The Bankruptcy Code. See* Dkt. 296.

15.     On March 16, 2026, the Debtors filed the solicitation version of the *First Amended Joint Plan of Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of The Bankruptcy Code.   See* Dkt. 313.

16.    On March 16, 2026, the Court entered an Order *Conditionally Approving The Adequacy of the Information Contained in the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures With Respect to Confirmation of the Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief.* (the "Order Approving Solicitation"). *See* Dkt. 315.

4

17.   On March 26, 2026, the Debtors filed a *Second Amended Joint Plan of Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of The Bankruptcy Code.* ("Plan") *See* Dkt. 363.

18.   On April 1, 2026, the Debtors filed a *Plan Supplement for the Second Amended Joint Plan of Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of The Bankruptcy Code.* ("Plan") *See* Dkt. 405.

**D.   Specific Provisions of the Plan**

19.   The Plan includes the following provisions relevant to this Objection.

**i.   Third-Party Release Provision**

20.   Article VIII Section D of the Plan broadly provides that each Released Party ("Released Party")[2] is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party ("Releasing Party")[3]from any and all

---

[2] The Plan defines "Released Party" as follows:

"*Released Party*" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Wind-Down Debtor and the Plan Administrator; (c) the Agents; (d) each Consenting Lender; (e) the Sponsors; (f) the Committee and each of its members (solely in their capacity as such); (g) each Releasing Party; (h) the Information Officer; (i) the Purchaser, if any; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clause (a) through this clause (k); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if it: (i) elects to opt out of the releases contained in the Plan; or (ii) timely objects to the releases contained in the Plan, and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

*See* Dkt. 363 at Section 119.

[3] The Plan defines "Releasing Party" as follows:

"*Releasing Party*" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Wind-Down Debtor and the Plan Administrator; (c) the Agents; (d) each Consenting Lender; (e) the Sponsors; (f) the Committee and each of its members (solely in their capacity as such); (g) all Holders of Claims that vote to accept the Plan; (h) all Holders of Claims who are deemed to accept this Plan but who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (i) all Holders of Claims who abstain from voting on the Plan, other than those who were not sent a ballot or an opt out form in accordance with the Disclosure Statement Order, and who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in the Plan; (j) all Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan and who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant

Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Party's authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all Claims and Causes of Action whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Wind-Down Debtors (if applicable)), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity. [4] *See* Dkt. 363 Article VIII Section D.

---

the releases provided for in this Plan; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) to the maximum extent permitted by law, each Related Party of each Entity in clause (a) through this clause (l); provided that, in each case, an Entity in clause (h) through clause (l) shall not be a Releasing Party if it: (i) elects to opt out of the releases contained in the Plan; or (ii) timely objects to the releases contained in this Plan and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

*See* Dkt. 363 at Section 120.

[4]  The Plan provides for a Third-Party Release as follows:

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Party's authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all Claims and Causes of Action whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Wind-Down Debtors (if applicable)), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort, contract, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, or any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, the Debtors (including the Debtors' capital structure, management, ownership, or operations), or their Estates or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the CCAA Recognition Proceedings, the Sale

21.     Holders of Claims in Classes 1 and 2, 4 and 5 and 7 through 10 are either presumed to have accepted the Plan (Class 1,2 7 and 8) or deemed to have rejected it (Class 4,5,7,8,9 and 10.), and so are not entitled to vote on the Plan.  *See* Dkt. 363. Pursuant to the Order Approving

---

Process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, any investment in any Debtor by any Released Party, the Restructuring Transactions, the Committee Settlement, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, any benefit provided by a Debtor to any Released Party, cash management arrangements, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the decision to File the Chapter 11 Cases, the decision to file the CCAA Recognition Proceedings, the negotiation, formulation, preparation, dissemination, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Committee Settlement, the Credit Agreements, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than, in each case, any direct claims that any Releasing Party may have against any non-Debtor Affiliates of the Debtors that, in each case, are wholly unrelated to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, (ii) any Retained Causes of Action by the Debtors pursuant to a Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, and (iii) any Claims, Causes of Action, obligations, rights, or remedies that could be asserted by the Secured Lenders against non-Debtor Loan Parties (as defined in the Credit Agreements) arising out of or related to the Credit Agreements and related loan documents, other than to the extent such Claims, Causes of Action, obligations, rights, or remedies arise directly or indirectly as a result of the Claims treated under this Plan and/or any other Claims, Causes of Action, obligations, rights, or remedies arising from any act or omission by the Debtors, the Wind-Down Debtors, the Plan Administrator, or any of their respective Related Parties or Affiliates (other than the non-Debtor Loan Parties).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan;
(iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release

*See* Dkt. 363 Article VIII Section D.

