**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Oliver Paré (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
matthew.fagen@kirkland.com
oliver.pare@kirkland.com

*Co-Counsel to the Debtors and*
*the Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel to the Debtors and*
*the Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER LLC, *et al.*, | Case No. 26-11422 (SLM) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF FILING OF THIRD**
**AMENDED JOINT PLAN OF REORGANIZATION**
**OF EDDIE BAUER LLC AND ITS DEBTOR AFFILIATES**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE THAT**, on February 23, 2026, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Joint Plan of Reorganization of Eddie Bauer LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 197] (the "Plan").

**PLEASE TAKE FURTHER NOTICE THAT** on March 15, 2026, the Debtors filed the *First Amended Joint Plan of Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 296] (the "First Amended Plan").

**PLEASE TAKE FURTHER NOTICE THAT** on March 16, 2026, the Debtors filed the solicitation version of the *First Amended Joint Plan of Reorganization of Eddie Bauer LLC and*

---

[1] The last four digits of Debtor Eddie Bauer LLC's tax identification number are 6060. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/EddieBauer. The location of Debtor Eddie Bauer LLC's principal place of business is 10401 Northeast 8th Street, Suite 500, Bellevue, WA 98004; the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Suite B100, Plano, TX 75024.

*its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 313] (the "Solicitation First Amended Plan").

**PLEASE TAKE FURTHER NOTICE THAT** on March 26, 2026, the Debtors filed the *Second Amended Joint Plan of Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 363] (the "Second Amended Plan").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file the *Third Amended Joint Plan of Reorganization of Eddie Bauer LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Third Amended Plan"), attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE THAT** a comparison between the Second Amended Plan and the Third Amended Plan is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE THAT** copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto Inc. at https://cases.stretto.com/EddieBauer.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of Page Intentionally Left Blank]*

2

Dated: April 15, 2026

/s/  *Michael D. Sirota*

**COLE SCHOTZ P.C.**

Michael D. Sirota, Esq.

Warren A. Usatine, Esq.

Felice R. Yudkin, Esq.

Court Plaza North, 25 Main Street

Hackensack, New Jersey 07601

Telephone:  (201) 489-3000

msirota@coleschotz.com

wusatine@coleschotz.com

fyudkin@coleschotz.com

*Co-Counsel to the Debtors and*
*the Debtors in Possession*

**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)

Matthew C. Fagen, P.C. (admitted *pro hac vice*)

Oliver Paré (admitted *pro hac vice*)

601 Lexington Avenue

New York, New York 10022

Telephone:  (212) 446-4800

Facsimile:   (212) 446-4900

joshua.sussberg@kirkland.com

matthew.fagen@kirkland.com

oliver.pare@kirkland.com

*Co-Counsel to the Debtors and*
*the Debtors in Possession*

## Exhibit A

**Third Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER LLC, *et al.*, | Case No. 26-11422 (SLM) |
| Debtors.[1] | (Jointly Administered) |

**THIRD AMENDED JOINT PLAN OF REORGANIZATION OF EDDIE BAUER LLC**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

| | |
|---|---|
| **KIRKLAND & ELLIS LLP** | **COLE SCHOTZ P.C.** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Michael D. Sirota, Esq. |
| Joshua A. Sussberg, P.C. (admitted *pro hac vice*) | Warren A. Usatine, Esq. |
| Matthew C. Fagen, P.C. (admitted *pro hac vice*) | Felice R. Yudkin, Esq. |
| Oliver Paré (admitted *pro hac vice*) | Court Plaza North, 25 Main Street |
| 601 Lexington Avenue | Hackensack, New Jersey 07601 |
| New York, New York 10022 | Telephone:  (201) 489-3000 |
| Telephone:  (212) 446-4800 | msirota@coleschotz.com |
| Facsimile:  (212) 446-4900 | wusatine@coleschotz.com |
| joshua.sussberg@kirkland.com | fyudkin@coleschotz.com |
| matthew.fagen@kirkland.com | |
| oliver.pare@kirkland.com | |
| | |
| *Co-Counsel to the Debtors and* | *Co-Counsel to the Debtors and* |
| *the Debtors in Possession* | *the Debtors in Possession* |

Dated:  April 15, 2026

---

[1]    The last four digits of Debtor Eddie Bauer LLC's tax identification number are 6060.  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/EddieBauer.  The location of Debtor Eddie Bauer LLC's principal place of business is 10401 Northeast 8th Street, Suite 500, Bellevue, WA 98004; the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Suite B100, Plano, TX 75024.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW................................................................................................1
    A.   Defined Terms. ...........................................................................................................1
    B.   Rules of Interpretation. ............................................................................................14
    C.   Computation of Time. ..............................................................................................15
    D.   Governing Law. .......................................................................................................15
    E.   Reference to Monetary Figures. ..............................................................................15
    F.   Reference to the Debtors or the Wind-Down Debtors. ...........................................15
    G.   Controlling Document. ............................................................................................15
    H.   Consultation, Notice, Information, and Consent Rights..........................................15

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS................................16
    A.   Administrative Claims. ............................................................................................16
    B.   Professional Fee Claims. .........................................................................................16
    C.   Priority Tax Claims. .................................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS...................18
    A.   Classification of Claims and Interests. ...................................................................18
    B.   Treatment of Claims and Interests. .........................................................................18
    C.   Special Provision Governing Unimpaired Claims. ..................................................22
    D.   Elimination of Vacant Classes. ...............................................................................22
    E.   Voting Classes, Presumed Acceptance by Non-Voting Classes. .............................22
    F.   Intercompany Interests. ...........................................................................................22
    G.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................22
    H.   Controversy Concerning Impairment........................................................................23
    I.   Subordinated Claims. ...............................................................................................23

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN.......................................23
    A.   General Settlement of Claims and Interests. ...........................................................23
    B.   Sale Transaction.......................................................................................................23
    C.   Store Closing Sales. .................................................................................................24
    D.   Committee Settlement...............................................................................................24
    E.   Sources of Consideration for Plan Distributions. ....................................................25
    F.   Employment Obligations. ........................................................................................25
    G.   The Wind-Down. .....................................................................................................25
    H.   Plan Administrator. ..................................................................................................27
    I.   Dissolution of the Wind-Down Debtors..................................................................29
    J.   The GUC Trust. .......................................................................................................29
    K.   Preservation of Causes of Action. ...........................................................................32
    L.   Cancellation of Existing Agreements and Interests. ...............................................32
    M.   Section 1146 Exemption. .........................................................................................33
    N.   Corporate Action......................................................................................................33
    O.   Effectuating Documents; Further Transactions........................................................33
    P.   Closing the Chapter 11 Cases. .................................................................................34
    Q.   Director and Officer Liability Insurance. .................................................................34

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............34
    A.   Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................34
    B.   Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases..........35
    C.   Indemnification Obligations......................................................................................36
    D.   Claims Based on Rejection of Executory Contracts or Unexpired Leases......................36
    E.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases....................36
    F.   Insurance Policies. ...................................................................................................37

G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ..........................38
H.    Reservation of Rights. .........................................................................................................38
I.    Nonoccurrence of Effective Date. .........................................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................................38
A.    Timing and Calculation of Amounts to Be Distributed. ..........................................................38
B.    Disbursing Agent. ...............................................................................................................39
C.    Rights and Powers of Disbursing Agent. ...............................................................................39
D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ................................39
E.    Manner of Payment. ............................................................................................................40
F.    Compliance with Tax Requirements. .....................................................................................40
G.    Allocations. ........................................................................................................................41
H.    No Postpetition Interest on Claims. ......................................................................................41
I.    Foreign Currency Exchange Rate. ........................................................................................41
J.    Setoffs and Recoupment. .....................................................................................................41
K.    Claims Paid or Payable by Third Parties. ..............................................................................41

ARTICLE VII.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED
CLAIMS ...........................................................................................................................42
A.    Disputed Claims Process. .....................................................................................................42
B.    Allowance of Claims. ...........................................................................................................42
C.    Estimation of Claims. ..........................................................................................................43
D.    Claims Administration Responsibilities. ................................................................................43
E.    Time to File Objections to Claims. ........................................................................................43
F.    Adjustment to Claims or Interests without Objection. ..............................................................44
G.    Disputed and Contingent Claims Reserve. .............................................................................44
H.    Disallowance of Claims or Interests. .....................................................................................44
I.    Amendments to Proofs of Claim or Interest. ..........................................................................44
J.    Distributions Pending Allowance. .........................................................................................44
K.    Distributions After Allowance. .............................................................................................45

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........................45
A.    Settlement, Compromise, and Release of Claims and Interests. ................................................45
**B.    Release of Liens.** ...............................................................................................................45
**C.    Releases by the Debtors.** ....................................................................................................46
**D.    Releases by Holders of Claims and Interests.** .......................................................................47
**E.    Exculpation.** .....................................................................................................................48
**F.    Injunction.** .......................................................................................................................49
G.    Protections Against Discriminatory Treatment. ......................................................................49
H.    Document Retention. ...........................................................................................................50
I.    Reimbursement or Contribution. ..........................................................................................50

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN. ..................................50
A.    Conditions Precedent to the Effective Date. ...........................................................................50
B.    Waiver of Conditions. ..........................................................................................................51
C.    Effect of Failure of Conditions. ............................................................................................51
D.    Substantial Consummation. ..................................................................................................51

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ................................51
A.    Modification and Amendments. ............................................................................................51
B.    Effect of Confirmation on Modifications. ..............................................................................52
C.    Revocation or Withdrawal of Plan. .......................................................................................52

ARTICLE XI. RETENTION OF JURISDICTION ................................................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ..............................................................................54

A.      Immediate Binding Effect. .........................................................................................................54
B.      Additional Documents. ..............................................................................................................54
C.      Payment of Statutory Fees. .......................................................................................................54
D.      Statutory Committee and Cessation of Fee and Expense Payment. ..........................................55
E.      Reservation of Rights. ...............................................................................................................55
F.      Successors and Assigns. ............................................................................................................55
G.      Notices. ......................................................................................................................................55
H.      Term of Injunctions or Stays. ....................................................................................................56
I.      Entire Agreement. ......................................................................................................................56
J.      Exhibits. .....................................................................................................................................56
K.      Nonseverability of Plan Provisions. ..........................................................................................56
L.      Votes Solicited in Good Faith. ..................................................................................................57
M.      Closing of Chapter 11 Cases. ....................................................................................................57
N.      Waiver or Estoppel.....................................................................................................................57

**INTRODUCTION**

Eddie Bauer LLC and the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") propose this joint chapter 11 plan (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*ABL Agent*" means Wells Fargo Bank, N.A., in its capacity as administrative agent under the ABL Credit Agreement.

2.    "*ABL Claims*" means any Claim against a Debtor on account of the ABL Facility.

3.    "*ABL Credit Agreement*" means that certain Credit Agreement, dated as of December 7, 2020 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) Penney Holdings LLC, as lead administrative borrower, (b) the other borrowers signatory thereto, (c) certain other Loan Parties (as defined in the ABL Credit Agreement), including the Debtors and non-Debtor affiliates, (d) the lenders party thereto, and (e) the ABL Agent.

4.    "*ABL Facility*" means that certain revolving credit facility issued pursuant to the ABL Credit Agreement.

5.    "*ABL Term Loan Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) the ABL Agent, (b) the Term Loan Agent, (c) Penney Holdings LLC, as lead administrative borrower, (d) the other borrowers signatory thereto, and (e) the guarantors signatory thereto.

6.    "*ABL Threshold Recovery Amount*" means (a) an amount equal to 60% of the cost value of all retail inventory, wholesale inventory, credit card accounts receivable, and wholesale receivables of the Debtors, based on the levels of such assets in the Approved Budget (as defined in the Cash Collateral Order) as of the Petition Date *less* (b) the aggregate amount of all Weekly Paydowns actually paid as of the Effective Date.

7.    "*Acquired Assets*" means the assets of the Debtors acquired by a Purchaser pursuant to a Sale Transaction, if any.

1

8.      "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Chapter 11 Cases pursuant to sections 330, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' business incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; (d) Adequate Protection Claims (as defined in the Cash Collateral Order); and (e) the Disinterested Manager Fee Claims.

9.      "*Administrative Claims Bar Date*" means the deadline for filing requests for payment of Administrative Claims, which:   (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

10.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the reference Entity were a debtor in a case under the Bankruptcy Code.  For the avoidance of doubt, with respect to the Debtors, the term "Affiliate" includes, without limitation, Simon Property Group, Brookfield Corporation, Authentic Brands Group, Penney Intermediate Holdings LLC, SPARC Group BB Holdings LLC, F21 OpCo, LLC, Lucky OpCo LLC, Aero Operations LLC, SPARC GC Mgmt LLC, SPARC Puerto Rico LLC, AeroLocker Holdings LLC, Nautica OpCo LLC, Nautica Retail USA LLC, and each of their respective direct and indirect subsidiaries.

11.     "*Agents*" means any administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement, the Term Loan Credit Agreement, and the Subordinated Loan Credit Agreement, and including, in each case, any successors thereto.

12.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely filed by the applicable bar date (or for which Claim or Interest a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order; *provided*, that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection is so Filed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim is or has been timely filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court, and Holders of such Claims or Interests shall not receive any distributions under this Plan on account of such Claims or Interests.  Notwithstanding anything to the contrary herein, no Claim or Interest of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtors or Wind-Down Debtors, as applicable.  For the avoidance of doubt, a Proof of Claim filed after the applicable bar date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.   "Allow," "Allowing," and "Allowance" shall have correlative meanings.

13.     "*Assigned Avoidance Actions*" means Avoidance Actions that are not (i) asserted and/or assertable against Released Parties (including Affiliates of the Debtors or the Wind-Down Debtors) and/or (ii) otherwise released under this Plan or the Cash Collateral Order.

14.     "*Assumed Liabilities*" means, in any Sale Transaction, the liabilities assumed by the Purchaser pursuant to the terms of the applicable Sale Transaction Documents.  For the avoidance of doubt, the Debtors and Wind-Down Debtors, as applicable, shall not be liable for any Assumed Liabilities and shall not be obligated to satisfy any such liabilities under this Plan.

2

15. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by, or on behalf of, the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code, or other similar or related local, state, federal, or foreign statutes, common Law, including fraudulent transfer Law or other applicable Law.

16. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect and hereafter amended.

17. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey.

18. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases and the general, local, and chamber rules of the Bankruptcy Court.

19. "*Bidding Procedures*" means the bidding procedures governing the submission and evaluation of bids in connection with the Sale Transaction, attached as Exhibit 1 to the Bidding Procedures Order.

20. "*Bidding Procedures Motion*" means the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures and Stalking Horse Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 10].

21. "*Bidding Procedures Order*" means the *Order (I) Approving the Bidding Procedures and Stalking Horse Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 65].

22. "*Business Day*" means any day other than a Saturday, Sunday, or any other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

23. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

24. "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

25. "*Cash Collateral Order*" means the *Final Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 374].

26. "*Cause of Action*" means any action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including under any state or federal securities laws). Causes of Action include: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by Law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state Law fraudulent transfer claim.

3

27.     "*CCAA*" means the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended.

28.     "*CCAA Court*" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the CCAA Recognition Proceedings.

29.     "*CCAA Court Ordered Charges*" means the super-priority court-ordered charges granted by the CCAA Court in the CCAA Recognition Proceedings on the assets, undertakings, and property in Canada of Debtors' 13051269 Canada Inc. and Eddie Bauer of Canada Corporation.

30.     "*CCAA Recognition Proceedings*" means the proceedings commenced by the Foreign Representative before the CCAA Court under Part IV of the CCAA recognizing the Chapter 11 Cases as "foreign main proceedings."

31.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

32.     "*Claim*" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

33.     "*Claims and Noticing Agent*" means Stretto, Inc., the claims, noticing, and solicitation agent for the Debtors in the Chapter 11 Cases.

34.     "*Claims Objection Deadline*" means the deadline for objecting to a Claim asserted against a Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

35.     "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

36.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

37.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

38.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 210], on February 25, 2026, which membership may be reconstituted from time to time by the U.S. Trustee.

39.     "*Committee Settlement*" means the comprehensive settlement between the Debtors and the Committee as set forth in Article IV.D of this Plan.

40.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order.

41.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

42.     "*Combined Hearing*" means the combined hearing held by the Bankruptcy Court to consider Confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, and final approval of the Disclosure Statement, as such hearing may be continued from time to time.

43.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, the form and substance of which shall be subject to the consent rights set forth in the Restructuring Support Agreement, and, in the event of a Sale Transaction, shall also be in form and substance reasonably acceptable to the Purchaser.

44.     "*Confirmation Recognition Order*" means an order of the CCAA Court recognizing and enforcing the Confirmation Order in Canada.

45.     "*Consenting ABL Lenders*" means, collectively, the Holders of ABL Claims that are signatories to the Restructuring Support Agreement or any subsequent or other Holder of ABL Claims that becomes party to the Restructuring Support Agreement, whether by joinder to the Restructuring Support Agreement or signature to a Transfer Agreement (as defined in the Restructuring Support Agreement), in accordance with the terms of the Restructuring Support Agreement, each solely in their capacity as such.

46.     "*Consenting Lenders*" means, collectively, the Consenting ABL Lenders, the Consenting Term Loan Lenders, and the Consenting Subordinated Loan Lenders.

47.     "*Consenting Subordinated Loan Lenders*" means, collectively, the Holders of Subordinated Loan Claims that are signatories to the Restructuring Support Agreement or any subsequent Holder of Subordinated Loan Claims that becomes party to the Restructuring Support Agreement in accordance with its terms, each solely in their capacity as such.

48.     "*Consenting Term Loan Lenders*" means, collectively, the Holders of Term Loan Claims that are signatories to the Restructuring Support Agreement or any subsequent Holder of Term Loan Claims that becomes party to the Restructuring Support Agreement in accordance with its terms, each solely in their capacity as such.

49.     "*Consummation*" means the occurrence of the Effective Date.

50.     "*Credit Agreements*" means, collectively, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Subordinated Loan Credit Agreement.

51.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

52.     "*Cure Notice*" means any notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed pursuant to section 365 of the Bankruptcy Code, and which notice shall include:  (a) procedures for objecting to the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases, if any; (b) proposed Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

53.     "*D&O Liability Insurance Policies*" means all Insurance Policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

54.     "*Debtor Release*" means the release set forth in Article VIII.C hereof.

55.     "*Definitive Documents*" means, collectively and as applicable, and including any exhibits, schedules, amendments, modifications, or supplements thereto: (a) this Plan; (b) the Confirmation Order and Confirmation Recognition Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (e) the first day pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the Sale Transaction Documents (if any); (h) the Cash Collateral Order; and (i) such other definitive documentation as is necessary or desirable to consummate the Restructuring Transactions; *provided* that any Definitive Documents not executed or in a form attached to the Restructuring Support Agreement as of the execution date thereof shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Lenders.

56.     "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as

5

to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or this Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or this Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

57.    "*Disbursing Agent*" means, as applicable, the Debtors, the Wind-Down Debtors, the Plan Administrator, the GUC Trust, or any Entity or Entities selected by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trustee, as applicable, to make or facilitate distributions in accordance with this Plan, which Entity may be the Claims and Noticing Agent and the Agents, if applicable.

58.    "*Disclosure Statement*" means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof.

59.    "*Disclosure Statement Order*" means any order of the Bankruptcy Court conditionally approving the Disclosure Statement.

60.    "*Disinterested Managers*" means, collectively, the disinterested managers or directors, as applicable, of SPARC EB Holdings LLC, Eddie Bauer LLC, Eddie Bauer Gift Card Services LLC, 13051269 Canada Inc., and Eddie Bauer of Canada Corporation.

61.    "*Disinterested Manager Fee Claims*" means all unpaid fees and expenses as of the Effective Date due to the Disinterested Managers pursuant to their respective director agreements with the Debtors.  On the Effective Date, the Disinterested Manager Fee Claims shall be deemed Allowed Administrative Claims against the Debtors.

62.    "*Disputed*" means, as to a Claim or Interest, a Claim or Interest:  (a) that is not Allowed; (b) that is not Disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

63.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under this Plan, which date shall be the Effective Date, or such other date reasonably designated by the Debtors.

64.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

65.    "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

66.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

67.    "*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such:  (a) each of the Debtors; (b) the Committee and each of its members; and (c) with respect to the Entities in clauses (a)  and (b), each of their respective current and former directors, the Disinterested Managers, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date.

68.    "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.     "*Existing Equity Interests*" means any Interest in SPARC EB Holdings LLC.

70.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date, calculated as set forth in section 1961 of the Judicial Code.

71.     "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

72.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

73.     "*Foreign Representative*" means Eddie Bauer LLC, in its capacity as foreign representative of the Debtors, as duly appointed as such under Section 1505 of the Bankruptcy Code.

74.     "*General Unsecured Claim*" means any Claim against a Debtor that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) a Priority Tax Claim, (d) an Other Secured Claim, (e) an Other Priority Claim, (f) an ABL Claim, (g) a Term Loan Claim, (h) a Subordinated Loan Claim, (i) an Intercompany Claim, (j) a Section 510(b) Claim, (k) a Disinterested Manager Fee Claim, or (l) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court.

75.     "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or any Wind-Down Debtor, as applicable.

76.     "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

77.     "*GUC Trust*" means the trust established for the benefit of the GUC Trust Beneficiaries on the Effective Date in accordance with this Plan and pursuant to the GUC Trust Agreement to receive, hold, and administer the GUC Trust Assets and to reconcile and make distributions on account of General Unsecured Claims.

78.     "*GUC Trust Agreement*" means the trust agreement establishing, among other things, the terms and conditions for the creation and operation of the GUC Trust to be entered into on or before the Effective Date between the Debtors and the GUC Trustee, which agreement shall be in form and substance reasonably acceptable to the Committee, the Debtors, and the Consenting Lenders.

79.     "*GUC Trust Assets*" means, collectively, (a) all of the Debtors' right, title, and interest in the Assigned Avoidance Actions, *plus* (b) the GUC Trust Expense Amount, *plus* (c) the GUC Trust Cash.

80.     "*GUC Trust Beneficiaries*" means, collectively, the Holders of Allowed General Unsecured Claims, *provided*, *however*, that none of the following shall be GUC Trust Beneficiaries: (a) any Holder of a Claim arising from or related to the waiver of prepetition intercompany claims, (b) any Holder of the SPARC Intercompany Claim, and (c) any Holder of a deficiency claim arising out of any obligations under the Credit Agreements.

81.    "*GUC Trust Cash*" means an amount of Cash equal to (a) the lesser of (i) $3,000,000.00 and (ii) the greater of (A) $0.00 and (B) Net Proceeds *less* the Mandatory Paydown Amount; *less* (b) the amount, if any, by which the amount of actual Allowed fees and expenses of the Committee and its Professionals exceeds the UCC Professional Fee Budget Amount; *plus* (c) the GUC Trust Top-Up Amount.

82.    "*GUC Trust Expense Amount*" means $250,000.00.

83.    "*GUC Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets) incurred by the GUC Trust, the GUC Trustee, any professionals retained by the GUC Trust or the GUC Trustee, and any additional amount determined necessary by the GUC Trustee to adequately reserve for the operating expenses of the GUC Trust that shall be paid out of the GUC Trust Assets.

84.    "*GUC Trust Interests*" means, collectively, non-certified beneficial interests in the GUC Trust granted to each GUC Trust Beneficiary, which shall entitle such GUC Trust Beneficiary to its *pro rata* share of the GUC Trust Net Assets, subject to the terms and conditions of this Plan and the GUC Trust Agreement.

85.    "*GUC Trust Net Assets*" means the GUC Trust Assets less the GUC Trust Fees and Expenses.

86.    "*GUC Trust Top-Up Amount*" has the meaning set forth in Article IV.D of this Plan.

87.    "*GUC Trustee*" means, in its capacity as such, the Person or Entity selected by the Committee to serve as the trustee of the GUC Trust, and any successor thereto, in accordance with the GUC Trust Agreement.

88.    "*Holder*" means an Entity that is the record owner of a Claim against, or an Interest in, any Debtor, as applicable.  For the avoidance of doubt, affiliated record owners of Claims or Interests managed or advised by the same institution shall constitute separate Holders.

89.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

90.    "*Independent Investigation*" means the Disinterested Managers' independent investigation regarding any potential Estate claims and Causes of Action.

91.    "*Information Officer*" means KSV Restructuring Inc., in its capacity as information officer appointed by the CCAA Court in the CCAA Recognition Proceedings.

92.    "*Insurance Policies*" means all insurance policies that have been issued at any time to, or provide coverage to, any of the Debtors and all agreements, documents or instruments relating thereto, including, without limitation, all D&O Liability Insurance Policies, and any of the Debtors' rights under any third parties' insurance policies.