Solicitation, the holders of claims in these classes received a Non-Voting Status Notice, which contained a Release Opt-Out Election Form.  ("Release Opt-Out Election Form") *See* Dkt. 315.

22.     The Notice of Non-Voting Status and Release Opt-Out Election Forms that were sent to members of those Classes  provides that "you may elect not to grant the third-party release contained in Article VIII D of the plan "only if (i) the court determines that you have the right to opt out of the third-party release and (ii) you (a) check the box below and submit the opt-out form by the opt-out deadline or (b) timely object to the third-party release contained in Article VIII D of the plan before the combined objection deadline." *See id.*

23.     Holders of Claims in Class 3 and 6 are impaired and entitled to vote under the Plan. The ballot provided to these voting classes includes an opt-out election.  *See* Dkt. 315.  The opt-out form provides that a member of Class 3 and 6 will be deemed to provide the Third Party Release contained in Section VIII Article D of the Plan unless you affirmatively opt out by completing and returning the Opt-Out Form in accordance with the instructions on or before the Opt-Out Deadline or timely file an objection to the Third-Party Release with the Bankruptcy Court. *See id.*

### ii.     Injunction Provision

24.     Article VIII Section F of the Plan broadly provides a permanent injunction."[5]  *See* Dkt. 363.

---

[5] The Plan's injunction provision states as follows:

> Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to

### iii. Rule 3020(e) Waiver

25. The Debtor seek a waiver of the 14-day stay under Fed R. Bankr. P. 3020(e).[6] *See*

Dkt. 363 Article X11 Section A.

## OBJECTION

---

any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan. No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party. Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.

*See* Dkt. 363 at Article VIII Section F.

[6] The Plan provides for the waiver of the 14-day stay as follows:

"Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, the Purchaser (if applicable), and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

*See* Dkt. 363 at Article XII Section A.

9

## I.    Confirmation Standard

26.    A chapter 11 plan cannot be confirmed unless this Court finds the plan complies with the provisions of 11 U.S.C. § 1129(a).  *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000).  A plan proponent bears the burden of proof with respect to each element of section 1129(a).  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

27.    For the following reasons, the Plan cannot be confirmed in its present form.

## II.    The Plan is Not Confirmable Because it Proposes Non-Consensual Third-Party Releases That Are Not Authorized Under the Bankruptcy Code.

### A.    Introduction

28.    The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them.  *See* 603 U.S. 204, 209, 227 (2024).  The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *See id.* at 226.

29.    A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law.  As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement.  *See Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up). A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

30.     Here, there is no existing release agreement between non-debtors. Debtor instead seeks a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent. Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

### B.     State Contract Law Applies

31.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *See Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979). Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

32.     The rule is no different for third-party releases. They are separate agreements between non-debtors governed by state law. Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*." *See In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original). *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source

11

of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *See Arrowmill*, 211 B.R. at 507.

33. Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *See Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But the Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

34 Some courts have held that federal rather than state law applies to determine

whether a third-party release is consensual.[7]  But because there is no applicable Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code).  Absent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims.  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return).  Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

35.    Accordingly, state-law contract principles govern whether a third-party release is consensual.  *See, e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704,

---

[7] One court recently found that the releases are not consensual under either State or Federal law, and therefore it is not necessary to decide whether federal or state law controls. *In re Gol Linhas Aereas Inteligentes S.A.*, __ B.R. __, 2025 WL 3456675, *5 (S.D.N.Y. Dec. 1, 2025)

13

720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *See In re Tonawanda Coke Corp*., 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law." *See id.*

36. Even if federal law applied, however, it would not lead to a different result. That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *See Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (cleaned up). *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

## C. Under State Law, Silence is Not Acceptance

37. The Debtor bears the burden to prove that its Plan is confirmable. *See In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). The Debtor had not met its burden

14

because it has failed to establish that the third-party release is consensual under applicable state law, nor has it even contended that consent exists under state law.