93.    "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

94.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

95.    "*Intercreditor Agreements*" means, collectively, the ABL Term Loan Intercreditor Agreement and the Senior-Subordinated Intercreditor Agreement.

96.    "*Interest*" means the common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other Securities or agreements to acquire the common stock (including convertible debt), preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

8

97.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

98.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

99.    "*Mandatory Paydown Amount*" means $15,485,219.00.

100.    "*Net Proceeds*" means all Cash, if any, held by the Debtors or the Wind-Down Debtors, as applicable, on or after the Effective Date in accordance with the Cash Collateral Order, after (a) funding the Professional Fee Escrow Account, (b) funding the Wind-Down Account, and (c) paying or reserving amounts for Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims as set forth in Article II of this Plan.

101.    "*Other Priority Claim*" means a Claim against any of the Debtors, other than an Administrative Claim or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

102.    "*Other Secured Claim*" means a Claim against any of the Debtors, other than an ABL Claim, a Term Loan Claim, or a Subordinated Loan Claim, (a) secured by a valid, perfected, unavoidable, and enforceable Lien on collateral to the extent of the Debtors' interest in such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

103.    "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, Governmental Unit, or political subdivision thereof, or any other Entity.

104.    "*Petition Date*" means February 9, 2026, the date on which the Debtors commenced the Chapter 11 Cases.

105.    "*Plan Administrator*" means the person, if any, selected by the Debtors, to have all powers and authorities set forth in Article IV.G of this Plan.

106.    "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Plan Administrator, and the Wind-Down Debtors, which shall be included in the Plan Supplement, providing for the appointment, roles, powers, and duties of the Plan Administrator and the implementation of this Plan by the Plan Administrator.

107.    "*Plan Supplement*" means the compilation of documents, term sheets, and forms of documents, agreements, schedules, and exhibits to this Plan (in each case as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), including, but not limited to, the following to the extent applicable:  (a) Schedule of Assumed Executory Contracts and Unexpired Leases, (b) Schedule of Retained Causes of Action, (c) the Wind-Down Transactions Memorandum; (d) the Plan Administrator Agreement; (e) the identity of the Plan Administrator; (f) the GUC Trust Agreement; and (g) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  Notwithstanding anything to the contrary herein, the Committee shall not have any consent rights with respect to the Plan Supplement (or any documents set forth therein), other than the GUC Trust Agreement.

108.    "*Priority Tax Claim*" means any Claim against any of the Debtors of a Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code.

109.    "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

110.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals reasonably estimate in good faith that they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B.3 of this Plan.

111.    "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

112.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

113.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases by the applicable bar date.

114.    "*Purchase Agreement*" means the purchase agreement or purchase agreements to be entered into by any of the Debtors and any Purchaser (or its designee) to effectuate the Sale Transaction, if any, in accordance with the Bidding Procedures.

115.    "*Purchase Price*" means the total consideration to be paid by the Purchaser to the Debtors for the purchase of some or all of the Debtors' assets pursuant to the Purchase Agreement and as approved by the Bankruptcy Court.

116.    "*Purchaser*" means the Entity or Entities whose bid for some or all of the Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the highest or otherwise best bid pursuant to the Bidding Procedures.

117.    "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

118.    "*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or Entity's current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

119.    "*Released Party*" means, each of, and in each case in its capacity as such:  (a) each Debtor; (b) each Wind-Down Debtor and the Plan Administrator; (c) the Agents; (d) each Consenting Lender; (e) the Sponsors; (f) the Committee and each of its members (solely in their capacity as such); (g) each Releasing Party; (h) the Information Officer; (i) the Purchaser, if any; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clause (a) through this clause (k); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if it:  (i) elects to opt out of the releases contained in the Plan; or (ii) timely objects to the releases contained in the Plan, and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

120.    "*Releasing Party*" means, each of, and in each case in its capacity as such:  (a) each Debtor; (b) each Wind-Down Debtor and the Plan Administrator; (c) the Agents; (d) each Consenting Lender; (e) the Sponsors; (f) the Committee and each of its members (solely in their capacity as such); (g) all Holders of Claims that vote to accept the Plan; (h) all Holders of Claims who are deemed to accept this Plan but who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable notice of non-voting status indicating

10

that they opt not to grant the releases provided for in the Plan; (i) all Holders of Claims who abstain from voting on the Plan, other than those who were not sent a ballot or an opt out form in accordance with the Disclosure Statement Order, and who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in the Plan; (j) all Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan and who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in this Plan; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) to the maximum extent permitted by law, each Related Party of each Entity in clause (a) through this clause (l); *provided* that, in each case, an Entity in clause (h) through clause (l) shall not be a Releasing Party if it: (i) elects to opt out of the releases contained in the Plan; or (ii) timely objects to the releases contained in this Plan and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

121. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of February 8, 2026, by and among the Debtors and the Consenting Lenders and attached to the *Declaration of Stephen Coulombe, Co-Chief Restructuring Officer of Eddie Bauer LLC and Its Affiliates, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 35] as Exhibit B, including all exhibits thereto (including the Restructuring Term Sheet), as may be amended, modified, or supplemented from time to time, in accordance with its terms.

122. "*Restructuring Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as Exhibit B.

123. "*Restructuring Transactions*" means, collectively, all transactions contemplated by the Restructuring Term Sheet, the Restructuring Support Agreement, and this Plan, including the Sale Transaction and the Wind-Down Transactions.

124. "*Retained Causes of Action*" means, collectively, all Claims and Causes of Action not released by the Debtors pursuant to the terms of this Plan or pursuant to the Cash Collateral Order, including any Claims and Causes of Action listed on the Schedule of Retained Causes of Action.

125. "*Sale Order*" means the order of the Bankruptcy Court approving the consummation of the Sale Transaction, if any, pursuant to the terms of the Purchase Agreement, which order may be the Confirmation Order.

126. "*Sale Proceeds*" means all proceeds of the Sale Transaction, if any, including all Cash proceeds and non-Cash proceeds, that the Debtors receive in accordance with the Purchase Agreement, if applicable.

127. "*Sale Process*" means the process to market and sell some, all, or substantially all of the Debtors' assets as a going concern to the highest or otherwise best bidder(s).

128. "*Sale Recognition Order*" means an order of the CCAA Court in the CCAA Recognition Proceedings recognizing and enforcing the Sale Order in Canada, which order may be part of the CCAA Confirmation Order, and, to the extent applicable, approving the Sale Transaction with respect to the Debtors' assets in Canada pursuant to the terms of the Purchase Agreement.

129. "*Sale Transaction*" means a sale or sales of all or substantially all of the Debtors' assets pursuant to the Bidding Procedures and the Bidding Procedures Order and as approved by the Sale Order (if any) and the Sale Recognition Order (if any).

130. "*Sale Transaction Documents*" means all agreements, instruments, pleadings, orders, or other related documents necessary or advisable to carry out the Sale Process and consummate a Sale Transaction, including, but not limited to, the Bidding Procedures, the Bidding Procedures Motion, the Bidding Procedures Order, the sale Purchase Agreement (if any), the Sale Order (if any), and the Sale Recognition Order (if any).

131. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed or assumed and assigned, as applicable, by the Debtors pursuant to

11

the Plan, if any, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time by the Debtors; *provided* that notwithstanding anything to the contrary in this Plan, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, reserve the right (i) in the event that the Debtors do not consummate a Sale Transaction, to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the earlier of (A) 45 days following the Effective Date and (B) solely with respect to Unexpired Leases of nonresidential real property, the deadline is the earlier of (I) the applicable deadline pursuant to section 365(d)(4) of the Bankruptcy Code, (II) the date of entry of the Confirmation Order, and (III) as such date may be extended with the written consent of the applicable landlord counterparty and (ii) in the event that the Debtors consummate a Sale Transaction, to alter, amend, modify, or supplement any schedule of Executory Contracts and Unexpired Leases that is attached to any Sale Transaction Documents, with the consent of the Purchaser, at any time prior to the earlier of (A) 90 days following the closing date of a Sale Transaction, and (B) solely with respect to Unexpired Leases of nonresidential real property, the applicable deadline pursuant to section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the consent of the applicable landlord counterparty, consistent with any Sale Transaction Documents, as applicable.

132.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors (to be included in the Plan Supplement) that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

133.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

134.    "*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

135.    "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, unavoidable, and enforceable Lien on collateral to the extent of the Debtors' interest in such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

136.    "*Secured Lenders*" means, collectively, the lenders under the ABL Credit Agreement, the Term Loan Credit Agreement, and the Subordinated Loan Credit Agreement.

137.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

138.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

139.    "*Senior-Subordinated Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) the ABL Agent, (b) the Term Loan Agent, (c) the Subordinated Loan Agent, and (d) the Loan Parties (as defined in the Senior-Subordinated Intercreditor Agreement) party thereto.

140.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to this Plan.

141.    "*SPARC Intercompany Claim*" means that certain Intercompany Claim in the amount of approximately $215 million held by SPARC Group Holdings LLC against Eddie Bauer LLC.

142.    "*Sponsors*" means, collectively, ABG Holdings LLC; Simon JCP Holdings, LLC; BPG Retail Holdings I LLC; SPARC Group Holdings II, LLC; Copper Retail JV LLC; Copper Intermediate LLC; Copper Retail Holdings LLC; Penney Holdings LLC; Penney Intermediate Holdings LLC; Catalyst Brands LLC; and SPARC Group Holdings LLC.

12

143.    "*Store Closing Order*" means the *Final Order (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales and the Related Sale Guidelines, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances; (III) Modifying Customer Programs at the Closing Stores; and (IV) Granting Related Relief* [Docket No. 306].

144.    "*Store Closing Sales*" means the store-closing sales ongoing as of the Petition Date at all of the Debtors' brick-and-mortar retail locations.

145.    "*Subordinated Loan Agent*" means Copper Retail JV LLC, in its capacity as administrative agent and collateral agent under the Subordinated Loan Credit Agreement.

146.    "*Subordinated Loan Claims*" means any Claim against a Debtor on account of the Subordinated Loan Facility.

147.    "*Subordinated Loan Credit Agreement*" means that certain Second Amendment to Amended and Restated Term Loan Credit Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) Penney Holdings LLC, as lead administrative borrower, (b) the other borrowers signatory thereto, (c) the Subordinated Loan Parties (as defined in the Subordinated Loan Credit Agreement), (d) the lenders party thereto, and (e) Copper Retail JV LLC, as administrative agent and collateral agent.

148.    "*Subordinated Loan Facility*" means the subordinated term loans issued pursuant to the Subordinated Loan Credit Agreement.

149.    "*Term Loan Agent*" means Whitehawk Capital Partners LP, as administrative agent and collateral agent under the Term Loan Credit Agreement.

150.    "*Term Loan Claims*" means any Claim against a Debtor on account of the Term Loan Facility.

151.    "*Term Loan Credit Agreement*" means that certain Credit Agreement dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) Penney Holdings LLC, as lead administrative borrower, (b) the other borrowers signatory thereto, (c) the other Loan Parties (as defined in the Term Loan Credit Agreement), including the Debtors and non-Debtor affiliates, (iv) the lenders party thereto, and (v) the Term Loan Agent.

152.    "*Term Loan Facility*" means the term loans issued pursuant to the Term Loan Credit Agreement.

153.    "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

154.    "*UCC Professional Fee Budget Amount*" means $1,250,000.00, representing the budgeted amount of Professional fees and expenses of the Committee and its Professionals as set forth in the Approved Budget (as defined in the Cash Collateral Order).

155.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of New Jersey.

156.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

157.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

158.    "*Weekly Paydown*" shall have the meaning ascribed to it in the Cash Collateral Order.

159.    "*Wind-Down Account*" means the account to be established and maintained by the Debtors or the Plan Administrator, as applicable, and funded on the Effective Date with the Wind-Down Amount to fund the

Wind-Down Transactions in accordance with the Plan.  Following the conclusion of the Wind-Down Transactions, any remaining amounts in the Wind-Down Account shall be distributed in accordance with Article III of this Plan.

160.    "*Wind-Down Amount*" means Cash in an amount agreed to by the Debtors and ABL Agent that is sufficient to fund the estimated fees, costs, and expenses necessary to administer the Wind-Down Transactions, in an amount that includes sufficient funds for the payment of all Administrative Claims, Priority Tax Claims, and Other Priority Claims as necessary to confirm this Plan.

161.    "*Wind-Down Assets*" means, on the Effective Date, all assets of each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan, and which shall in any event include, without limitation, any tariff refund claims and all Retained Causes of Action, but which shall exclude (i) the Professional Fee Amounts held in the Professional Fee Escrow Account, (ii) the GUC Trust Assets, and (iii) any amounts necessary to fund administrative expenses, Priority Tax Claims, and Other Priority Claims.

162.    "*Wind-Down Debtors*" means the Debtors or any successor or successors thereto after the Effective Date responsible for winding down the Debtors' Estates and implementing the terms of this Plan.

163.    "*Wind-Down Transactions*" means the transactions described in Article IV.F of this Plan.

164.    "*Wind-Down Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Wind-Down Transactions, the form of which shall be included in the Plan Supplement.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (iii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iv) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (v) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (vi) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (vii) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (viii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (ix) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with, applicable federal Law, including the Bankruptcy Code and Bankruptcy Rules; (x) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be limiting and shall be deemed to be followed by the words "without limitation"; (xi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (xii) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xiii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xiv) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xv) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xvi) any immaterial effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtors and Plan Administrator in such a manner that is consistent with the overall purpose and intent of this Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (xvii) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that

14

have such consent, acceptance, or approval rights, including by electronic mail; (xviii) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter; (xix) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and (xx) on and after the Effective Date, all references to the Debtors in this Plan shall be deemed references to the Wind-Down Debtors.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of this Plan; any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Wind-Down Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and any document or instrument in the Plan Supplement, the terms of the relevant document or instrument in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

H.      *Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as applicable, and as respectively set forth therein, with respect to the form and substance of this Plan, all exhibits to this Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

15

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement, as applicable, shall not impair such rights and obligations.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (i) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable; or (v) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim that is an Assumed Liability under the Sale Transaction Documents shall be an obligation of the Purchaser and shall not be an obligation of the Debtors or the Wind-Down Debtors.

Except as otherwise provided in this Article II.A of this Plan, requests for payment of Administrative Claims must be filed with the Claims and Noticing Agent and served on the Wind-Down Debtors by the applicable Administrative Claims Bar Date.  **Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Wind-Down Debtors, their Estates, or their property, and such Administrative Claims shall be deemed released and extinguished as of the Effective Date without the need for any objection from the Debtors or the Wind-Down Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors or the Wind-Down Debtors, as applicable, and the requesting party by the Claims Objection Deadline.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.  Notwithstanding anything to the contrary in this Plan, counterparties to an Unexpired Lease to which one or more of the Debtors was a party as of the Petition Date shall not be required to File requests for payment of Administrative Claims with the Bankruptcy Court; instead, Holders of such Claims may submit their Claims directly to the Claims and Noticing Agent by mail, by hand delivery, or through the Claims and Noticing Agent's website.

B.      *Professional Fee Claims.*

1.      Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Wind-Down Debtors shall

16

pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account.

     2.   Professional Fee Escrow Account.

On the Effective Date, the Wind-Down Debtors shall establish and fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount, less any unapplied cash deposited in respect of the Carve-Out (as defined in the Cash Collateral Order), which cash shall be added to the Professional Fee Escrow Account. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Debtors' Estates, the Wind-Down Debtors, or the Plan Administrator, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors and constitute part of the Wind-Down Assets without any further notice to or action, order, or approval of the Bankruptcy Court, which amounts shall be considered Net Proceeds and promptly distributed in accordance with this Plan.

     3.   Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment. If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of determining the Professional Fee Amount. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

     4.   Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Debtors or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors or the Wind-Down Debtors, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Wind-Down Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything to the contrary set forth in this Plan, the professional fees and expenses of professionals incurred in connection with the CCAA Recognition Proceedings shall in all cases continue to be paid in accordance with the terms of the orders of the CCAA Court.

C.    *Priority Tax Claims.*

All Allowed Priority Tax Claims shall either (1) be paid during the Chapter 11 Cases or (2) constitute an Assumed Liability under the Sale Transaction Documents and shall be an obligation of the Debtors or the Wind-Down Debtors. To the extent that an Allowed Priority Tax Claim was not otherwise paid during the Chapter 11 Cases or assumed and paid as an Assumed Liability under the applicable Sale Transaction Documents and the Holder of such Allowed Priority Tax Claim does not agree to less favorable treatment, in full and final satisfaction,

settlement, and release of, and in exchange for, such Allowed Priority Tax Claim, such Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.    *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of this Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Claims | Impaired | Entitled to Vote |
| Class 4 | Term Loan Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Subordinated Loan Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Wind-Down Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.   Class 1 - Other Secured Claims.

(a)    *Classification*:  Class 1 consists of all Other Secured Claims against the Debtors.

18

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Wind-Down Debtors, as applicable, in full and final satisfaction of such Allowed Other Secured Claim, either:

     (i)     payment in full in Cash in an amount equal to its Allowed Other Secured Claim;

     (ii)    delivery of the collateral securing its Allowed Other Secured Claim; or

     (iii)   such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Class 1 is Unimpaired under this Plan.  Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.   Class 2 - Other Priority Claims.

(a)     *Classification*:  Class 2 consists of all Other Priority Claims against the Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*:  Class 2 is Unimpaired under this Plan.  Holders of Allowed Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.   Class 3 - ABL Claims.

(a)     *Classification*:  Class 3 consists of all ABL Claims against the Debtors.

(b)     *Allowance*:  On the Effective Date, the ABL Claims shall be Allowed in the aggregate principal amount of $728,477,563,[2] plus any and all unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the ABL Credit Agreement or related documents as of the Effective Date, after giving effect to the Weekly Paydowns made during the Chapter 11 Cases.

(c)     *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed ABL Claim agrees to less favorable treatment, each Holder of an Allowed ABL Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of (a) 100% of the Net Proceeds *less* (b) to the extent the Net Proceeds received by Holders of Allowed ABL Claims, in the aggregate, exceeds the Mandatory Payment Amount (including after reducing the Net Proceeds for the following adjustment), the GUC Trust Cash and the GUC Trust Expense Amount in accordance with the Plan.

Notwithstanding the foregoing, all ABL Claims shall be reserved and preserved as against all Persons or Entities other than the Debtors (and as to the Debtors, all ABL Claims shall be subject to this Plan and Confirmation Order).

---

[2]   The ABL Claims also include letters of credit in the aggregate undrawn face amount of $196,811,453.

(d)     *Voting*:  Class 3 is Impaired under this Plan, and Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject this Plan.

4.    Class 4 - Term Loan Claims.

(a)     *Classification*:  Class 4 consists of all Term Loan Claims against the Debtors.

(b)     *Allowance*:  On the Effective Date, the Term Loan Claims shall be Allowed in the aggregate principal amount of $600,000,000, plus any and all unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the Term Loan Credit Agreement or related documents as of the Effective Date.

(c)     *Treatment*:  On the Effective Date, each Allowed Term Loan Claim shall be canceled, released, and extinguished as against the Debtors, and no Holder of an Allowed Term Loan Claim shall receive any distribution from the Debtors on account of such Claim; *provided* that it is expressly understood and agreed that all Term Loan Claims shall be reserved and preserved as against all Persons or Entities other than the Debtors (and as to the Debtors, all Term Loan Claims shall be subject to this Plan and Confirmation Order).

(d)     *Voting*:  Class 4 is Impaired under this Plan.  Holders of Allowed Term Loan Claims in Class 4 are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

5.    Class 5 - Subordinated Loan Claims.

(a)     *Classification*:  Class 5 consists of all Subordinated Loan Claims against the Debtors.

(b)     *Allowance*:  On the Effective Date, the Subordinated Loan Claims shall be Allowed in the aggregate principal amount of $216,281,687, plus any and all unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the Subordinated Loan Credit Agreement or related documents as of the Effective Date.

(c)     *Treatment*:  On the Effective Date, each Allowed Subordinated Loan Claim shall be canceled, released, and extinguished as against the Debtors, and no Holder of an Allowed Subordinated Loan Claim shall receive any distribution from the Debtors on account of such Claim; *provided* that it is expressly understood and agreed that all Subordinated Loan Claims shall be reserved and preserved as against all Persons or Entities other than the Debtors (and as to the Debtors, all Subordinated Loan Claims shall be subject to this Plan and Confirmation Order).

(d)     *Voting*:  Class 5 is Impaired under this Plan.  Holders of Allowed Subordinated Loan Claims in Class 5 are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

6.    Class 6 - General Unsecured Claims.

(a)     *Classification*:  Class 6 consists of all General Unsecured Claims against the Debtors.

(b)     *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of the GUC Trust Interests; *provided*, for the avoidance of doubt, that (a) any Holder of a Claim arising from or related to the waiver of prepetition intercompany claims, (b) any Holder of the SPARC

Intercompany Claim, and (c) any Holder of a deficiency claim arising out of any obligations under the Credit Agreements shall not be a GUC Trust Beneficiary and shall not receive any share of the GUC Trust Interests.

(c) *Voting*: Class 6 is Impaired under this Plan, and Holders of Allowed Claims in Class 6 are entitled to vote to accept or reject this Plan.

7. <u>Class 7 - Intercompany Claims</u>.

(a) *Classification*: Class 7 consists of all Intercompany Claims against the Debtors.

(b) *Treatment*: On the Effective Date, each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or Wind-Down Debtor, either:

    (i) reinstated (solely for the purpose of facilitating the Wind-Down Transactions);

    (ii) set off, settled, distributed, contributed, canceled, and released without any distribution on account of such Intercompany Claim; or

    (iii) otherwise addressed at the option of the applicable Debtor or Wind-Down Debtor.

(c) *Voting*: Class 7 is Unimpaired if the Class 7 Intercompany Claims are Reinstated or Impaired if the Class 7 Intercompany Claims are cancelled. Holders of Class 7 Intercompany Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

8. <u>Class 8 - Intercompany Interests</u>.

(a) *Classification*: Class 8 consists of all Intercompany Interests in the Debtors.

(b) *Treatment*: On the Effective Date, each Allowed Intercompany Interest shall be, at the option of the applicable Debtor or Wind-Down Debtor, either:

    (i) reinstated (solely for the purpose of facilitating the Wind-Down Transactions);

    (ii) set off, settled, distributed, contributed, canceled, and released without any distribution on account of such Intercompany Interest; or

    (iii) otherwise addressed at the option of the applicable Debtor or Wind-Down Debtor.

(c) *Voting*: Class 8 is Unimpaired if the Class 8 Intercompany Interests are Reinstated or Impaired if the Class 8 Intercompany Interests are cancelled. Holders of Class 8 Intercompany Interests are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

9. <u>Class 9 - Existing Equity Interests</u>.

(a) *Classification*: Class 9 consists of all Existing Equity Interests.

21

(b)     *Treatment*:  On the Effective Date, all Existing Equity Interests will be canceled, released, and extinguished and will be of no further force and effect.  No Holders of Existing Equity Interests will receive a distribution under this Plan on account of such Existing Equity Interests.

(c)     *Voting*: Class 9 is Impaired under this Plan.  Holders of Allowed Interests in Class 9 are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

10.  Class 10 – Section 510(b) Claims.

(a)     *Classification*:  Class 10 consists of all Section 510(b) Claims.

(b)     *Treatment*:  Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(c)     *Voting*: Class 10 is Impaired under this Plan.  Holders, if any, of Class 10 Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders, if any, are not entitled to vote to accept or reject this Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Wind-Down Debtors, as applicable, regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted this Plan.

F.     *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of any Purchaser, and/or in exchange for the agreement of the Debtors and/or the Wind-Down Debtors, as applicable, under this Plan to make certain distributions to the Holders of Allowed Claims.

G.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan.  The Debtors shall

22

seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify this Plan in accordance with Article X of this Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Wind-Down Debtors and the Plan Administrator reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan, including the Committee Settlement, shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan. This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Sale Transaction.*

The Debtors conducted the Sale Process in accordance with the Bidding Procedures in order to identify and consummate a Sale Transaction to the extent that doing so would maximize the value of the Debtors' Estates. The Bidding Procedures Order was entered on February 10, 2026, and established March 3, 2026 as the Bid Deadline (as defined in the Bidding Procedures). Although the Debtors did not receive a Qualified Bid (as defined in the Bidding Procedures) for a going-concern sale of some or all of the Debtors' business prior to the Bid Deadline, the Debtors will consider any proposal, including any proposal to purchase some or all of the Debtors' assets as a going-concern, to the extent that doing so would maximize the value of the Debtors' business. To the extent that the Debtors, in their business judgment, elect to consummate a Sale Transaction, the Debtors shall seek Bankruptcy Court approval of such Sale Transaction before or in connection with Consummation of this Plan.