38.     An agreement to release claims—like any other contract—requires a manifestation of assent to that agreement. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *In re Hertz Corp.*, 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) ("Under Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (cleaned up); *see also In re Gol Linhas*, 2025 WL 3456675, at *5 ("Looking to the Restatement (Second) of Contracts for guidance, the New York Court of Appeals has 'repeatedly' held that 'a binding contract requires an objective manifestation of mutual assent, through words or conduct, to the essential terms of the agreement'").

39.     Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

40.     There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *See Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

41.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *See id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *See id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

### D.     Failing to Opt Out Does Not Provide the Required Affirmative Consent

42.     The Plan imposes a third-party release on all holders of claims who are deemed to accept the Plan and who do not return the opt-out form, and all holders of claims that vote to accept or reject the Plan and who do not opt out. In other words, the Debtor purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent. But under black-letter law that silence is not acceptance of the offer to release non-debtors. *See, e.g., Gol Linhas,* 2025 WL 3456675, at * 5 (under federal law, consent cannot be conferred by silence absent rare exceptions not applicable to third-party releases in a plan); *Patterson*, 636 B.R. at 688 ("Whether the Court labels these

16

'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

43.     A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement.  *See Norcia*, 845 F.3d at 1282.  The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage.  *See id.* The customer did not opt out.  *See id.*  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *See id.* at 1282-83.

44.     The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  *See Norcia*, 845 F.3d at 1284 (quotation marks omitted).  *See also, Weichert Co. Realtors v. Ryan*, 128 N.J. at 436 ([s]ilence does not ordinarily manifest assent, but the relationships between the parties or other circumstances may justify the offeror's expecting a reply and, therefore, assuming that silence indicates assent to the proposal).  The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement."  *See Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes

17

with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *See id*. at 1286 (quotation marks and citation omitted).

45.  The Ninth Circuit held that none of the exceptions to this rule applied. *See Norcia*, 845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

46.  Here, too, Debtor's creditors have not signed an agreement to release the non-debtors nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

### i.  Not voting and not opting out is not consent to release non-debtors

47.  Third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  442 B.R. 314, 355 (Bankr. D. Del. 2011).  This applies to both those creditors who simply abstain from voting and those creditors who are not entitled to vote on the Plan because they are deemed to accept or reject. There is no basis to infer consent by those who do not vote and are taking no action with respect to the Plan.

48.  Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61.  Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C.

18

§ 1126(a) (providing that creditors "may" vote on a plan); *Gol Linhas*, 2025 WL 3456675, at * 6 ("[I]t is undisputed that the creditors had no duty to respond to the opt-out opportunity and courts do not enter default judgment when parties have no duty to respond."); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981).  Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

49.    Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016).  Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases.  *See SunEdison*, 576 B.R. at 461.  This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote, along with a form to opt-out that they must return to avoid being bound by the third-party release.

50.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *See Chassix*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being

given away through the debtor's bankruptcy." *See Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *See Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *See id.*

51.    Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *See In re Washington Mut., Inc.*, 442 at 355; *see also Chassix*, 533 B.R. at 81–82.

### ii.    Voting on a plan plus a failure to opt out does not manifest consent to a non-debtor release

52.    Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* Restatement (Second) of Contracts § 69 cmt. a (1981). Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors. The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors. *See* Restatement (Second) of Contracts § 69 cmt. a. Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan. *See* 11 U.S.C. § 1126(a). Merely exercising that right does not manifest consent to release claims against non-debtors.

53.     Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan.  *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*"  *See* 533 B.R. at 79 (emphasis added).

### iii.     Smallhold's conclusion that voting plus a failure to opt out equals consent to a non-debtor release is incorrect

54.     One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote.  *See Smallhold*, 665 B.R. at 723.  The *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release.  *See id.*  But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "manifestation of intention that silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).  That is because "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction," id.—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a).  Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.[8]  Thus, consent to release third-party claims (which are governed by nonbankruptcy

---

[8] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases."  *See In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *21 (Bankr. S.D.N.Y Mar. 7, 2025).  That is wrong because an unsolicited offer of a third-

law) cannot properly be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed treatment of claims against the debtor (governed by bankruptcy law).  *See supra.*

### E.    Opt Outs Cannot Be Imposed Based on a Procedural Default Theory

55.    Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[9]  *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011).  These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release.  *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

56.    An explanation of this theory was articulated prior to the *Purdue* ruling in *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).  The *Mallinckrodt* court stated

---

party release cannot impose a duty to speak or impair the freedom to vote on a plan.  Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *See id.* at *21. " When the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016).  And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

[9] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 666 B.R. at 715, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond.