Pursuant to any Sale Transaction, if applicable, the Acquired Assets shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, Interests, or other encumbrances (except for those Liens, Claims, charges, Interests, or other encumbrances expressly assumed by the Purchaser pursuant to the terms of the Sale Transaction Documents) pursuant to sections 363 and 1141(c) of the Bankruptcy Code (and the CCAA, if

23

applicable) and in accordance with the terms of the Sale Transaction Documents.  In exchange, the Purchaser shall pay to the Debtors the Sale Proceeds in accordance with the terms of the Sale Transaction Documents.

The Debtors and the Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Purchase Agreement, the Sale Order, and this Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without (i) further notice to or order of the Bankruptcy Court; (ii) any requirement to take any other action under applicable law, regulation, order, or rule; or (iii) the vote, consent, authorization, or approval of any Entity.  On and after the Effective Date, except as expressly set forth in the Purchase Agreement, the Sale Order, or other order of the Bankruptcy Court, neither the Purchaser nor any of its affiliates shall be liable for any Claims, Administrative Claims, or other liabilities of the Debtors or the Wind-Down Debtors (which shall be payable solely in accordance with this Plan) that do not constitute Assumed Liabilities or that were not otherwise transferred or assigned to the Purchaser or any of its affiliates pursuant to the Purchase Agreement, the Sale Order, or other order of the Bankruptcy Court.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Debtors or the Purchaser, as applicable, may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided,* that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

C.    *Store Closing Sales.*

The Debtors are in the process of conducting store-closing sales at all of the Debtors' store locations in accordance with the Store Closing Order.  The Debtors shall be authorized to take all actions necessary or appropriate to implement and consummate the Store Closing Sales, including entering into and performing under liquidation agreements, discounting and selling inventory, advertising and conducting store closing sales, rejecting executory contracts and unexpired leases in connection therewith, and taking such other actions as are customary in connection with retail liquidations, without further order of the Bankruptcy Court, except as otherwise provided in this Plan, the Store Closing Order, or any other Final Order.

Notwithstanding the foregoing, the Debtors, in consultation with the Consenting Lenders, shall retain the right, in the exercise of their business judgment, to suspend or terminate the Store Closing Sales and pursue a Sale Transaction to the extent the Debtors determine that doing so would maximize the value of the Debtors' Estates.

D.    *Committee Settlement*

This Article IV.D implements paragraph 33 of the Cash Collateral Order, which is incorporated herein in its entirety.  In the event of any inconsistency between this Plan and the Cash Collateral Order, the Cash Collateral Order shall control.

The Debtors, the Consenting Lenders, and the Committee agreed to the terms of the Committee Settlement to be implemented through this Plan and to be approved by the Bankruptcy Court as a good faith compromise and settlement of Claims and controversies among the Debtors, the Consenting Lenders, and the Committee.  The compromises and settlements included in the Committee Settlement are each (a) integrated with and dependent on all other compromises and settlements contemplated in connection with this Plan and (b) necessary and integral to this Plan and the success of these Chapter 11 Cases.  The principal terms of the Committee Settlement are reflected below.

On the Effective Date, the Debtors shall establish the GUC Trust for the benefit of the GUC Trust Beneficiaries, with a GUC Trustee selected by the Committee.  On the Effective Date, the GUC Trust shall be funded with the GUC Trust Assets in accordance with and subject to the conditions set forth in this Article IV.D and paragraph 33 of the Cash Collateral Order.  In consideration for the foregoing, the Committee shall (a) support Confirmation of this Plan, (b) shall not object to Confirmation of this Plan, and (c) shall recommend that Holders of General Unsecured Claims vote to accept this Plan and not opt out of the releases contained in this Plan.  To the

24

extent the amount of Cash (inclusive of GUC Trust Cash and the GUC Trust Expense Amount) actually distributed to the GUC Trust on the Effective Date is less than (a) $3,250,000.00 *less* (b) the amount, if any, by which the amount of actual Allowed fees and expenses of the Committee and its Professionals exceeds the UCC Professional Fee Budget Amount, all Net Proceeds, if any, monetized by the Wind-Down Debtors after the Effective Date, shall be paid into the GUC Trust until the total amount of Cash (inclusive of GUC Trust Cash and the GUC Trust Expense Amount) distributed to the GUC Trust equals (x) $3,250,000.00 *less* (y) the amount, if any, by which the amount of actual Allowed fees and expenses of the Committee and its Professionals exceeds the UCC Professional Fee Budget Amount (the "GUC Trust Top-Up Amount"), and, thereafter, all Net Proceeds monetized by the Wind-Down Debtors shall be paid to the ABL Agent, for the benefit of the Holders of ABL Claims, until the ABL Claims are indefeasibly paid in full.

Notwithstanding anything to the contrary herein or in the GUC Trust Agreement, no portion of the GUC Trust Cash shall vest in, be funded to, or otherwise be made available to the GUC Trust unless and until the ABL Agent has received, in immediately available funds, the Mandatory Paydown Amount for irrevocable application and indefeasible paydown of the ABL Claims.

In the event that the fees and expenses of the Committee and its Professionals subject to the Carve-Out (as defined in the Cash Collateral Order) exceed the UCC Professional Fee Budget Amount as set forth in the Approved Budget (as defined in the Cash Collateral Order) in the line item titled "total professional fees", the sole source of recovery for the payment of any such excess fees and expenses shall be the GUC Trust Cash, and the GUC Trust Cash shall be reduced on a dollar-for-dollar basis by each dollar of such excess fees and expenses. For the avoidance of doubt, no such excess fees and expenses shall be recoverable from the Wind-Down Account, the Professional Fee Escrow Account, or any other assets of the Debtors, the Wind-Down Debtors, or the Plan Administrator.

E.      *Sources of Consideration for Plan Distributions.*

On or after the Effective Date, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall fund or make distributions under this Plan, as applicable, with: (i) the Debtors' Cash on hand; (ii) the proceeds from the Debtors' ordinary course operations and Store Closing Sales; and (iii) the Sale Proceeds, if *applicable*. The GUC Trust shall fund all distributions to Holders of General Unsecured Claims under this Plan, as contemplated by this Plan and the GUC Trust Agreement, solely from the GUC Trust Net Assets. Each distribution and issuance referred to in Article VI of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

F.      *Employment Obligations.*

The Debtors do not maintain any retiree benefit plans within the meaning of section 1114 of the Bankruptcy Code and, accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable. To the extent any such retiree benefit obligations are determined to exist, on the Effective Date, the Wind-Down Debtors shall assume and continue to pay such benefits in accordance with applicable law, thereby satisfying the requirements of section 1129(a)(13) of the Bankruptcy Code.

G.      *The Wind-Down.*

1.      Wind-Down Transactions.

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall enter into any transaction and shall take all actions as may be necessary or appropriate to effectuate the Wind-Down Transactions, including the steps set forth in the Wind-Down Transactions Memorandum, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Wind-Down Transactions that are consistent with and pursuant to the terms and conditions of this Plan, including, as applicable: (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms

that are consistent with the terms of this Plan and that satisfy the requirements of applicable law and any other term to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and/or the Restructuring Support Agreement and having other terms with which the applicable parties agree; (iii) to the extent applicable, the filing of a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (iv) if applicable, effectuate distributions contemplated by the Plan; (v) liquidating or otherwise monetizing the Wind-Down Assets; (vi) the implementation of the Committee Settlement; and (vii) such other transactions that, in the business judgement of the Debtors, the Wind-Down Debtors, or the Plan Administrator, if applicable are required to effectuate the Wind-Down Transactions.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan. On and after the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, will be authorized to implement this Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtors and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and of the Plan Administrator Agreement, compromise or settle any Wind-Down Assets remaining with the Wind-Down Debtors as a successor to the Debtors. On and after the Effective Date, the Wind-Down Debtors and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Retained Causes of Action or Claims relating to any Wind-Down Assets remaining with the Wind-Down Debtors as successor to the Debtors or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtors and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided for herein and in the Plan Administrator Agreement. The Wind-Down Debtors and the Plan Administrator shall be entitled to enforce all defenses and counterclaims to any and all Claims asserted against the Debtors and their Estates, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

2. Wind-Down Debtors.

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors for the purposes of carrying out the Wind-Down Transactions.

Notwithstanding anything to the contrary in this Plan, on the Effective Date, any Cause of Action not settled, released, enjoined, or exculpated under this Plan or transferred pursuant to the Sale Transaction Documents on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator or the Wind-Down Debtors, as applicable, and the net proceeds thereof shall constitute the Wind-Down Assets.

On and after the Effective Date, except as otherwise provided in this Plan, each Wind-Down Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

3. Wind-Down Assets.

On the Effective Date, the Wind-Down Debtors shall become successors to the Debtors' rights, title, and interests to any Estate assets and any additional Wind-Down Assets that may become available, which shall vest in

26

the Wind-Down Debtors for the primary purpose of liquidating the Wind-Down Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business.

Notwithstanding any prohibition on assignability under applicable nonbankruptcy law, on the Effective Date and thereafter, if additional Wind-Down Assets become available, such additional Wind-Down Assets, subject to this Plan, the Confirmation Order, and the Plan Administrator Agreement, as applicable, shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor as a successor to the applicable Debtor with all of attendant rights, title, and interests in and to all of the Wind-Down Assets, in accordance with section 1141(c) of the Bankruptcy Code.  At such time when any of the Wind-Down Assets vest in the Wind-Down Debtors, all such assets shall automatically vest in the Wind-Down Debtors free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth herein and the Wind-Down Debtors' expenses as set forth herein and in the Plan Administrator Agreement.

3. <u>The Wind-Down Account</u>.

On or prior to the Effective Date, the Debtors shall establish the Wind-Down Account by depositing Cash on hand in the amount of the Wind-Down Amount into the Wind-Down Account.  The Wind-Down Account shall be used by the Wind-Down Debtors to fund the estimated fees, costs, and expenses necessary to fully administer the Wind-Down Transactions.  Any amount remaining in the Wind-Down Account after the dissolution of the Wind-Down Debtors shall be distributed on account of unpaid Claims and Interests in accordance with the priorities and treatment set forth in <u>Article III</u> herein until such Claims and Interests are paid in full.

H. *Plan Administrator.*

1. <u>General</u>.

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors or the Wind-Down Debtors, as applicable, shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers; *provided* that the Disinterested Managers shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Wind-Down Debtors, the Purchaser, or any other Entity without the Disinterested Managers' prior written consent.  The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by this Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Transactions and as otherwise provided in the Confirmation Order.

The Plan Administrator shall act in accordance with the Plan Administrator Agreement, which shall be entered into by and among the Debtors or the Wind-Down Debtors, as applicable, and the Plan Administrator Agreement shall be effective as of the Plan Effective Date.  In the event of any conflict between the terms of this <u>Article IV</u> and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors in the Plan Administrator Agreement shall be terminated.

2.   <u>Powers and Obligations</u>.

The powers of the Plan Administrator shall be set forth in the Plan Administrator Agreement and in any event shall include any and all powers and authority to implement this Plan and wind down the business and affairs of the Debtors and Wind-Down Debtors, including:  (i) making distributions under this Plan; (ii) performing any obligations under any Executory Contract or Unexpired Lease assumed but not assigned on or before the Effective Date, including any transition services agreement entered into in connection with a Sale Transaction, if applicable; (iii) liquidating, receiving, holding, investing, supervising, and protecting the Wind-Down Assets to be administered by the Plan Administrator; (iv) taking all steps and executing all instruments and documents necessary to effectuate the distributions to be made under this Plan; (v) establishing and maintaining bank accounts in the name of the Wind-Down Debtors, including the Wind-Down Account; (vi) making distributions from the Wind-Down Account to facilitate the Wind-Down Transactions; (vii) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating this Plan to the extent necessary; (viii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (ix) except as otherwise provided for herein, enforcing and prosecuting claims, interests, rights, and privileges under the Retained Causes of Action on the Schedule of Retained Causes of Action in accordance with <u>Article IV.I</u>; (x) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (xi) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (xii) resolving any disputed Claims and administering the Claims resolution process; (xiii) to the extent applicable, filing any certificate of dissolutions or equivalent documents, together with all with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (ix) filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports; and (x) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to this Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of this Plan.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors.  Nothing herein shall limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer.  The Debtors, before the Effective Date, and the Wind-Down Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind-Down Transactions, without any further notice to or action, order, or approval of the Bankruptcy Court.  Any distributions to be made under this Plan shall be made by the Plan Administrator or its designee.  The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of this Plan, the Confirmation Order, and the Plan Administrator Agreement.

3.   <u>Retention of Professionals</u>.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, at the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Wind-Down Debtors.  The reasonable fees and expenses of such professionals, if applicable, shall be paid from the Wind-Down Account upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Wind-Down Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Account and shall not be subject to the approval of the Bankruptcy Court or any other court of competent jurisdiction.

4.   <u>Compensation of the Plan Administrator</u>.

The Plan Administrator's compensation shall be paid out of the Wind-Down Account as set forth in the Plan Administrator Agreement.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or

28

approval of, the Bankruptcy Court in Cash from the Wind-Down Account if such amounts relate to any actions taken hereunder.

5.   Plan Administrator Expenses.

All costs, expenses, and obligations incurred by the Plan Administrator or the Wind-Down Debtors in administering this Plan or in effecting distributions thereunder (including the reimbursement of reasonable expenses), including any costs, expenses, or obligations in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Account.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.  In the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Account.

6.   Exculpation, Indemnification, Insurance, and Liability Limitation.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

7.   Tax Returns.

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505 of the Bankruptcy Code and subject to applicable law, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate.

I.     *Dissolution of the Wind-Down Debtors.*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made, completion of all its duties under this Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which each Wind-Down Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable state(s).

J.     *The GUC Trust.*

On or before the Effective Date, the Debtors and the GUC Trustee shall enter into the GUC Trust Agreement and, on the Effective Date, the GUC Trust Assets shall vest or be deemed to be vested in the GUC Trust irrevocably and automatically without further action by any Person or Entity, free and clear of all Claims, Liens, and Interests, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.  Under no circumstance shall the Debtors, the Wind-Down Debtors, the Plan Administrator, or any other party be required to contribute any additional assets to the GUC Trust other than the GUC Trust Assets.  After the Effective Date, neither the Debtors, the Wind-Down Debtors, the Plan Administrator, nor any other party shall have any interest in the GUC Trust Assets except as expressly set forth herein.

The GUC Trustee shall be the exclusive administrator of the assets of the GUC Trust (including the GUC Trust Assets) for purposes of section 1123(b)(3)(B) of the Bankruptcy Code with respect to any matters involving Class 6 General Unsecured Claims under this Plan for purposes of carrying out the GUC Trustee's duties under the

29

GUC Trust Agreement.  The GUC Trustee shall be a party in interest under section 1109(b) of the Bankruptcy Code for purposes of the claims reconciliation process, including objecting to General Unsecured Claims, and any other matter affecting the GUC Trust.

The Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall provide commercially reasonable access to the GUC Trustee and any professionals retained by the GUC Trust (at the sole cost and expense of the GUC Trust) to retrieve or access data reasonably necessary to reconcile General Unsecured Claims; *provided* that the Debtors, the Wind-Down Debtors, and the Plan Administrator shall not incur any expenses to provide such access to the GUC Trustee and any professionals retained by the GUC Trust.  To the extent the GUC Trust receives information from the Debtors, the Wind-Down Debtors, or the Plan Administrator in connection with the General Unsecured Claims, the GUC Trust's receipt of such documents, information, or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, and the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, retain the sole right to waive their own privileges.  Reasonable agreements will be made with the GUC Trustee such that confidential information and privileges are preserved, while permitting the GUC Trustee to use, as necessary to administer the GUC Trust, such information and privilege; absent such agreements, either the GUC Trustee, the Wind-Down Debtors, or the Plan Administrator may present the issue to the Bankruptcy Court for resolution.

The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee. The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include, without limitation, the authority and responsibility to take the actions set forth in this Article IV.J. Among other things, the GUC Trustee shall have the power and authority to distribute and allocate the GUC Trust Net Assets to the GUC Trust Beneficiaries on account of such beneficiaries' GUC Trust Interests in accordance with the treatment set forth in this Plan for Class 6 General Unsecured Claims.  The GUC Trust Agreement will provide for, among other things, reasonable and customary provisions that allow for limitation of liability and indemnification of the GUC Trustee and its professionals by the GUC Trust.  Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the GUC Trust Assets.  In the event of any conflict between the terms of this Plan and the GUC Trust Agreement, the terms of this Plan shall govern.

From and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall, in the ordinary course of business and without the need for any approval by the Bankruptcy Court, pay the GUC Trust Fees and Expenses solely from the GUC Trust Assets.  The Debtors, the Wind-Down Debtors, the Plan Administrator, and their Affiliates (and anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the GUC Trust.

In furtherance of this section of this Plan, (i) it is intended that the GUC Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and as a "grantor trust" within the meaning of sections 671 through 677 of the Internal Revenue Code, to the extent permitted by applicable law, with the GUC Trust Beneficiaries treated as grantors and owners of the liquidating trust, and accordingly, for all U.S. federal income tax purposes, the transfer of the GUC Trust Assets to the GUC Trust shall be treated in accordance with the terms herein as distributed by the Debtors or the Wind-Down Debtors, as applicable, directly to the GUC Trust Beneficiaries, and then contributed by such GUC Trust Beneficiaries to the GUC Trust in exchange for their pro rata GUC Trust Interest; (ii) the primary purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Net Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan and the GUC Trust Agreement, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors or the Wind-Down Debtors, as applicable, the GUC Trust Beneficiaries, and the GUC Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) as soon as possible after the transfer of the GUC Trust Assets to the GUC Trust, the GUC Trustee shall make a good faith valuation of the GUC Trust Assets, and such valuation will be made available from time to time, as relevant for tax reporting purposes, and each of the Debtors or the Wind-Down Debtors, as applicable, the GUC Trustee, and the GUC Trust Beneficiaries shall take consistent positions with respect to the valuation of the GUC Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes; (v) the "taxable year" of the GUC Trust shall be the "calendar year" as such terms are defined in section 441 of the Internal Revenue

30

Code; (vi) the GUC Trustee shall be responsible for filing all applicable tax returns for the GUC Trust and shall file such tax returns treating the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vii) the GUC Trustee shall annually send to each Holder of a GUC Trust Interest a separate statement regarding such Holder's share of items of income, gain, loss, deduction or credit (including receipts and expenditures) of the GUC Trust as relevant for U.S. federal income tax purposes.

The GUC Trustee (i) may, in its sole discretion, timely elect to treat any GUC Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently with the foregoing for federal, state, and local income tax purposes.  If a "disputed ownership fund" election is made, (i) the GUC Trust Assets will be subject to entity-level taxation and (ii) all parties (including, without limitation, the GUC Trustee and the holders of GUC Trust Interests) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing. The GUC Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the GUC Trustee under this Plan have been made, but in no event later than the fifth anniversary of the Effective Date (unless extended by order of the Bankruptcy Court).  Upon dissolution of the GUC Trust, any remaining GUC Trust Net Assets shall be distributed to all Holders of Allowed General Unsecured Claims in accordance with this Plan and the GUC Trust Agreement, as appropriate; *provided*, *however*, that if the GUC Trustee reasonably determines that such remaining GUC Trust Assets are insufficient to render a further distribution practicable, the GUC Trustee may donate any balance to a charitable organization that is (A) described in Section 501(c)(3) of the Internal Revenue Code, (B) exempt from U.S. federal income tax under Section 501(a) of the Internal Revenue Code, (C) not a "private foundation" as defined in Section 509(a) of the Internal Revenue Code, and (D) unrelated to the Debtors, the GUC Trust, and any insider of the GUC Trustee.

The GUC Trustee may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local, or non-U.S. tax Law with respect to any GUC Trust Beneficiary, including with respect to any payment or distribution to the Debtors, the GUC Trustee, and the GUC Trust Beneficiary, any amounts received by, collections of, or earnings of the GUC Trust and any proceeds from the disposition of GUC Trust Assets.  All such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be treated as amounts distributed to the applicable GUC Trust Beneficiary to the extent permitted by applicable Law.  The GUC Trustee shall be authorized to collect such tax information from the GUC Trust Beneficiaries (including social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order, and the GUC Trust Agreement and to determine whether any deduction or withholding applies with respect to a payment to a GUC Trust Beneficiary and the amount of such deduction or withholding.  Notwithstanding the above, each Holder of any Claim that is to receive any portion of the Distributable Proceeds shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any governmental authority, including income, withholding, and other tax obligations, on account of such distribution or with respect to its ownership of an interest in the GUC Trust.

As a condition to receiving, or being entitled to receive, distributions of Cash from the GUC Trust in respect of a GUC Trust Beneficiary's interest in the GUC Trust, GUC Trust Beneficiaries may be required to identify themselves to the GUC Trustee and provide tax information and the specifics of their holdings, to the extent requested by the GUC Trustee, including an IRS Form W-9 or, in the case of non-U.S. Persons for U.S. federal income tax purposes, certification of foreign status on an applicable IRS Form W-8, including all applicable supporting documents. If a GUC Trust Beneficiary does not, within ninety days of the GUC Trustee's first written request, provide sufficient documentation that is, in the GUC Trustee's reasonable business judgment, necessary to determine applicable tax withholding and reporting requirements for any such distribution, any current or future distribution in respect of such GUC Trust Beneficiary's GUC Trust Interest shall be deemed forfeited, the underlying applicable Claim disallowed and expunged in its entirety, and the funds in respect of such present and future distribution(s) shall revert to the GUC Trust for all purposes including, but not limited to, redistribution to other GUC Trust Beneficiaries in accordance with this Plan, the Confirmation Order, and the GUC Trust Agreement.

*K.*      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Wind-Down Debtors, shall retain and may enforce (or the Plan Administrator may enforce, if applicable) all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the rights of the Wind-Down Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Wind-Down Debtors, as applicable, as of the Effective Date.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including Article VIII of this Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, the Wind-Down Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Wind-Down Debtor except as otherwise expressly provided in this Plan, including Article VIII of this Plan. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, through their authorized agents or representatives, including the Plan Administrator, shall retain and may exclusively enforce any and all such Causes of Action. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, including the Plan Administrator, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.I include any Claim or Cause of Action against a Released Party or Exculpated Party, or any Claim or Cause of Action released pursuant to the Cash Collateral Order.

*L.*      *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except to the extent otherwise provided in this Plan, including in Article V.A hereof, to the maximum extent permitted by law, all notes, instruments, certificates, Securities, shares, purchase rights, security agreements, collateral agreements, subordination agreements, the Intercreditor Agreements, and other documents evidencing Claims against or Interests in the Debtors, including credit agreements and indentures, shall be cancelled, and all present and future obligations of the Debtors or the Wind-Down Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, and of no force or effect, with respect to the Debtors, without the need for further action or approval of the Bankruptcy Court or for a Holder to take further action, and the Agents shall be discharged and released and shall not have any continuing duties or obligations thereunder, with respect to the Debtors. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.

32

*M.*      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, as applicable, or to any other Person) of property under this Plan or pursuant to: (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Wind-Down Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; (v) the Sale Transaction, if applicable; or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*N.*      *Corporate Action.*

Upon the Effective Date, all actions contemplated under this Plan (including the steps set forth in the Wind-Down Transactions Memorandum) shall be deemed authorized and approved in all respects, including, as and if applicable: (i) formation of the Wind-Down Debtors and the selection of the Plan Administrator; (ii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (iii) the implementation of the Restructuring Transactions; (iv) consummation of the Sale Transaction, if any, pursuant to the Purchase Agreement; (v) funding of all applicable escrows and accounts; (vi) formation of the GUC Trust, issuance of the GUC Trust Interests, execution and delivery of the GUC Trust Agreement, and the vesting of the GUC Trust Assets in the GUC Trust; (vii) implementation of the Committee Settlement; and (viii) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan involving the corporate structure of the Debtors or the Wind-Down Debtors and any corporate action required by the Debtors or the Wind-Down Debtors in connection with this Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the Security Holders, directors, officers, or managers of the Debtors or the Wind-Down Debtors. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors. The authorizations and approvals contemplated by this Article IV.L shall be effective notwithstanding any requirements under non-bankruptcy law.

*O.*      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Plan Administrator may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Confirmation Order, the Confirmation Recognition Order, and the Restructuring Transactions, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan or the Confirmation Order.