22

that "the notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system." *See id.* "When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them." *See id.* at 879. The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *See id.*

57. This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *See United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *See id.* at 733. *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

58. Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731; *Gol Linhas*, 2025 WL 3456675, at * 6 (rejecting arguments that: (i) creditors who have consented to the bankruptcy court's jurisdiction also consent to the approval of releases; (ii) class action opt-out procedures applied to the third-party releases before it; and (iii) that consent may be imputed from the failure to opt out)

59. And under *Purdue*, imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 603 U.S. at 215-227 & n.1; *see*

23

*also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See Smallhold*, 665 B.R. at 719.

60.     The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *See Smallhold*, 665 B.R. at 708-09; *see also id*. at 708 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *See id*. at 717-18. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *See id*. at 709; *see also id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

61.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *See id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and

protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

62. "[After *Purdue*], that is no longer the case in the context of a third-party release." *See Smallhold*, 665 B.R. at 722. A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *See id*. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *See id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *See id*. at 719-20.

63. Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *See id*. at 709. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *See id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-

25

debtor release.[10] Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *See id*. at 720 (emphasis added).

64. In sum, the failure to opt out does not constitute the affirmative consent necessary to reflect unqualified acceptance by holders of Claims or Interests to the third-party releases the Plan seeks to provide to the many so-called "Released Parties." As a result, the Debtor does not meet its state-law burden of establishing that the members of the Classes in the Plan have agreed to release their property rights and have that release memorialized in the Plan. *See Weichert*, 608 A.2d at 284. Nothing in the Bankruptcy Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law. The Plan's third-party releases are therefore non-consensual, and so are prohibited by *Purdue*.

## IV. The Injunction Provision in the Plan is Overbroad and Impermissible

65. The Plan includes overbroad and impermissible injunction language. Pursuant to Section 524(a)(3) of the Bankruptcy Code, confirmation of a plan does not operate as an injunction. Only a discharge operates as an injunction. Instead, pursuant to Section 362(c) of the Bankruptcy Code, the automatic stay remains in effect until the earlier of the time the case is closed or the case is dismissed. Additionally, pursuant to Section 1141(a), the provisions of a confirmed plan bind all parties, including the debtor and creditors, to the terms of a plan. Because the Bankruptcy Code protects the Debtor by continuing the automatic stay and by binding all parties to the terms of the Plan (11 U.S.C. § 1141(a)), the U.S. Trustee submits that Article VIII Section F is unnecessary and should be removed.

## V. The Court Should Not Waive the Rule 3020 Stay

---

[10] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

26

66.    The Debtor's request for a waiver of the 14-day stay under Fed R. Bankr. P. 3020(e) is inappropriate and should be denied.

67.    Federal Rule of Bankruptcy Procedure 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." *See* Fed. R. Bankr. P. 3020(e).  The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot." *See id.*

68.    Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review.  *See In re Chemtura Corp.*, No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010).  Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay.  *See id.*; *see also In re Adelphia Comm. Corp.*, 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review").

69.    "An orderly bankruptcy process depends on a concomitantly efficient appeals process," *see In re Syncora Guarantee Inc.*, 757 F.3d 511, 517 (6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay.

70.    Debtor has presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review.  The Court should thus deny their request to waive Rule 3020(e)'s stay.

**RESERVATION OF RIGHTS**

27

71.     The U.S. Trustee reserves all of his rights and objections regarding any and all future amendments to the Plan.  The U.S. Trustee reserves the right to comment on and object to the proposed form of confirmation order.  The U.S. Trustee leaves the Debtor to its burden of proof and reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection and reservation of rights, assert any objection, file any appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that this Court sustain the Objection and either deny confirmation or require revisions to be made to the Plan and grant such other relief it deems just and proper.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

By: */s/ Fran B. Steele*
Fran B. Steele
Trial Attorney

Dated: April 8, 2026

28