33

P.      *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Wind-Down Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Wind-Down Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

Q.      *Director and Officer Liability Insurance.*

After the Effective Date, none of the Wind-Down Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

On the Effective Date, any and all D&O Liability Insurance Policies shall be assumed by the Wind-Down Debtors pursuant to sections 105 and 365 of the Bankruptcy Code, and nothing shall alter, modify, amend, expand or otherwise affect any coverage for defense and indemnity under any applicable D&O Liability Insurance Policy available to any individuals and/or entities under such D&O Liability Insurance Policy in accordance with and subject in all respects to the terms and conditions of such D&O Liability Insurance Policy, which shall not be altered.  Coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals insured thereunder.  The Wind-Down Debtors shall maintain tail coverage under any D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies.  In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, shall be deemed automatically rejected by the applicable Debtor, applicable Wind-Down Debtor, or the Plan Administrator, as applicable, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (i) is specifically described in this Plan as to be assumed in connection with Confirmation of this Plan; (ii) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (iii) is subject to a Filed motion to assume (or assume and assign) such Unexpired Lease or Executory Contract as of the Effective Date; (iv) is to be assumed by the Debtors and assigned to another third party in connection with a Sale Transaction, if any, including the Purchaser as set forth in the Purchase Agreement approved pursuant to the Sale Order; (v) is a contract, instrument, release, or other agreement or document entered into in connection with this Plan; or (vi) is an Insurance Policy (including any D&O Liability Insurance Policies).

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code; *provided* that in no event shall any counterparty to an Executory Contract or Unexpired Lease have less than seven (7) days' notice of an opportunity to object to the Debtors' proposed assumption, assumption and assignment, or rejection of such Executory Contract or Unexpired Lease.  To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with a Sale Transaction, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether the Bankruptcy

34

Court has actually ruled on such proposed assumption or rejection prior to such deadline. Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in this Plan, or the Schedule of Assumed Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code; *provided* that neither this Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under a Sale Transaction, if any, to assume and assign Executory Contracts and Unexpired Leases to the Purchaser pursuant to the Purchase Agreement and any related documents relating to the Sale Transaction. Except as otherwise specifically set forth herein or in the Confirmation Order or any Sale Transaction Documents approved pursuant to the Sale Order, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors.

Notwithstanding anything to the contrary in this Plan, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, reserve the right (i) in the event that the Debtors do not consummate a Sale Transaction, to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the earlier of (A) 45 days following the Effective Date and (B) solely with respect to Unexpired Leases of nonresidential real property, the deadline is the earlier of (I) the applicable deadline pursuant to section 365(d)(4) of the Bankruptcy Code, (II) the date of entry of the Confirmation Order, and (III) as such date may be extended with the written consent of the applicable landlord counterparty and (ii) in the event that the Debtors consummate a Sale Transaction, to alter, amend, modify, or supplement any schedule of Executory Contracts and Unexpired Leases that is attached to any Sale Transaction Documents, with the consent of the Purchaser, at any time prior to the earlier of (A) 90 days following the closing date of a Sale Transaction, and (B) solely with respect to Unexpired Leases of nonresidential real property, the applicable deadline pursuant to section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the consent of the applicable landlord counterparty, consistent with any Sale Transaction Documents, as applicable.

Subject to any Purchase Agreement and Sale Order, to the maximum extent permitted by law, the transactions contemplated by this Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan, or any other transaction, event, or matter that would (i) result in a violation, breach, or default under such Executory Contract or Unexpired Lease, (ii) increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Debtors or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (iii) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Wind-Down Debtors pursuant to the applicable Executory Contract or Unexpired Lease, and to the extent any provision in any such Executory Contract or Unexpired Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the transactions contemplated by this Plan, the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, and any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof (subject to the other provisions of this Article V) shall be deemed satisfied by Confirmation.

B.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease to the extent of applicable law. Without limiting the general nature of the foregoing, and solely to the extent afforded by applicable law, the Debtors and the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased or services previously

35

received by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

C.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of this Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Wind-Down Debtors.

D.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court or submitted directly to the Claims and Noticing Agent by mail, by hand delivery, or through the Claims and Noticing Agent's website within thirty days after the later of (i) the date of service of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (ii) the effective date of such rejection, or (iii) the Effective Date. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors no later than seven days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will, absent further order of the Bankruptcy Court to the contrary, be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Wind-Down Debtors, or the property of any of the foregoing without the need for any objection by the Debtors or the Wind-Down Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall, absent further order of the Bankruptcy Court to the contrary, be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection by any Debtor of any of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of this Plan or such other treatment as agreed to by the Wind-Down Debtors and Holder of such Claim; *provided, however*, that nothing in this Plan shall prevent a counterparty to a rejected Unexpired Lease from asserting an Administrative Claim prior to the Administrative Claims Bar Date.

E.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash within five (5) days after the entry of an order approving such assumption or assumption and assignment, subject to the limitations described in the following sentence, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree; *provided* that nothing herein shall prevent the Wind-Down Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Wind-Down Debtors may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any such objection will be scheduled to be

36

heard by the Bankruptcy Court at the next scheduled omnibus hearing, or such other time as requested by the Debtors or the Wind-Down Debtors, as applicable, and the objecting party.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.  In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Wind-Down Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption or as may otherwise be agreed by the Wind-Down Debtors, with such cure payments to be made within five (5) days of any such resolution.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Wind-Down Debtors, as applicable, may remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the later of (i) the Effective Date and (ii) with respect to Unexpired Leases, the date upon which the Debtors vacate the leased premises by either (A) turning over all keys, key codes, and alarm codes to the applicable Unexpired Lease counterparty, or (B) providing a notice of surrender to the applicable Unexpired Lease counterparty advising that they can reenter the premises and re-key the locks.

The assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to <u>Article V</u>, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or action, order, or approval of the Bankruptcy Court; *provided* that prior to the disallowance and expungement of such Proof of Claim (i) notice with an opportunity to be heard in accordance with the Bankruptcy Code and Bankruptcy Rules will be provided to such Executory Contract or Unexpired Lease counterparty and (ii) such notice shall be Filed with the Bankruptcy Court.**

For the avoidance of doubt, nothing in this Plan shall be deemed to impair the rights of any landlord to an Unexpired Lease, solely to the extent of available insurance coverage and in accordance with the terms, conditions, limitations, and exclusions of such insurance policies and applicable law, with respect to third-party claims asserted in connection with the use by one or more of the Debtors of any leased premises, including with respect to events that occurred prior to the date of any assumption, assumption and assignment, or rejection of any Unexpired Lease. Nothing herein shall (i) expand, increase, or otherwise modify the scope of coverage under any such insurance policies, or (ii) create any direct rights of recovery against the Debtors or the Wind-Down Debtors beyond those otherwise provided under applicable law.  This provision shall apply solely to the extent of valid and collectible insurance and subject to all defenses available to the Debtors, the Wind-Down Debtors, and their insurers.

*F.*     *Insurance Policies.*

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan.  Unless otherwise provided in this Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (ii) all such Insurance Policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest, unaltered and in their entireties, in the Wind-Down Debtors.

Nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or

otherwise amends the terms and conditions of (or the coverage provided by) any of Insurance Policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Plan Administrator, as applicable, (or any Purchaser, solely to the extent assumed and assigned to the Purchaser under the Purchase Agreement) or draw on any collateral or security therefor.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

H.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in this Plan or the Plan Supplement, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor, Wind-Down Debtor, or any other Entity, as applicable, has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in this Plan.

I.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in this Plan or the Confirmation Order, on the Effective Date (or, if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest) or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in this Plan, Holders of Claims of Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

*B.      Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent or the GUC Trustee, acting on behalf of the GUC Trust, as applicable, on the Effective Date or at such other time as provided for in this Plan. The Disbursing Agent and the GUC Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, the GUC Trustee may, in its sole discretion, retain or employ a disbursing agent, which may be the Disbursing Agent, in accordance with the GUC Trust Agreement.

*C.      Rights and Powers of Disbursing Agent.*

       1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan and the Confirmation Order; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan or the Confirmation Order, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

       2.      Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Wind-Down Debtors.

*D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

       1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

       2.      Delivery of Distributions in General.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent or the GUC Trustee, as appropriate:  (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Wind-Down Debtors, or the applicable GUC Trustee or Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Wind-Down Debtors.  Subject to this Article VI, distributions under this Plan on account of Allowed Claims or Allowed Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Allowed Interest shall have and receive the benefit of the distributions in the manner set forth in this Plan.  The Debtors, the Wind-Down Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under this Plan except for actual fraud, gross negligence, or willful misconduct.

39

3.    Minimum Distributions.

Notwithstanding any other provision of the Plan, the Disbursing Agent or the GUC Trustee, as applicable, will not be required to make distributions of Cash less than $250 in value and each such Claim to which this limitation applies shall be released and extinguished pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claim against the Debtors or the Wind-Down Debtors, as applicable, or their respective property.

4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of an Allowed Claim or Allowed Interest (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent or the GUC Trustee, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of the initial attempted distribution. After such date, all unclaimed property or interests in property shall revest in the Wind-Down Debtors, or the GUC Trust (in the case of distributions from the GUC Trust Net Assets) automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheatment, abandoned property, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder of Claims or Interests related to such property or interest in property shall be released, settled, compromised, extinguished, and forever barred. The Wind-Down Debtors and the Disbursing Agent shall have no obligation to attempt to locate a Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

5.    Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or Interest (including with respect to any Security, for the avoidance of doubt) that has been cancelled in accordance with Article VI hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Reinstated under this Plan.

*E.      Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F.      Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Wind-Down Debtors reserve the right to allocate all distributions made under this Plan in compliance with all

40

applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances in a tax-efficient manner.

G.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

J.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Wind-Down Debtor may, pursuant to the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount among the relevant Wind-Down Debtor(s) and Holder of Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Wind-Down Debtor or its successor of any and all claims, rights, and Causes of Action that such Wind-Down Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to setoff or recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, as applicable, unless (i) such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of this Plan on or before the Effective Date, (ii) such Holder has timely filed a Proof of Claim preserving such setoff or recoupment in such Proof of Claim, or (iii) such Holder is a counterparty to a rejected Unexpired Lease relating to nonresidential real property that provides for such setoff or recoupment. The provisions in this section also apply to the GUC Trust, as applicable, in the GUC Trustee's discretion.

K.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors, Wind-Down Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Wind-Down Debtor, or the GUC Trustee, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Wind-Down Debtor, or the GUC Trustee, as applicable, on account of such Claim, such Holder shall, within

41

fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Wind-Down Debtor, the Plan Administrator, or the GUC Trustee (in the case of distributions from the GUC Trust Net Assets), as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Wind-Down Debtor, Plan Administrator, or the GUC Trustee (in the case of distributions from the GUC Trust Net Assets), as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is fully repaid.

2. <u>Claims Payable by Third Parties</u>.

Absent agreement by the Wind-Down Debtors or the GUC Trust, as applicable, no distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy.  Notwithstanding anything to the contrary contained herein (including <u>Article III</u> of this Plan), nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.
PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Disputed Claims Process*.

The Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (ii) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. **Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of:  (i) the Effective Date or (ii) the applicable claims bar date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, the Wind-Down Debtor, and/or the GUC Trust, as applicable, without the need for any objection by the Debtor, the Wind-Down Debtor, or the GUC Trust, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

If the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust (solely with respect to General Unsecured Claims) as applicable, dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to <u>Article III.B</u> or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall File an objection with, and the dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court.

B.      *Allowance of Claims*.

After the Effective Date and subject to the terms of this Plan, the Plan Administrator, each of the Wind-Down Debtors, or the GUC Trust (solely with respect to General Unsecured Claims), as applicable, shall have

and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by this Plan or a Final Order is not considered Allowed and shall be expunged without further action by the Debtors or the GUC Trust and without further notice to any party or action, approval, or order of the Bankruptcy Court.

C.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors, the Wind-Down Debtors, or the GUC Trustee, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in this Plan, a Disputed Claim or Interest that has been expunged from the Claims Register but that either is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under this Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

D.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Wind-Down Debtors, the Plan Administrator, or the GUC Trustee (solely with respect to General Unsecured Claims), as applicable, shall have the sole authority: (i) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (ii) to settle, compromise, withdraw, litigate to judgment, or otherwise resolve any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Wind-Down Debtor or the Plan Administrator shall have and retain all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Retained Causes of Action pursuant to this Plan.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the applicable Claims Objection Deadline, as such deadline may be extended from time to time, or any other date established by a Final Order of the Bankruptcy Court.

F.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Wind-Down Debtors, the Plan Administrator, and/or the GUC Trust (with respect to General Unsecured Claims), as applicable, without the Wind-Down Debtors, the Plan Administrator, or the GUC Trust, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Wind-Down Debtors may establish one or more reserves to fund distributions to Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the Wind-Down Debtors, or Plan Administrator.  Following the final resolution of all Disputed Claims, any residual amounts in such reserves(s) shall constitute residual Cash and be immediately distributed to the Wind-Down Debtors.

H.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust, as applicable, under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Debtors or the GUC Trust, as applicable.

Except as provided herein or otherwise agreed to by the Wind-Down Debtors, the Plan Administrator, or the GUC Trust (with respect to any General Unsecured Claim), as applicable, in their sole discretion, any and all Proofs of Claim Filed after the applicable bar date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Combined Hearing such late Claim has been deemed timely Filed by a Final Order.

I.      *Amendments to Proofs of Claim or Interest.*

On or after the Effective Date, a Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, or the applicable the Debtors, Wind-Down Debtors, the Plan Administrator, or the GUC Trust (with respect to General Unsecured Claims), and any such new or amended Proof of Claim Filed that is not so authorized before it is Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court absent prior Bankruptcy Court approval or agreement by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust (with respect to General Unsecured Claims), as applicable.

J.      *Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided under this Plan shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

44

K.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent or the GUC Trustee, as applicable, shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Settlement, Compromise, and Release of Claims and Interests.*

Except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Wind-Down Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted this Plan.  Except as otherwise provided herein, any default or "event of default" by the Debtors or their non-Debtor Affiliates with respect to any Claim or Interest existing immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtors, or the Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in this Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by this Plan.  The Confirmation Order shall be a judicial determination of the satisfaction and release of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan.

B.      **Release of Liens.**

**Except as otherwise specifically provided in this Plan, the Plan Supplement, the Confirmation Order, any order of the Canadian Court with respect to the CCAA Court Ordered Charges, the Purchase Agreement (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or**

45

retransferred to the Wind-Down Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable Agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Wind-Down Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Wind-Down Debtors or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order (and the Confirmation Recognition Order, with respect to Liens in Canada) to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens with respect to the Debtors.

If any Holder of a Secured Claim that has been satisfied or released in full pursuant to this Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      *Releases by the Debtors.*

Notwithstanding anything contained in this Plan or the Confirmation to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by and on behalf of the Debtors, their Estates, and, if applicable, the Wind-Down Debtors and the Plan Administrator, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, the Wind-Down Debtors, or the Plan Administrator), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort, contract, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, the Wind-Down Debtors, if applicable, the Plan Administrator, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, the Debtors, their Estates, or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operations), or the Estates, the Chapter 11 Cases, the CCAA Recognition Proceedings, the Restructuring Transactions, the Committee Settlement, the Sale Process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, any direct or indirect investment in any Debtor by any Released Party, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, any other benefit provided by any Debtor to any Released Party, cash management arrangements, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the decision to File the Chapter 11 Cases, the decision to file the CCAA Recognition Proceedings, the negotiation, formulation, preparation, dissemination, or consummation of the Restructuring Support

46

Agreement, the Restructuring Transactions, including the Sale Transaction (if applicable) and the Wind Down Transactions, the Committee Settlement, the Credit Agreements, the Cash Collateral Order, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if applicable), this Plan and related agreements, instruments, and other documents, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the Cash Collateral Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, or (ii) any Retained Causes of Action by the Debtors pursuant to a Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Wind-Down Debtors or the Plan Administrator, asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### D.    *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Party's authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all Claims and Causes of Action whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Wind-Down Debtors (if applicable)), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort, contract, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, or any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, the Debtors (including the Debtors' capital structure, management, ownership, or operations), or their Estates or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the CCAA Recognition Proceedings, the Sale Process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, any investment in any Debtor by any Released Party, the Restructuring Transactions, the Committee Settlement, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released

47

Party or the distribution of any Cash or other property of the Debtors to any Released Party, any benefit provided by a Debtor to any Released Party, cash management arrangements, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the decision to File the Chapter 11 Cases, the decision to file the CCAA Recognition Proceedings, the negotiation, formulation, preparation, dissemination, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Committee Settlement, the Credit Agreements, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than, in each case, any direct claims that any Releasing Party may have against any non-Debtor Affiliates of the Debtors that, in each case, are wholly unrelated to the foregoing.  Notwithstanding anything to the contrary in the foregoing or in this Plan, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, (ii) any Retained Causes of Action by the Debtors pursuant to a Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, and (iii) any Claims, Causes of Action, obligations, rights, or remedies that could be asserted by the Secured Lenders against non-Debtor Loan Parties (as defined in the Credit Agreements) arising out of or related to the Credit Agreements and related loan documents, other than to the extent such Claims, Causes of Action, obligations, rights, or remedies arise as a result of the Claims treated under this Plan, and subject to the provisions set forth in Articles III.B.3, III.B.4, and III.B.5 of this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release.

*E.      Exculpation.*

Except as otherwise expressly provided in this Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Restructuring Transactions, the Committee Settlement, the Sale Process, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, this Plan, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of Securities under or in connection with this Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, if applicable, in connection with this Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing.  The Exculpated Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions will not be,

48

liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

**F.      Injunction.**

Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to **Article VIII.C**, **Article VIII.D**, or **Article VIII.E** hereof without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this **Article VIII.F**.

**G.      Protections Against Discriminatory Treatment.**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtors, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against the Wind-Down Debtors, or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

49

*H.      Document Retention.*

On and after the Effective Date, the Wind-Down Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors.

*I.      Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN**

*A.      Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Restructuring Support Agreement shall not have been validly terminated by any of the parties thereto and shall continue to be in full force and effect;

2.      each document or agreement constituting the applicable Definitive Documents shall (a) be in form and substance consistent with this Plan, the Restructuring Support Agreement, and the Restructuring Term Sheet, (b) have been duly executed, delivered, acknowledged, Filed, and/or effectuated, as applicable, and (c) be in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

3.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan, and all applicable regulatory or government-impose waiting periods shall have expired or been terminated;

4.      the Bankruptcy Court shall have entered the Confirmation Order, and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered;

5.      if and as applicable, the Purchase Agreement shall have been executed and all conditions precedent to the effectiveness thereof shall have occurred or will occur substantially simultaneously with the effectiveness of the Plan;

6.      if and as applicable, the Purchaser shall deliver the Purchase Price, as specified in the Purchase Agreement, to the Debtors in exchange for the Wind-Down Debtors' transfer of the purchase assets to the Purchaser;

7.      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed;

8.      the Debtors shall have funded the Wind-Down Amount in Cash;

9.      all actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed and shall be in form and substance consistent with this Plan and the Restructuring Support Agreement;

50

10.      the Professional Fee Escrow Account shall have been established and funded in Cash in an amount sufficient to pay in full all professional fees and expenses of retained professionals approved by the Bankruptcy Court before or after the Effective Date;

11.      the GUC Trust shall have been established and funded with the GUC Trust Assets; and

12.      the sum of (i) the aggregate Weekly Paydowns as of the Effective Date and (ii) the distribution to be made to the Holders of Class 3 ABL Claims under this Plan on the Effective Date shall be not less than the Mandatory Paydown Amount.

B.      *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting Lenders, as defined in the Restructuring Support Agreement, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.  Notwithstanding anything to the contrary contained herein, if the condition set forth in Article IX.A.12 is satisfied, the condition set forth in Article IX.A.11 may be waived solely by the Committee.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan or the Disclosure Statement shall:  (i) constitute a waiver or release by the Debtors of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof. Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of (a) the Cash Collateral Order, including, without limitation, any releases provided for therein, or (b) the Sale Transactions and/or the Store Closing Sales, as applicable, or the revocation of the Debtors' authority under any Sale Order to consummate the Sale Transaction or the Store Closing Sales, as applicable, and all provisions of the Sale Transaction Documents that survive termination thereof shall remain in effect in each case, in accordance with the terms thereof.

D.      *Substantial Consummation.*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan (in each case, subject to the rights set forth in the Restructuring Support Agreement).  Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, rule 3019 of the Bankruptcy Rules, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify, this Plan with respect to such Debtor, one or more times, after Confirmation; *provided*, that in accordance with section 1127 of the Bankruptcy Code, circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms such plan as modified.  To the extent necessary, the Debtors may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission or reconcile any inconsistencies in this Plan, the

51

Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void, *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof; and (iii) nothing contained in this Plan shall (A) constitute a waiver or release of any Claims or Interests, (B) prejudice in any manner the rights of such Debtor or any other Entity, or (C) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code (provided that the CCAA Court shall retain jurisdiction over the CCAA Recognition Proceedings and all matters arising out of, or related to, the CCAA Recognition Proceedings, the Information Officer, and the orders of the CCAA Court), including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including the amount of cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Wind-Down Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the Schedule of Assumed Executory Contracts and Unexpired Leases; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.      ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of this Plan;

52

6.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.        adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

8.        enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, the Disclosure Statement, the Plan Supplement, or the Restructuring Support Agreement;

9.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

11.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

12.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and exculpations contained in this Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

13.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI hereof;

14.        enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.        determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement, including the Restructuring Support Agreement and the Purchase Agreement (if applicable);

16.        enter an order or final decree concluding or closing the Chapter 11 Cases;

17.        adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

18.        consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.        determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Sale Order, or the Confirmation Order, including disputes arising under agreements (including the Purchase Agreement, if applicable), documents, or instruments executed in connection with this Plan;

21.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on, or after the Effective Date;

22.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in this Plan, including under Article VIII hereof;

24.      hear and determine all disputes with respect to the Committee Settlement;

25.      hear and determine all disputes with respect to the GUC Trust or the GUC Trust Assets;

26.      enforce all orders previously entered by the Bankruptcy Court; and

27.      hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.*      *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, the Purchaser (if applicable), and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

*B.*      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan and the Restructuring Support Agreement. The Debtors or the Wind-Down Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

*C.*      *Payment of Statutory Fees.*

All monthly reports shall be Filed, and all fees due and payable pursuant to section 1930(a) of Title 28 of the United States Code shall be paid by the Debtors or the Wind-Down Debtors, as applicable, (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) on the Effective Date, and following the Effective Date, the Wind-Down Debtors (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) until such Wind-Down Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first. The Wind-Down Debtors shall File quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each of the Debtors and the Wind-Down Debtors are jointly and severally liable for the payment of quarterly fees and shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

54

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee and any other statutory committee appointed in these Chapter 11 Cases shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Wind-Down Debtors, and the Plan Administrator, as applicable, shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Plan Supplement, or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.  if to the Debtors, to:

Eddie Bauer LLC
6501 Legacy Drive, Suite B100
Plano, TX 75024

Attention:          Glen Morris, Executive Vice President &
                    Chief Legal Officer
                    Dawn Wolverton, Secretary
E-mail address:     glen.morris@catalystbrands.com
                    dawn.wolverton@catalystbrands.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

Attention:          Matthew C. Fagen, P.C.
                    Oliver Paré
E-mail address:     matthew.fagen@kirkland.com
                    oliver.pare@kirkland.com

2.  if to a Consenting ABL Lender:

Otterbourg P.C.
230 Park Avenue
New York, New York 10169

Attention:                         Daniel F. Fiorillo
E-mail address:                    dfiorillo@otterbourg.com

3.    if to a Consenting Term Loan Lender:

Ropes & Gray LLP
1211 Avenue of the Americas

New York, New York 10036-8704
Attention:                         Gregg Galardi
E-mail address:                    gregg.galardi@ropesgray.com

4.    if to a Consenting Subordinated Loan Lender:

Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
Attention:                         Mark Silva
E-mail address:                    msilva@choate.com

After the Effective Date, the Wind-Down Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, this Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

J.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/EddieBauer or the Bankruptcy Court's website at www.njb.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

K.    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to

56

make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors, consistent with the terms set forth herein; and (iii) non-severable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan (to the extent any) and any previous plan, and, therefore, neither any of such parties nor individuals nor the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan or any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Remainder of Page Intentionally Left Blank.*]

Dated:  April 15, 2026

Eddie Bauer, LLC
on behalf of itself and all other Debtors


/s/  George Pantelis
     Name:  George Pantelis
     Title:   Co-Chief Restructuring Officer

58

**<u>Exhibit B</u>**

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER LLC, *et al.*, | Case No. 26-11422 (SLM) |
| Debtors.[1] | (Jointly Administered) |

**~~SECOND~~THIRD AMENDED JOINT PLAN OF REORGANIZATION OF EDDIE BAUER LLC**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Matthew C. Fagen, P.C. (admitted *pro hac vice*)
Oliver Paré (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
joshua.sussberg@kirkland.com
matthew.fagen@kirkland.com
oliver.pare@kirkland.com

*Co-Counsel to the Debtors and*
*the Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel to the Debtors and*
*the Debtors in Possession*

Dated:  ~~March 26~~April 15, 2026

---

[1]  The last four digits of Debtor Eddie Bauer LLC's tax identification number are 6060.  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/EddieBauer.  The location of Debtor Eddie Bauer LLC's principal place of business is 10401 Northeast 8th Street, Suite 500, Bellevue, WA 98004; the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Suite B100, Plano, TX 75024.

**TABLE OF CONTENTS**

ARTICLE I.  DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ............................................................................................................1
    A.    Defined Terms. ...........................................................................................................1
    B.    Rules of Interpretation. ............................................................................................14
    C.    Computation of Time. ..............................................................................................15
    D.    Governing Law. ........................................................................................................15
    E.    Reference to Monetary Figures. ...............................................................................15
    F.    Reference to the Debtors or the Wind-Down Debtors. .............................................15
    G.    Controlling Document. .............................................................................................15
    H.    Consultation, Notice, Information, and Consent Rights. ..........................................15

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ....................................16
    A.    Administrative Claims. .............................................................................................16
    B.    Professional Fee Claims. ..........................................................................................16
    C.    Priority Tax Claims. .................................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..........18
    A.    Classification of Claims and Interests. ....................................................................18
    B.    Treatment of Claims and Interests. ..........................................................................18
    C.    Special Provision Governing Unimpaired Claims. ..................................................22
    D.    Elimination of Vacant Classes. ................................................................................22
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ..............................22
    F.    Intercompany Interests. ............................................................................................22
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ....22
    H.    Controversy Concerning Impairment. ......................................................................23
    I.    Subordinated Claims. ...............................................................................................23

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ...........................................23
    A.    General Settlement of Claims and Interests. ............................................................23
    B.    Sale Transaction. ......................................................................................................23
    C.    Store Closing Sales. .................................................................................................24
    D.    Committee Settlement ..............................................................................................24
    E.    Sources of Consideration for Plan Distributions. .....................................................25
    F.    Employment Obligations. .........................................................................................25
    G.    The Wind-Down. .....................................................................................................25
    H.    Plan Administrator. ..................................................................................................27
    I.    Dissolution of the Wind-Down Debtors. .................................................................29
    J.    The GUC Trust. .......................................................................................................29
    K.    Preservation of Causes of Action. ............................................................................30
    L.    Cancellation of Existing Agreements and Interests. .................................................31
    M.    Section 1146 Exemption. .........................................................................................31
    N.    Corporate Action. ....................................................................................................31
    O.    Effectuating Documents; Further Transactions. .......................................................32
    P.    Closing the Chapter 11 Cases. .................................................................................32
    Q.    Director and Officer Liability Insurance. .................................................................32

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....33
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. .............33
    B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ....34
    C.    Indemnification Obligations. ....................................................................................34
    D.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..............34
    E.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...........35
    F.    Insurance Policies. ...................................................................................................35
    G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ....36

| | | |
|---|---|---|
| H. | Reservation of Rights. | 368 |
| I. | Nonoccurrence of Effective Date. | 368 |
| **ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** | | **368** |
| A. | Timing and Calculation of Amounts to Be Distributed. | 368 |
| B. | Disbursing Agent. | 379 |
| C. | Rights and Powers of Disbursing Agent. | 379 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 379 |
| E. | Manner of Payment. | 3840 |
| F. | Compliance with Tax Requirements. | 3840 |
| G. | Allocations. | 3941 |
| H. | No Postpetition Interest on Claims. | 3941 |
| I. | Foreign Currency Exchange Rate. | 3941 |
| J. | Setoffs and Recoupment. | 3941 |
| K. | Claims Paid or Payable by Third Parties. | 3941 |
| **ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** | | **402** |
| A. | Disputed Claims Process. | 402 |
| B. | Allowance of Claims. | 412 |
| C. | Estimation of Claims. | 413 |
| D. | Claims Administration Responsibilities. | 413 |
| E. | Time to File Objections to Claims. | 423 |
| F. | Adjustment to Claims or Interests without Objection. | 424 |
| G. | Disputed and Contingent Claims Reserve. | 424 |
| H. | Disallowance of Claims or Interests. | 424 |
| I. | Amendments to Proofs of Claim or Interest. | 424 |
| J. | Distributions Pending Allowance. | 434 |
| K. | Distributions After Allowance. | 435 |
| **ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** | | **435** |
| A. | Settlement, Compromise, and Release of Claims and Interests. | 435 |
| **B.** | **Release of Liens.** | **435** |
| **C.** | **Releases by the Debtors.** | **446** |
| **D.** | **Releases by Holders of Claims and Interests.** | **457** |
| **E.** | **Exculpation.** | **468** |
| **F.** | **Injunction.** | **479** |
| G. | Protections Against Discriminatory Treatment. | 479 |
| H. | Document Retention. | 4850 |
| I. | Reimbursement or Contribution. | 4850 |
| **ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN** | | **4850** |
| A. | Conditions Precedent to the Effective Date. | 4850 |
| B. | Waiver of Conditions. | 4951 |
| C. | Effect of Failure of Conditions. | 4951 |
| D. | Substantial Consummation. | 4951 |
| **ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN** | | **4951** |
| A. | Modification and Amendments. | 4951 |
| B. | Effect of Confirmation on Modifications. | 502 |
| C. | Revocation or Withdrawal of Plan. | 502 |
| **ARTICLE XI. RETENTION OF JURISDICTION** | | **502** |
| **ARTICLE XII. MISCELLANEOUS PROVISIONS** | | **524** |

| | | |
|---|---|---|
| A. | Immediate Binding Effect. | 524 |
| B. | Additional Documents. | 524 |
| C. | Payment of Statutory Fees. | 524 |
| D. | Statutory Committee and Cessation of Fee and Expense Payment. | 535 |
| E. | Reservation of Rights. | 535 |
| F. | Successors and Assigns. | 535 |
| G. | Notices. | 535 |
| H. | Term of Injunctions or Stays. | 546 |
| I. | Entire Agreement. | 546 |
| J. | Exhibits. | 546 |
| K. | Nonseverability of Plan Provisions. | 556 |
| L. | Votes Solicited in Good Faith. | 557 |
| M. | Closing of Chapter 11 Cases. | 557 |
| N. | Waiver or Estoppel. | 557 |

**INTRODUCTION**

Eddie Bauer LLC and the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") propose this joint chapter 11 plan (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

*A.      Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*ABL Agent*" means Wells Fargo Bank, N.A., in its capacity as administrative agent under the ABL Credit Agreement.

2.      "*ABL Claims*" means any Claim against a Debtor on account of the ABL Facility.

3.      "*ABL Credit Agreement*" means that certain Credit Agreement, dated as of December 7, 2020 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) Penney Holdings LLC, as lead administrative borrower, (b) the other borrowers signatory thereto, (c) certain other Loan Parties (as defined in the ABL Credit Agreement), including the Debtors and non-Debtor affiliates, (d) the lenders party thereto, and (e) the ABL Agent.

4.      "*ABL Facility*" means that certain revolving credit facility issued pursuant to the ABL Credit Agreement.

5.      "*ABL Term Loan Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) the ABL Agent, (b) the Term Loan Agent, (c) Penney Holdings LLC, as lead administrative borrower, (d) the other borrowers signatory thereto, and (e) the guarantors signatory thereto.

6.      "*ABL Threshold Recovery Amount*" means (a) an amount equal to 60% of the cost value of all retail inventory, wholesale inventory, credit card accounts receivable, and wholesale receivables of the Debtors, based on the levels of such assets in the Approved Budget (as defined in the Cash Collateral Order) as of the Petition Date *less* (b) the aggregate amount of all Weekly Paydowns actually paid as of the Effective Date.

7.      "*Acquired Assets*" means the assets of the Debtors acquired by a Purchaser pursuant to a Sale Transaction, if any.

8.    "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Chapter 11 Cases pursuant to sections 330, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' business incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; (d) Adequate Protection Claims (as defined in the Cash Collateral Order); and (e) the Disinterested Manager Fee Claims.

9.    "*Administrative Claims Bar Date*" means the deadline for filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

10.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the reference Entity were a debtor in a case under the Bankruptcy Code. For the avoidance of doubt, with respect to the Debtors, the term "Affiliate" includes, without limitation, Simon Property Group, Brookfield Corporation, Authentic Brands Group, Penney Intermediate Holdings LLC, SPARC Group BB Holdings LLC, F21 OpCo, LLC, Lucky OpCo LLC, Aero Operations LLC, SPARC GC Mgmt LLC, SPARC Puerto Rico LLC, AeroLocker Holdings LLC, Nautica OpCo LLC, Nautica Retail USA LLC, and each of their respective direct and indirect subsidiaries.

11.    "*Agents*" means any administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement, the Term Loan Credit Agreement, and the Subordinated Loan Credit Agreement, and including, in each case, any successors thereto.

12.    "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest that is evidenced by a Proof of Claim timely filed by the applicable bar date (or for which Claim or Interest a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order; *provided*, that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or, if such an objection is so Filed, such Claim or Interest shall have been Allowed by a Final Order. Any Claim or Interest that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim is or has been timely filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court, and Holders of such Claims or Interests shall not receive any distributions under this Plan on account of such Claims or Interests. Notwithstanding anything to the contrary herein, no Claim or Interest of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtors or Wind-Down Debtors, as applicable. For the avoidance of doubt, a Proof of Claim filed after the applicable bar date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowing," and "Allowance" shall have correlative meanings.

13.    "*Assigned Avoidance Actions*" means Avoidance Actions that are not (i) asserted and/or assertable against Released Parties (including Affiliates of the Debtors or the Wind-Down Debtors) and/or (ii) otherwise released under this Plan or the Cash Collateral Order.

14.    "*Assumed Liabilities*" means, in any Sale Transaction, the liabilities assumed by the Purchaser pursuant to the terms of the applicable Sale Transaction Documents. For the avoidance of doubt, the Debtors and Wind-Down Debtors, as applicable, shall not be liable for any Assumed Liabilities and shall not be obligated to satisfy any such liabilities under this Plan.

2

15.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by, or on behalf of, the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code, or other similar or related local, state, federal, or foreign statutes, common Law, including fraudulent transfer Law or other applicable Law.

16.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect and hereafter amended.

17.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey.

18.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases and the general, local, and chamber rules of the Bankruptcy Court.

19.     "*Bidding Procedures*" means the bidding procedures governing the submission and evaluation of bids in connection with the Sale Transaction, attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

20.     "*Bidding Procedures Motion*" means the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures and Stalking Horse Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 10].

21.     "*Bidding Procedures Order*" means the *Order (I) Approving the Bidding Procedures and Stalking Horse Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 65].

22.     "*Business Day*" means any day other than a Saturday, Sunday, or any other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

23.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

24.     "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

25.     "*Cash Collateral Order*" means~~, individually or collectively (as the context may require), any order or orders entered in the Chapter 11 Cases~~ the *Final Order (I)* ~~a~~*Authorizing* ~~the use~~*Postpetition Use* of ~~c~~*Cash* ~~c~~*Collateral* ~~(whether interim or final) that has been consented to and approved by the Consenting ABL Lenders.~~*, (II) Granting Adequate Protection to the Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 374].

26.     "*Cause of Action*" means any action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including under any state or federal securities laws).  Causes of Action include:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by Law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, usury,

and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state Law fraudulent transfer claim.

27.    "*CCAA*" means the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended.

28.    "*CCAA Court*" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the CCAA Recognition Proceedings.

29.    "*CCAA Court Ordered Charges*" means the super-priority court-ordered charges granted by the CCAA Court in the CCAA Recognition Proceedings on the assets, undertakings, and property in Canada of Debtors' 13051269 Canada Inc. and Eddie Bauer of Canada Corporation.

30.    "*CCAA Recognition Proceedings*" means the proceedings commenced by the Foreign Representative before the CCAA Court under Part IV of the CCAA recognizing the Chapter 11 Cases as "foreign main proceedings."

31.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

32.    "*Claim*" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

33.    "*Claims and Noticing Agent*" means Stretto, Inc., the claims, noticing, and solicitation agent for the Debtors in the Chapter 11 Cases.

34.    "*Claims Objection Deadline*" means the deadline for objecting to a Claim asserted against a Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

35.    "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

36.    "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

37.    "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

38.    "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 210], on February 25, 2026, which membership may be reconstituted from time to time by the U.S. Trustee.

39.    "*Committee Settlement*" means the comprehensive settlement between the Debtors and the Committee as set forth in Article IV.D of this Plan.

40.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order.

41.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

42.    "~~*Confirmation*~~*Combined Hearing*" means the combined hearing held by the Bankruptcy Court ~~on~~to consider Confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, and final approval of the Disclosure Statement, as such hearing may be continued from time to time.

4

43.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, the form and substance of which shall be subject to the consent rights set forth in the Restructuring Support Agreement, and, in the event of a Sale Transaction, shall also be in form and substance reasonably acceptable to the Purchaser.

44.     "*Confirmation Recognition Order*" means an order of the CCAA Court recognizing and enforcing the Confirmation Order in Canada.

45.     "*Consenting ABL Lenders*" means, collectively, the Holders of ABL Claims that are signatories to the Restructuring Support Agreement or any subsequent or other Holder of ABL Claims that becomes party to the Restructuring Support Agreement, whether by joinder to the Restructuring Support Agreement or signature to a Transfer Agreement (as defined in the Restructuring Support Agreement), in accordance with the terms of the Restructuring Support Agreement, each solely in their capacity as such.

46.     "*Consenting Lenders*" means, collectively, the Consenting ABL Lenders, the Consenting Term Loan Lenders, and the Consenting Subordinated Loan Lenders.

47.     "*Consenting Subordinated Loan Lenders*" means, collectively, the Holders of Subordinated Loan Claims that are signatories to the Restructuring Support Agreement or any subsequent Holder of Subordinated Loan Claims that becomes party to the Restructuring Support Agreement in accordance with its terms, each solely in their capacity as such.

48.     "*Consenting Term Loan Lenders*" means, collectively, the Holders of Term Loan Claims that are signatories to the Restructuring Support Agreement or any subsequent Holder of Term Loan Claims that becomes party to the Restructuring Support Agreement in accordance with its terms, each solely in their capacity as such.

49.     "*Consummation*" means the occurrence of the Effective Date.

50.     "*Credit Agreements*" means, collectively, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Subordinated Loan Credit Agreement.

51.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

52.     "*Cure Notice*" means any notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed pursuant to section 365 of the Bankruptcy Code, and which notice shall include:  (a) procedures for objecting to the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases, if any; (b) proposed Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

53.     "*D&O Liability Insurance Policies*" means all Insurance Policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

54.     "*Debtor Release*" means the release set forth in Article VIII.C hereof.

55.     "*Definitive Documents*" means, collectively and as applicable, and including any exhibits, schedules, amendments, modifications, or supplements thereto: (a) this Plan; (b) the Confirmation Order and Confirmation Recognition Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (e) the first day pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the Sale Transaction Documents (if any); (h) the Cash Collateral Order; and (i) such other definitive documentation as is necessary or desirable to consummate the Restructuring Transactions; *provided* that any Definitive Documents not executed or in a form attached to the

Restructuring Support Agreement as of the execution date thereof shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Lenders.

56.    "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or this Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or this Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

57.    "*Disbursing Agent*" means, as applicable, the Debtors, the Wind-Down Debtors, the Plan Administrator, the GUC Trust, or any Entity or Entities selected by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trustee, as applicable, to make or facilitate distributions in accordance with this Plan, which Entity may be the Claims and Noticing Agent and the Agents, if applicable.

58.    "*Disclosure Statement*" means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof.

59.    "*Disclosure Statement Order*" means any order of the Bankruptcy Court conditionally approving the Disclosure Statement.

60.    "*Disinterested Managers*" means, collectively, the disinterested managers or directors, as applicable, of SPARC EB Holdings LLC, Eddie Bauer LLC, Eddie Bauer Gift Card Services LLC, 13051269 Canada Inc., and Eddie Bauer of Canada Corporation.

61.    "*Disinterested Manager Fee Claims*" means all unpaid fees and expenses as of the Effective Date due to the Disinterested Managers pursuant to their respective director agreements with the Debtors.  On the Effective Date, the Disinterested Manager Fee Claims shall be deemed Allowed Administrative Claims against the Debtors.

62.    "*Disputed*" means, as to a Claim or Interest, a Claim or Interest:  (a) that is not Allowed; (b) that is not Disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

63.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under this Plan, which date shall be the Effective Date, or such other date reasonably designated by the Debtors.

64.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

65.    "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

66.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

67.    "*Exculpated Parties*" means, collectively, and in each case solely in its capacity as such:  (a) each of the Debtors; (b) the ~~Wind Down Debtors; (c) the~~ Committee and each of its members; and (~~d~~c) with respect to the Entities in clauses (a) ~~through~~ and (~~e~~b), each of their respective current and former directors, the Disinterested

6

Managers, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date.

68.    "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.    "*Existing Equity Interests*" means any Interest in SPARC EB Holdings LLC.

70.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date, calculated as set forth in section 1961 of the Judicial Code.

71.    "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases. "Filed" and "Filing" shall have correlative meanings.

72.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

73.    "*Foreign Representative*" means Eddie Bauer LLC, in its capacity as foreign representative of the Debtors, as duly appointed as such under Section 1505 of the Bankruptcy Code.

74.    "*General Unsecured Claim*" means any Claim against a Debtor that is not (a) an Administrative Claim, (b) a Professional Fee Claim, (c) a Priority Tax Claim, (d) an Other Secured Claim, (e) an Other Priority Claim, (f) an ABL Claim, (g) a Term Loan Claim, (h) a Subordinated Loan Claim, (i) an Intercompany Claim, (j) a Section 510(b) Claim, (k) a Disinterested Manager Fee Claim, or (l) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court.

75.    "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or any Wind-Down Debtor, as applicable.

76.    "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

77.    "*GUC Trust*" means the trust established for the benefit of the GUC Trust Beneficiaries on the Effective Date in accordance with this Plan and pursuant to the GUC Trust Agreement to receive, hold, and administer the GUC Trust Assets and to reconcile and make distributions on account of General Unsecured Claims.

78.    "*GUC Trust Agreement*" means the trust agreement establishing, among other things, the terms and conditions for the creation and operation of the GUC Trust to be entered into on or before the Effective Date between the Debtors and the GUC Trustee, which agreement shall be in form and substance reasonably acceptable to the Committee, the Debtors, and the Consenting Lenders.

7

79. "*GUC Trust Assets*" means, collectively, (a) all of the Debtors' right, title, and interest in the Assigned Avoidance Actions, *plus* (b) the GUC Trust Expense Amount, *plus* (c) the GUC Trust Cash.

80. "*GUC Trust Beneficiaries*" means, collectively, the Holders of Allowed General Unsecured Claims, *provided*, *however*, that none of the following shall be GUC Trust Beneficiaries: (a) any Holder of a Claim arising from or related to the waiver of prepetition intercompany claims, (b) any Holder of the SPARC Intercompany Claim, and (c) any Holder of a deficiency claim arising out of any obligations under the Credit Agreements.

81. "*GUC Trust Cash*" means an amount of Cash equal to (a) the lesser of (i) $3,000,000.00 and (ii) the greater of (A) $0.00 and (B) Net Proceeds *less* the Mandatory Paydown Amount; *less* (b) the amount, if any, by which the amount of actual Allowed fees and expenses of the Committee and its Professionals exceeds the UCC Professional Fee Budget Amount; *plus* (c) the GUC Trust Top-Up Amount.

82. "*GUC Trust Expense Amount*" means $250,000.00.

83. "*GUC Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets) incurred by the GUC Trust, the GUC Trustee, any professionals retained by the GUC Trust or the GUC Trustee, and any additional amount determined necessary by the GUC Trustee to adequately reserve for the operating expenses of the GUC Trust that shall be paid out of the GUC Trust Assets.

84. "*GUC Trust Interests*" means, collectively, non-certified beneficial interests in the GUC Trust granted to each GUC Trust Beneficiary, which shall entitle such GUC Trust Beneficiary to its *pro rata* share of the GUC Trust Net Assets, subject to the terms and conditions of this Plan and the GUC Trust Agreement.

85. "*GUC Trust Net Assets*" means the GUC Trust Assets less the GUC Trust Fees and Expenses.

86. "*GUC Trust Top-Up Amount*" has the meaning set forth in Article IV.D of this Plan.

87. "*GUC Trustee*" means, in its capacity as such, the Person or Entity selected by the Committee to serve as the trustee of the GUC Trust, and any successor thereto, in accordance with the GUC Trust Agreement.

88. "*Holder*" means an Entity that is the record owner of a Claim against, or an Interest in, any Debtor, as applicable. For the avoidance of doubt, affiliated record owners of Claims or Interests managed or advised by the same institution shall constitute separate Holders.

89. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

90. "*Independent Investigation*" means the Disinterested Managers' independent investigation regarding any potential Estate claims and Causes of Action.

91. "*Information Officer*" means KSV Restructuring Inc., in its capacity as information officer appointed by the CCAA Court in the CCAA Recognition Proceedings.

92. "*Insurance Policies*" means all insurance policies that have been issued at any time to, or provide coverage to, any of the Debtors and all agreements, documents or instruments relating thereto, including, without limitation, all D&O Liability Insurance Policies, and any of the Debtors' rights under any third parties' insurance policies.

93. "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

94. "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

8

95.  "*Intercreditor Agreements*" means, collectively, the ABL Term Loan Intercreditor Agreement and the Senior-Subordinated Intercreditor Agreement.

96.  "*Interest*" means the common stock, preferred stock, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other Securities or agreements to acquire the common stock (including convertible debt), preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

97.  "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

98.  "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

99.  "*Mandatory Paydown Amount*" means $15,485,219.00.

100.  "*Net Proceeds*" means all Cash, if any, held by the Debtors or the Wind-Down Debtors, as applicable, on or after the Effective Date in accordance with the Cash Collateral Order, after (a) funding the Professional Fee Escrow Account, (b) funding the Wind-Down Account, and (c) paying or reserving amounts for Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims as set forth in Article II of this Plan.

101.  "*Other Priority Claim*" means a Claim against any of the Debtors, other than an Administrative Claim or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

102.  "*Other Secured Claim*" means a Claim against any of the Debtors, other than an ABL Claim, a Term Loan Claim, or a Subordinated Loan Claim, (a) secured by a valid, perfected, unavoidable, and enforceable Lien on collateral to the extent of the Debtors' interest in such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

103.  "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, Governmental Unit, or political subdivision thereof, or any other Entity.

104.  "*Petition Date*" means February 9, 2026, the date on which the Debtors commenced the Chapter 11 Cases.

105.  "*Plan Administrator*" means the person, if any, selected by the Debtors, to have all powers and authorities set forth in Article IV.G of this Plan.

106.  "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Plan Administrator, and the Wind-Down Debtors, which shall be included in the Plan Supplement, providing for the appointment, roles, powers, and duties of the Plan Administrator and the implementation of this Plan by the Plan Administrator.

107.  "*Plan Supplement*" means the compilation of documents, term sheets, and forms of documents, agreements, schedules, and exhibits to this Plan (in each case as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), including, but not limited to, the following to the extent applicable:  (a) Schedule of Assumed Executory Contracts and Unexpired Leases, (b) Schedule of Retained Causes of Action, (c) the Wind-Down Transactions Memorandum; (d) the Plan Administrator Agreement; (e) the identity of the Plan Administrator; (f) the GUC Trust Agreement; and (g) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  Notwithstanding anything to the contrary herein, the Committee shall not have any consent rights with respect to the Plan Supplement (or any documents set forth therein), other than the GUC Trust Agreement.

9

108.    "*Priority Tax Claim*" means any Claim against any of the Debtors of a Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code.

109.    "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

110.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals reasonably estimate in good faith that they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B.3 of this Plan.

111.    "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

112.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

113.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases by the applicable bar date.

114.    "*Purchase Agreement*" means the purchase agreement or purchase agreements to be entered into by any of the Debtors and any Purchaser (or its designee) to effectuate the Sale Transaction, if any, in accordance with the Bidding Procedures.

115.    "*Purchase Price*" means the total consideration to be paid by the Purchaser to the Debtors for the purchase of some or all of the Debtors' assets pursuant to the Purchase Agreement and as approved by the Bankruptcy Court.

116.    "*Purchaser*" means the Entity or Entities whose bid for some or all of the Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the highest or otherwise best bid pursuant to the Bidding Procedures.

117.    "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

118.    "*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or Entity's current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

119.    "*Released Party*" means, each of, and in each case in its capacity as such:  (a) each Debtor; (b) each Wind-Down Debtor and the Plan Administrator; (c) the Agents; (d) each Consenting Lender; (e) the Sponsors; (f) the Committee and each of its members (solely in their capacity as such); (g) each Releasing Party; (h) the Information Officer; (i) the Purchaser, if any; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clause (a) through this clause (k); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if it:  (i) elects to opt out of the releases

10

contained in the Plan; or (ii) timely objects to the releases contained in the Plan, and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

120.    "*Releasing Party*" means, each of, and in each case in its capacity as such:  (a) each Debtor; (b) each Wind-Down Debtor and the Plan Administrator; (c) the Agents; (d) each Consenting Lender; (e) the Sponsors; (f) the Committee and each of its members (solely in their capacity as such); (g) all Holders of Claims that vote to accept the Plan; (h) all Holders of Claims who are deemed to accept this Plan but who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided for in the Plan; (i) all Holders of Claims who abstain from voting on the Plan, other than those who were not sent a ballot or an opt out form in accordance with the Disclosure Statement Order, and who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided for in the Plan; (j) all Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan and who do not affirmatively opt out of the releases provided for in this Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided for in this Plan; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) to the maximum extent permitted by law, each Related Party of each Entity in clause (a) through this clause (l); *provided* that, in each case, an Entity in clause (h) through clause (l) shall not be a Releasing Party if it:  (i) elects to opt out of the releases contained in the Plan; or (ii) timely objects to the releases contained in this Plan and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered.

121.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of February 8, 2026, by and among the Debtors and the Consenting Lenders and attached to the *Declaration of Stephen Coulombe, Co-Chief Restructuring Officer of Eddie Bauer LLC and Its Affiliates, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 35] as Exhibit B, including all exhibits thereto (including the Restructuring Term Sheet), as may be amended, modified, or supplemented from time to time, in accordance with its terms.

122.    "*Restructuring Term Sheet*" means the term sheet attached to the Restructuring Support Agreement as Exhibit B.

123.    "*Restructuring Transactions*" means, collectively, all transactions contemplated by the Restructuring Term Sheet, the Restructuring Support Agreement, and this Plan, including the Sale Transaction and the Wind-Down Transactions.

124.    "*Retained Causes of Action*" means, collectively, all Claims and Causes of Action not released by the Debtors pursuant to the terms of this Plan or pursuant to the Cash Collateral Order, including any Claims and Causes of Action listed on the Schedule of Retained Causes of Action.

125.    "*Sale Order*" means the order of the Bankruptcy Court approving the consummation of the Sale Transaction, if any, pursuant to the terms of the Purchase Agreement, which order may be the Confirmation Order.

126.    "*Sale Proceeds*" means all proceeds of the Sale Transaction, if any, including all Cash proceeds and non-Cash proceeds, that the Debtors receive in accordance with the Purchase Agreement, if applicable.

127.    "*Sale Process*" means the process to market and sell some, all, or substantially all of the Debtors' assets as a going concern to the highest or otherwise best bidder(s).

128.    "*Sale Recognition Order*" means an order of the CCAA Court in the CCAA Recognition Proceedings recognizing and enforcing the Sale Order in Canada, which order may be part of the CCAA Confirmation Order, and, to the extent applicable, approving the Sale Transaction with respect to the Debtors' assets in Canada pursuant to the terms of the Purchase Agreement.

11

129.    "*Sale Transaction*" means a sale or sales of all or substantially all of the Debtors' assets pursuant to the Bidding Procedures and the Bidding Procedures Order and as approved by the Sale Order (if any) and the Sale Recognition Order (if any).

130.    "*Sale Transaction Documents*" means all agreements, instruments, pleadings, orders, or other related documents necessary or advisable to carry out the Sale Process and consummate a Sale Transaction, including, but not limited to, the Bidding Procedures, the Bidding Procedures Motion, the Bidding Procedures Order, the sale Purchase Agreement (if any), the Sale Order (if any), and the Sale Recognition Order (if any).

131.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed or assumed and assigned, as applicable, by the Debtors pursuant to the Plan, if any, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time by the Debtors; *provided* that notwithstanding anything to the contrary in this Plan, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, reserve the right (i) in the event that the Debtors do not consummate a Sale Transaction, to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the earlier of (A) 45 days following the Effective Date and (B) solely with respect to Unexpired Leases of nonresidential real property, the deadline is the earlier of (I) the applicable deadline pursuant to section 365(d)(4) of the Bankruptcy Code, (II) the date of entry of the Confirmation Order, and (III) as such date may be extended with the written consent of the applicable landlord counterparty and (ii) in the event that the Debtors consummate a Sale Transaction, to alter, amend, modify, or supplement any schedule of Executory Contracts and Unexpired Leases that is attached to any Sale Transaction Documents, with the consent of the Purchaser, at any time prior to the earlier of (A) 90 days following the closing date of a Sale Transaction, and (B) solely with respect to Unexpired Leases of nonresidential real property, the applicable deadline pursuant to section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the consent of the applicable landlord counterparty, consistent with any Sale Transaction Documents, as applicable.

132.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors (to be included in the Plan Supplement) that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

133.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

134.    "*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

135.    "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, unavoidable, and enforceable Lien on collateral to the extent of the Debtors' interest in such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

136.    "*Secured Lenders*" means, collectively, the lenders under the ABL Credit Agreement, the Term Loan Credit Agreement, and the Subordinated Loan Credit Agreement.

137.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

138.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

139.    "*Senior-Subordinated Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among

(a) the ABL Agent, (b) the Term Loan Agent, (c) the Subordinated Loan Agent, and (d) the Loan Parties (as defined in the Senior-Subordinated Intercreditor Agreement) party thereto.

140.   "*Solicitation Materials*" means, collectively, the solicitation materials with respect to this Plan.

141.   "*SPARC Intercompany Claim*" means that certain Intercompany Claim in the amount of approximately $215 million held by SPARC Group Holdings LLC against Eddie Bauer LLC.

142.   "*Sponsors*" means, collectively, ABG Holdings LLC; Simon JCP Holdings, LLC; BPG Retail Holdings I LLC; SPARC Group Holdings II, LLC; Copper Retail JV LLC; Copper Intermediate LLC; Copper Retail Holdings LLC; Penney Holdings LLC; Penney Intermediate Holdings LLC; Catalyst Brands LLC; and SPARC Group Holdings LLC.

143.   "*Store Closing Order*" means the *Final Order (I) Authorizing the Debtors to Assume the Agency Agreement; (II) Authorizing and Approving the Conduct of Store Closing Sales and the Related Sale Guidelines, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances; (III) Modifying Customer Programs at the Closing Stores; and (IV) Granting Related Relief* [Docket No. 306].

144.   "*Store Closing Sales*" means the store-closing sales ongoing as of the Petition Date at all of the Debtors' brick-and-mortar retail locations.

145.   "*Subordinated Loan Agent*" means Copper Retail JV LLC, in its capacity as administrative agent and collateral agent under the Subordinated Loan Credit Agreement.

146.   "*Subordinated Loan Claims*" means any Claim against a Debtor on account of the Subordinated Loan Facility.

147.   "*Subordinated Loan Credit Agreement*" means that certain Second Amendment to Amended and Restated Term Loan Credit Agreement, dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) Penney Holdings LLC, as lead administrative borrower, (b) the other borrowers signatory thereto, (c) the Subordinated Loan Parties (as defined in the Subordinated Loan Credit Agreement), (d) the lenders party thereto, and (e) Copper Retail JV LLC, as administrative agent and collateral agent.

148.   "*Subordinated Loan Facility*" means the subordinated term loans issued pursuant to the Subordinated Loan Credit Agreement.

149.   "*Term Loan Agent*" means Whitehawk Capital Partners LP, as administrative agent and collateral agent under the Term Loan Credit Agreement.

150.   "*Term Loan Claims*" means any Claim against a Debtor on account of the Term Loan Facility.

151.   "*Term Loan Credit Agreement*" means that certain Credit Agreement dated as of September 19, 2025 (as amended, restated, supplemented, or otherwise modified from time to time), by and among (a) Penney Holdings LLC, as lead administrative borrower, (b) the other borrowers signatory thereto, (c) the other Loan Parties (as defined in the Term Loan Credit Agreement), including the Debtors and non-Debtor affiliates, (iv) the lenders party thereto, and (v) the Term Loan Agent.

152.   "*Term Loan Facility*" means the term loans issued pursuant to the Term Loan Credit Agreement.

153.   "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

13

154.    "*UCC Professional Fee Budget Amount*" means $1,250,000.00, representing the budgeted amount of Professional fees and expenses of the Committee and its Professionals as set forth in the Approved Budget (as defined in the Cash Collateral Order).

155.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of New Jersey.

156.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

157.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

158.    "*Weekly Paydown*" shall have the meaning ascribed to it in the Cash Collateral Order.

159.    "*Wind-Down Account*" means the account to be established and maintained by the Debtors or the Plan Administrator, as applicable, and funded on the Effective Date with the Wind-Down Amount to fund the Wind-Down Transactions in accordance with the Plan.  Following the conclusion of the Wind-Down Transactions, any remaining amounts in the Wind-Down Account shall be distributed in accordance with Article III of this Plan.

160.    "*Wind-Down Amount*" means Cash in an amount agreed to by the Debtors and ABL Agent that is sufficient to fund the estimated fees, costs, and expenses necessary to administer the Wind-Down Transactions, in an amount that includes sufficient funds for the payment of all Administrative Claims, Priority Tax Claims, and Other Priority Claims as necessary to confirm this Plan.

161.    "*Wind-Down Assets*" means, on the Effective Date, all assets of each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan, and which shall in any event include, without limitation, any tariff refund claims and all Retained Causes of Action, but which shall exclude (i) the Professional Fee Amounts held in the Professional Fee Escrow Account, (ii) the GUC Trust Assets, and (iii) any amounts necessary to fund administrative expenses, Priority Tax Claims, and Other Priority Claims.

162.    "*Wind-Down Debtors*" means the Debtors or any successor or successors thereto after the Effective Date responsible for winding down the Debtors' Estates and implementing the terms of this Plan.

163.    "*Wind-Down Transactions*" means the transactions described in Article IV.F of this Plan.

164.    "*Wind-Down Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Wind-Down Transactions, the form of which shall be included in the Plan Supplement.

B.    *Rules of Interpretation.*

For purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (iii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iv) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (v) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (vi) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (vii) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (viii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (ix) subject to

14

the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with, applicable federal Law, including the Bankruptcy Code and Bankruptcy Rules; (x) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be limiting and shall be deemed to be followed by the words "without limitation"; (xi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (xii) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xiii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (xiv) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xv) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xvi) any immaterial effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtors and Plan Administrator in such a manner that is consistent with the overall purpose and intent of this Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (xvii) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (xviii) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter; (xix) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and (xx) on and after the Effective Date, all references to the Debtors in this Plan shall be deemed references to the Wind-Down Debtors.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of this Plan; any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Wind-Down Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

15

G.        *Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and any document or instrument in the Plan Supplement, the terms of the relevant document or instrument in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

H.        *Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as applicable, and as respectively set forth therein, with respect to the form and substance of this Plan, all exhibits to this Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement, as applicable, shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.        *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (i) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable; or (v) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim that is an Assumed Liability under the Sale Transaction Documents shall be an obligation of the Purchaser and shall not be an obligation of the Debtors or the Wind-Down Debtors.

Except as otherwise provided in this Article II.A of this Plan, requests for payment of Administrative Claims must be ~~F~~filed with the Claims and Noticing Agent and served on the Wind-Down Debtors by the applicable Administrative Claims Bar Date.  **Holders of Administrative Claims that are required to, but do not, ~~F~~file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped,**

16

**and enjoined from asserting such Administrative Claims against the Debtors, the Wind-Down Debtors, their Estates, or their property, and such Administrative Claims shall be deemed released and extinguished as of the Effective Date without the need for any objection from the Debtors or the Wind-Down Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.** Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors or the Wind-Down Debtors, as applicable, and the requesting party by the Claims Objection Deadline. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed. Notwithstanding anything to the contrary in this Plan, counterparties to an Unexpired Lease to which one or more of the Debtors was a party as of the Petition Date shall not be required to File requests for payment of Administrative Claims with the Bankruptcy Court; instead, Holders of such Claims may submit their Claims directly to the Claims and Noticing Agent by mail, by hand delivery, or through the Claims and Noticing Agent's website.

B.      *Professional Fee Claims.*

1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Wind-Down Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account.

2.      <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Wind-Down Debtors shall establish and fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount, less any unapplied cash deposited in respect of the Carve-Out (as defined in the Cash Collateral Order), which cash shall be added to the Professional Fee Escrow Account. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Debtors' Estates, the Wind-Down Debtors, or the Plan Administrator, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors and constitute part of the Wind-Down Assets without any further notice to or action, order, or approval of the Bankruptcy Court, which amounts shall be considered Net Proceeds and promptly distributed in accordance with this Plan.

3.      <u>Professional Fee Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimates to the Debtors no later than three Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment. If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional for the purpose of determining the Professional Fee Amount. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

17

4.      Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Debtors or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors or the Wind-Down Debtors, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Wind-Down Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything to the contrary set forth in this Plan, the professional fees and expenses of professionals incurred in connection with the CCAA Recognition Proceedings shall in all cases continue to be paid in accordance with the terms of the orders of the CCAA Court.

C.      *Priority Tax Claims.*

All Allowed Priority Tax Claims shall either (1) be paid during the Chapter 11 Cases or (2) constitute an Assumed Liability under the Sale Transaction Documents and shall be an obligation of the Debtors or the Wind-Down Debtors. To the extent that an Allowed Priority Tax Claim was not otherwise paid during the Chapter 11 Cases or assumed and paid as an Assumed Liability under the applicable Sale Transaction Documents and the Holder of such Allowed Priority Tax Claim does not agree to less favorable treatment, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Priority Tax Claim, such Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of this Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Claims | Impaired | Entitled to Vote |
| Class 4 | Term Loan Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Subordinated Loan Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |

18

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.       *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, and release of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Wind-Down Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.   Class 1 - Other Secured Claims.

   (a)   *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

   (b)   *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Wind-Down Debtors, as applicable, in full and final satisfaction of such Allowed Other Secured Claim, either:

      (i)   payment in full in Cash in an amount equal to its Allowed Other Secured Claim;

      (ii)   delivery of the collateral securing its Allowed Other Secured Claim; or

      (iii)   such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c)   *Voting*: Class 1 is Unimpaired under this Plan. Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.   Class 2 - Other Priority Claims.

   (a)   *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

   (b)   *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

   (c)   *Voting*: Class 2 is Unimpaired under this Plan. Holders of Allowed Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.   Class 3 - ABL Claims.

(a)   *Classification*:  Class 3 consists of all ABL Claims against the Debtors.

(b)   *Allowance*:  On the Effective Date, the ABL Claims shall be Allowed in the aggregate principal amount of $728,477,563,[2] plus any and all unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the ABL Credit Agreement or related documents as of the Effective Date, after giving effect to the Weekly Paydowns made during the Chapter 11 Cases.

(c)   *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed ABL Claim agrees to less favorable treatment, each Holder of an Allowed ABL Claim shall receive, in full and final satisfaction of such Claim, its *pro rata* share of (a) 100% of the Net Proceeds *less* (b) to the extent the Net Proceeds received by Holders of Allowed ABL Claims, in the aggregate, exceeds the Mandatory Payment Amount (including after reducing the Net Proceeds for the following adjustment), the GUC Trust Cash and the GUC Trust Expense Amount in accordance with the Plan.

Notwithstanding the foregoing, all ABL Claims shall be reserved and preserved as against all Persons or Entities other than the Debtors (and as to the Debtors, all ABL Claims shall be subject to this Plan and Confirmation Order).

(d)   *Voting*:  Class 3 is Impaired under this Plan, and Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject this Plan.

4.   Class 4 - Term Loan Claims.

(a)   *Classification*:  Class 4 consists of all Term Loan Claims against the Debtors.

(b)   *Allowance*:  On the Effective Date, the Term Loan Claims shall be Allowed in the aggregate principal amount of $600,000,000, plus any and all unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the Term Loan Credit Agreement or related documents as of the Effective Date.

(c)   *Treatment*:  On the Effective Date, each Allowed Term Loan Claim shall be canceled, released, and extinguished as against the Debtors, and no Holder of an Allowed Term Loan Claim shall receive any distribution from the Debtors on account of such Claim; *provided* that it is expressly understood and agreed that all Term Loan Claims shall be reserved and preserved as against all Persons or Entities other than the Debtors (and as to the Debtors, all Term Loan Claims shall be subject to this Plan and Confirmation Order).

(d)   *Voting*:  Class 4 is Impaired under this Plan.  Holders of Allowed Term Loan Claims in Class 4 are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

5.   Class 5 - Subordinated Loan Claims.

(a)   *Classification*:  Class 5 consists of all Subordinated Loan Claims against the Debtors.

---

2    The ABL Claims also include letters of credit in the aggregate undrawn face amount of $196,811,453.

20

(b) *Allowance*:  On the Effective Date, the Subordinated Loan Claims shall be Allowed in the aggregate principal amount of $216,281,687, plus any and all unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the Subordinated Loan Credit Agreement or related documents as of the Effective Date.

(c) *Treatment*:  On the Effective Date, each Allowed Subordinated Loan Claim shall be canceled, released, and extinguished as against the Debtors, and no Holder of an Allowed Subordinated Loan Claim shall receive any distribution from the Debtors on account of such Claim; *provided* that it is expressly understood and agreed that all Subordinated Loan Claims shall be reserved and preserved as against all Persons or Entities other than the Debtors (and as to the Debtors, all Subordinated Loan Claims shall be subject to this Plan and Confirmation Order).

(d) *Voting*:  Class 5 is Impaired under this Plan.  Holders of Allowed Subordinated Loan Claims in Class 5 are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

6. Class 6 - General Unsecured Claims.

(a) *Classification*:  Class 6 consists of all General Unsecured Claims against the Debtors.

(b) *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of the GUC Trust Interests; *provided*, for the avoidance of doubt, that (a) any Holder of a Claim arising from or related to the waiver of prepetition intercompany claims, (b) any Holder of the SPARC Intercompany Claim, and (c) any Holder of a deficiency claim arising out of any obligations under the Credit Agreements shall not be a GUC Trust Beneficiary and shall not receive any share of the GUC Trust Interests.

(c) *Voting*:  Class 6 is Impaired under this Plan, and Holders of Allowed Claims in Class 6 are entitled to vote to accept or reject this Plan.

7. Class 7 - Intercompany Claims.

(a) *Classification*:  Class 7 consists of all Intercompany Claims against the Debtors.

21

(b)     *Treatment*:  On the Effective Date, each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or Wind-Down Debtor, either:

(i)     reinstated (solely for the purpose of facilitating the Wind-Down Transactions);

(ii)     set off, settled, distributed, contributed, canceled, and released without any distribution on account of such Intercompany Claim; or

(iii)     otherwise addressed at the option of the applicable Debtor or Wind-Down Debtor.

(c)     *Voting*:  Class 7 is Unimpaired if the Class 7 Intercompany Claims are Reinstated or Impaired if the Class 7 Intercompany Claims are cancelled.  Holders of Class 7 Intercompany Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

8.     Class 8 - Intercompany Interests.

(a)     *Classification*:  Class 8 consists of all Intercompany Interests in the Debtors.

(b)     *Treatment*:  On the Effective Date, each Allowed Intercompany Interest shall be, at the option of the applicable Debtor or Wind-Down Debtor, either:

(i)     reinstated (solely for the purpose of facilitating the Wind-Down Transactions);

(ii)     set off, settled, distributed, contributed, canceled, and released without any distribution on account of such Intercompany Interest; or

(iii)     otherwise addressed at the option of the applicable Debtor or Wind-Down Debtor.

(c)     *Voting*:  Class 8 is Unimpaired if the Class 8 Intercompany Interests are Reinstated or Impaired if the Class 8 Intercompany Interests are cancelled.  Holders of Class 8 Intercompany Interests are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

9.     Class 9 - Existing Equity Interests.

(a)     *Classification*:  Class 9 consists of all Existing Equity Interests.

(b)     *Treatment*:  On the Effective Date, all Existing Equity Interests will be canceled, released, and extinguished and will be of no further force and effect.  No Holders of Existing Equity Interests will receive a distribution under this Plan on account of such Existing Equity Interests.

(c)     *Voting*:  Class 9 is Impaired under this Plan.  Holders of Allowed Interests in Class 9 are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

22

10.  Class 10 – Section 510(b) Claims.

(a)  *Classification*:  Class 10 consists of all Section 510(b) Claims.

(b)  *Treatment*:  Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(c)  *Voting*:  Class 10 is Impaired under this Plan.  Holders, if any, of Class 10 Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders, if any, are not entitled to vote to accept or reject this Plan.

C.  *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Wind-Down Debtors, as applicable, regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.  *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the ConfirmationCombined Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.  *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted this Plan.

F.  *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of any Purchaser, and/or in exchange for the agreement of the Debtors and/or the Wind-Down Debtors, as applicable, under this Plan to make certain distributions to the Holders of Allowed Claims.

G.  *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan.  The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with Article X of this Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

23

H.        *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.        *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Wind-Down Debtors and the Plan Administrator reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.        *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan, including the Committee Settlement, shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan.  This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.        *Sale Transaction.*

The Debtors conducted the Sale Process in accordance with the Bidding Procedures in order to identify and consummate a Sale Transaction to the extent that doing so would maximize the value of the Debtors' Estates.  The Bidding Procedures Order was entered on February 10, 2026, and established March 3, 2026 as the Bid Deadline (as defined in the Bidding Procedures).  Although the Debtors did not receive a Qualified Bid (as defined in the Bidding Procedures) for a going-concern sale of some or all of the Debtors' business prior to the Bid Deadline, the Debtors will consider any proposal, including any proposal to purchase some or all of the Debtors' assets as a going-concern, to the extent that doing so would maximize the value of the Debtors' business.  To the extent that the Debtors, in their business judgment, elect to consummate a Sale Transaction, the Debtors shall seek Bankruptcy Court approval of such Sale Transaction before or in connection with Consummation of this Plan.

Pursuant to any Sale Transaction, if applicable, the Acquired Assets shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, Interests, or other encumbrances (except for those Liens, Claims, charges, Interests, or other encumbrances expressly assumed by the Purchaser pursuant to the terms of the Sale Transaction Documents) pursuant to sections 363 and 1141(c) of the Bankruptcy Code (and the CCAA, if applicable) and in accordance with the terms of the Sale Transaction Documents.  In exchange, the Purchaser shall pay to the Debtors the Sale Proceeds in accordance with the terms of the Sale Transaction Documents.

The Debtors and the Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Purchase Agreement, the Sale Order, and this Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection

24

therewith, without (i) further notice to or order of the Bankruptcy Court; (ii) any requirement to take any other action under applicable law, regulation, order, or rule; or (iii) the vote, consent, authorization, or approval of any Entity. On and after the Effective Date, except as expressly set forth in the Purchase Agreement, the Sale Order, or other order of the Bankruptcy Court, neither the Purchaser nor any of its affiliates shall be liable for any Claims, Administrative Claims, or other liabilities of the Debtors or the Wind-Down Debtors (which shall be payable solely in accordance with this Plan) that do not constitute Assumed Liabilities or that were not otherwise transferred or assigned to the Purchaser or any of its affiliates pursuant to the Purchase Agreement, the Sale Order, or other order of the Bankruptcy Court.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Debtors or the Purchaser, as applicable, may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided,* that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

C.       *Store Closing Sales.*

The Debtors are in the process of conducting store-closing sales at all of the Debtors' store locations in accordance with the Store Closing Order.   The Debtors shall be authorized to take all actions necessary or appropriate to implement and consummate the Store Closing Sales, including entering into and performing under liquidation agreements, discounting and selling inventory, advertising and conducting store closing sales, rejecting executory contracts and unexpired leases in connection therewith, and taking such other actions as are customary in connection with retail liquidations, without further order of the Bankruptcy Court, except as otherwise provided in this Plan, the Store Closing Order, or any other Final Order.

Notwithstanding the foregoing, the Debtors, in consultation with the Consenting Lenders, shall retain the right, in the exercise of their business judgment, to suspend or terminate the Store Closing Sales and pursue a Sale Transaction to the extent the Debtors determine that doing so would maximize the value of the Debtors' Estates.

D.       *Committee Settlement*

This Article IV.D implements paragraph 33 of the Cash Collateral Order, which is incorporated herein in its entirety.  In the event of any inconsistency between this Plan and the Cash Collateral Order, the Cash Collateral Order shall control.

The Debtors, the Consenting Lenders, and the Committee agreed to the terms of the Committee Settlement to be implemented through this Plan and to be approved by the Bankruptcy Court as a good faith compromise and settlement of Claims and controversies among the Debtors, the Consenting Lenders, and the Committee.   The compromises and settlements included in the Committee Settlement are each (a) integrated with and dependent on all other compromises and settlements contemplated in connection with this Plan and (b) necessary and integral to this Plan and the success of these Chapter 11 Cases.   The principal terms of the Committee Settlement are reflected below.

On the Effective Date, the Debtors shall establish the GUC Trust for the benefit of the GUC Trust Beneficiaries, with a GUC Trustee selected by the Committee.   On the Effective Date, the GUC Trust shall be funded with the GUC Trust Assets in accordance with and subject to the conditions set forth in this Article IV.D and paragraph 33 of the Cash Collateral Order.   In consideration for the foregoing, the Committee shall (a) support Confirmation of this Plan, (b) shall not object to Confirmation of this Plan, and (c) shall recommend that Holders of General Unsecured Claims vote to accept this Plan and not opt out of the releases contained in this Plan.   To the extent the amount of Cash (inclusive of GUC Trust Cash and the GUC Trust Expense Amount) actually distributed to the GUC Trust on the Effective Date is less than (a) $3,250,000.00 *less* (b) the amount, if any, by which the amount of actual Allowed fees and expenses of the Committee and its Professionals exceeds the UCC Professional Fee Budget Amount, all Net Proceeds, if any, monetized by the Wind-Down Debtors after the Effective Date, shall be paid into the GUC Trust until the total amount of Cash (inclusive of GUC Trust Cash and the GUC Trust Expense Amount) distributed to the GUC Trust equals (x) $3,250,000.00 *less* (y) the amount, if any, by which the amount of

25

actual Allowed fees and expenses of the Committee and its Professionals exceeds the UCC Professional Fee Budget Amount (the "GUC Trust Top-Up Amount"), and, thereafter, ~~any~~all Net Proceeds monetized by the ~~Wind Down~~Wind-Down Debtors shall be ~~retained by the Wind Down Debtors and distributed~~ ~~in accordance with this Plan~~paid to the ABL Agent, for the benefit of the Holders of ABL Claims, until the ABL Claims are indefeasibly paid in full.

Notwithstanding anything to the contrary herein or in the GUC Trust Agreement, no portion of the GUC Trust Cash shall vest in, be funded to, or otherwise be made available to the GUC Trust unless and until the ABL Agent has received, in immediately available funds, the Mandatory Paydown Amount for irrevocable application and indefeasible paydown of the ABL Claims.

In the event that the fees and expenses of the Committee and its Professionals subject to the Carve-Out (as defined in the Cash Collateral Order) exceed the UCC Professional Fee Budget Amount as set forth in the Approved Budget (as defined in the Cash Collateral Order) in the line item titled "total professional fees", the sole source of recovery for the payment of any such excess fees and expenses shall be the GUC Trust Cash, and the GUC Trust Cash shall be reduced on a dollar-for-dollar basis by each dollar of such excess fees and expenses.  For the avoidance of doubt, no such excess fees and expenses shall be recoverable from the Wind-Down Account, the Professional Fee Escrow Account, or any other assets of the Debtors, the Wind-Down Debtors, or the Plan Administrator.

E.      *Sources of Consideration for Plan Distributions.*

On or after the Effective Date, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall fund or make distributions under this Plan, as applicable, with:  (i) the Debtors' Cash on hand; (ii) the proceeds from the Debtors' ordinary course operations and Store Closing Sales; and (iii) the Sale Proceeds, if *applicable*.  The GUC Trust shall fund all distributions to Holders of General Unsecured Claims under this Plan, as contemplated by this Plan and the GUC Trust Agreement, solely from the GUC Trust Net Assets.  Each distribution and issuance referred to in Article VI of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

F.      *Employment Obligations.*

The Debtors do not maintain any retiree benefit plans within the meaning of section 1114 of the Bankruptcy Code and, accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable.  To the extent any such retiree benefit obligations are determined to exist, on the Effective Date, the Wind-Down Debtors shall assume and continue to pay such benefits in accordance with applicable law, thereby satisfying the requirements of section 1129(a)(13) of the Bankruptcy Code.

G.      *The Wind-Down.*

1.      Wind-Down Transactions.

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall enter into any transaction and shall take all actions as may be necessary or appropriate to effectuate the Wind-Down Transactions, including the steps set forth in the Wind-Down Transactions Memorandum, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Wind-Down Transactions that are consistent with and pursuant to the terms and conditions of this Plan, including, as applicable:  (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law and any other term to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and/or the Restructuring Support Agreement and having other terms with which the applicable parties agree; (iii) to the extent applicable, the filing of a certificate of dissolution or

26

equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (iv) if applicable, effectuate distributions contemplated by the Plan; (v) liquidating or otherwise monetizing the Wind-Down Assets; (vi) the implementation of the Committee Settlement; and (vii) such other transactions that, in the business judgement of the Debtors, the Wind-Down Debtors, or the Plan Administrator, if applicable are required to effectuate the Wind-Down Transactions.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan.  On and after the Effective Date, the Wind-Down Debtors or the Plan Administrator, as applicable, will be authorized to implement this Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without the need for any action or approval by the shareholders or board of directors or managers of any Debtor.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtors and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and of the Plan Administrator Agreement, compromise or settle any Wind-Down Assets remaining with the Wind-Down Debtors as a successor to the Debtors.  On and after the Effective Date, the Wind-Down Debtors and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Retained Causes of Action or Claims relating to any Wind-Down Assets remaining with the Wind-Down Debtors as successor to the Debtors or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtors and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided for herein and in the Plan Administrator Agreement.  The Wind-Down Debtors and the Plan Administrator shall be entitled to enforce all defenses and counterclaims to any and all Claims asserted against the Debtors and their Estates, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

2.  <u>Wind-Down Debtors.</u>

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors for the purposes of carrying out the Wind-Down Transactions.

Notwithstanding anything to the contrary in this Plan, on the Effective Date, any Cause of Action not settled, released, enjoined, or exculpated under this Plan or transferred pursuant to the Sale Transaction Documents on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator or the Wind-Down Debtors, as applicable, and the net proceeds thereof shall constitute the Wind-Down Assets.

On and after the Effective Date, except as otherwise provided in this Plan, each Wind-Down Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

3.  <u>Wind-Down Assets</u>.

On the Effective Date, the Wind-Down Debtors shall become successors to the Debtors' rights, title, and interests to any Estate assets and any additional Wind-Down Assets that may become available, which shall vest in the Wind-Down Debtors for the primary purpose of liquidating the Wind-Down Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business.

27

Notwithstanding any prohibition on assignability under applicable nonbankruptcy law, on the Effective Date and thereafter, if additional Wind-Down Assets become available, such additional Wind-Down Assets, subject to this Plan, the Confirmation Order, and the Plan Administrator Agreement, as applicable, shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor as a successor to the applicable Debtor with all of attendant rights, title, and interests in and to all of the Wind-Down Assets, in accordance with section 1141(c) of the Bankruptcy Code.  At such time when any of the Wind-Down Assets vest in the Wind-Down Debtors, all such assets shall automatically vest in the Wind-Down Debtors free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims as set forth herein and the Wind-Down Debtors' expenses as set forth herein and in the Plan Administrator Agreement.

3.   The Wind-Down Account.

On or prior to the Effective Date, the Debtors shall establish the Wind-Down Account by depositing Cash on hand in the amount of the Wind-Down Amount into the Wind-Down Account.  The Wind-Down Account shall be used by the Wind-Down Debtors to fund the estimated fees, costs, and expenses necessary to fully administer the Wind-Down Transactions.  Any amount remaining in the Wind-Down Account after the dissolution of the Wind-Down Debtors shall be distributed on account of unpaid Claims and Interests in accordance with the priorities and treatment set forth in Article III herein until such Claims and Interests are paid in full.

H.   *Plan Administrator.*

1.   General.

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors or the Wind-Down Debtors, as applicable, shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers; *provided* that the Disinterested Managers shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Wind-Down Debtors, the Purchaser, or any other Entity without the Disinterested Managers' prior written consent.  The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by this Plan to permit and authorize the same) and shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Transactions and as otherwise provided in the Confirmation Order.

The Plan Administrator shall act in accordance with the Plan Administrator Agreement, which shall be entered into by and among the Debtors or the Wind-Down Debtors, as applicable, and the Plan Administrator Agreement shall be effective as of the Plan Effective Date.  In the event of any conflict between the terms of this Article IV and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors in the Plan Administrator Agreement shall be terminated.

2.   Powers and Obligations.

The powers of the Plan Administrator shall be set forth in the Plan Administrator Agreement and in any event shall include any and all powers and authority to implement this Plan and wind down the business and affairs of the Debtors and Wind-Down Debtors, including:  (i) making distributions under this Plan; (ii) performing any

28

obligations under any Executory Contract or Unexpired Lease assumed but not assigned on or before the Effective Date, including any transition services agreement entered into in connection with a Sale Transaction, if applicable; (iii) liquidating, receiving, holding, investing, supervising, and protecting the Wind-Down Assets to be administered by the Plan Administrator; (iv) taking all steps and executing all instruments and documents necessary to effectuate the distributions to be made under this Plan; (v) establishing and maintaining bank accounts in the name of the Wind-Down Debtors, including the Wind-Down Account; (vi) making distributions from the Wind-Down Account to facilitate the Wind-Down Transactions; (vii) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating this Plan to the extent necessary; (viii) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (ix) except as otherwise provided for herein, enforcing and prosecuting claims, interests, rights, and privileges under the Retained Causes of Action on the Schedule of Retained Causes of Action in accordance with Article IV.I; (x) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (xi) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (xii) resolving any disputed Claims and administering the Claims resolution process; (xiii) to the extent applicable, filing any certificate of dissolutions or equivalent documents, together with all with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); (ix) filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports; and (x) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to this Plan, the Confirmation Order, or any applicable orders of the Bankruptcy Court or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of this Plan.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors.  Nothing herein shall limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer.  The Debtors, before the Effective Date, and the Wind-Down Debtors or Plan Administrator, after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and, in the reasonable business judgment of the Plan Administrator, to implement additional employee programs and make payments thereunder solely as necessary to effectuate the Wind-Down Transactions, without any further notice to or action, order, or approval of the Bankruptcy Court.  Any distributions to be made under this Plan shall be made by the Plan Administrator or its designee.  The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of this Plan, the Confirmation Order, and the Plan Administrator Agreement.

3.    Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, at the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties for the Wind-Down Debtors.  The reasonable fees and expenses of such professionals, if applicable, shall be paid from the Wind-Down Account upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Wind-Down Debtors' retained professionals shall be made in the ordinary course of business from the Wind-Down Account and shall not be subject to the approval of the Bankruptcy Court or any other court of competent jurisdiction.

4.    Compensation of the Plan Administrator.

The Plan Administrator's compensation shall be paid out of the Wind-Down Account as set forth in the Plan Administrator Agreement.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Account if such amounts relate to any actions taken hereunder.

29

5. <u>Plan Administrator Expenses</u>.

All costs, expenses, and obligations incurred by the Plan Administrator or the Wind-Down Debtors in administering this Plan or in effecting distributions thereunder (including the reimbursement of reasonable expenses), including any costs, expenses, or obligations in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Account.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. In the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Account.

6. <u>Exculpation, Indemnification, Insurance, and Liability Limitation</u>.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

7. <u>Tax Returns</u>.

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and, pursuant to section 505 of the Bankruptcy Code and subject to applicable law, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate.

I. *Dissolution of the Wind-Down Debtors.*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made, completion of all its duties under this Plan, and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which each Wind-Down Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable state(s).

J. *The GUC Trust.*

On or before the Effective Date, the Debtors and the GUC Trustee shall enter into the GUC Trust Agreement and, on the Effective Date, the GUC Trust Assets shall vest or be deemed to be vested in the GUC Trust irrevocably and automatically without further action by any Person or Entity, free and clear of all Claims, Liens, and Interests, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. Under no circumstance shall the Debtors, the Wind-Down Debtors, the Plan Administrator, or any other party be required to contribute any additional assets to the GUC Trust other than the GUC Trust Assets. After the Effective Date, neither the Debtors, the Wind-Down Debtors, the Plan Administrator, nor any other party shall have any interest in the GUC Trust Assets except as expressly set forth herein.

The GUC Trustee shall be the exclusive administrator of the assets of the GUC Trust (including the GUC Trust Assets) for purposes of section 1123(b)(3)(B) of the Bankruptcy Code with respect to any matters involving Class 6 General Unsecured Claims under this Plan for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement. The GUC Trustee shall be a party in interest under section 1109(b) of the Bankruptcy Code for purposes of the claims reconciliation process, including objecting to General Unsecured Claims, and any other matter affecting the GUC Trust.

The Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall provide commercially reasonable access to the GUC Trustee and any professionals retained by the GUC Trust (at the sole cost and expense of the GUC Trust) to retrieve or access data reasonably necessary to reconcile General Unsecured Claims; *provided* that the Debtors, the Wind-Down Debtors, and the Plan Administrator shall not incur any expenses to provide such access to the GUC Trustee and any professionals retained by the GUC Trust. To the extent the GUC Trust receives information from the Debtors, the Wind-Down Debtors, or the Plan Administrator in connection with the General Unsecured Claims, the GUC Trust's receipt of such documents, information, or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, and the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, retain the sole right to waive their own privileges. Reasonable agreements will be made with the GUC Trustee such that confidential information and privileges are preserved, while permitting the GUC Trustee to use, as necessary to administer the GUC Trust, such information and privilege; absent such agreements, either the GUC Trustee, the Wind-Down Debtors, or the Plan Administrator may present the issue to the Bankruptcy Court for resolution.

The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee. The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include, without limitation, the authority and responsibility to take the actions set forth in this Article IV.J. Among other things, the GUC Trustee shall have the power and authority to distribute and allocate the GUC Trust Net Assets to the GUC Trust Beneficiaries on account of such beneficiaries' GUC Trust Interests in accordance with the treatment set forth in this Plan for Class 6 General Unsecured Claims. The GUC Trust Agreement will provide for, among other things, reasonable and customary provisions that allow for limitation of liability and indemnification of the GUC Trustee and its professionals by the GUC Trust. Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the GUC Trust Assets. In the event of any conflict between the terms of this Plan and the GUC Trust Agreement, the terms of this Plan shall govern.

From and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall, in the ordinary course of business and without the need for any approval by the Bankruptcy Court, pay the GUC Trust Fees and Expenses solely from the GUC Trust Assets. The Debtors, the Wind-Down Debtors, the Plan Administrator, and their Affiliates (and anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the GUC Trust.

In furtherance of this section of this Plan, (i) it is intended that the GUC Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 684, and as a "grantor trust" within the meaning of sections 671 through 677 of the Internal Revenue Code, to the extent permitted by applicable law, with the GUC Trust Beneficiaries treated as grantors and owners of the liquidating trust, and accordingly, for all U.S. federal income tax purposes, the transfer of the GUC Trust Assets to the GUC Trust shall be treated in accordance with the terms herein as distributed by the Debtors or the Wind-Down Debtors, as applicable, directly to the GUC Trust Beneficiaries, and then contributed by such GUC Trust Beneficiaries to the GUC Trust in exchange for their pro rata GUC Trust Interest; (ii) the primary purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Net Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan and the GUC Trust Agreement, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors or the Wind-Down Debtors, as applicable, the GUC Trust Beneficiaries, and the GUC Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) as soon as possible after the transfer of the GUC Trust Assets to the GUC Trust, the GUC Trustee shall make a good faith valuation of the GUC Trust Assets, and such valuation will be made available from time to time, as relevant for tax reporting purposes, and each of the Debtors or the Wind-Down Debtors, as applicable, the GUC Trustee, and the GUC Trust Beneficiaries shall take consistent positions with respect to the valuation of the GUC Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes; (v) the "taxable year" of the GUC Trust shall be the "calendar year" as such terms are defined in section 441 of the Internal Revenue Code; (vi) the GUC Trustee shall be responsible for filing all applicable tax returns for the GUC Trust and shall file such tax returns treating the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vii) the GUC Trustee shall annually send to each Holder of a GUC Trust Interest a separate statement regarding

31

such Holder's share of items of income, gain, loss, deduction or credit (including receipts and expenditures) of the GUC Trust as relevant for U.S. federal income tax purposes.

The GUC Trustee (i) may, in its sole discretion, timely elect to treat any GUC Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently with the foregoing for federal, state, and local income tax purposes. If a "disputed ownership fund" election is made, (i) the GUC Trust Assets will be subject to entity-level taxation and (ii) all parties (including, without limitation, the GUC Trustee and the holders of GUC Trust Interests) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing. The GUC Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the GUC Trustee under this Plan have been made, but in no event later than the fifth anniversary of the Effective Date (unless extended by order of the Bankruptcy Court). Upon dissolution of the GUC Trust, any remaining GUC Trust Net Assets shall be distributed to all Holders of Allowed General Unsecured Claims in accordance with this Plan and the GUC Trust Agreement, as appropriate. To the extent; provided, however, that if the GUC Trustee retains any residual reasonably determines that such remaining GUC Trust Assets, but such assets, net of GUC Trust Fees and Expenses, are insufficient to effectuate any render a further distribution pursuant to the GUC Trust Agreement practicable, the GUC Trustee shall donate such residual GUC Trust Assets to a Tax Code may donate any balance to a charitable organization that is (A) described in sSection 501(c)(3) non-profit organization selected by of the Internal Revenue Code, (B) exempt from U.S. federal income tax under Section 501(a) of the Internal Revenue Code, (C) not a "private foundation" as defined in Section 509(a) of the Internal Revenue Code, and (D) unrelated to the Debtors, the GUC Trust, and any insider of the GUC Trustee in its discretion.

The GUC Trustee may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the IRC or provision of any state, local, or non-U.S. tax Law with respect to any GUC Trust Beneficiary, including with respect to any payment or distribution to the Debtors, the GUC Trustee, and the GUC Trust Beneficiary, any amounts received by, collections of, or earnings of the GUC Trust and any proceeds from the disposition of GUC Trust Assets. All such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be treated as amounts distributed to the applicable GUC Trust Beneficiary to the extent permitted by applicable Law. The GUC Trustee shall be authorized to collect such tax information from the GUC Trust Beneficiaries (including social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order, and the GUC Trust Agreement and to determine whether any deduction or withholding applies with respect to a payment to a GUC Trust Beneficiary and the amount of such deduction or withholding. Notwithstanding the above, each Holder of any Claim that is to receive any portion of the Distributable Proceeds shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any governmental authority, including income, withholding, and other tax obligations, on account of such distribution or with respect to its ownership of an interest in the GUC Trust.

As a condition to receiving, or being entitled to receive, distributions of Cash from the GUC Trust in respect of a GUC Trust Beneficiary's interest in the GUC Trust, GUC Trust Beneficiaries may be required to identify themselves to the GUC Trustee and provide tax information and the specifics of their holdings, to the extent requested by the GUC Trustee, including an IRS Form W-9 or, in the case of non-U.S. Persons for U.S. federal income tax purposes, certification of foreign status on an applicable IRS Form W-8, including all applicable supporting documents. If a GUC Trust Beneficiary does not, within ninety days of the GUC Trustee's first written request, provide sufficient documentation that is, in the GUC Trustee's reasonable business judgment, necessary to determine applicable tax withholding and reporting requirements for any such distribution, any current or future distribution in respect of such GUC Trust Beneficiary's GUC Trust Interest shall be deemed forfeited, the underlying applicable Claim disallowed and expunged in its entirety, and the funds in respect of such present and future distribution(s) shall revert to the GUC Trust for all purposes including, but not limited to, redistribution to other GUC Trust Beneficiaries in accordance with this Plan, the Confirmation Order, and the GUC Trust Agreement.

32

K.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Wind-Down Debtors, shall retain and may enforce (or the Plan Administrator may enforce, if applicable) all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the rights of the Wind-Down Debtors to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Wind-Down Debtors, as applicable, as of the Effective Date.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including Article VIII of this Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, the Wind-Down Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Wind-Down Debtor except as otherwise expressly provided in this Plan, including Article VIII of this Plan. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, through their authorized agents or representatives, including the Plan Administrator, shall retain and may exclusively enforce any and all such Causes of Action. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind-Down Debtors, including the Plan Administrator, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.I include any Claim or Cause of Action against a Released Party or Exculpated Party, or any Claim or Cause of Action released pursuant to the Cash Collateral Order.

L.      *Cancellation of Existing Agreements and Interests.*

On the Effective Date, except to the extent otherwise provided in this Plan, including in Article V.A hereof, to the maximum extent permitted by law, all notes, instruments, certificates, Securities, shares, purchase rights, security agreements, collateral agreements, subordination agreements, the Intercreditor Agreements, and other documents evidencing Claims against or Interests in the Debtors, including credit agreements and indentures, shall be cancelled, and all present and future obligations of the Debtors or the Wind-Down Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, and of no force or effect, with respect to the Debtors, without the need for further action or approval of the Bankruptcy Court or for a Holder to take further action, and the Agents shall be discharged and released and shall not have any continuing duties or obligations thereunder, with respect to the Debtors. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.

33

*M.      Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, as applicable, or to any other Person) of property under this Plan or pursuant to: (i) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Wind-Down Debtors, as applicable; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; (v) the Sale Transaction, if applicable; or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*N.      Corporate Action.*

Upon the Effective Date, all actions contemplated under this Plan (including the steps set forth in the Wind-Down Transactions Memorandum) shall be deemed authorized and approved in all respects, including, as and if applicable: (i)  formation of the Wind-Down Debtors and the selection of the Plan Administrator; (ii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (iii) the implementation of the Restructuring Transactions; (iv) consummation of the Sale Transaction, if any, pursuant to the Purchase Agreement; (v) funding of all applicable escrows and accounts; (vi) formation of the GUC Trust, issuance of the GUC Trust Interests, execution and delivery of the GUC Trust Agreement, and the vesting of the GUC Trust Assets in the GUC Trust; (vii) implementation of the Committee Settlement; and (viii) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in this Plan involving the corporate structure of the Debtors or the Wind-Down Debtors and any corporate action required by the Debtors or the Wind-Down Debtors in connection with this Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the Security Holders, directors, officers, or managers of the Debtors or the Wind-Down Debtors.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors.  The authorizations and approvals contemplated by this Article IV.L shall be effective notwithstanding any requirements under non-bankruptcy law.

*O.      Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Plan Administrator may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Confirmation Order, the Confirmation Recognition Order, and the Restructuring Transactions, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan or the Confirmation Order.

P.    *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Wind-Down Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Wind-Down Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

Q.    *Director and Officer Liability Insurance.*

After the Effective Date, none of the Wind-Down Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

On the Effective Date, any and all D&O Liability Insurance Policies shall be assumed by the Wind-Down Debtors pursuant to sections 105 and 365 of the Bankruptcy Code, and nothing shall alter, modify, amend, expand or otherwise affect any coverage for defense and indemnity under any applicable D&O Liability Insurance Policy available to any individuals and/or entities under such D&O Liability Insurance Policy in accordance with and subject in all respects to the terms and conditions of such D&O Liability Insurance Policy, which shall not be altered.  Coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals insured thereunder.  The Wind-Down Debtors shall maintain tail coverage under any D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies.  In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, shall be deemed automatically rejected by the applicable Debtor, applicable Wind-Down Debtor, or the Plan Administrator, as applicable, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (i) is specifically described in this Plan as to be assumed in connection with Confirmation of this Plan; (ii) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (iii) is subject to a Filed motion to assume (or assume and assign) such Unexpired Lease or Executory Contract as of the Effective Date; (iv) is to be assumed by the Debtors and assigned to another third party in connection with a Sale Transaction, if any, including the Purchaser as set forth in the Purchase Agreement approved pursuant to the Sale Order; (v) is a contract, instrument, release, or other agreement or document entered into in connection with this Plan; <u>or</u> (vi) is an Insurance Policy (including any D&O Liability Insurance Policies)~~; or (vii) is an employee benefit plan, severance plan, or other Executory Contract under which employee obligations arise~~.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code<u>; *provided* that in no event shall any counterparty to an Executory Contract or Unexpired Lease have less than seven (7) days' notice of an opportunity to object to the Debtors' proposed assumption, assumption and assignment, or rejection of such Executory Contract or Unexpired Lease</u>.  To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or

identification in the Plan Supplement or similar schedule in connection with a Sale Transaction, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.  Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in this Plan, or the Schedule of Assumed Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code; *provided* that neither this Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under a Sale Transaction, if any, to assume and assign Executory Contracts and Unexpired Leases to the Purchaser pursuant to the Purchase Agreement and any related documents relating to the Sale Transaction. Except as otherwise specifically set forth herein or in the Confirmation Order or any Sale Transaction Documents approved pursuant to the Sale Order, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors.

Notwithstanding anything to the contrary in this Plan, the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, reserve the right (i) in the event that the Debtors do not consummate a Sale Transaction, to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the earlier of (A) 45 days following the Effective Date and (B) solely with respect to Unexpired Leases of nonresidential real property, the deadline is the earlier of (I) the applicable deadline pursuant to section 365(d)(4) of the Bankruptcy Code, (II) the date of entry of the Confirmation Order, and (III) as such date may be extended with the written consent of the applicable landlord counterparty and (ii) in the event that the Debtors consummate a Sale Transaction, to alter, amend, modify, or supplement any schedule of Executory Contracts and Unexpired Leases that is attached to any Sale Transaction Documents, with the consent of the Purchaser, at any time prior to the earlier of (A) 90 days following the closing date of a Sale Transaction, and (B) solely with respect to Unexpired Leases of nonresidential real property, the applicable deadline pursuant to section 365(d)(4) of the Bankruptcy Code, as such date may be extended with the consent of the applicable landlord counterparty, consistent with any Sale Transaction Documents, as applicable.

Subject to any Purchase Agreement and Sale Order, to the maximum extent permitted by law, the transactions contemplated by this Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan, or any other transaction, event, or matter that would (i) result in a violation, breach, or default under such Executory Contract or Unexpired Lease, (ii) increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Debtors or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (iii) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Wind-Down Debtors pursuant to the applicable Executory Contract or Unexpired Lease, and to the extent any provision in any such Executory Contract or Unexpired Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the transactions contemplated by this Plan, the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, and any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof (subject to the other provisions of this Article V) shall be deemed satisfied by Confirmation.

B.       *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease to the extent of applicable law.  Without limiting the general nature of the foregoing, and solely to the extent afforded by applicable law, the Debtors and the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased or services previously

received by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

C.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of this Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Wind-Down Debtors.

D.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court or submitted directly to the Claims and Noticing Agent by mail, by hand delivery, or through the Claims and Noticing Agent's website within thirty days after the later of (i) the date of service of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (ii) the effective date of such rejection, or (iii) the Effective Date. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors no later than seven days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will, absent further order of the Bankruptcy Court to the contrary, be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Wind-Down Debtors, or the property of any of the foregoing without the need for any objection by the Debtors or the Wind-Down Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall, absent further order of the Bankruptcy Court to the contrary, be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection by any Debtor of any of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of this Plan or such other treatment as agreed to by the Wind-Down Debtors and Holder of such Claim; *provided, however,* that nothing in this Plan shall prevent a counterparty to a rejected Unexpired Lease from asserting an Administrative Claim prior to the Administrative Claims Bar Date.

E.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash as soon as reasonably practicable within five (5) days after the entry of an order approving such assumption or assumption and assignment, subject to the limitations described in the following sentence, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree; *provided* that nothing herein shall prevent the Wind-Down Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Wind-Down Debtors may

also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Any such objection will be scheduled to be heard by the Bankruptcy Court at the next scheduled omnibus hearing, or such other time as requested by the Debtors or the Wind-Down Debtors, as applicable, and the objecting party. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption. In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Wind-Down Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption or as may otherwise be agreed by the Wind-Down Debtors, with such cure payments to be made within five (5) days of any such resolution.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Wind-Down Debtors, as applicable, may remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the later of (i) the Effective Date and (ii) with respect to Unexpired Leases, the date upon which the Debtors vacate the leased premises by either (A) turning over all keys, key codes, and alarm codes to the applicable Unexpired Lease counterparty, or (B) providing a notice of surrender to the applicable Unexpired Lease counterparty advising that they can reenter the premises and re-key the locks.

The assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. **Any Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to Article V, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or** ~~any further notice to or~~ **action, order, or approval of the Bankruptcy Court.; *provided* that prior to the disallowance and expungement of such Proof of Claim (i) notice with an opportunity to be heard in accordance with the Bankruptcy Code and Bankruptcy Rules will be provided to such Executory Contract or Unexpired Lease counterparty and (ii) such notice shall be Filed with the Bankruptcy Court.**

For the avoidance of doubt, nothing in this Plan shall be deemed to impair the rights of any landlord to an Unexpired Lease, solely to the extent of available insurance coverage and in accordance with the terms, conditions, limitations, and exclusions of such insurance policies and applicable law, with respect to third-party claims asserted in connection with the use by one or more of the Debtors of any leased premises, including with respect to events that occurred prior to the date of any assumption, assumption and assignment, or rejection of any Unexpired Lease. Nothing herein shall (i) expand, increase, or otherwise modify the scope of coverage under any such insurance policies, or (ii) create any direct rights of recovery against the Debtors or the Wind-Down Debtors beyond those otherwise provided under applicable law. This provision shall apply solely to the extent of valid and collectible insurance and subject to all defenses available to the Debtors, the Wind-Down Debtors, and their insurers.

F.      *Insurance Policies.*

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan. Unless otherwise provided in this Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (ii) all such Insurance Policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest, unaltered and in their entireties, in the Wind-Down Debtors.

38

Nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (i) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of Insurance Policies or (ii) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Plan Administrator, as applicable, (or any Purchaser, solely to the extent assumed and assigned to the Purchaser under the Purchase Agreement) or draw on any collateral or security therefor.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

H.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in this Plan or the Plan Supplement, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor, Wind-Down Debtor, or any other Entity, as applicable, has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in this Plan.

I.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in this Plan or the Confirmation Order, on the Effective Date (or, if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest) or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in this Plan, Holders of Claims of Interests

39

shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent or the GUC Trustee, acting on behalf of the GUC Trust, as applicable, on the Effective Date or at such other time as provided for in this Plan. The Disbursing Agent and the GUC Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, the GUC Trustee may, in its sole discretion, retain or employ a disbursing agent, which may be the Disbursing Agent, in accordance with the GUC Trust Agreement.

C.      *Rights and Powers of Disbursing Agent.*

1.  Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan and the Confirmation Order; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan or the Confirmation Order, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.  Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Wind-Down Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.  Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.  Delivery of Distributions in General.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent or the GUC Trustee, as appropriate:  (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Wind-Down Debtors, or the applicable GUC Trustee or Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Wind-Down Debtors.  Subject to this Article VI, distributions under this Plan on account of Allowed Claims or Allowed Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Allowed Interest shall have and receive the benefit of the distributions in the manner set forth in this Plan.  The Debtors, the Wind-Down Debtors, and the Disbursing Agent, as applicable, shall not incur any

40

liability whatsoever on account of any distributions under this Plan except for actual fraud, gross negligence, or willful misconduct.

3.   Minimum Distributions.

Notwithstanding any other provision of the Plan, the Disbursing Agent or the GUC Trustee, as applicable, will not be required to make distributions of Cash less than $250 in value and each such Claim to which this limitation applies shall be released and extinguished pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claim against the Debtors or the Wind-Down Debtors, as applicable, or their respective property.

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of an Allowed Claim or Allowed Interest (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent or the GUC Trustee, as applicable, has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of the initial attempted distribution.   After such date, all unclaimed property or interests in property shall revest in the Wind-Down Debtors, or the GUC Trust (in the case of distributions from the GUC Trust Net Assets) automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheatment, abandoned property, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder of Claims or Interests related to such property or interest in property shall be released, settled, compromised, extinguished, and forever barred.   The Wind-Down Debtors and the Disbursing Agent shall have no obligation to attempt to locate a Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

5.   Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or Interest (including with respect to any Security, for the avoidance of doubt) that has been cancelled in accordance with Article VI hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.   Such surrendered certificate or instrument shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Reinstated under this Plan.

E.   *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.   *Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such

41

distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and the Wind-Down Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances in a tax-efficient manner.

G.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

J.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Wind-Down Debtor may, pursuant to the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount among the relevant Wind-Down Debtor(s) and Holder of Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Wind-Down Debtor or its successor of any and all claims, rights, and Causes of Action that such Wind-Down Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to setoff or recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, as applicable, unless (i) such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of this Plan on or before the Effective Date, ~~notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of~~(ii) such Holder has timely filed a Proof of Claim preserving such setoff or recoupment in such Proof of Claim, or (iii) such Holder is a counterparty to a rejected Unexpired Lease relating to nonresidential real property that provides for such setoff or recoupment.  The provisions in this section also apply to the GUC Trust, as applicable, in the GUC Trustee's discretion.

K.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors, Wind-Down Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Wind-Down Debtor, or the

42

GUC Trustee, as applicable.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Wind-Down Debtor, or the GUC Trustee, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Wind-Down Debtor, the Plan Administrator, or the GUC Trustee (in the case of distributions from the GUC Trust Net Assets), as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Wind-Down Debtor, Plan Administrator, or the GUC Trustee (in the case of distributions from the GUC Trust Net Assets), as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is fully repaid.

2.   Claims Payable by Third Parties.

Absent agreement by the Wind-Down Debtors or the GUC Trust, as applicable, no distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy.  Notwithstanding anything to the contrary contained herein (including Article III of this Plan), nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

*A.*   *Disputed Claims Process.*

The Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (ii) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  **Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of:  (i) the Effective Date or (ii) the applicable claims bar date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, the Wind-Down Debtor, and/or the GUC Trust, as applicable, without the need for any objection by the Debtor, the Wind-Down Debtor, or the GUC Trust, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

If the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust (solely with respect to General Unsecured Claims) as applicable, dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to Article III.B or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall File an objection with, and the dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court.

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, the Plan Administrator, each of the Wind-Down Debtors, or the GUC Trust (solely with respect to General Unsecured Claims), as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by this Plan or a Final Order is not considered Allowed and shall be expunged without further action by the Debtors or the GUC Trust and without further notice to any party or action, approval, or order of the Bankruptcy Court.

C.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors, the Wind-Down Debtors, or the GUC Trustee, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in this Plan, a Disputed Claim or Interest that has been expunged from the Claims Register but that either is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under this Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

D.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Wind-Down Debtors, the Plan Administrator, or the GUC Trustee (solely with respect to General Unsecured Claims), as applicable, shall have the sole authority:  (i) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (ii) to settle, compromise, withdraw, litigate to judgment, or otherwise resolve any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Wind-Down Debtor or the Plan Administrator shall have and retain all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Retained Causes of Action pursuant to this Plan.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the applicable Claims Objection Deadline, as such deadline may be extended from time to time, or any other date established by a Final Order of the Bankruptcy Court.

F.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Wind-Down Debtors, the Plan Administrator, and/or the GUC Trust (with respect to General Unsecured Claims), as applicable, without the Wind-Down Debtors, the Plan Administrator, or the GUC Trust, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Wind-Down Debtors may establish one or more reserves to fund distributions to Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the Wind-Down Debtors, or Plan Administrator.  Following the final resolution of all Disputed Claims, any residual amounts in such reserves(s) shall constitute residual Cash and be immediately distributed to the Wind-Down Debtors.

H.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust, as applicable, under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust, as applicable, allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Debtors or the GUC Trust, as applicable.

Except as provided herein or otherwise agreed to by the Wind-Down Debtors, the Plan Administrator, or the GUC Trust (with respect to any General Unsecured Claim), as applicable, in their sole discretion, any and all Proofs of Claim Filed after the applicable bar date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the ~~Confirmation~~Combined Hearing such late Claim has been deemed timely Filed by a Final Order.

I.      *Amendments to Proofs of Claim or Interest.*

On or after the Effective Date, a Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, or the applicable the Debtors, Wind-Down Debtors, the Plan Administrator, or the GUC Trust (with respect to General Unsecured Claims), and any such new or amended Proof of Claim Filed that is not so authorized before it is Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court absent prior Bankruptcy Court approval or agreement by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust (with respect to General Unsecured Claims), as applicable.

J.       *Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided under this Plan shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

K.       *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent or the GUC Trustee, as applicable, shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.       *Settlement, Compromise, and Release of Claims and Interests.*

Except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Wind-Down Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted this Plan.  Except as otherwise provided herein, any default or "event of default" by the Debtors or their non-Debtor Affiliates with respect to any Claim or Interest existing immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtors, or the Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in this Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by this Plan.  The Confirmation Order shall be a judicial determination of the satisfaction and release of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan.

B.       **Release of Liens.**

**Except as otherwise specifically provided in this Plan, the Plan Supplement, the Confirmation Order, any order of the Canadian Court with respect to the CCAA Court Ordered Charges, the Purchase**

46

Agreement (if applicable), or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with **Article III.B.1** hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, benefit, title, and interest of any Holder (and the applicable Agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Wind-Down Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable Agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Wind-Down Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and to take such actions as may be reasonably requested by the Wind-Down Debtors or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order (and the Confirmation Recognition Order, with respect to Liens in Canada) to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens with respect to the Debtors.

If any Holder of a Secured Claim that has been satisfied or released in full pursuant to this Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf.

## C. *Releases by the Debtors.*

Notwithstanding anything contained in this Plan or the Confirmation to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by and on behalf of the Debtors, their Estates, and, if applicable, the Wind-Down Debtors and the Plan Administrator, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims asserted or assertable on behalf of the Debtors, their Estates, the Wind-Down Debtors, or the Plan Administrator), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort, contract, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, the Wind-Down Debtors, if applicable, the Plan Administrator, if applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, the Debtors, their Estates, or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operations), or the Estates, the Chapter 11 Cases, the CCAA Recognition Proceedings, the Restructuring Transactions, the Committee Settlement, the Sale Process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, any direct or indirect investment in any Debtor by any Released Party, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other

47

property of the Debtors to any Released Party, any other benefit provided by any Debtor to any Released Party, cash management arrangements, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the decision to File the Chapter 11 Cases, the decision to file the CCAA Recognition Proceedings, the negotiation, formulation, preparation, dissemination, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, including the Sale Transaction (if applicable) and the Wind Down Transactions, the Committee Settlement, the Credit Agreements, the Cash Collateral Order, the Disclosure Statement, the Plan Supplement, the Purchase Agreement (if applicable), this Plan and related agreements, instruments, and other documents, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, **the Cash Collateral Order,** any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, or (ii) any Retained Causes of Action by the Debtors pursuant to a Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims, Interests, and Intercompany Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Debtors' Estates, or, if applicable, the Wind-Down Debtors or the Plan Administrator, asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**D.**      *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons that may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, in each case solely to the extent of the Releasing Party's authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all Claims and Causes of Action whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their Estates, or the Wind-Down Debtors (if applicable)), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort, contract, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, or any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest or Intercompany Interest in, the Debtors (including the Debtors' capital structure, management, ownership, or

48

operations), or their Estates or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the CCAA Recognition Proceedings, the Sale Process, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, any investment in any Debtor by any Released Party, the Restructuring Transactions, the Committee Settlement, the subject matter of, or the transactions or events giving rise to, any Claim, Interest, or Intercompany Interest that is treated under the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, any benefit provided by a Debtor to any Released Party, cash management arrangements, the assertion of or enforcement of rights or remedies against the Debtors, the restructuring of any Claim, Interest, or Intercompany Interest before or during the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the decision to File the Chapter 11 Cases, the decision to file the CCAA Recognition Proceedings, the negotiation, formulation, preparation, dissemination, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Committee Settlement, the Credit Agreements, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Transactions, the solicitation of votes with respect to the Plan, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than, in each case, any direct claims that any Releasing Party may have against any non-Debtor Affiliates of the Debtors that, in each case, are wholly unrelated to the foregoing.  Notwithstanding anything to the contrary in the foregoing **or in this Plan**, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, (ii) any Retained Causes of Action by the Debtors pursuant to a Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, and (iii) any Claims, Causes of Action, obligations, rights, or remedies that could be asserted by the Secured Lenders against non-Debtor Loan Parties (as defined in the Credit Agreements) arising out of or related to the Credit Agreements and related loan documents, other than to the extent such Claims, Causes of Action, obligations, rights, or remedies arise ~~directly or indirectly~~ as a result of the Claims treated under this Plan ~~and/or any other Claims, Causes of Action, obligations, rights, or remedies arising from any act or omission by the Debtors, the Wind-Down Debtors, the Plan Administrator, or any of their respective Related Parties or Affiliates (other than the non-Debtor Loan Parties).~~**, and subject to the provisions set forth in Articles III.B.3, III.B.4, and III.B.5 of this Plan.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release.

*E.      Exculpation.*

Except as otherwise expressly provided in this Plan or the Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the

49

Restructuring Support Agreement, the Restructuring Transactions, the Committee Settlement, the Sale Process, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, and all other Definitive Documents, the solicitation of votes for, or Confirmation of, this Plan, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of Securities under or in connection with this Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, if applicable, in connection with this Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing. The Exculpated Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

### F. Injunction.

Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this **Article VIII.F**.

50

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtors, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against the Wind-Down Debtors, or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Wind-Down Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Restructuring Support Agreement shall not have been validly terminated by any of the parties thereto and shall continue to be in full force and effect;

2.      each document or agreement constituting the applicable Definitive Documents shall (a) be in form and substance consistent with this Plan, the Restructuring Support Agreement, and the Restructuring Term Sheet, (b) have been duly executed, delivered, acknowledged, Filed, and/or effectuated, as applicable, and (c) be in full force and effect, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

3.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan, and all applicable regulatory or government-impose waiting periods shall have expired or been terminated;

4.      the Bankruptcy Court shall have entered the Confirmation Order, and such order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered;

5.      if and as applicable, the Purchase Agreement shall have been executed and all conditions precedent to the effectiveness thereof shall have occurred or will occur substantially simultaneously with the effectiveness of the Plan;

6.        if and as applicable, the Purchaser shall deliver the Purchase Price, as specified in the Purchase Agreement, to the Debtors in exchange for the Wind-Down Debtors' transfer of the purchase assets to the Purchaser;

7.        the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed;

8.        the Debtors shall have funded the Wind-Down Amount in Cash;

9.        all actions, documents, and agreements necessary to implement and consummate the Restructuring Transactions shall have been effected and executed and shall be in form and substance consistent with this Plan and the Restructuring Support Agreement;

10.        the Professional Fee Escrow Account shall have been established and funded in Cash in an amount sufficient to pay in full all professional fees and expenses of retained professionals approved by the Bankruptcy Court before or after the Effective Date;

11.        the GUC Trust shall have been established and funded with the GUC Trust Assets; and

12.        the sum of (i) the aggregate Weekly Paydowns as of the Effective Date and (ii) the distribution to be made to the Holders of Class 3 ABL Claims under this Plan on the Effective Date shall be not less than the Mandatory Paydown Amount.

B.        *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX may be waived in whole or in part at any time by the Debtors only with the prior written consent (email shall suffice) of the Required Consenting Lenders, as defined in the Restructuring Support Agreement, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.  Notwithstanding anything to the contrary contained herein, if the condition set forth in Article IX.A.12 is satisfied, the condition set forth in Article IX.A.11 may be waived solely by the Committee.

C.        *Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan or the Disclosure Statement shall:  (i) constitute a waiver or release by the Debtors of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof. Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of (a) the Cash Collateral Order, including, without limitation, any releases provided for therein, or (b) the Sale Transactions and/or the Store Closing Sales, as applicable, or the revocation of the Debtors' authority under any Sale Order to consummate the Sale Transaction or the Store Closing Sales, as applicable, and all provisions of the Sale Transaction Documents that survive termination thereof shall remain in effect in each case, in accordance with the terms thereof.

D.        *Substantial Consummation.*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN**

A.       *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan (in each case, subject to the rights set forth in the Restructuring Support Agreement).  Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, rule 3019 of the Bankruptcy Rules, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify, this Plan with respect to such Debtor, one or more times, after Confirmation ~~and, to~~; *provided*, that in accordance with section 1127 of the Bankruptcy Code, circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms such plan as modified.  To the extent necessary, the Debtors may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

B.       *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void, *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof; and (iii) nothing contained in this Plan shall (A) constitute a waiver or release of any Claims or Interests, (B) prejudice in any manner the rights of such Debtor or any other Entity, or (C) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code (provided that the CCAA Court shall retain jurisdiction over the CCAA Recognition Proceedings and all matters arising out of, or related to, the CCAA Recognition Proceedings, the Information Officer, and the orders of the CCAA Court), including jurisdiction to:

1.               allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

53

2.          decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3.          resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including the amount of cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Wind-Down Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the Schedule of Assumed Executory Contracts and Unexpired Leases; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.          grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.          ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of this Plan;

6.          adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.          adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

8.          enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, the Disclosure Statement, the Plan Supplement, or the Restructuring Support Agreement;

9.          enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.         resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

11.         issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

12.         resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and exculpations contained in this Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

13.         resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI hereof;

14.         enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.         determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or

54

document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement, including the Restructuring Support Agreement and the Purchase Agreement (if applicable);

16.          enter an order or final decree concluding or closing the Chapter 11 Cases;

17.          adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

18.          consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.          determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.          hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Sale Order, or the Confirmation Order, including disputes arising under agreements (including the Purchase Agreement, if applicable), documents, or instruments executed in connection with this Plan;

21.          hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on, or after the Effective Date;

22.          hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.          hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in this Plan, including under Article VIII hereof;

24.          hear and determine all disputes with respect to the Committee Settlement;

25.          hear and determine all disputes with respect to the GUC Trust or the GUC Trust Assets;

26.          enforce all orders previously entered by the Bankruptcy Court; and

27.          hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.      Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, the Purchaser (if applicable), and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

*B.      Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan and the Restructuring Support Agreement.  The Debtors or the Wind-Down Debtors, as applicable, and all Holders of

Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C.      *Payment of Statutory Fees.*

All monthly reports shall be Filed, and all fees due and payable pursuant to section 1930(a) of Title 28 of the United States Code shall be paid by the Debtors or the Wind-Down Debtors, as applicable, (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) on the Effective Date, and following the Effective Date, the Wind-Down Debtors (or the Disbursing Agent on behalf of each of the Wind-Down Debtors) shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) until such Wind-Down Debtor's Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.  The Wind-Down Debtors shall File quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each of the Debtors and the Wind-Down Debtors are jointly and severally liable for the payment of quarterly fees and shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee and any other statutory committee appointed in these Chapter 11 Cases shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Wind-Down Debtors, and the Plan Administrator, as applicable, shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Plan Supplement, or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.   if to the Debtors, to:

Eddie Bauer LLC
6501 Legacy Drive, Suite B100
Plano, TX 75024
Attention:                        Glen Morris, Executive Vice President &
                                        Chief Legal Officer
                                        Dawn Wolverton, Secretary

56

|  |  |
|---|---|
| E-mail address: | glen.morris@catalystbrands.com |
|  | dawn.wolverton@catalystbrands.com |
| with copies to: |  |

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

|  |  |
|---|---|
| Attention: | Matthew C. Fagen, P.C. |
|  | Oliver Paré |
| E-mail address: | matthew.fagen@kirkland.com |
|  | oliver.pare@kirkland.com |

2.   if to a Consenting ABL Lender:

Otterbourg P.C.
230 Park Avenue
New York, New York 10169

|  |  |
|---|---|
| Attention: | Daniel F. Fiorillo |
| E-mail address: | dfiorillo@otterbourg.com |

3.   if to a Consenting Term Loan Lender:

Ropes & Gray LLP
1211 Avenue of the Americas

New York, New York 10036-8704

|  |  |
|---|---|
| Attention: | Gregg Galardi |
| E-mail address: | gregg.galardi@ropesgray.com |

4.   if to a Consenting Subordinated Loan Lender:

Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110

|  |  |
|---|---|
| Attention: | Mark Silva |
| E-mail address: | msilva@choate.com |

After the Effective Date, the Wind-Down Debtors may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, this Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and

contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/EddieBauer or the Bankruptcy Court's website at www.njb.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors, consistent with the terms set forth herein; and (iii) non-severable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan (to the extent any) and any previous plan, and, therefore, neither any of such parties nor individuals nor the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan or any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Remainder of Page Intentionally Left Blank.*]

Dated:  ~~March 26~~April 15, 2026

Eddie Bauer, LLC
on behalf of itself and all other Debtors

*/s/  George Pantelis*

Name:  George Pantelis
Title:   Co-Chief Restructuring Officer